**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>*Plaintiff*,<br><br>-*versus*-<br><br>**BARCLAYS CAPITAL, INC.; BARCLAYS GROUP US INC.; BARCLAYS US LLC; BARCLAYS BANK PLC; BARCLAYS PLC; BCAP LLC; SECURITIZED ASSET BACKED RECEIVABLES LLC; SUTTON FUNDING LLC; PAUL K. MENEFEE; and JOHN T. CARROLL,**<br><br>*Defendants*. | Civil Action No.:  16-CV-7057 |

### COMPLAINT OF THE UNITED STATES OF AMERICA

ROBERT L. CAPERS
United States Attorney
Eastern District of New York

F. FRANKLIN AMANAT
Senior Counsel
KATHARINE E.G. BROOKER
EVAN P. LESTELLE
JOSEPHINE M. VELLA
Assistant United States Attorneys
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

TABLE OF CONTENTS

**Summary of Claims** ........................................................................................................1

**The Parties** ....................................................................................................................9

**Jurisdiction and Venue** ..............................................................................................12

**Background** ..................................................................................................................14

   I.   Mortgage Loan Origination. .................................................................................. 14

   II.  Barclays' Securitization of Residential Mortgage Loans. ................................... 16

      A.  Barclays' Role with Respect to Principal (Whole Loan) Deals.................................. 17

      B.  Barclays' Role with Respect to Third-Party (Agented) Deals.................................. 22

      C.  Principal Deals: Barclays Bid on Loan Pools and Conducted Due Diligence........... 23

      D.  Third-Party Deals: Barclays Received Underwriting Mandates and Conducted Due Diligence. ................................................................................... 27

      E.  How Barclays Structured its RMBS. ................................................................. 29

**Defendants' Scheme to Defraud** ................................................................................31

   I.   Defendants Sold RMBS Certificates on the Strength of Their Representations. ............. 31

      A.  Representations in Offering Documents. ........................................................ 31

          1.   Representations About Compliance with Underwriting Guidelines and with Applicable Law and Regulations. ................................................................. 33

          2.   Representations About the Loan Characteristics. ......................................... 36

      B.  Representations in the MLPA and PSA. ........................................................ 38

      C.  Representations in Investor and Rating Agency Presentations........................... 40

   II.  Defendants Knew That Their Representations as to Loan Quality Were False. ............. 42

      A.  Defendants Knew the Securitized Loans Subjected to Due Diligence were of Materially Worse Quality than they Represented. ........................................ 43

          1.   Defendants Routinely Agreed to Minimize Kickout Rates. ................................ 45

          2.   Defendants Securitized Thousands of Loans Rated EV3, Without Disclosing this to Investors. ..................................................................... 49

          3.   In Some Deals, Defendants Knowingly Securitized Loans Graded as EV3 and Kicked out of Prior Deals, Recycling Hundreds of Rejected Loans into Subsequent Deals without Disclosure or Further Due Diligence. ....................... 50

          4.   Defendants Securitized Thousands of Loans that their Due Diligence Vendors Had Originally Graded EV3 but for which Defendants Unjustifiably Instructed the Vendors to Change the Grade. ........................................ 51

          5.   Defendants Knowingly Securitized Thousands of Loans Bearing Significant Risk with Respect to the Borrower's Ability to Pay, Without Disclosing these Risks to Investors. ................................................... 53

6.   Defendants Knowingly Misrepresented Material Characteristics of the Loans They Securitized. ................................................. 55

B.   Defendants Knew that the Unreviewed Loans were of Materially Worse Quality than they Represented. .................................. 57

1.   Defendants Knew from the High Credit/Compliance Defect Rates that the Unreviewed Portions of the Pool Also Contained Large Numbers of Loans that Should Not Have Been Securitized. ........................... 58

2.   Defendants Knew that Their Due Diligence Process Failed to Identify for Review or Exclusion All Defective and Unacceptable Loans. ........... 59

a.   Defendants Manipulated their Adverse Selection Criteria to Appease their Originator Clients, Who Wanted to Limit Kickouts. ................... 60

b.   Defendants were Aware that Additional Loans met the Bank's Own Risk Criteria and yet Proceeded to Securitize Them without further Review. ....... 61

c.   Barclays Drew Diligence Selections from Incomplete Loan Pools. .............. 62

3.   By Monitoring the Performance of Their Own Deals, Defendants Knew That the Unreviewed Loans Were of Significantly Poorer Quality Than Defendants Were Representing. ............................. 63

4.   On Multiple Loan Pools Securitized in SABR 2007-BR4 and SABR 2007-BR5, Defendants Decided to Conduct No Credit/Compliance Due Diligence but Instead Securitized Thousands of Unreviewed Loans that they Knew Contained Material Defects. .......................... 65

III.   Defendants Knowingly Securitized Defaulted, Delinquent, and Defective "Scratch and Dent" Loans, to Get Them Off Barclays' Books. ..................... 68

A.   Defendants Knew that Hundreds of Loans They Securitized Had Already Experienced First Payment or Early Payment Default, or Were Otherwise Scratch and Dent Collateral. .................................. 68

B.   Defendants Knew from their Diagnostic Review of Defaulted Fremont Loans that Loans that Experience Early Payment Delinquency Are Very Likely to Be Defective or Even Fraudulent. .............................. 73

IV.   Defendants Knew that their Representations as to the Value of Mortgaged Properties and the Validity of the Underlying Appraisals Were False. .................... 74

A.   Defendants' Valuation Due Diligence Process. ........................ 75

B.   Defendants Learned of Declining Loan Quality and Defective Loans from Their Valuation Due Diligence Providers. ............................ 77

C.   Defendants Disregarded their Own Valuation Variance Tolerances and Securitized Loans Despite Knowledge of Significantly Overstated Appraisal Values or the Likelihood that Mortgaged Properties Were Underwater. ............ 78

D.   Defendants Securitized Thousands of Loans without Any Appraisal Review. .......... 79

V. Defendants Repeatedly Misrepresented Their Due Diligence Process and Results to Investors and Rating Agencies.............................................................................................. 81

    A. Defendants Misrepresented the Scope of their Credit/Compliance Due Diligence Process Both to Investors and to Rating Agencies. ................................................... 81

    B. Defendants Repeatedly Misrepresented their Due Diligence Results Both to Investors and to Rating Agencies. ................................................................................ 85

VI. Defendants' Fraudulent Scheme Affected Federally-Insured Financial Institutions and Victimized Other Financial Institutions............................................................................ 87

**Facts Specific to Defendant Menefee.............................................................................91**

**Facts Specific to Defendant Carroll ...............................................................................96**

**Deal-Specific Facts .........................................................................................................101**

    I. New Century ("NC") Deals ......................................................................................... 101

        A. SABR 2006-NC1 .................................................................................................. 102

        B. SABR 2006-NC2 .................................................................................................. 104

        C. SABR 2006-NC3 .................................................................................................. 106

        D. SABR 2007-NC1 .................................................................................................. 107

        E. SABR 2007-NC2 .................................................................................................. 108

    II. Barclays Representation ("BR") Deals......................................................................... 109

        A. SABR 2007-BR1 .................................................................................................. 111

        B. SABR 2007-BR2 .................................................................................................. 116

        C. SABR 2007-BR3 .................................................................................................. 119

        D. SABR 2007-BR4 .................................................................................................. 123

        E. SABR 2007-BR5 .................................................................................................. 127

    III. Fremont ("FR") Deals ................................................................................................. 130

        A. SABR 2006-FR1 .................................................................................................. 130

        B. SABR 2006-FR2 .................................................................................................. 131

        C. SABR 2006-FR3 .................................................................................................. 132

        D. FHLT 2006-C........................................................................................................ 139

        E. SABR 2006-FR4 .................................................................................................. 140

    IV. WMC Mortgage ("WM") Deals .................................................................................. 146

        A. SABR 2006-WM1 ................................................................................................ 146

        B. SABR 2006-WM2 ................................................................................................ 147

        C. SABR 2006-WM3 ................................................................................................ 149

        D. SABR 2006-WM4 ................................................................................................ 150

V.  HomEq ("HE") Deals ................................................................................. 151

    A.  SABR 2006-HE1 and SABR 2006-HE2 ........................................... 151

    B.  SABR 2007-HE1 ............................................................................ 154

VI. BCAP Deals ................................................................................................ 155

    A.  BCAP 2006-AA1 ........................................................................... 156

    B.  BCAP 2006-AA2 ........................................................................... 157

    C.  BCAP 2007-AA1 ........................................................................... 158

    D.  BCAP 2007-AA2 ........................................................................... 160

    E.  BCAP 2007-AA3 ........................................................................... 161

    F.  BCAP 2007-AA4 ........................................................................... 162

    G.  BCAP 2007-AA5 ........................................................................... 164

VII.    EquiFirst Deal (EQLS 2007-1) ......................................................... 165

VIII.    Alliance Bancorp Deal (ALBT 2007-OA1) ........................................ 166

IX. Ameriquest Deals (ARSI 2005-W5 and ARSI 2006-W2) ........................ 168

    A.  ARSI 2005-W5 .............................................................................. 169

    B.  ARSI 2006-W2 .............................................................................. 170

X.  RFC Deal (RASC 2006-KS8) ..................................................................... 171

XI. Wells Fargo Deals ...................................................................................... 172

    A.  WFHET 2006-3 ............................................................................. 172

    B.  WFHET 2007-1 ............................................................................. 174

**Claims for Relief ..............................................................................................175**

CLAIM I: FIRREA CIVIL MONEY PENALTIES PREDICATED ON MAIL FRAUD
(ALL CORPORATE DEFENDANTS AS TO EACH SUBJECT DEAL) ............. 175

CLAIM II: FIRREA CIVIL MONEY PENALTIES PREDICATED ON MAIL FRAUD
(PAUL MENEFEE AS TO EACH MENEFEE/CARROLL DEAL) ...................... 178

CLAIM III: FIRREA CIVIL MONEY PENALTIES PREDICATED ON MAIL FRAUD
(JOHN CARROLL AS TO EACH MENEFEE/CARROLL DEAL) ...................... 179

CLAIM IV: FIRREA CIVIL MONEY PENALTIES PREDICATED ON WIRE FRAUD
(ALL CORPORATE DEFENDANTS AS TO EACH SUBJECT DEAL) ............. 181

CLAIM V: FIRREA CIVIL MONEY PENALTIES PREDICATED ON WIRE FRAUD
(PAUL MENEFEE AS TO EACH MENEFEE/CARROLL DEAL) ...................... 183

CLAIM VI: FIRREA CIVIL MONEY PENALTIES PREDICATED ON WIRE FRAUD
(JOHN CARROLL AS TO EACH MENEFEE/CARROLL DEAL) ...................... 185

CLAIM VII: FIRREA CIVIL MONEY PENALTIES PREDICATED ON BANK
FRAUD (ALL CORPORATE DEFENDANTS AS TO EACH SUBJECT DEAL) 187

CLAIM VIII: FIRREA CIVIL MONEY PENALTIES UNDER FIRREA PREDICATED ON BANK FRAUD (PAUL MENEFEE AS TO EACH MENEFEE/CARROLL DEAL) .................................................................................................. 188

CLAIM IX: FIRREA CIVIL MONEY PENALTIES UNDER FIRREA PREDICATED ON BANK FRAUD (JOHN CARROLL AS TO EACH MENEFEE/CARROLL DEAL) .................................................................................................. 189

CLAIM X: FIRREA CIVIL MONEY PENALTIES PREDICATED ON FRAUDULENT BENEFIT FROM A TRANSACTION WITH A COVERED FINANCIAL INSTITUTION (ALL CORPORATE DEFENDANTS AS TO EACH SUBJECT DEAL) .................................................................................................. 190

CLAIM XI: FIRREA CIVIL MONEY PENALTIES PREDICATED ON FALSE STATEMENTS MADE TO INFLUENCE THE ACTIONS OF A COVERED FINANCIAL INSTITUTION (ALL CORPORATE DEFENDANTS AS TO EACH SUBJECT DEAL) .................................................................................. 191

## TABLE OF APPENDICES

| Table 1 | The Subject Deals |
|---------|-------------------|
| Table 2 | The Menefee/Carroll Deals |
| Table 3 | Participants, Originators, and Counterparties in the Subject Deals |
| Table 4 | Compendium of Misrepresentations from Prospectus Supplements Issued for the Subject Deals |
| Table 5 | Compendium of Misrepresentations from Mortgage Loan Purchase Agreements and Pooling and Servicing Agreements for the Subject Deals |
| Table 6 | Compendium of Representations in Investor and Rating Agency Presentations for Certain Subject Deals |
| Table 7 | Credit/Compliance Due Diligence Results for the Subject Deals |
| Table 8 | Securitized Loans that Met Barclays' Adverse Selection Criteria But Were Not Subjected to Due Diligence |
| Table 9 | Valuation Due Diligence Results for the Subject Deals |

Plaintiff the United States of America alleges and complains against Defendants Barclays

Capital, Inc., Barclays Group US Inc., Barclays US LLC, Barclays Bank PLC, Barclays PLC,

BCAP LLC, Securitized Asset Backed Receivables LLC, Sutton Funding LLC (collectively,

"Barclays" or "the Corporate Defendants"), Paul K. Menefee, and John T. Carroll as follows:

## SUMMARY OF CLAIMS

1.      Between December 1, 2005, and December 31, 2007 (the "Relevant Period"),

Barclays engaged in a fraudulent scheme to sell tens of billions of dollars of residential mortgage-

backed securities ("RMBS"), in which it repeatedly deceived investors about the characteristics of

the loans backing those trusts.  This action relates to 36 of those securitizations ("the Subject

Deals"), which are identified in the Table of Contents and on the annexed Table 1, and which

Barclays sponsored, issued, underwrote, managed, or offered during the Relevant Period.

2.      Barclays securitized over $31 billion worth of mortgage loans in the Subject Deals,

which proved to be catastrophic failures.  More than half of the underlying loans defaulted, causing

investors in those deals to lose many billions of dollars, with hundreds of millions more in losses

projected during the remaining life of the deals.  Even many investors in the AAA-rated tranches

of these securitizations, which were rated as safe as investments in U.S. Treasury bonds, have

suffered or are projected to suffer significant losses.

3.      In publicly-filed offering documents, in other deal transaction documents, and in

direct communications with investors and rating agencies, Barclays systematically and

intentionally misrepresented key characteristics of the loans it included in the Subject Deals.  The

borrowers whose loans backed the Subject Deals were significantly less creditworthy than

Barclays represented to investors, and those loans defaulted at exceptionally high rates early in the

life of the deals.  In addition, the mortgaged properties were systematically worth less than what

Barclays represented to investors, meaning there was not enough equity in the collateral to protect investors from loss when loans defaulted.

4.      As Barclays knew, the origination standards of the lenders issuing these mortgages (companies such as Fremont, New Century, WMC, Countrywide, and IndyMac) were severely deteriorating during the Relevant Period, resulting in loans to borrowers with no ability to repay. Indeed, Barclays knew that such companies were routinely originating fraudulent loans, including "stated documentation" loans rife with misrepresentations.  Those companies then pushed to have Barclays buy as many of their shoddy loans as possible in order to shift the risk of default from the originators onto Barclays' RMBS investors.

5.      Barclays was a willing and active participant in this business, eagerly seeking to do more and more deals, and to securitize more and more loans, in order to increase its profits and its share of the RMBS market.  Indeed, in its relentless pursuit of new loans to feed its securitization machine, and in its active collaboration with originators to maximize loan volume, Barclays not only acquired and securitized billions of dollars of loans it knew had material defects, but it also extended billions of dollars in financing to lenders it knew were originating loans without regard to the ability of the borrowers to repay them (including, in many cases, loans that were fraudulent). This pump-priming activity contributed to the housing bubble and to the ensuing crash, whose effects devastated the world economy in the Financial Crisis of 2008.

6.       In selling certificates in the Subject Deals, Barclays repeatedly assured investors that it had excluded "*unacceptable*" loans and that the loans in the deals had been underwritten in accordance with loan origination guidelines intended to ensure the borrowers' ability to pay.  It represented to investors that the appraisals accompanying the mortgaged properties were reliable and that the properties had sufficient value to avoid loss in the event of default.  It told investors

that it had conducted "*robust*," "*thorough*," and "*comprehensive*" due diligence on the loans it securitized, and that it did not securitize non-compliant, delinquent, or "*scratch and dent*" loans.

7.     These statements were false.  In reality, Barclays' due diligence on the Subject Deals was a sham.  When it did not skip due diligence altogether, Barclays routinely ignored or kept to itself the results of that due diligence, from which it knew that a considerable percentage of the loans in the Subject Deals were not as Barclays represented to investors.

8.     Barclays' due diligence vendors informed it that large percentages of the loans they reviewed did not comply with underwriting guidelines or with the relevant law, or involved borrowers who lacked the ability to repay.  They also informed Barclays that the appraised values of significant percentages of the mortgaged properties were overstated and that thousands of those properties were underwater – that is, they were worth less than the amount of the liens encumbering them.  These vendors described some of these securitized loans as "*craptacular*," others as "*scariest collateral*," and others as having the "*distinct aroma of default.*"

9.     Barclays' employees reviewed these due diligence results and, in many cases, portions of the loan files, and they saw for themselves that the pools were riddled with materially defective loans that should not have been included in the deals.  Defendant Menefee, the head Barclays banker in charge of due diligence on the subprime deals, observed that one loan pool was "*about as bad as it can be*" and another "*scares the sh\*t out of me.*"  He complained about a Wells Fargo pool that "*we have to eat their sh\*t loans.*"  Meanwhile, a Barclays salesperson described "*the deluge of Fremont garbage being put out there.*"

10.     Despite this knowledge, Barclays securitized many thousands of loans (worth billions of dollars) that its vendors had graded as materially defective and that should not have been included in the deals. For thousands more, Barclays directed its vendors to change the grades

on defective loans for no legitimate reason, before it proceeded to securitize them.  On a number of occasions, Barclays even recycled into its deals loans it had kicked out of previous deals due to their defects, without conducting any additional due diligence on the loans.  And on thousands of occasions, Barclays left in loans whose property valuations were overstated to a degree that was "out of tolerance" under its own metrics.  Barclays' strategy throughout was to "*jam things in, you know, bob and weave and hope for the best.*"

11.      Barclays sought to maximize the number of loans securitized and to minimize the number of loans kicked from each deal, regardless of how poor the quality of the loans.  Its principal aim in conducting due diligence was not to validate the truth and accuracy of its representations to investors but to protect its own bottom line and its relationship with the loan originators whose substandard products were the lifeblood of Barclays' securitization machine.

12.      Barclays viewed these originators (and not the RMBS investors) as its true clients, and it repeatedly bent over backwards to please them.  As Menefee said in a telephone call to one of the originators, "*I don't make any money kicking out loans, I just don't.*"  He repeatedly assured originators that "*you'll be happy with the pull-through rate,*" "*we are embarrassed by bad pull-throughs,*" "*[we want] to accept as many loans as possible,*" and "*we want to be known as people who come through for you.*"  In fact, Barclays frequently stipulated with originators to limit the size or composition of its due diligence selections, and on a number of occasions it even agreed to limit the percentage of loans that could be kicked out of a deal.

13.      Barclays did kick some loans from the Subject Deals.  Its aim in doing so, however, was not to protect its investors from the risk of loss but rather to serve its own interests and to make it appear that it was conducting meaningful due diligence.  Indeed, Barclays' leadership congratulated itself at management meetings for having persuaded rating agencies that its due

diligence practices were comprehensive and effective, as a result of which the rating agencies required less credit enhancement in the deals, which made them more profitable for Barclays and riskier for investors.

14.     Barclays also knowingly securitized in the Subject Deals thousands of loans it knew were "scratch and dent," while repeatedly lying to investors that it never securitized such loans on its subprime or Alt-A shelves.  Indeed, even when loans were already delinquent or in default by the time a deal closed, it did not seem to matter to Barclays, which securitized thousands of such loans in the Subject Deals.

15.     When asked about a group of 40 such delinquent loans, Defendant Carroll, the head subprime trader at Barclays, instructed Menefee to "*just leave them in.*"  Menefee later stated that "*[y]ou have to know 90% of the reason something like this would default is because of fraud,*" and he even claimed he could prove that all of the delinquent loans were fraudulent.  But within weeks of complying with Carroll's instruction to "*leave them in the deal,*" Menefee falsely represented to investors and rating agencies on call after call that the deal (SABR 2006-FR3) did not contain any such delinquent loans.

16.     Carroll justified his instruction to Menefee to include the millions of dollars of defaulted loans in SABR 2006-FR3 by arguing that securitizing the delinquent loans would save Barclays one million dollars, even if it made it more likely that investors would end up bearing the loss.  Indeed, as Menefee reasoned after learning that a different group of delinquent loans securitized in another deal (SABR 2007-BR1) "*have just gone straight down,*" Barclays was "*willing to take it on the chin from [an investor] because we did the right thing for the firm by securitizing as many loans*" as possible.  Or as Carroll put it, "*if we pull them out of the deal, you know, we take on 100% of the risk; we've sold 97% of the risk in the deal. Just leave them in.*"

17.     Even when investors in SABR 2007-BR1 called upon Barclays, post-securitization, to buy out from the deal loans that they discovered were already in default before the deal issued, Barclays refused, deciding to protect its own bottom line despite knowing full well that this decision would expose investors to significant risk of harm.  As Menefee put it, "*we can make a corporate decision to buy these loans out, but it's going to be very costly and it is an extraordinarily slippery slope.*"  He described the operative mentality at Barclays when he told Carroll, in connection with SABR 2007-BR2, that "*we ... did the right thing for the firm, securitized a good portion of the loans that were 30-59 days delinquent.*"

18.     Barclays knew that the defaulted and delinquent loans securitized in its deals had numerous underwriting defects.  As Barclays' own due diligence consultant concluded in a diagnostic review of hundreds of securitized loans that had gone into default almost immediately after the deals issued, "*an overwhelming percentage of [those] loans exhibit material deficiencies,*" and "*essentially default was inevitable.*"  The consultant commented that for many of these loans, which had contributed to an "*unprecedented default rate,*" the originator, Fremont, "*ignored guidelines*" and had given "*no regard for borrower's ability to repay debt.*"

19.     In addition to securitizing thousands of loans with defects discovered in due diligence, Barclays knew that the loans it securitized, but had not reviewed in due diligence, were similarly riddled with material defects.  Barclays conducted due diligence on only some of the loans it securitized, and it knew that the criteria it used to choose loans for due diligence did not identify for review or exclusion all loans in the pools that violated its representations, or even all fraudulent loans.  Even before the Relevant Period, Barclays' management expressed concern that "*the process is not capturing some loans that should be kicked out.*"

20.     To make matters worse, Barclays often loosened its selection criteria to satisfy originator demands for limits on due diligence sample sizes and kickouts, as a result of which Barclays securitized billions of dollars' worth of loans, without due diligence review, that it had itself identified as risky enough to merit review.  It then misled investors and rating agencies, telling them that its selection criteria were far more comprehensive than they actually were.

21.     Barclays found exceedingly high rates of material defects in its due diligence samples – in some cases more than 50%.  Barclays knew from these high defect rates that the unreviewed portions of the pools also contained large numbers of defective loans.  Nevertheless, Barclays continued to make representations about the loan pools it knew were false, and it repeatedly misled investors about the due diligence results on the Subject Deals.

22.     On some loan pools, including all three of the pools securitized in SABR 2007-BR5, Defendants dispensed with due diligence altogether.  For example, as New Century was teetering towards bankruptcy in early 2007, Defendants decided that, without a solvent counterparty to which to put back defective loans, it was not worth the cost or effort to conduct due diligence on the pools.  Defendants determined to "*tell the diligence guys to stand down*" in order to "*save the money*," and they instructed their vendor to cancel a due diligence job that had been scheduled for the following week.  Defendants took this decision despite being well aware of significant problems with the New Century loan pools, which Menefee and Carroll agreed "*look[ed] like sh\*t*."  Weeks later, Barclays doctored an investor presentation to falsely make it appear as if due diligence had actually been performed on SABR 2007-BR5.

23.     Throughout the Relevant Period, Defendants at no point had a good faith belief that they were kicking out all of the "*unacceptable*" loans that they assured investors they were removing from the deals, or that the representations they were making as to the characteristics of

the securitized collateral were actually true.  Instead of ensuring that their representations to investors as to the characteristics of the loans were accurate and transparent, so that investors could make properly informed investment decisions, Defendants repeatedly misled investors and kept to themselves critical information about the loans in the deals, knowingly putting those investors at risk of harm.

24.    Barclays sold certificates in the Subject Deals to a wide range of investors that included, among other entities: financial institutions (including many that were federally-insured), government-sponsored entities (such as Fannie Mae and Freddie Mac), federal home loan banks, credit unions, pension plans, charitable and religious organizations, and university endowments. Many of these investors suffered devastating losses.

25.    The United States now brings this action pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 498, tit. IX, § 951, *codified as amended at* 12 U.S.C. § 1833a, to recover civil penalties and other appropriate relief from Barclays on account of its fraudulent and illegal conduct, including its intentional misrepresentations and material omissions to investors about the Subject Deals.

26.    The United States further seeks to recover civil penalties under FIRREA from Menefee and Carroll individually, on account of their fraudulent and illegal conduct, including their intentional misrepresentations and material omissions about the seven RMBS identified on the annexed Table 2 ("the Menefee/Carroll Deals").  Barclays sponsored, issued, underwrote, managed, or offered the Menefee/Carroll Deals during the Relevant Period, with Menefee and Carroll's direct involvement.

27.    The United States seeks from Defendants the maximum civil penalties available under FIRREA, and other appropriate relief, for: (a) mail fraud affecting federally-insured

financial institutions; (b) wire fraud affecting federally-insured financial institutions; (c) executing

or attempting to execute a scheme to defraud financial institutions; (d) executing or attempting to

execute a scheme to obtain money, funds, credits, assets, securities, or other property owned by,

or under the custody or control of, financial institutions, by false or fraudulent pretenses,

representations, or promises; (e) executing a scheme to fraudulently benefit from a transaction with

a financial institution (Corporate Defendants only); and (f) making false statements to influence

the action of certain financial institutions (Corporate Defendants only).  *See* 12 U.S.C. § 1833a;

18 U.S.C. §§ 1005, 1014, 1341, 1343, and 1344.


## The Parties

28.    Plaintiff is the United States of America, a body politic and sovereign.  It brings

this action in its own right pursuant to FIRREA, 12 U.S.C. § 1833a.

29.    Defendant Barclays Capital, Inc. ("Barclays Capital") is a Connecticut corporation

with its headquarters and principal place of business currently located at 745 Seventh Avenue,

New York, NY 10119.  Barclays Capital's direct parent and sole stockholder is Defendant Barclays

Group US Inc., which in turn is wholly owned by Defendant Barclays US LLC, a direct subsidiary

of Defendant Barclays Bank PLC, and it is ultimately owned by Defendant Barclays PLC.

Barclays Capital is a registered securities broker-dealer with the United States Securities Exchange

Commission ("SEC") and a 4(k)(4)(E) securities subsidiary under the Bank Holding Company

Act.  It served as the lead or managing co-lead underwriter for each Subject Deal.

30.    Defendant Barclays Group US Inc. ("BGUS") is a Delaware corporation and bank

holding company with its headquarters and principal place of business located at 745 Seventh

Avenue, New York, NY 10119, and an official address of 100 South West Street, Wilmington, DE

19801.  It is wholly owned by Defendant Barclays US LLC, a direct subsidiary of Defendant

Barclays Bank PLC, and it is ultimately owned by Defendant Barclays PLC.  It serves as the holding company for many of Barclays' United States subsidiaries, including Barclays Capital.

31.     Defendant Barclays US LLC ("BUSLLC") is a Delaware limited liability company and intermediate holding company with its headquarters and principal place of business located at 745 Seventh Avenue, New York, NY 10119.  BUSLLC is a direct subsidiary of Defendant Barclays Bank PLC and is ultimately owned by Defendant Barclays PLC.  BUSLLC is the intermediate holding company for the majority of Barclays' operations in the United States, including Barclays Capital, and it is regulated by the Federal Reserve Bank.

32.     Defendant Barclays Bank PLC ("Barclays Bank") and its parent company, Defendant Barclays PLC ("BPLC"), are United Kingdom-based multinational banking, investment banking, and financial services firms, with a United States headquarters at 745 Seventh Avenue, New York, NY 10019.  On information and belief, BPLC and Barclays Bank operate in all 50 States, as well as in the District of Columbia.  Barclays Bank has a New York Branch that is licensed by the New York State Department of Financial Services as a New York branch of a foreign bank; the New York Branch conducts banking operations in New York within, *inter alia*, the Counties of Kings, Queens, Nassau, and Suffolk.  Barclays Bank served as the sponsor or co-sponsor of nine of the Subject Deals (BCAP 2006-AA1, BCAP 2006-AA2, BCAP 2007-AA1, BCAP 2007-AA2, BCAP 2007-AA3, BCAP 2007-AA4, BCAP 2007-AA5, SABR 2006-FR1, and SABR 2006-WM1).  As sponsor, Barclays Bank was responsible for acquiring, holding, and transferring the loans securitized in these Subject Deals.

33.     Defendant BCAP LLC ("BCAP") is a Delaware limited liability company with its principal place of business located at 745 Seventh Avenue, New York, NY 10019.  BCAP's managing and sole equity member is Defendant Barclays Bank.  BCAP was the depositor and

registrant for all of the Subject Deals whose names begin with "BCAP," as well as for EQLS 2007-1 and SABR 2007-BR5.  It was responsible for registering certificates with the SEC and preparing and filing reports required under the Securities Exchange Act of 1934.

34.     Defendant Securitized Asset Backed Receivables LLC ("SABR") is a Delaware limited liability company with its principal places of business located at 200 Park Avenue, New York, NY 10166, and at 745 Seventh Avenue, New York, NY 10019.  SABR's managing and sole equity member is Defendant Barclays Bank.  SABR was the depositor and registrant for all of the Subject Deals whose names begin with "SABR," except for SABR 2007-BR5.  It was responsible for registering certificates with the SEC and preparing and filing reports required under the Securities Exchange Act of 1934.

35.     Defendant Sutton Funding LLC ("Sutton") is a Delaware limited liability company with its principal place of business located at 445 Broad Hollow Road, Suite 239, Melville, NY 11747.  On information and belief, Sutton's managing and sole equity member is GSS Holdings (Sutton), Inc., which in turn is a wholly-owned subsidiary of Barclays Capital.  Barclays Capital established Sutton as a special purpose vehicle and manages Sutton's loan acquisition business through an administration agreement.  Sutton was the sponsor or co-sponsor for 25 of the Subject Deals (BCAP 2007-AA1, BCAP 2007-AA2, BCAP 2007-AA3, BCAP 2007-AA4, BCAP 2007-AA5, EQLS 2007-1, SABR 2006-FR2, SABR 2006-FR3, SABR 2006-FR4, SABR 2006-HE1, SABR 2006-HE2, SABR 2006-NC1, SABR 2006-NC2, SABR 2006-NC3, SABR 2006-WM2, SABR 2006-WM3, SABR 2006-WM4, SABR 2007-BR1, SABR 2007-BR2, SABR 2007-BR3, SABR 2007-BR4, SABR 2007-BR5, SABR 2007-HE1, SABR 2007-NC1, and SABR 2007-NC2).  Sutton, as sponsor, was responsible for acquiring, holding, and transferring the loans securitized in these Subject Deals.

36.     Defendant Paul K. Menefee was a Managing Director in Barclays Capital's Asset Securitization Group ("ASG") and Vice President and Chief Accounting Officer of SABR.  He was also managing agent, administrative agent, and attorney-in-fact for Sutton from 2003-08.

37.     Defendant John T. Carroll was a Managing Director and Head of Global Securitized Asset Trading in Barclays Capital's U.S. Asset Backed Security ("ABS") and Whole Loan Trading Division and Vice President and Chief Financial Officer of SABR from 2003-08.


## JURISDICTION AND VENUE

38.     This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. § 1833a(e), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

39.     Venue lies in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District. Thousands of loans underlying the Subject Deals were secured by homes and other properties located in this District.  Barclays marketed and sold RMBS backed by materially defective loans to federally-insured financial institutions and other investors in this District, who incurred significant losses on their investments.  Additionally, Defendant Sutton, which is domiciled and has its principal place of business in this District, served as sponsor for 25 of the Subject Deals (see Table 3).  Through Sutton's involvement, the loans in those 25 Subject Deals were acquired and securitized, and the representations pertaining to those deals and those loans were made, substantially in this District.

40.     Venue also lies in this District under 28 U.S.C. § 1395 in that this is a civil proceeding for the recovery of a pecuniary fine, penalty, or forfeiture, and all Defendants are found in this District.  The Corporate Defendants are all found in this District because they reside in this

District under 28 U.S.C. §§ 1391(c)(2),(3), (d), and are subject to personal jurisdiction in this District.  Defendant Menefee is found in this District because he is subject to personal jurisdiction in this District.  Defendant Carroll is found in this District because he resides in and is domiciled in this District and is subject to its personal jurisdiction.

41.     The Corporate Defendants are all subject to personal jurisdiction in this District. Defendants Barclays Capital, BGUS, BUSLLC, Barclays Bank (New York Branch), BCAP, SABR, and Sutton maintain (or maintained during the Relevant Period) their principal place of business in the State of New York.  Together with BPLC and their respective subsidiaries and corporate affiliates, these entities regularly perform (or performed during the Relevant Period) a substantial amount of business within the State of New York, and provide(d) banking and investment banking services to persons and entities in the State of New York, including, during the Relevant Period, the marketing and sale of RMBS.  Substantially all of the events, actions, representations, and omissions alleged herein relating to the Subject Deals occurred in New York.

42.     Defendant Menefee, who currently resides in Texas, was domiciled in New York (and resided in this District) at all times during the Relevant Period.  The substantial majority of his actions, representations, and omissions relating to the Subject Deals occurred in the State of New York.  Menefee conducted substantial, systematic, and continuous business in the State of New York during the Relevant Period, when he worked primarily out of Barclays Capital's New York City office.  From 2003 to 2008, Menefee was also managing agent, administrative agent, and attorney-in-fact for Sutton (which is and was domiciled in this District). In the regular course of his work for Barclays Capital, SABR, or Sutton within the State of New York, Menefee signed dozens of officer's certificates and other offering documents. While in the employ of Barclays Capital, SABR, or Sutton within the State of New York, he averred to the accuracy of the

statements in certain of Barclays' offering documents.  Menefee is accordingly subject to personal jurisdiction in this District.

43.     Defendant Carroll, who currently resides in this District, was domiciled in the State of New York (and resided in this District) at all times during the Relevant Period.  The substantial majority of his actions, representations, and omissions relating to the Subject Deals occurred in the State of New York.  Carroll conducted substantial, systematic, and continuous business in the State of New York during the Relevant Period, when he worked primarily out of Barclays Capital's New York City office.  In the regular course of his work for Barclays Capital, SABR, or Sutton within the State of New York, Carroll signed dozens of officer's certificates and other offering documents. While in the employ of Barclays Capital, SABR, or Sutton within the State of New York, he averred to the accuracy of the statements in certain of Barclays' offering documents. Carroll is accordingly subject to personal jurisdiction in this District.

**BACKGROUND**

**I.      Mortgage Loan Origination.**

44.     When investors buy RMBS, they are buying a security backed by residential mortgage loans.  A mortgage loan is a loan made to the owner of real property secured by the value of that real property.

45.     When a current or prospective homeowner wants to borrow money to purchase or refinance a home, he or she typically seeks a loan from a mortgage lender, also known as an "originator."  In exchange for the money to buy or refinance the home, the borrower promises to repay the original amount lent (the "principal"), plus interest at either a fixed or adjustable rate. This promise is documented in a promissory note.  The originator obtains a lien against the home, on which the lender can foreclose if the borrower defaults on his or her obligation to repay.

46.     To determine whether a borrower has the wherewithal to repay the loan on the terms set forth in the note, and also whether the value of the particular property supports the loan amount, an originator performs a process called "loan underwriting."   The originator applies loan underwriting standards or "guidelines" to determine whether a particular borrower is qualified to receive a mortgage for a property on the terms offered.

47.     Loan underwriting guidelines typically require an underwriter to consider a variety of key facts about the borrower, including: the borrower's overall debt level, annual income, debt-to-income ("DTI") ratio, amount of cash reserves or disposable savings, employment history and prospects for future employment, credit history, and credit score (a measure of a borrower's credit risk, also called a "FICO score").  Factors considered that concern the property itself are: whether the property was owner-occupied or investor-owned, the nature of the property (e.g., single family home, multi-family home), and the ratio of the loan amount to the property value, also known as the loan-to-value ("LTV") ratio.  Often, other liens on the property are also considered, in what is referred to as the combined loan-to-value ("CLTV") ratio.

48.     To determine whether the borrower is likely to repay the loan, the mortgage lender considers whether the loan fully complies with the loan underwriting guidelines.   If it does not strictly comply with the guidelines, the mortgage lender considers whether there are sufficient "compensating factors" that nevertheless justify the extension of credit to the borrower. "Compensating factors" must relate to, and materially offset, the particular deviations from the underwriting guidelines that apply to the loan.  For example, if a borrower has a slightly higher than acceptable DTI, a compensating factor may exist if the borrower has significant cash reserves to make up for the smaller income.

49.     In addition, the originator must assess the adequacy of the value of the collateral securing the loan.  An appraisal of the property enables the originator to consider how much collateral the lender will be able to recover if the borrower defaults and the property is foreclosed upon or sold.

50.     The CLTV ratio measures the overall amount of equity in the mortgaged property. Because of the CLTV ratio's potential impact on a borrower's willingness to repay a loan, as CLTV ratios rise, so, typically, do defaults.  A delinquent borrower with little to no equity in a property may have little incentive to work with a lender to bring the loan current and avoid foreclosure.  Thus, the higher a loan's CLTV ratio, the more likely it is that the borrower will walk away from the mortgage debt, particularly where home values are declining or where a borrower faces an unexpected financial hardship (such as loss of a job or an unexpected medical emergency). Where the CLTV ratio exceeds 100%, the risk that a borrower will walk away from his or her mortgage becomes especially strong, as the borrower is "underwater" and has no (or negative) equity in his or her home.

51.     The originator must also ensure that the loan complies with all applicable law. There are many provisions of federal and state law designed to prevent predatory lending and other improper lending practices, and to ensure truth-in-lending, with which loans must comply.

## II.     Barclays' Securitization of Residential Mortgage Loans.

52.     During the Relevant Period, investment banks such as Barclays played a central role in arranging the securitization of mortgage loans and in making key representations to investors about the securities, and about the loans being securitized.

53.     Barclays securitized residential mortgage loans in two main ways: "principal" and "third-party" deals.

*United States* v. *Barclays*
Complaint
Page 16

### A.      Barclays' Role with Respect to Principal (Whole Loan) Deals.

54.      In the 29 Subject Deals known as "principal" RMBS deals, Barclays purchased pools consisting of hundreds or thousands of newly-originated subprime or Alt-A loans (called "whole loan purchases") from one or more counterparty originators such as Countrywide, Fremont, IndyMac, New Century, or WMC.[1]   For each Subject Deal, Table 3 lists the originator(s) from which Barclays purchased the loans securitized in that deal.  Where the loans were purchased from more than one originator, the table lists the percentage by loan count purchased from each originator.

55.      Barclays then structured and securitized these loan pools on its own registered shelf using a variety of affiliates, including entities known as "sponsors"[2] and "depositors."[3]  Through other affiliates, it then issued, underwrote, and sold to investors debt instruments known as "RMBS certificates," or, in the vernacular, "mortgage bonds."

---

[1]   One principal deal, EQLS 2007-1, was comprised of loans originated by EquiFirst, a mortgage loan originator that was a wholly-owned subsidiary of Barclays.

[2]   Generally speaking, the pool or pools of loans to be securitized in a principal deal are aggregated by an entity known as a "sponsor," which is responsible for acquiring, holding, and transferring (to the depositor) the loans to be securitized in the RMBS.  Among the Subject Deals that were principal deals, Defendant Sutton was the sponsor or co-sponsor for 25 of them:  BCAP 2007-AA1, BCAP 2007-AA2, BCAP 2007-AA3, BCAP 2007-AA4, BCAP 2007-AA5, EQLS 2007-1, SABR 2006-FR2, SABR 2006-FR3, SABR 2006-FR4, SABR 2006-HE1, SABR 2006-HE2, SABR 2006-NC1, SABR 2006-NC2, SABR 2006-NC3, SABR 2006-WM2, SABR 2006-WM3, SABR 2006-WM4, SABR 2007-BR1, SABR 2007-BR2, SABR 2007-BR3, SABR 2007-BR4, SABR 2007-BR5, SABR 2007-HE1, SABR 2007-NC1, SABR 2007-NC2.  Defendant Barclays Bank was the sponsor or co-sponsor for 9 such deals:  BCAP 2006-AA1, BCAP 2006-AA2, BCAP 2007-AA1, BCAP 2007-AA2, BCAP 2007-AA3, BCAP 2007-AA4, BCAP 2007-AA5, SABR 2006-FR1, and SABR 2006-WM1.

[3]   The depositor for all of Barclays' subprime principal Subject Deals except for SABR 2007-BR5 and EQLS 2007-1 was SABR, while the depositor for the remaining principal Subject Deals (including SABR 2007-BR5 and EQLS 2007-1) was BCAP. In selling the pool to the depositor, the sponsor makes representations about the specific characteristics of the mortgage loans, generally in a document called a Mortgage Loan Purchase Agreement ("MLPA").  A "depositor" deposits the loans into a special purpose entity created by the depositor that is sometimes called the "issuer" or "issuing trust" and whose name typically contains the name of the security.  For example, the issuing trust for SABR 2006-FR1 is an entity called "Securitized Asset Backed Receivables LLC Trust 2006-FR1." The issuing trust then holds the pool of mortgages during the remaining duration of the RMBS's existence.  The issuing trust is established pursuant to a Pooling and Servicing Agreement ("PSA"), which defines the rights, duties, and obligations of various entities that have responsibility for servicing the assets of the trusts and RMBS held by investors (e.g., the servicer and the trustee).  The PSA provides that the representations made in the MLPA about the loans are made for the benefit of investors.

56.     The following diagram illustrates the steps in securitizing mortgage loans in principal deals, using as an example the RMBS that Barclays issued under its SABR shelf:



57.     The sponsor and underwriter together selected the other members of the transaction team.  They hired, among other parties, a "custodian" to maintain possession of the loan files; a "servicer"[4] to administer the relationship with the borrowers; a "trustee" to act on behalf of the

---

[4]     "Servicers" interact directly with the borrowers on the underlying loans, collect the monthly mortgage payments (including principal and interest payments), and remit the funds to the issuing trust or trust administrator for distribution to the RMBS investors, under the terms of the PSA.  Servicers manage and respond to any delinquencies or defaults on the underlying mortgage payments, such as by negotiating forbearances and loan modifications with

investors; and other entities to handle other functions associated with the security.  The underwriter coordinated and supervised all the transaction team members and marketed and sold the certificates to investors.

58.     The underwriter was also responsible for preparing, or coordinating the preparation of, the "Offering Documents" for each issuance.  These Offering Documents included: (a) "shelf" registration statements, which cover numerous offerings of securities made up to three years after the shelf registration is filed with the SEC; (b) "base" prospectuses, which describe the basic characteristics of the RMBS to be sold in issuances off of the shelf; (c) "prospectus supplements" ("ProSupps"), which provide granular detail on the characteristics of the loans in a particular RMBS; (d) mortgage loan purchase agreements (MLPAs) or similar agreements, which describe the basic characteristics of each of the loans being sold; (e) pooling and servicing agreements (PSAs), which arrange for a trustee and a servicer to collect and distribute loan payments; (f) mortgage loan schedules, which detail certain characteristics of each loan; and (g) marketing materials, including term sheets, free writing prospectuses, draft prospectuses, slideshow presentations, and loan data, all used to market and sell the certificates to investors.

59.     Before issuing any RMBS, a depositor (e.g., SABR) filed with the SEC a shelf registration statement and a base prospectus.  The base prospectus described the characteristics of later issuing trusts that the depositor proposed to establish.  For example, a base prospectus might have informed the SEC that the depositor planned to engage in future offerings of residential mortgage loans that complied with origination standards and that complied with law.

---

the borrowers or alternatively pursuing collection efforts including through mortgage foreclosures.  In June 2006, Barclays acquired mortgage loan servicer HomEq, which thereafter served as the servicer on the majority of the Subject Deals that were principal deals.

60.     With respect to each specific issuing trust, the depositor then filed with the SEC a ProSupp that applied only to that particular trust.  The depositor also filed with the SEC, as part of a Form 8-K, various other documents, such as the PSA and (typically) the MLPA.

61.     Between the filing of the base prospectus and the ProSupp, the depositor generally filed, and disseminated to investors, a free writing prospectus ("FWP"), which served as a preliminary supplement to the base prospectus. The FWP contained statistical information about the characteristics of the loans and representations as to origination standards and compliance with law.

62.     The contents of the Offering Documents were dictated, in large measure, by the then-existing version of SEC Regulation AB, 17 C.F.R. § 229.1111 (March 8, 2005), which confirmed the general obligation of RMBS underwriters to disclose all material facts relating to the issuance.  Recognizing that "the characteristics and quality of the asset pool…is often what is most important to investors," 70 Fed. Reg. 1508 (Jan. 7, 2005), Regulation AB required a description of "the material characteristics of the asset pool." 17 C.F.R. § 229.1111(b).  Regulation AB also required a "description of the solicitation, credit granting or underwriting criteria used to originate or purchase the pool assets, including, to the extent known, any changes to such criteria and the extent to which such policies and criteria could be overridden," and the disclosure of other material statistics regarding the underlying loans (e.g., LTV ratios, credit scores, occupancy types, etc.).  *Id.* at (a)(3); 17 C.F.R. § 229.1111(b).

63.     The Asset Securitization Group ("ASG") was the component within Barclays that managed and executed all of the principal subprime Subject Deals.  ASG was comprised of the trading desk, run by Defendant Carroll, and the banking desk, run by Defendant Menefee.

64.     The ASG trading desk was responsible for bidding on and purchasing subprime whole loan pools from originators such as New Century, Fremont, and WMC, including negotiating the terms (or "stipulations") of those purchases with the counterparty originators.  The trading group also had the final say in how deals were structured.

65.     The ASG banking desk was responsible for, among other functions: conducting due diligence on the loans to be securitized and reviewing the due diligence results; making representations to investors about those loans in the Offering Documents and other transaction documents; and running cash flow models on deals to help determine optimal structures.  It routinely exchanged information with other parties involved in the RMBS transaction, including originators, due diligence providers, investors, rating agencies, bond insurers, and others.  It also worked, alongside the trading desk, in negotiating whole loan pool purchases (including trade stipulations) and developing ventures to secure additional sources of whole loan pools (such by acquiring one originator and entering into a forward flow agreement with another originator).

66.     The principal Alt-A Subject Deals were managed and executed by a different component within Barclays – the RMBS Securitization Group.[5]  Originally, this group's primary business was to execute securitizations of prime loans for sale to government-sponsored enterprises such as Fannie Mae and Freddie Mac.  In mid-2006, it also began securitizing Alt-A loans on the BCAP shelf.  Both the trading desk and the banking desk for these deals were managed principally by the RMBS Securitization Group, but the banking group in ASG also supported the securitization of these deals in various ways.

---

[5]   At Barclays, subprime mortgage-backed securities, along with securities backed by student loans and credit card debt, were referred to as "asset backed securities," or "ABS," while prime and Alt-A mortgage-backed securities were referred to as "RMBS."  For purposes of this Complaint, however, all residential mortgage-backed securities, whether subprime or Alt-A, are called RMBS.

67.     The trading desk and banking desk in the RMBS Securitization Group had functions similar to those of their counterparts in ASG.  The process by which the RMBS Securitization Group acquired Alt-A loans and securitized them on the BCAP shelf was also very similar to the process by which ASG acquired subprime loans and securitized them on the SABR shelf.  The principle differences were that the RMBS Securitization Group generally bought the Alt-A loans from different originators (e.g., Countrywide, IndyMac, Chevy Chase) than the companies from which ASG bought subprime loans, and used different vendors and somewhat different procedures than ASG used to conduct credit/compliance and valuation due diligence. Many of the transaction team participants on the Alt-A deals were also different from those for the subprime deals.

68.     Another difference was that the Alt-A loan pools that the RMBS Securitization Group purchased were typically smaller than the subprime pools that ASG purchased and were often commingled with multiple other pools that were then securitized in several different BCAP deals, whose composition was generally not determined until well after the pools were acquired.

**B.     Barclays' Role with Respect to Third-Party (Agented) Deals.**

69.     The other seven Subject Deals are what are known as "third-party" or "agented" deals.  In these deals, Barclays did not purchase or acquire an ownership interest in the underlying loans or loan pools but rather underwrote them for a client originator such as Ameriquest, Fremont, or Wells Fargo, typically using the originator's own affiliates to issue RMBS certificates, which Barclays would then market to investors on the sponsor's behalf.[6]

70.     When acting as the underwriter in these securitizations (a process Barclays referred to as having an "agented mandate"), Barclays managed the securitization by structuring the

---

[6]     In each of the Subject Deals that were third-party deals, the originator (or its affiliates) acted as sponsor and depositor, and the securities were issued through a registered shelf belonging to the sponsor or its affiliates.

security, conducting and reviewing due diligence, supervising the preparation of the transaction documents and the associated representations, and marketing and selling the RMBS.

71.     When acting as a "sole" underwriter (which it was on ALBT 2007-OA1, RASC 2006-KS8, WFHET 2006-3, and WFHET 2007-1), Barclays performed this process alone, undertaking sole responsibility for structuring the transaction, preparing the offering materials, and selling the RMBS through its trading desk.  The other three third-party Subject Deals (ARSI 2005-W5, ARSI 2006-W2, and FHLT 2006-C) had multiple underwriters who worked together in what is called a "syndicate."  On those four deals, Barclays served as "lead underwriter" and undertook primary responsibility for the transaction.  As such, Barclays was responsible for structuring the transaction, for conducting and reviewing the due diligence, for determining which loans would be included in and which would be removed from the deal, and for preparing the offering materials. However, other underwriters within the syndicate assisted Barclays by taking responsibility for selling smaller assigned portions of the RMBS.

72.     Within Barclays, the third-party securitizations were managed and executed in the Home Equity Financing Group.  This group had the main responsibility to ensure that all necessary work was completed to get the deal to market and to ensure that SEC filings and other disclosures to investors and rating agencies were accurate.  This included making presentations to rating agencies and investors.

### C.     Principal Deals: Barclays Bid on Loan Pools and Conducted Due Diligence.

73.     The process leading to the issuance of the principal Subject Deals began with Barclays bidding against other investment banks for a pool of whole loans put on offer for sale by an originator, with the bids to be made within a few days of the solicitation.

74.     With its bid solicitation, the originator provided Barclays and other investment banks with a "data tape" (or spreadsheet) containing data regarding each loan in the pool, including

loan balance and term, interest rate information, mortgage product type (e.g., fixed interest rate or adjustable rate), borrower's FICO score, DTI, LTV, and CLTV.

75.    Bid solicitations from originators generally also included "bid stipulations" – terms and conditions pursuant to which the originator offered the loans for sale.  Bid stipulations generally concerned issues such as due diligence by the purchaser, repurchases of defective loans by the originators, and servicing rights.  Often, and particularly with larger originators (such as Ameriquest, New Century, Countrywide, and Wells Fargo), the bid stipulations limited the percentage (or number) of mortgages that the purchaser could examine as part of due diligence before the closing of the whole loan purchase, or required the winning bidder to purchase a minimum percentage of the offered pool.

76.    In deciding whether and how much to bid on an offered pool, Barclays, through its collateral analytics team, would "crack the tape" (i.e., analyze the loan-level data spreadsheet) and prepare "stratifications," or summary data regarding the pool.  The "cracked" loan tape and stratified data were then closely analyzed by the asset analysts, as well as the due diligence and trading teams.  Barclays' analysts modeled assumptions for loan losses and prepayments, including expected default rates and loss severity in the event of default, to project an optimal capital structure for an RMBS securitization backed by this particular loan pool.  Barclays' projections included forecasts for its trading profit from marketing the securities.

77.    Barclays then forwarded its proposed capital structure to credit rating agencies, along with the originator's loan data, to obtain a preliminary commitment from the agencies as to how a deal structured as proposed would be rated, including any requirements for credit enhancements needed to protect investors in the event of default.

78.     On the subprime deals, the ASG trading desk, headed by Carroll, would then determine whether to bid on an offered pool and if so at what price; the ASG trading desk often consulted closely with Menefee in deciding whether and how much to bid on subprime pools.  On the Alt-A deals, the trading desk within the RMBS Securitization Group performed this function, often consulting with the banking desk.  In either event, if the Barclays trading desk won the bid for a loan pool offered for sale, it then negotiated the terms of the pool acquisition with the originator, including the general parameters of the purchase, any contractual terms governing the acquisition, and a timetable for due diligence and for concluding the transaction.

79.     After an originator conditionally accepted Barclays' whole loan bid, the next step was for Barclays to conduct due diligence on the loan pool it was acquiring.  Barclays informed investors that the purpose of due diligence was to ensure that the representations the originator made to Barclays about the characteristics of the loan pool (representations Barclays would itself make to investors about the RMBS) were materially accurate, and to determine if the loans had any defects that rendered them non-securitizable.

80.     Barclays' had in place internal policies which dictated how and why due diligence should be conducted.  Barclays' Global Due Diligence Policy as of September 2006 (the "Global Due Diligence Policy") called for "appropriate due diligence in primary issuance and offering of securities" and described due diligence as "essential" and a "critical element of the offering process."   It required a "Director" level employee (e.g., Menefee) "to ensure appropriate due diligence has been performed," and explained that a main purpose of due diligence was to "minimize legal risks relating to the accuracy and completeness of the disclosure in the offering document" and to "[m]inimize reputational risks that might arise in respect of any dispute."

81.     On both subprime and Alt-A principal deals, Barclays' due diligence typically consisted of (1) a "credit" review, the principal purpose of which was to determine whether the loans in the pool met the originator's lending guidelines, or whether the originator documented sufficient compensating factors to justify a deviation from these guidelines, and whether the loans were otherwise creditworthy, (2) a "compliance review," meant to determine whether the loans had been originated in compliance with all applicable federal, state, and local laws and regulations, (3) a "tape delta" review, aimed at identifying any inconsistencies between the loan-level data provided by originators and the information in the loan files concerning various loan characteristics (e.g., credit scores, DTI, LTV, CLTV, property type, loan purpose), and (4) a "valuation" or "appraisal" review, meant to validate the stated valuation of the mortgaged properties and to ensure they provided sufficient collateral for the loans.

82.     More specifically, Barclays' Whole Loan Acquisition and Securitization Procedures laid out a standard timeline and step-by-step process for the diligence involved in acquisition and securitization of whole loan pools.  According to this policy statement, diligence "typically will include 100% appraisal review and a minimum of 25% credit review of loan underwriting and documentation compliance review."

83.     Regardless of how due diligence was described in the Global Due Diligence Policy or the Whole Loan Acquisition and Securitization Procedures, the process by which Barclays actually conducted due diligence in the principal Subject Deals is set forth in detail below, in ¶¶ 134-192.

84.     Barclays generally relied on third-party vendors to conduct credit, compliance, and tape delta due diligence.  It used other vendors to conduct valuation due diligence.  Barclays employees received a great deal of information from these vendors about the characteristics of the

loans being reviewed.  The due diligence vendors provided regular updates to Barclays employees by multiple means, including by e-mailing reports or summaries, or posting reports to secure databases and websites that Barclays could access.

85.     At the completion of due diligence, Barclays conducted a "tie out" where it identified the loans it would purchase and the loans it was rejecting.  The tie out typically took place on-site at the originator's offices.

86.     In the Global Due Diligence Policy and the accompanying policies concerning file and document retention, Barclays bankers were directed by Barclays' senior management to discard the answers they received during due diligence (as well as any notes taken) and to retain only the questions they asked.  As the President of Barclays Capital admitted, this discard policy was implemented because "the firm sought to have a clean record" in defending any claims.

### D.     Third-Party Deals: Barclays Received Underwriting Mandates and Conducted Due Diligence.

87.     In the third-party Subject Deals, lenders owning pools of their own loans granted Barclays a mandate to underwrite a securitization backed by those loans, either alone or as part of a syndicate consisting of other investment banks.  On some occasions, Barclays bid for these mandates against other investment banks in a process similar to whole loan pool purchases, while on other deals existing clients of the bank approached the Home Equity Financing Group to negotiate the terms of a mandate for a specific securitization.  In either situation, the originator provided Barclays with a data tape containing representations about each loan in the pool, including loan balance and term, interest rate information, mortgage product type, borrower's FICO score, DTI, LTV, and CLTV, as well as access to the underlying loan files.

88.     In addition to providing a schedule of fees and transaction costs, the mandate also typically contained stipulations concerning due diligence, including limitations on the percentage

(or number) of mortgages that the underwriter could examine as part of due diligence before the closing of the deal.  The mandate sometimes also required the underwriter to purchase an equity stake in the issued securitization.

89.     Barclays' responsibilities as lead or co-lead underwriter in third-party deals included, among other things, ensuring that the representations the originator made about the characteristics of the loan pool (representations Barclays would itself make to investors about the RMBS) were accurate, and determining if the loans had any defects that rendered them non-securitizable.  In that regard, Barclays ostensibly conducted loan-level due diligence in which it (a) reviewed a sample of the loans for compliance with underwriting guidelines and law, and (b) tested the accuracy of the property values underlying the loans in the securitizations.

90.     Although the Managing Director of the Home Equity Financing Group was ultimately responsible for conducting or overseeing due diligence on third-party deals, in practice most of those functions were executed by the ASG banking desk – that is, by Menefee and his team.   As with its principal deals, Barclays hired third-party due diligence vendors to conduct credit, compliance, and appraisal diligence.   Barclays employees received a great deal of information from these vendors about the characteristics of the loans being reviewed.  The due diligence vendors provided regular updates to Barclays employees by multiple means, including by e-mailing reports or summaries, or posting reports to secure databases and websites that Barclays could access.  At the completion of due diligence, Barclays conducted a "tie out" where it identified the loans it would securitize and the loans it would not.  The tie out typically took place on-site at the originator's offices.

91.     Due diligence on the agented deals was also subject to the Global Due Diligence Policy.  Regardless of how due diligence was described in the Global Due Diligence Policy or the

Whole Loan Acquisition and Securitization Procedures, the process by which Barclays actually conducted due diligence in the agented Subject Deals is set forth in detail below, in ¶¶ 134-192.

### E.    How Barclays Structured its RMBS.

92.    RMBS certificates are interests in the cash flows from loan pools. The certificates pay amounts based on the principal and interest payments made by the underlying borrowers.  If a borrower does not pay his mortgage (or if losses are incurred in foreclosing upon the mortgage), that default (or those losses) will reduce the available cash flow to pay the RMBS investors.  The characteristics and creditworthiness of the underlying loans are thus paramount to the RMBS investors, who will see a reduction in their income stream, or in the principal balance of their certificates, when defaults and losses exceed the credit enhancements attendant to their certificates.

93.    When structuring both principal and agented RMBS transactions, Barclays grouped the RMBS certificates into different tranches, or classes, organized in a hierarchical capital structure, or "waterfall," in which the highest-rated tranches were entitled to earlier payment from loan pool cash flows and had the most cushion against losses but the lowest rate of return, while the subordinate tranches were paid later, and bore progressively higher rates of return and less protection from losses.

94.    Barclays arranged for the tranches in its deals to be rated by one or more of the nationally-recognized rating agencies.  A rating agency's grade on an RMBS tranche was an opinion offered to investors on the quality of the collateral backing the cash flow and on the level of risk associated with the timely payment of principal and interest on a security over the life of the bond.  It was based on information provided to the rating agency by the underwriter.  Ratings for each tranche were based on a number of factors, including the reported characteristics of the underlying loans (particularly the likelihood of loss due to mortgage default), and the level and

type of credit enhancements structured into the deal.[7]  Standard & Poor's Financial Services LLC, Moody's Investors Service, Inc. ("Moody's"), Fitch Ratings, Inc. ("Fitch"), and DBRS, Inc. were the credit rating agencies that assigned credit ratings to the Subject Deals.

95.     Barclays made money from its RMBS deals in numerous ways.  As a threshold matter, by securitizing the loans it purchased in principal deals, Barclays avoided tens of billions of dollars in collateral losses when a substantial percentage of those loans defaulted, by shifting the risk of those losses onto the investors whom it had fraudulently induced to purchase the certificates.  Barclays also earned and retained the interest payments (often called "carried interest") that the underlying borrowers paid on their mortgages during the short period of time (typically just a few months) between acquisition and securitization of whole loan pools.

96.     On the majority of the Subject Deals (both principal and agented), Barclays held a short-term economic interest by retaining the equity or "residual" tranche(s) of the deal; most of these residual interests generated significant income or profits for Barclays, whether through cash flows from the excess spread Barclays earned on the deals, or by selling its equity interest to a third party in a net-interest-margin ("NIM") security or through the sale of a post-NIM residual ("PNR") interest.[8]  Barclays and its affiliates also earned substantial sums from underwriting commissions, trading and syndicate fees, transaction charges, and similar revenue from

---

[7]  Credit enhancement in an RMBS absorbs the initial losses stemming from defaults in the underlying mortgages. Common credit enhancement mechanisms include subordination (a hierarchy of cash flows among tranches), overcollateralization (the inclusion of a larger dollar amount of mortgages in the pool than the par value of the security), excess spread (the difference between the weighted average coupon received on the underlying mortgages and the weighted average coupon paid on the RMBS certificates), triggers (provisions aimed at capturing more credit enhancement in the event of collateral deterioration), monoline insurance (third-party insurance to cover losses from mortgage defaults), and cross-collateralization (a pooling mechanism to reduce the risk of cash flow interruption to senior tranches due to disproportionate loan defaults).

[8]   A net-interest margin, or NIM, security is a debt instrument, typically rated by a credit rating agency, that receives the excess spread naturally flowing from securitized mortgage loan pools, after paying bond tranche coupons and absorbing losses.  The issuance of a NIM allows the underwriter to monetize a portion of its residual position. Once the NIM has been carved out from the residual trust account, the Post-NIM Residual, or PNR, is the remaining equity-like subordinate portion.  This secondary residual position may also be sold to an investor, although it is typically not rated.

counterparty interactions at various stages of the securitization process.   Finally, Barclays generated significant revenue by trading RMBS certificates (both its own and those of other banks) in the secondary and derivatives markets.

## DEFENDANTS' SCHEME TO DEFRAUD

97.   During the Relevant Period, Defendants engaged in a scheme to defraud investors in the Subject Deals through intentional misrepresentations and material omissions as to the characteristics of the securitized loans, as to the values of the mortgaged properties, as to Barclays' process for securitizing the Subject Deals, and as to the alleged non-inclusion in the Subject Deals of defaulted, delinquent, and scratch and dent[9] loans.

## I.   Defendants Sold RMBS Certificates on the Strength of Their Representations.

98.   In securitizing loan pools and selling RMBS certificates to investors, Defendants made a number of representations about the certificates being sold, and more specifically, about the credit quality and other characteristics of the loans backing the securities.   The purpose of these representations was to induce investors to purchase the RMBS certificates by assuring them that the material risks of these investments were transparent and fully disclosed.

### A.   Representations in Offering Documents.

99.   Defendants made many such representations in each issuance's Offering Documents, including but not limited to the ProSupp.   Offering Documents including the ProSupp include statements about the material characteristics and credit quality of the loans underlying the securitization.   Because the characteristics of the loans directly relate to the likelihood of payment, such statements are material to a reasonable investor's decision whether to purchase the RMBS,

---

[9]  "Scratch and dent" is an industry term used to describe loans with material defects, including performance-related issues, origination-related exceptions, or missing key documentation.

or how much to pay for it. These statements include the origination and underwriting practices used to make and approve those loans, the creditworthiness of the borrowers, and whether the loans were issued in compliance with relevant law. Annexed as Table 4 is a compendium of representations that Defendants made in the ProSupp for each Subject Deal.

100. Among other things, Defendants repeatedly represented in the Offering Documents for the Subject Deals that:

- the loans they securitized met stated underwriting standards designed to ensure that the borrower had the wherewithal to repay the mortgage in accordance with its terms and that the mortgaged property had sufficient market value to avoid loss in the event of default (or else that the loans had compensating factors sufficient to justify a deviation from those standards);

- the loans they securitized complied with all applicable law and regulations;

- the origination and collection practices used by the originator as to the loan were legal, proper, prudent, and customary in the mortgage origination and servicing business;

- the loans they securitized were not contractually delinquent, had not gone into "first pay" or other "early pay" default, and would not otherwise be considered "scratch and dent"; and

- the loans they securitized had reliable appraisals (upon which the critical underwriting metrics of LTV and CLTV depended), and were not "underwater" (meaning the combined value of all liens on the property did not exceed the property value).

101. The Offering Documents also contained detailed tables showing the characteristics of the loans in each RMBS, such as the number of loans secured by owner-occupied properties and the number of loans with LTV or CLTV ratios within specific ranges.

102. Defendants communicated these loan-level representations to numerous transaction participants, such as the trustee and servicer. These entities were parties to the PSA, in which the depositor specified that these representations were made for the benefit of the eventual investors. The representations about the loans were made and communicated as essential steps in the

securitization process.  Because investors in RMBS did not have the opportunity to conduct their own due diligence on the thousands of loans that were typically involved in an RMBS securitization, investors relied on Defendants' representations for assurance that the loans conformed to certain basic characteristics of creditworthiness.

**1.   Representations About Compliance with Underwriting Guidelines and with Applicable Law and Regulations.**

103.   The Offering Documents for each Subject Deal described the underwriting guidelines pursuant to which the loans in the deal were originated and then represented that the loans were originated in accordance with those guidelines.  In some deals, this representation was qualified with the statement that the loans were "generally" originated in accordance with the guidelines, a phrase which meant that on a case-by-case basis the originator had made an exception to its guidelines for a "not strictly qualifying" prospective mortgagor, where relevant and sufficient "compensating factors," which the originator documented in the loan approval package at time of origination, warranted such an exception.

104.   The Offering Documents further represented that the primary purpose of the loan underwriting guidelines was to ensure that: (1) the borrower had the ability and willingness to repay the loans on the specified terms; and (2) the loan was secured by sufficient property value to ensure the full loan amount could be recouped if the borrower defaults.

105.   The following excerpts from Table 4 are examples of the representations set forth in Barclays' ProSupps for the Subject Deals:

- "The mortgage loans ... were originated or acquired generally in accordance with the underwriting guidelines described in this Prospectus Supplement under 'The Original Loan Sellers – Countrywide Home Loans – Underwriting Standards.'  The mortgage loans ... were originated or acquired generally in accordance with the underwriting guidelines described in this Prospectus Supplement under 'The Original Loan Sellers – IndyMac Bank – Mortgage Loan Underwriting Standards.'" (BCAP 2007-AA1 ProSupp at 40).

- "The mortgage loans originated or acquired by NCMC were done so in accordance with the underwriting guidelines established by it (collectively, the 'New Century Underwriting Guidelines')." (SABR 2007-BR5 ProSupp at 59).

- "All of the mortgage loans were originated or acquired by Fremont, generally in accordance with the underwriting criteria in this Prospectus Supplement." (SABR 2006-FR4 ProSupp at 21).

- "Approximately 98.83% of the Mortgage Loans are Subprime Mortgage Loans originated under the guidelines described under 'The Sponsor's Mortgage Loan Programs-Mortgage Loan Underwriting-Subprime Mortgage Loans' (the 'Subprime Underwriting Standards') in the prospectus, and approximately 1.17% of the Mortgage Loans are Alt-A Minus Mortgage Loans originated under the guidelines described under 'The Sponsor's Mortgage Loan Programs-Mortgage Loan Underwriting-Alt-A Minus Mortgage Loans' (the 'Alt-A Minus Underwriting Standards,' and together with the Subprime Underwriting Standards, the 'Underwriting Standards' ) in the prospectus." (WFHET 2007-1 ProSupp at 57).

- "The Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults." (SABR 2006-WM3 ProSupp at 43).

- "The New Century Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan." (SABR 2007-NC1 ProSupp at 45).

106.    These statements about underwriting guidelines and compliance therewith were of critical importance to investors.  A loan pool consisting of loans not originated according to guidelines, and lacking compensating factors, has a much different risk profile than a pool of properly-originated loans.  The failure to originate a loan under the applicable guidelines creates a higher risk of delinquency and default by the borrower.  It also creates a risk that losses upon default or liquidation will be higher.  Deviations from underwriting guidelines thus result in a

greater economic risk to an investor, because each loan default negatively impacts the flow of payments to the certificate holders.

107.  For these reasons, investors frequently inquired from Defendants about the underwriting guidelines, including at times asking about the compliance of the loans with underwriting guidelines.

108.  The ProSupps represented that the loan pools contained some loans not "strictly qualifying" under underwriting guidelines that were made because the originator found them to have sufficient "compensating factors."  The following excerpts from Table 4 are examples of representations about compensating factors Barclays made in the ProSupps for the Subject Deals:

- "On a case by case basis, it may be determined that an applicant warrants a debt service-to-income ratio exception, a pricing exception, a loan-to-value ratio exception, an exception from certain requirements of a particular risk category, etc. An exception may be allowed if the application reflects compensating factors, such as: low loan-to-value ratio; a maximum of one 30 day late payment on all mortgage loans during the last 12 months; and stable employment or ownership of current residence of four or more years. An exception may also be allowed if the applicant places a down payment through escrow of at least 20% of the purchase price of the mortgaged property or if the new loan reduces the applicant's monthly aggregate mortgage payment by 25% or more. Accordingly, a borrower may qualify in a more favorable risk category than, in the absence of compensating factors, would satisfy only the criteria of a less favorable risk category." (SABR 2007-BR4 ProSupp at S-63)

- "On a case-by case basis, Wells Fargo Bank may have made the determination that the prospective borrower warrants loan parameters beyond those shown above based upon the presence of acceptable compensating factors. Examples of compensating factors include, but are not limited to, loan-to-value ratio, debt-to-income ratio, long-term stability of employment and/or residence, statistical credit scores, verified cash reserves or reduction in overall monthly expenses." (BCAP 2007-AA2 ProSupp at S-82)

- "On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception.  Compensating

> factors may include, but are not limited to, low loan-to-value ratio, low debt
> to income ratio, substantial liquid assets, good credit history, stable
> employment and time in residence at the applicant's current address."
> (FHLT 2006-C ProSupp at 40).

109.    Defendants' representations about compensating factors were material to investors. As noted above, when a loan is issued that does not comply with the guidelines, it presents serious risks to investors.   Investors in Barclays' RMBS relied on the fact that Barclays was not securitizing such loans unless they had legitimate compensating factors that would offset the defect and warrant an exception to the guidelines.

110.    The Offering Documents also represented that every loan in each Subject Deal had been originated in compliance with all applicable laws and regulations, including those designed to prevent predatory lending and other improper lending practices and to ensure truth-in-lending. These representations were also material to investors.  A "non-compliant" loan was one with a materially increased risk of default and loss, particularly because servicers often have difficulty foreclosing on properties that secure illegal loans.   Such defects could not be offset by compensating factors.

### 2.    Representations About the Loan Characteristics.

111.    The Offering Documents also presented data concerning a number of important characteristics of the loans, such as those relating to borrower creditworthiness and to property valuation.  Such factors generally included the property value, LTV, the borrower's FICO score and DTI ratio, the presence and balance of second liens on the properties, and occupancy status (i.e., whether the borrower intended to occupy the property).  Much of this data was presented about the pool as a whole on a weighted average basis, or in tables stratifying the loans into different bands for different metrics (e.g., LTV, DTI, or FICO scores).

112.    Other representations were made at the loan level, meaning they were representations about each individual loan in the security, rather than statistics about the whole loan pool.  For example, one typical representation was that "[e]ach mortgage loan is and will be a mortgage loan arising out of the originator's practice in accordance with the seller/originator's underwriting guidelines.  The seller has no knowledge of any fact that should have led it to expect at the time of the initial creation of an interest in the mortgage loan that such mortgage loan would not be paid in full when due."

113.    Investors relied on the integrity of the information that Defendants provided to assess the likelihood of borrowers repaying their mortgages in a timely manner and the value of the collateral supporting the RMBS.  Defendants knew investors in the Subject Deals did not have access to the underlying loan files and that investors relied on Defendants to perform due diligence on those loan files as part of the securitization process.

114.    The Offering Documents also represented that none of the loans in the pool had CLTV ratios greater than 100% (i.e., none of the properties were underwater), and that the values of the financed properties were sufficient to support the outstanding loan balances.

115.    These representations were material to investors.  The value of the property securing a mortgage is one of the most important predictors of loss severity in the event of a default (meaning how much the trust stands to lose from the default).  In addition, if the loan balance exceeds the value of the property, there is a significant risk that the borrower (who has no home equity) will forego monthly payments and walk away from the mortgage.  Even small differences in the property value and LTV ratio of a mortgaged property can have a significant effect on the likelihood of timely repayment or, if not repaid, on the sufficiency of the underlying collateral.

Misrepresenting property values therefore poses undisclosed material risks of loss to RMBS investors.

116.    Barclays' employees involved in the securitization or sale of RMBS, including Menefee and Carroll, knew from their experience that characteristics such as property value, LTV, and CLTV were material to investors.  As they were aware, when property values are inflated and the LTV or CLTV ratios of loans are understated, the degree of risk to investors on those loans is materially misrepresented.

**B.    Representations in the MLPA and PSA.**

117.    In the Subject Deals, Defendants also endorsed and adopted the representations concerning the loan characteristics that the originator or sponsor made in the MLPA, the PSA, or other agreements incorporated in the Offering Documents.  These representations were made for the benefit for the eventual investors, but were also provided to and relied on by other parties, including the trustees and servicers.

118.    Annexed as Table 5 is a compendium of representations in the MLPAs or PSAs for a number of Subject Deals. Among the many representations made in the MLPAs and PSAs, the following are examples:

- "Upon discovery by any of the Responsible Party, the Depositor, the Trustee, or the Servicer of a breach of any of the foregoing representations and warranties, the party discovering such breach shall give prompt written notice to the others."

- "The Mortgage Loan was underwritten in accordance with the Underwriting Guidelines."

- "Except with respect to the Mortgage Loans identified on Exhibit I-A, (i) all payments required to be made up to the Closing Date for the Mortgage Loan under the terms of the Mortgage Note, other than payments not yet 30 days Delinquent, have been made and credited, (ii) no payment required under the Mortgage Loan has been 30 days or more Delinquent at any time since the origination of the Mortgage Loan, and (iii) the first Monthly

Payment was made with respect to the Mortgage Loan on its related Due Date or within the grace period, all in accordance with the terms of the related Mortgage Note;"

- "Any and all requirements of any federal, state or local law including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, disclosure and all predatory, abusive and fair lending laws applicable to the Mortgage Loan, including, without limitation, any provisions relating to Prepayment Charges, have been complied with, and the consummation of the transactions contemplated hereby will not involve the violation of any such laws or regulations;"

- "No Mortgage Loan has an LTV greater than 100%;"

- "There are no circumstances or conditions with respect to the Mortgage, the Mortgaged Property, the Mortgagor, the Mortgage File, or the Mortgagor's credit standing that to the best of the Responsible Party's knowledge, can reasonably be expected to cause private institutional investors who invest in mortgage loans similar to the Mortgage Loan to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent, or adversely affect the value or marketability of the Mortgage Loan."

119.  By incorporating these representations into the Offering Documents, Defendants provided assurances to investors regarding the quality of the loans backing the securities and the compliance of those loans with the guidelines described in the prospectuses and ProSupps.

120.  Barclays' employees, including Menefee and Carroll, viewed these representations as an essential component of securitization.  They also knew that these representations were required to be true and that Defendants should not have endorsed them if Defendants had reason to believe the representations were false.  Indeed, Defendants had agreed to report any breaches of the representations to other participants to the transaction.

121.  All of these representations about the loans were important to investors.  Like representations in the Offering Documents, these representations compensated for the investors' inability to conduct their own due diligence on the loans, including investors' inability to review

loan files.  Investors expected that the RMBS would be supported by such representations, that such representations were true and accurate, and that the loans therefore were not defective.

C.      **Representations in Investor and Rating Agency Presentations.**

122.    During the Relevant Period, Defendants distributed many shelf and deal presentations to investors and to rating agencies, including by using the mail and interstate wires. A partial list of relevant representations made by Defendants in presentations distributed to investors and rating agencies is set forth on the annexed Table 6.  Defendants used email communications to invite attendees to the meetings where they delivered these presentations. These presentations were given in a wide variety of settings, including meetings with rating agencies and "roadshows" with potential investors.

123.    In these investor and rating agency presentations, Defendants made numerous representations about the process they used to securitize the loans, and specifically about the process they used to assess the risk that those loans might default and lead to investor losses.  As Menefee explained in testimony, "[i]nvestors wanted to know the scope and the nature of our due diligence. They would often ask about the results of our due diligence, sample sizes, what we reviewed, what we kicked out. Or they may ask more in-depth questions."

124.    In connection with the SABR deals, Defendants routinely represented:

- "Barclays conducts comprehensive due diligence on each purchased pool which is more complete in scope and significantly more thorough than diligence conducted by other buyers of [home equity loans]."

- "Rejected loans are put back to seller. Barclays does not support re-pricing of defective loans or inclusion of scratch and dent collateral in SABR deals."

- "Barclays does not support re-pricing or inclusion of loans that are subject to first payment/early payment default provisions."

125.     Defendants also consistently represented that, during their due diligence process on the Subject Deals, they refused to securitize non-creditworthy or unduly risky loans.  According to Defendants, during due diligence they conducted a "comprehensive review of individual loan files," which included a "credit" review that identified (a) "exceptions to sellers' underwriting guidelines," (b) "layered risk," and (c) "unacceptable risk factors that are unique to Barclays." Defendants represented that their due diligence review further identified "whether the loan has been underwritten *both* in accordance with the seller's guidelines *and* is acceptable to Barclays." Defendants represented that deviations from these parameters would be permitted only upon the finding of "significant compensating factors."

126.     Defendants represented that their due diligence also included an "appraisal" review, where they allegedly reviewed "100% of original appraisals" to assess whether the appraised values of the mortgaged properties were valid and reliable.  Defendants represented that they did this by applying a valuation cascade based on both automated valuation models ("AVMs") and broker price opinions ("BPOs"), and that they did not securitize loans with appraisals that were more than 15% "out-of-tolerance" for SABR deals, or 10% "out-of-tolerance" for BCAP deals.

127.     The due diligence section of these presentations to investors made representations that Defendants knew were important to investors.  Among those representations were:

- "Barclays emphasizes a comprehensive review of individual loan files in connection with the acquisition of subprime mortgage loans."

- "Review is designed to gauge adequacy of borrower's willingness and ability to pay."

- "Credit review identifies: Exceptions to sellers underwriting guidelines, Layered Risk, and Unacceptable risk factors that are unique to Barclays."

128. In SABR shelf presentations, Defendants explained that they relied on "third party due diligence providers to detail their loan level findings in individual asset summaries" and that any "loans deemed to be unacceptable are excluded from the purchased portfolio."

129. Defendants made these representations to persuade investors and rating agencies that they had taken effective, diligent steps to validate their representations about loan-level characteristics, and ultimately to induce investors to purchase certificates in these deals.

## II.     Defendants Knew That Their Representations as to Loan Quality Were False.

130. Defendants' responsibilities as lead underwriter included, among other things, ensuring that all of the disclosures made to investors in marketing the certificates were accurate.

131. All of Defendants' representations listed on Tables 4 and 5 were false or misleading, and Defendants knew they were false or misleading at the time they made them. Many of the representations that Defendants made to investors and rating agencies in other communications in connection with the Subject Deals were also false or misleading, and Defendants knew that those representations were false or misleading at the time they made them.

132. When they made their representations, Defendants knew that the quality and creditworthiness of the loan pools they were securitizing were materially worse than they were representing to investors and rating agencies. Defendants knew their representations were untrue because, among other reasons, Defendants discovered that a large percentage of loans they reviewed in due diligence violated their representations to investors.

133. In providing false and material representations about the loans, Defendants intended to deceive and harm investors: they knew they were depriving investors of material information concerning loan characteristics and knew they were misleading investors to believe

that the securitized loans complied with the originators' underwriting guidelines and had the characteristics represented in the Offering Documents and associated materials.

### A.   Defendants Knew the Securitized Loans Subjected to Due Diligence were of Materially Worse Quality than they Represented.

134.   Between 2005 and 2007, Defendants hired a variety of vendors, such as Clayton Holdings, LLC ("Clayton"), The Bohan Group ("Bohan"), OfficeTiger, LLC ("OfficeTiger"), and Mortgage Ramp, Inc. ("Mortgage Ramp"), to conduct credit/compliance due diligence on a subset of the loan pool that Defendants chose.  These vendors employed teams of trained underwriters to review loan files and to assess the quality and creditworthiness of the loans in the selection, including whether the loans complied with the originator's underwriting guidelines and with all applicable laws and regulations.

135.   The ostensible purpose of the due diligence process was to check the accuracy of the representations about the loan characteristics made to investors, and to determine if the loans had any defects rendering them non-securitizable.  According to Menefee, one purpose of due diligence was to affirm the representations in the Offering Documents and to "mak[e] sure that we are comfortable making the statements in the prospectus supplement."

136.   Defendants' credit/compliance due diligence providers were located in states other than New York, and Defendants communicated with each of these firms through the mail or through interstate wires as part of their scheme to defraud.  In particular, on information and belief, Defendants, located in New York City, sent and received mail and interstate wire communications to and from, for example, (i) Clayton, headquartered in Shelton, Connecticut, (ii) Bohan, located in San Francisco, California, (iii) and OfficeTiger and Mortgage Ramp, located in Atlanta, Georgia.  These mail and interstate wire communications were at least incidental to an essential part of Defendants' scheme to defraud.

137.    The credit/compliance due diligence review culminated in the vendors' assigning a final "event level" grade to each loan in the selection.  A loan was graded event level 1 (or "EV1") if it complied with underwriting guidelines and all applicable laws and regulations and did not possess risk factors making the loan inappropriate for inclusion in the security.  A loan was graded event level 2 (or "EV2") if it did not meet underwriting guidelines but if the originator had approved and documented relevant compensating factors sufficient to offset the deviation and warranting an exception to the guidelines.  "Compensating factors" warranting an EV2 rating were standard across the industry.

138.    A loan was graded event level 3 (or "EV3") if it was not appropriate for inclusion in the security due to the presence of one or more material defects or risk factors rendering the loan unaffordable, un-creditworthy, or otherwise unduly risky, including (among other defects):

- loan underwriting guideline violations that were not offset by relevant or sufficient compensating factors;

- non-compliance with applicable law and regulations;

- presence of other risk factors indicating an inability of the borrower to repay the loan; and

- absence of key documents rendering the loan un-creditworthy or preventing a full assessment of the loan's creditworthiness.

139.    The re-underwriters on the credit/compliance due diligence teams used analytical software and multiple levels of review, typically spending several hours reviewing each loan file. Their underwriting review was ostensibly a fact-finding exercise to determine compliance with underwriting guidelines and the existence of legitimate compensating factors.

140.    The due diligence firms presented their results in asset summaries, exception reports, and loan-level spreadsheets.  These documents showed, for each reviewed loan, the event

grade and any associated or explanatory comments. These comments were often quite detailed, and they were accessible to and reviewed by Barclays employees.

141. Defendants received due diligence results in a variety of ways, including by email, by viewing data directly on the due diligence provider's website, or by downloading those results from the due diligence provider's website.

142. As set forth in Part I above, Defendants consistently represented to investors that the loans in each Subject Deal had either been underwritten according to the originator's underwriting guidelines, or else the originator had on a case-by-case basis approved and documented relevant compensating factors sufficient to offset the deviation and warranting an exception to the guidelines.

143. Consistent with Defendants' representations to investors, loans graded EV3 should not have been securitized, but should have been rejected and kicked out from the deal.

144. Nevertheless, Defendants repeatedly overrode the due diligence vendors' findings without justification and securitized thousands of loans that Defendants knew to have material defects so as to keep loan volume up and to limit their due diligence kickouts.

**1. Defendants Routinely Agreed to Minimize Kickout Rates.**

145. Throughout the Relevant Period, Barclays sought to increase its profits and its share of the RMBS market by doing as many RMBS deals as possible, and securitizing as many loans as possible. Access to mortgage loans was the lifeblood of Barclays' RMBS business, and the more mortgages it securitized (no matter how defective), the more profit it stood to make.

146. Defendants needed to keep the originators happy, so that they could do business with them and so that they would continue to supply Barclays with mortgages to securitize. Defendants frequently bowed to originator pressure to limit the number of loans they kicked out during due diligence.

147.    Due diligence kickouts were costly to originators.  If a securitizing bank, such as Barclays, kicked out a loan during due diligence, the originator faced an unpleasant (and potentially unprofitable) choice.  It either had to:  sell the defective loan in the "scratch and dent" market at a discount to its face value; pass the loan off to another investment bank by including it in a subsequent loan pool offering (although that bank could generally detect that the now-seasoned loan had been kicked out from a prior pool); or keep the defective loan on its own balance sheet and bear the significant risk of loss on the loan.

148.    For this reason, originators routinely sought to minimize "kickout rates"[10] and maximize "pull-through rates."[11]  Defendants received pushback from all of their originator clients as to kickouts and repurchase requests.  Defendants frequently acceded to such pushback to maintain relationships with originators or when originators failed to take back the defective loans; by doing so, Defendants securitized loans they knew had characteristics that contradicted their representations to investors.

149.    Defendants also sought to maximize pull-through rates because they wanted to securitize as many loans as possible to increase Barclays' standing in industry "league tables," as well as its market share and profits.  In telephone calls with originators, Barclays' employees frequently emphasized the company's interest in minimizing kickouts to please the originators.  In one call in which Menefee and an originator set up a prospective tie-out session, Menefee promised, *"you'll be happy with the pull-through rate."*  In another telephone call to New Century, Menefee stated, *"[w]e want to be known as people who came through for you."*

---

[10]  The kickout rate is the number (or cumulative principal balance) of loans removed from a loan pool and put back to the originator during due diligence, divided by the number (or cumulative principal balance) of loans in the pool offered by the originator.

[11]  The pull-through rate is the converse of the kickout rate, i.e., the number (or cumulative principal balance) of loans that are purchased and securitized after due diligence, divided by the number (or cumulative principal balance) of loans in the pool offered by the originator.

150.    In a May 26, 2006, telephone call between Menefee and a representative of the originator Decision One, about a pool that was securitized in SABR 2006-HE1, Menefee explained that "*I don't make any money kicking out loans, I just don't*. That, that, that doesn't help anybody.… *[W]e are embarrassed by bad pull-throughs* because we want to, you know, leave a good impression, have an opportunity to do more with you guys...."

151.    Likewise, in a December 22, 2006, telephone call with New Century concerning due diligence on a loan pool from that originator that was securitized in SABR 2007-BR1, Menefee related that:

> we're still working through the credit exceptions. I know that the rate there looks like it's about 10%, which I would deem to be too high....  Doesn't sound like there is a lot of disagreement about the loans that have been flagged with exceptions so far. That being said, you know, I don't want to get back to you with, you know, an 11% kickout rate....  You know, we were hoping to get to kind of a 90% plus pull-through rate … 82 rather is just not gonna cut it. So we know that.

The New Century employee responded, "No, no worries. No, that's good news ... you made me feel so much better."

152.    In another telephone call with WMC, the originator asked Menefee if there was "any way you can look at all the EV3s and find a way to get comfortable with some more." Menefee responded "[y]eah, absolutely," and later boasted about "the best pull-through rate of any pool we've acquired from any seller in perhaps the past two years."

153.    When Barclays' employees waived in loans that Barclays' due diligence vendors had graded EV3, those exceptions significantly smoothed relations with the originators.  If the loan seller could not convince the due diligence vendor to change the grade, it would pressure members of the Barclays team to ignore the vendor's recommendation and to purchase the loan despite the grade, which Defendants did on thousands of occasions.  Defendants knew that if they resisted this pressure, the originators could refuse to do business with them in the future.

154.    Defendants also repeatedly misrepresented to investors that they did not consent to kickout caps.[12] In an August 14, 2006, telephone call with RMBS investors, Menefee emphasized that "[i]mportantly, we will not participate in auctions where the seller dictates, a ... maximum kickout percentage.... We will simply either not bid or bid with the condition that we are able to kick out the loans that we have problems with."

155.    Similarly, in an August 21, 2006, call with Moody's, Menefee averred that "[t]here have been many many situations where a seller will dictate a sample size and we've refused to work with them. I think in every case when a seller has dictated a kickout rate we've refused to provide a bid."

156.    These representations were false, and Defendants knew they were false when they made them.  Fremont consistently requested that Defendants limit kickouts from its loan pools to no more than 7%, and Defendants consistently acceded to this request.  Only a few weeks before the call with Moody's, in a July 27, 2006, call between Menefee and a Fremont employee discussing due diligence on a Fremont pool, Menefee noted that Barclays' proposed kickout rate of 7.4% was "probably close enough ..." to Fremont's target to be acceptable. He further noted that "last month we had a pull-through rate of 93.1% ...  And in April we were at 92.3. So – and I think we've been very consistent ...."

157.    In another telephone call from the same day with another Fremont employee, Menefee noted that "when we left your office, we thought that we were at, you know, 7.36% ... Close enough to 7 to, you know, feel good about the effort." Menefee further noted that had Fremont agreed to rebate certain loans that Fremont decided to remove from the offered pool and securitize in one of its shelf deals, "that would have put us at your target."

---

[12] A kickout cap is an agreed-upon limit on kickouts for a particular loan pool, whether the agreement is formalized in a bid stip or adopted during the course of dealings with a particular originator.

158.     In a back-and-forth email exchange on July 26, 2006, Fremont pushed Menefee to reduce the pool kick rate from 9% to 7%.  Defendants gave in to Fremont's request, and accepted enough loans to reduce the credit kick rate to 7%.

159.     By acceding to originator pressure to minimize the kickout rate, Defendants securitized loans that they knew did not meet the representations they made to investors.

## 2. Defendants Securitized Thousands of Loans Rated EV3, Without Disclosing this to Investors.

160.     When a due diligence vendor graded a loan as EV1, Barclays' employees seldom if ever questioned that grade.  They relied on the vendor's determination and securitized the loan without further review.  Similarly, when a due diligence vendor graded a loan as EV2, Defendants rarely if ever overturned or even revisited that rating.

161.     Despite the widespread understanding in the industry that loans graded EV3 had not been underwritten in accordance with guidelines or were otherwise materially defective (and should therefore not have been securitized), Defendants did not kick out all loans graded EV3.

162.     Instead, to increase loan volume and achieve target pull-through rates, Menefee reviewed portions of the EV3 loan files, and on thousands of occasions he waived the vendors' EV3 findings and directed that the loans be securitized, notwithstanding their defects.

163.     Typically, Menefee spent just a few minutes on each file, after the due diligence vendor had already spent several hours arriving at the EV3 grade and had documented both the guideline exception and the absence of legitimate compensating factors.  Except in rare instances, Menefee did not memorialize in any way his reasons for waiving the EV3 loan.

164.     The annexed Table 7 shows, for all Subject Deals, the number of loans to which Defendants' due diligence vendors gave a final rating of EV3 but that Defendants decided to securitize.  As noted in the table, over 9% of all of the loans securitized in the BCAP deals had

received a final due diligence rating of EV3.  On the two third-party Wells Fargo deals (WFHET 2006-2 and WFHET 2007-1), 70% of the EV3 loans were securitized, while in ALBT 2007-OA1 the rate was 82%.  And in FHLT 2006-C – a third-party Fremont deal where only 303 loans out of a pool of 7,806 loans (3.9%) had been subjected to due diligence in the first place – Defendants securitized 100% of the EV3s identified by their due diligence vendors.

165.    Defendants never informed investors that EV3 loans were securitized in the Subject Deals.  To the contrary, Defendants misrepresented that the loans in Barclays' securitizations were creditworthy (i.e., that the borrowers had the ability to repay the mortgages in accordance with their terms), were generally underwritten in accordance with underwriting guidelines or had legitimate compensating factors, complied with applicable law and regulations, were not missing key documentation, and were not "scratch and dent."  The great majority of the EV3 loans that Defendants securitized in the Subject Deals did not meet these representations to investors.

### 3.  In Some Deals, Defendants Knowingly Securitized Loans Graded as EV3 and Kicked out of Prior Deals, Recycling Hundreds of Rejected Loans into Subsequent Deals without Disclosure or Further Due Diligence.

166.    Defendants had in place software and other mechanisms to alert them to the existence of loans in an offered pool that they had previously reviewed in due diligence and kicked out.  Defendants nevertheless knowingly recycled at least several hundred such loans into subsequent securitizations.  In one deal (SABR 2006-HE2), Menefee explicitly instructed the due diligence vendor to ignore "evidence a loan may have been rejected from any previous pool."

167.    In the third-party Fremont deal FHLT 2006-C, Defendants securitized 227 loans (with a balance of over $56 million) previously graded EV3 and kicked out during due diligence in previous SABR shelf deals backed by Fremont loans.  Defendants had kicked these defective loans out of principal deals but proceeded to securitize those same loans a few months later when Fremont presented them as part of a third-party deal.  Defendants securitized another 38 loans in

FHLT 2006-C that they had previously kicked during valuation due diligence in SABR deals. Defendants did not disclose to investors in FHLT 2006-C that the deal contained recycled loans that they had kicked out of prior deals due to material defects.

168.    In ARSI 2006-W2, Defendants recycled and securitized 180 loans (balance of $38.8 million) that they had kicked from ARSI 2005-W5 for credit or appraisal reasons.

169.    Defendants securitized 88 recycled EV3 loans in SABR 2007-BR5, when they negotiated to buy these loans (and many others) from New Century as that lender progressed towards insolvency.  Defendants did not conduct due diligence on these loans (or any other loans Barclays acquired from New Century at that time and then securitized), and Defendants knew that these loans had been kicked out from prior New Century pools.  The defective nature of these 88 loans was not disclosed to investors.

### 4. Defendants Securitized Thousands of Loans that their Due Diligence Vendors Had Originally Graded EV3 but for which Defendants Unjustifiably Instructed the Vendors to Change the Grade.

170.    In addition to the loans Defendants waived and securitized in the Subject Deals that had received a final due diligence grade of EV3, and that remained EV3s when they were securitized, Defendants securitized thousands more loans that vendors initially graded EV3 but for which Defendants instructed them to change the grade before securitizing them in the deals. Defendants directed such changes both through "bulk waivers" for groups of loans at a time and in communications concerning individual loans.  In both instances, Defendants typically provided no justification for their instruction to change event level grades or ignore underwriting defects.

171.    Defendants' due diligence providers were so uncomfortable with Defendants' instructions to change the grade on these loans that they used a special coding system to track the loans and to indicate that the event level grade was contrary to their recommendation.  They used designations such as "EV2 Per Client," "OK per Client," or "EV2W" (the W stands for "waiver")

to indicate that Defendants were instructing them to waive EV3 loans without a valid reason. Clayton instructed its employees to grade a loan "2W" if it was "*waived by client with regard to excessive or material risk.*"

172.    For example, in ALBT 2007-OA1, a May 30, 2007 due diligence report from Clayton showed that Defendants waived 45 loans with material defects that Clayton had originally graded EV3 but now graded "EV2W per client."  Clayton noted that these loans did not comply with underwriting guidelines, and had issues such as "unreasonable stated income," "insufficient credit history," "prior bankruptcy," and "no cash reserves."  Despite these serious issues, Defendants directed that the loans be "Waived in Bulk per client" with no documented rationale, and without regard to the considerable material risks inherent in these loans.

173.    Table 7 shows, for each Subject Deal, the number and percentage of loans denoted "EV2 per client" and securitized in the deal.  As set forth there, in at least 13 Subject Deals, loans graded "EV2 per client" or the equivalent accounted for more than 10% of the due diligence sample, and the vast majority of these loans were securitized in the deals.

174.    Defendants never informed the investors in the Subject Deals that they had instructed their vendors to change EV3 loans to EV2 loans, which Defendants then securitized. To the contrary, Defendants misrepresented that all of the loans complied with underwriting guidelines, law, and regulations, that none were missing key documents in the loan file, that the borrowers had the ability to repay the mortgages in accordance with their terms, and that none of the loans securitized were "scratch and dent." A substantial percentage of the waived EV3 loans that Defendants securitized in the Subject Deals did not meet these representations to investors.

175.    Taking the securitized EV3 loans together with the securitized EV3 upgrades, Defendants securitized in the Subject Deals more than 6,000 loans, worth over $1 billion, that they reviewed in credit/compliance due diligence and learned had material defects.

**5.    Defendants Knowingly Securitized Thousands of Loans Bearing Significant Risk with Respect to the Borrower's Ability to Pay, Without Disclosing these Risks to Investors.**

176.    Defendants consistently represented in ProSupps that the underwriting guidelines pursuant to which the securitized loans had been originated were designed to determine that the borrowers had the ability to repay the loans in accordance with their terms.  Taken together with Defendants' representations that the loans in each deal had been underwritten in accordance with those guidelines, Defendants were assuring investors that, based on their review of the loan files, all the loans in the deal were made to borrowers who had the ability to repay the loans in accordance with their terms.

177.    But Defendants knew that this representation was not true.  They knew that, for hundreds of loans in the pools they securitized, the borrowers had no reasonable ability to repay them in accordance with their terms, even if the loans met originator underwriting guidelines. They also knew that in many cases the underwriting guidelines were so weak that those guidelines did not fully or appropriately assess the borrower's ability to pay.

178.    To protect Barclays' short-term economic interests in the deals, Defendants used sets of what they called "layered risk" factors (sometimes called "overlays" or "Barclays exception codes") to identify loans where the borrowers had no realistic ability to repay, despite the fact that the loans may have been underwritten to weak originator guidelines.  In the due diligence results for the loan pools they securitized, Defendants frequently identified high rates of loans displaying such layered risk factors.

179.    In many cases, loans displaying these risk factors could not have been originated consistent with any reasonable loan underwriting standards (even for subprime loans).  For instance, a stated income loan[13] extended to a borrower on a fixed income was a red flag for fraud (falsification of the borrower's income), because a fixed-income borrower should have been able to substantiate his or her income and had no legitimate need for a stated income loan.  Likewise, an adjustable-rate mortgage ("ARM") loan to a fixed income borrower is inherently problematic because a fixed income borrower may have difficulty repaying an ARM if the rate adjusts upwards.

180.    From the due diligence results, Defendants knew that these risk factors were prevalent in the loan pools they securitized.  In many cases, they did kick some loans from pools they were securitizing based on the existence of these risk factors.  Their aim in these situations was to reduce Barclays' risk in the short-term economic interests Barclays held in the loan pools.

181.    In hundreds of other cases, however, after learning during due diligence that a relevant borrower was not sufficiently likely to be able to repay the mortgage,[14] Defendants waived the loans into the final deals, just as they had waived thousands of other EV3 loans and "EV2 per Client" loans into the Subject Deals.  In a significant percentage of such waivers, Defendants acceded to originator pressure to waive in these loans possessing risk factors indicating that the borrower was unable to repay them, to improve pull-through rates.

182.    What is more, high rates of loans with layered risk factors told Defendants that the originator had abandoned underwriting guidelines that had the capacity to appropriately assess a borrower's ability to pay.  Menefee himself admitted that "one of the central tenets of good underwriting" was to ensure that the borrower had the ability to repay the loan.

---

[13]  A "stated doc" or "stated income" loan is a loan where the originator relies on the borrower's declaration of his income without requiring documentation of income such as pay stubs, tax returns, etc.

[14]  In many cases, Barclays' due diligence vendors graded loans that met Barclays' layered risk factors EV3.  In other cases, they gave such loans a special designation of EV4.

*United States* v. *Barclays*
Complaint
Page 54

183.    Although Defendants did occasionally inform investors that they had kicked out some loans based on their layered risk criteria, they never told investors that they had securitized loans where they knew the borrower had no ability to pay.  They never told investors that they knew, based on the prevalence of loans meeting those layered risk criteria, that the originator had abandoned underwriting guidelines aimed at assessing fraud or a borrower's ability to pay. Defendants kept this knowledge to themselves and did not disclose it in the Offering Documents.

184.    In a June 28, 2007, call between Menefee and a Barclays trader in which the two discussed the poor quality of a loan pool they were considering purchasing, Menefee lamented that, because investors had started to get smarter about layered risk factors in loan pools, Barclays would not likely be able to continue its past practice of including such defective loans in its RMBS. He bemoaned that "*I just don't think we're able to hide as much as we were last year, jam things in, you know, bob and weave and hope for the best. And I think those days are behind us.*"

### 6.  Defendants Knowingly Misrepresented Material Characteristics of the Loans They Securitized.

185.    Defendants repeatedly and knowingly misrepresented to investors and to rating agencies certain key characteristics of the loans underlying the Subject Deals, including property value, CLTV, DTI ratio, and borrowers' FICO score.  Defendants knew their representations as to these characteristics were false based on the information they obtained from due diligence.

186.    During their due diligence review, Defendants' vendors identified numerous factual discrepancies between loan-level data reported in the originator's loan tape and data reflected in the loan file.  These revisions were relayed through regular "tape delta" reports.

187.    When presented with clear evidence that key characteristics of the loans were false, Defendants usually did nothing.  They ignored the tape delta reports, did not correct the final tapes

they provided to rating agencies and investors, and instead used the uncorrected data as the basis for the factual representations about the loan quality in Offering Documents.

188.     In SABR 2006-FR1, Bohan discovered that 1,211 loans, or 26.3% of the final loan population, had DTI ratios incorrectly reported on the loan tape.  In many cases, the true DTI was greater than 50%.  In the face of these findings, Defendants did not change the loan tapes to reflect the correct DTI ratios.  Instead, they knowingly provided investors and rating agencies with loan tapes relying on the inaccurate DTI ratios reported by the originator, which were lower than the actual values.

189.     Similarly, in SABR 2007-BR3, Bohan identified on its tape delta report 319 loans with inaccurate DTI ratios, including 3 loans with DTIs higher than 60%.  Again, Defendants securitized these loans while representing to investors that the DTI ratios were the lower amounts reported by the originator, which they knew to be wrong.

190.     The Offering Documents and final loan tapes for many Subject Deals included information regarding borrowers' FICO scores that Defendants knew was incorrect, oftentimes painting a better picture of a borrower's creditworthiness than was actually the case.

191.     Defendants routinely reported that some of the loans they securitized had "full documentation" of the borrower's income level, even after Bohan reported on the tape deltas that these loans actually had no income verification documented in the loan files and, as such, should have been classified as stated or limited documentation loans.  For example, in SABR 2006-FR1, Bohan informed Defendants that the originator's tape incorrectly reported the documentation type for 16 loans, but Defendants securitized these loans without correcting this data in the documents and spreadsheets they provided to investors.  Similarly, in SABR 2006-WM3, Defendants listed

22 loans as having "full" documentation even after Bohan informed them they were in fact "limited" or "lite" documentation loans.

192.    Menefee admitted that Barclays did not correct loan-level data based on the tape delta reports but instead relied on the representations of the originators as to the loan characteristics.  In publishing these data in ProSupps and providing uncorrected loan tapes to investors and rating agencies who requested loan-level data, Defendants made representations about the characteristics of the loan pool they knew were false when they made them.

### B.    Defendants Knew that the Unreviewed Loans were of Materially Worse Quality than they Represented.

193.    Defendants did not conduct credit/compliance due diligence on the entire pool of loans they securitized, but instead selected a subset of loans from the initial loan pool to submit to their due diligence vendor.

194.    Defendants' representations as to the characteristics and risks of the underlying loans were not limited to the loans they actually reviewed in credit/compliance due diligence but also applied to the unreviewed loans in each deal.[15]

195.    Throughout the course of their fraudulent scheme, Defendants acquired information from which they knew that the characteristics of the unreviewed loans were inconsistent with their representations as to the quality of those loans, including, among other information, the high defect rates they discovered in their due diligence.  Defendants securitized these loans all the same.

---

[15] Throughout this complaint, the term "unreviewed" refers to loans securitized in the Subject Deals that were not subjected to loan-by-loan review in credit/compliance due diligence.

1.  **Defendants Knew from the High Credit/Compliance Defect Rates that the Unreviewed Portions of the Pool Also Contained Large Numbers of Loans that Should Not Have Been Securitized.**

196.   In addition to securitizing loans reviewed in due diligence that should not have been securitized based on their known defects, Defendants also knew from the due diligence results that the unreviewed loans likewise contained high percentages of materially defective and non-securitizable loans.

197.   Across the Subject Deals, Defendants' due diligence vendors graded as EV3 almost a third of the loans they reviewed, meaning they could not be included in the security consistent with Defendants' representations to investors.  As shown in the attached Table 7:

- 6 of the 35 Subject Deals for which EV3 rates could be calculated had EV3 rates that exceeded 50%.

- Another 5 had EV3 rates between 40% and 50%.

- 7 more had rates of between 30% and 40%.

(These numbers include the significant numbers of loans that Defendants' vendors had graded EV3 but that Defendants directed their vendors to waive without justification.)

198.   Defendants knew that a high EV3 rate in the due diligence sample meant that significant numbers of similarly defective loans would also be found in the unreviewed portion of the pool.  *See infra* ¶ 210.  In fact, in the great majority of the Subject Deals, the EV3 rate was so high that Defendants knew that the originators from which they bought the loans had systematically abandoned their underwriting guidelines.

199.   Despite this knowledge of what high EV3 rates told them about the characteristics of the pool as a whole, Defendants never told investors the truth about the unreviewed portions of the pool.  Instead, they simply securitized those loans while making representations to investors about their quality that they knew to be false and fraudulent.

## 2. Defendants Knew that Their Due Diligence Process Failed to Identify for Review or Exclusion All Defective and Unacceptable Loans.

200.    The credit/compliance due diligence pool was most commonly assembled through what Defendants described as an "adverse selection" process.[16]

201.    Defendants chose the loans for review that they believed were the "riskiest," apparently meaning those loans that Menefee believed would prompt the rating agencies to require the greatest credit enhancement, and which would therefore be the most expensive for Barclays to securitize.  To identify these "riskiest" loans, Defendants adopted a number of criteria for each deal (*e.g.*, borrowers with a FICO score below a certain threshold or with a DTI ratio above a certain threshold) that they would apply to the initial loan tape provided by the originator to devise the due diligence sample.

202.    But Defendants knew that these criteria, like their credit/compliance due diligence process as a whole, failed to identify for review or exclusion all or even substantially all defective and non-securitizable loans – loans that Defendants ultimately securitized, despite their false representations as to the quality of those loans.

203.    For example, Defendants knew their process did not identify for review or exclusion the full set of loans that were missing key documents or that failed to comply with applicable laws and regulations – meaning that the prevalence of such loans in due diligence selections established the existence (or at least the high probability of) similarly non-compliant loans in the unreviewed portions of the pools.

204.    Similarly, Defendants were aware that their due diligence process would not result in the review or exclusion of all loans that deviated from the originators' underwriting guidelines

---

[16] On the BCAP deals and some of the agented deals, Barclays supplemented its adverse selection with a small "random sample."

or even all fraudulent loans.  Indeed, their due diligence process highlighted the presence of such loans in the set of mortgages that were securitized without review.

205.    Menefee has in fact admitted that he did not believe that the unreviewed portions of the loan pools were free of loans that violated originator underwriting guidelines.

### a.    Defendants Manipulated their Adverse Selection Criteria to Appease their Originator Clients, Who Wanted to Limit Kickouts.

206.    Defendants repeatedly manipulated their adverse selection criteria to appease their originator clients, who put pressure on Defendants to limit the size or composition of the due diligence selections in order to minimize due diligence kickouts.  Originators frequently dictated limits on the size and composition of diligence samples as a condition of the sale of whole loan pools by using bid stipulations, or "trade stips," to which Defendants agreed when they won the bid for a loan pool.  For example, New Century's trade stips typically limited the sample sizes on its pools to 25%; Countrywide's trade stips limited the sample to just 5%.

207.    Menefee admitted that due diligence sample sizes were a "negotiated percentage" and that "our efforts to come up with adverse selection criteria needed to meet the trade stips." When Defendants' application of their criteria to the initial loan tape yielded more loans for due diligence than the trade stip allowed, Defendants would simply narrow the criteria so that fewer loans would be included in the sample.

208.    As a result, loans possessing characteristics that Defendants themselves identified as suggestive of high risk were deliberately and repeatedly excluded from the due diligence selection, and securitized without credit/compliance review, in order to comply with the trade stips imposed by the originator.  Defendants did not disclose this fact to their RMBS investors.

209.    Even as loan quality declined into 2007, Defendants continued to adjust the selection criteria downward to accommodate caps originators placed on sample size.

210.    Defendants knew that by limiting the size of due diligence selections in response to originator demands, they were securitizing without review large numbers of loans that, upon review, should have been kicked out of the deals.  The minutes for an August 22, 2005, meeting of Barclays' Whole Loan Business Review Committee, attended by Menefee, Carroll, and many of the other key participants in Barclays' RMBS business, reflect Defendants' knowledge that the unreviewed portions of the pools contained loans "that should be kicked out":

> Loan level due diligence for SABR securitizations was reviewed. Currently Barclays, through a third party provider, reviews ... a sample percentage of individual loan files, dependent on the profile of the collateral (e.g., 100% of loans in I/O pools) and our view of/relationship with the originator. A potential positive correlation with the kick-out percentage and the percentage of loans we review (i.e., higher % of loans reviewed, higher % of loans kicked out) was highlighted. Concern would be that, for those pools where a lower percentage of the loans are reviewed, *the process is not capturing some loans that should be kicked out*. Concern is mitigated by a process that kicks out all loans in the pool that have the similar characteristic that causes the one loan to be kicked out.

211.    Despite expressing these concerns, Defendants did not ever "kick[] out all loans in the pool that ha[d] the similar characteristic that cause[d] the one loan to be kicked out."

> **b.    Defendants were Aware that Additional Loans met the Bank's Own Risk Criteria and yet Proceeded to Securitize Them without further Review.**

212.    On many occasions, Defendants knowingly failed to send to their due diligence vendors all of the loans that actually met their own adverse selection criteria.  Defendants instead passed over and securitized without review large numbers of loans that met the risk criteria they told rating agencies they used to select their sample.  For example, in EQLS 2007-1, Defendants stated to the rating agencies that all loans with a "Credit Grade of C or C-" were selected for review.  In reality, of the 282 loans in the pool that met this criterion, only 89 were individually analyzed.  Of the remaining 193 loans that met this criterion, 176 (with an aggregate value of $32,158,021) were securitized without review.

213.    In SABR 2007-NC1, Defendants told rating agencies that they selected for due diligence all rate-term refinance loans where the borrower had a FICO score less than or equal to 600.  But of the unique 175 loans meeting these criteria, only 53 were actually reviewed.  Of the remaining 122 loans, 93 of them (with an aggregate value of $14,348,048) were securitized in SABR 2007-NC1 without review.

214.    Table 8 sets forth, for a subset of Subject Deals, the number of loans that met Defendants' selection criteria but were not subjected to due diligence.

### c.    Barclays Drew Diligence Selections from Incomplete Loan Pools.

215.    On some BCAP deals, originators only provided initial loan tapes containing data for a portion of the pool of loans being offered for sale.  At some point after Barclays' bid on the pool was accepted, the originator would then "gross up" the pool by adding additional loans to complete the pool, disclosing the characteristics of these loans only in subsequent loan tapes.

216.    Barclays only applied its adverse selection criteria to the initial, partial loan tape, and not to the subsequent loan tapes.  Barclays failed to select loans for due diligence review from the "grossed up" portions of the loan pool, which it knew had characteristics similar to the loans in the initial set.  Barclays instead securitized those "grossed up" portions of the pools without any due diligence review.

217.    Countrywide was one of the main originators that grossed up loan pools in this fashion.  In five Countrywide pools that Barclays acquired in March 2007, comprised of over $600 million in loans, Countrywide added more than $200 million in loans to the pools after Barclays drew its due diligence selection.  None of these additional loans were subjected to due diligence before securitization.

218.    On January 4, 2007, IndyMac Bank sent Barclays a loan tape that was only 87% complete, and asked that Barclays select its due diligence sample from that tape.  Barclays agreed

to this limitation, selecting a sample of 193 loans for due diligence from the 87% complete tape. When IndyMac subsequently grossed up the pool with the remaining 13% (with a principal balance of approximately $109 million), Barclays securitized it without conducting any additional due diligence.

### 3. By Monitoring the Performance of Their Own Deals, Defendants Knew That the Unreviewed Loans Were of Significantly Poorer Quality Than Defendants Were Representing.

219.    The RMBS Certificates in the Subject Deals were rated with the assumptions that only a very small percentage of the loans would default over the entire life of the deal.  However, significantly higher-than-assumed percentages of the loans backing the Subject Deals went into delinquency, default, foreclosure, or bankruptcy within just the first twelve months after they were securitized.

220.    This exceedingly rapid decline in the performance of the loans that Defendants securitized was a direct consequence of the fact that they were not underwritten in accordance with underwriting standards, as represented in the Offering Documents.  Had the loans been properly underwritten, with due consideration of the borrower's credit quality and the property value, and with the characteristics represented in the Offering Documents, they would have experienced substantially fewer payment problems and substantially lower percentages of delinquencies, defaults, foreclosures, and bankruptcies than occurred here.

221.    Defendants were well aware that the mortgages they securitized, including those not subjected to due diligence, were rapidly going into default.  Defendants employed "surveillance" teams tasked with monitoring the performance of their RMBS, and these employees knew that delinquencies were spiking as early as the middle of 2006, particularly on loans originated by Fremont.  Defendants knew that this was a sign the loans had not been properly underwritten.

222.     SABR 2006-FR1 was securitized on February 23, 2006, and almost immediately began experiencing high rates of early payment defaults ("EPDs") and foreclosures.  By April 2006, SABR 2006-FR1 had a 2.20% foreclosure rate and a 6.17% delinquency rate.  These rates increased to 3.44% and 7.63%, respectively, by May 2006, 3.58% and 8.65% by June 2006, and 4.54% and 10.41% by July 2006.  Menefee acknowledged in July 2006 that Barclays was "*experiencing unprecedented rates of early payment defaults*" with Fremont loans.

223.     The next two Fremont-backed Subject Deals, SABR 2006-FR2 and SABR 2006-FR3, closed on July 6 and August 3, 2006, respectively.  By this time, Defendants were well aware of the exceedingly poor performance of the Fremont loans securitized in FR1, including those that had not been subjected to due diligence review.  Yet Defendants did not change their approach to due diligence, nor did they change their representations to investors.  Instead, Defendants continued buying and securitizing Fremont loan pools and making representations to investors about Fremont-originated loans that they knew to be false.

224.     SABR 2006-FR2 and SABR 2006-FR3 also immediately began to perform poorly.  Within 3 months of securitization, almost 8% of the loans in SABR 2006-FR2 were already more than 60 days delinquent.  In SABR 2006-FR3, almost 6% were 60 or more days delinquent just two months after the deal issued.  Nevertheless, Defendants continued securitizing Fremont loans, while knowingly passing onto their RMBS investors, without appropriate disclosures, the risk from loans that they knew with a high probability would default (and in many cases had defaulted).

225.     By the time SABR 2006-FR4 was securitized on December 12, 2006, Defendants had between four and nine months of performance history on the three previous Fremont-backed SABR deals.  All three of these deals were experiencing astronomical rates of foreclosure and early payment delinquency, including both among loans that had and that had not been reviewed.

226.    Notwithstanding Defendants' knowledge of soaring delinquency rates within the deals they securitized, Defendants took a business as usual approach to loan acquisition and securitization, and continued securitizing loans from the same originators (including Fremont) whose previously-securitized loans were rapidly failing, while making the same standard representations about the loans that they knew to be false.

> **4.    On Multiple Loan Pools Securitized in SABR 2007-BR4 and SABR 2007-BR5, Defendants Decided to Conduct No Credit/Compliance Due Diligence but Instead Securitized Thousands of Unreviewed Loans that they Knew Contained Material Defects.**

227.    On March 9, 2007, Barclays acquired a whole loan pool from New Century, consisting of thousands of loans with an aggregate principal balance of over $1 billion, as to which Defendants decided to conduct no credit/compliance due diligence whatsoever before securitizing the loans in SABR 2007-BR4 and SABR 2007-BR5.

228.    Defendants were well aware that this loan pool contained significant defects when they acquired it from New Century, which was heading towards bankruptcy at the time.  Menefee and Carroll in particular knew from the beginning that this pool was highly problematic, with Menefee characterizing the collateral on a February 27, 2007, call with Carroll as "*look[ing] like sh\*t*" and describing the preliminary rating agency feedback on the pool as "*atrocious*."  Menefee told Carroll on another call that the pool "*scares the sh\*t out of me*," in part because of the inability to put defaulted loans back to an originator which was likely to be defunct.  Carroll agreed that the pool was "*going to look like sh\*t*."

229.    Given the significant problems at New Century at that time as it was heading towards bankruptcy, Menefee and Carroll initially resisted buying anymore New Century collateral, observing that "*the f\*\*\*ing place is on fire*" and that "*save an act of God I think these guys [New Century] are going to BK [bankruptcy] as quickly as you can imagine.*"  Nevertheless,

upon learning that the President of Barclays Capital wanted Barclays to purchase the March pool in order to maintain Barclays' longstanding relationship with New Century, Menefee and Carroll proceeded to purchase the March pool for Barclays.

230.    Despite their expressed concerns about the pool, Menefee and Carroll made a deliberate decision not to conduct any credit/compliance due diligence on that pool once they decided to proceed with the purchase.  This decision is reflected in phone calls in which they together determined to "*tell the diligence guys to stand down*" to "*save the money*" (i.e., to avoid the cost of conducting due diligence) and in emails in which Menefee's team instructed Bohan to cancel a due diligence job that had been scheduled for March 12 on the New Century pool.

231.    SABR 2007-BR4 and SABR 2007-BR5 also included thousands of loans that Barclays acquired from New Century in March 2007 when it foreclosed on the warehouse line of credit it had extended to New Century as that company approached bankruptcy (*see infra* ¶ 373). When they acquired and securitized these loans from the New Century warehouse line, Defendants were aware that a significant percentage of the loans had material defects, but they securitized them after deciding not to conduct any credit/compliance due diligence whatsoever.

232.    While Defendants did not conduct credit/compliance due diligence on the March 2007 New Century whole loan pool (as already discussed), they did "programmatically kick" hundreds of loans from that pool which they identified using a set of adverse selection criteria, in order to persuade rating agencies to give the deal a more favorable rating.  Defendants knew that these adverse selection criteria did not identify for exclusion all loans from the pool with characteristics different from what they represented. Regardless, these "programmatically kicked" loans went back to New Century (which was still solvent at the time) and many became part of the collateral for the warehouse line.  When Defendants then determined to foreclose on that line just

a few days later, Menefee and Carroll were aware that the collateral they were acquiring included hundreds of loans that they had previously kicked from the March 2007 pool.

233.   Defendants were also aware that the warehouse line contained hundreds of loans that New Century had explicitly labeled scratch and dent.  They were also aware that the warehouse line included at least 100 loans on which Defendants had conducted due diligence in connection with prior deals and had kicked back to New Century; 88 of these 100 loans had been graded EV3.

234.   Menefee, Carroll, and others at Barclays discussed the warehouse line loans via email on March 15, when Menefee was told that it was unlikely he would have time to conduct due diligence on the warehouse line loans before they were to be securitized.  Menefee initially suggested that he would rather not acquire the loans, but he and Carroll acquired them anyway.

235.   At Menefee's direction, Barclays then conducted no due diligence on the loans acquired from the New Century warehouse line before securitizing them in SABR 2007-BR4 and SABR 2007-BR5.  Carroll acknowledged in an email that it was imperative that Barclays close this deal as soon as possible to pass the risk of delinquency onto investors, even if that meant skipping due diligence, observing that "[we n]eed to get BR5 out to protect against DQ [delinquency] risk."

236.   SABR 2007-BR5 also included a pool of loans that New Century had sold to the mortgage aggregator Carrington Securities, L.P., under the forward flow agreement between Carrington and New Century, which was financed through a warehouse line from Barclays to Carrington (*see infra* ¶ 375).  Defendants securitized this pool, as well, without conducting any credit/compliance due diligence.  Menefee and Carroll, among others, were aware that Carrington had kicked at least 132 of these loans out of other loan pools it had acquired from New Century, after they had been graded EV3 in due diligence conducted by Carrington. Menefee also expressed

reservations about the quality and thoroughness of Carrington's due diligence. Nevertheless, at Menefee and Carroll's direction, no credit/compliance due diligence was performed on the Carrington pool before it was securitized.

237.    Because Barclays had no solvent counterparty that could buy back non-compliant loans, Defendants apparently believed they had nothing to gain by reviewing and kicking out non-compliant loans. Verifying Defendants' representations to investors was not enough incentive to Defendants to conduct due diligence. Instead, they simply passed on the undisclosed risks in these loans to the investors who bought the securities, while misrepresenting in the ProSupps and elsewhere that due diligence had been conducted on these loans.

### III.    Defendants Knowingly Securitized Defaulted, Delinquent, and Defective "Scratch and Dent" Loans, to Get Them Off Barclays' Books.

**A.    Defendants Knew that Hundreds of Loans They Securitized Had Already Experienced First Payment or Early Payment Default, or Were Otherwise Scratch and Dent Collateral.**

238.    In some cases, by the time Barclays concluded the securitization process on its RMBS, many of the loans in the supporting pools were already demonstrating significant rates of delinquency and default. Rather than "kicking" loans from these deals that were already delinquent as of the closing date, Defendants proceeded to securitize them and misrepresented to investors the actions they took to address early delinquencies.

239.    Defendants knowingly securitized hundreds of first payment default ("FPD") and early payment default ("EPD") loans, despite repeatedly representing to investors and rating agencies that they did not ever securitize loans for which the borrower had defaulted on his or her first payment or first few payments, or other types of scratch and dent collateral.

240.    To entice investors to purchase certificates in the Subject Deals, Menefee repeatedly misrepresented to investors that Barclays did not securitize FPD loans in any SABR deal.  He assured an investor in SABR 2006-NC2 that "[e]very loan that is part of any SABR transaction has made the first payment to Barclays before they were securitized."  Menefee told a potential investor in SABR 2006-FR1 that "[w]e do not allow any loans that missed their first payment into the deal" and "it is important to note that each borrower in the pool has made their first payment.  Those loans that violate this standard will be put back to the seller."

241.    Defendants also made this representation to the rating agencies.  Rating agency presentations stated that "all [FPD] loans were rejected and put back to the seller" and "Barclays does not support re-pricing of defective loans or inclusion of 'scratch and dent' collateral in SABR deals."

242.    Menefee acknowledged that Barclays could "not make the rep that all loans had made their contractual first payment" if it was knowingly securitizing FPD loans.  Notwithstanding this acknowledgment, Defendants routinely securitized FPD loans in the Subject Deals.   They did this to avoid keeping non-performing loans in their inventory.

243.    In SABR 2006-FR3, Defendants knowingly securitized 40 FPD loans (with a balance of approximately $10 million) after Barclays failed to sell them back to Fremont.

244.    Recorded telephone calls from August 2006 reveal that Menefee and Carroll were angry with Fremont's refusal to buy back the FPD loans after Barclays failed to put them back to Fremont in a timely manner under the terms of the loan sale agreement.

245.    Rather than keeping the defaulted loans in their own inventory, or selling them at a discount in the scratch and dent market, both Carroll and Menefee agreed that the loans were going

to "*stay in the deal*," despite acknowledging that the loans were FPDs.  Menefee even claimed he could document fraud on all of these securitized FPD loans.

246.    In an August 2, 2006, telephone call, while discussing what to do with the $10 million worth of FPD Fremont loans, Menefee noted that if Barclays were to sell (rather than securitize) the 40 loans, "we would lose 10 points on that .... We would sell those at 90, which appears to be the going rate [for scratch and dent]." Carroll responded, "[i]t's a million bucks. *Leave them in the deal*. Take it on the back end.  If we pull them out of the deal, you know, we take on 100% of the risk; we've sold 97% of the risk in the deal. *Just leave them in*."

247.    To avoid losing Barclays $1 million by selling the defaulted loans at a 10% discount, Carroll and Menefee decided to securitize the loans and knowingly pass the risk of loss on these loans onto the RMBS investors.

248.    Barclays securitized SABR 2006-FR3 the following day, on August 3, 2006.  In an August 4, 2006, telephone call, in reference to the securitized FPD loans from Fremont, Menefee told Carroll that "[y]ou have to know that 90% of the reason something like this would default [so soon after origination] is because of fraud." Carroll responded: "Yeah absolutely." Menefee further stated: "And if you don't think I could go and document fraud in 50 loans? Wrong. And I will. And I don't want to."

249.    In an August 15, 2006, follow-up telephone call, Menefee asked Carroll, "What do you want me to do on these first pay defaults? ... The group of loans – 40 of them – that we forfeited our right to put back to Fremont because we notified them late?" Carroll responded, "*Oh they're going to stay in the deal.*" Menefee later remarked that "this is a situation which I think you know we've averted a disaster that could have cost us a million dollars."

250.    Despite having knowingly securitized dozens of FPD loans in the FR3 deal, Menefee repeatedly made false statements to investors about it.  In a December 4, 2006, telephone call where investors asked Menefee specifically whether FPD loans were securitized in SABR 2006-FR3, Menefee falsely stated that "each of the loans in the deal has made at least one payment. Those that have failed to make their first payment were put back to the originator." In a telephone call the same day, a Barclays salesperson asked Menefee whether FPD loans were securitized in SABR 2006-FR3 so she could provide that information to investors.  Menefee falsely stated, "each loan going into the deal has made at least one payment because we have first-payment default protection ...  The loans that fail to make a payment, we'll put back to Fremont."

251.    In a March 5, 2007, telephone call with investors, where rising EPD rates in Fremont deals and Barclays' repurchase demand of Fremont were discussed, Menefee falsely stated that "We have not ever securitized first pay defaults, and one of the provisions in our agreements is that the seller will repurchase loans where the borrower defaults on its initial payment to us. So, before the securitization has formed ...  we've either pulled them out, sold them separately, or put all of those back to Fremont."

252.    Additionally, Barclays securitized at least 125 FPD loans (worth over $21.8 million in principal balance) in SABR 2007-BR1 after New Century, which was heading into bankruptcy, failed to buy them back. Defendants' presentations to investors and rating agencies regarding this deal misrepresented that all loans that "were in violation of first payment default provisions ... were rejected and put back to the seller," and that "Barclays does not support re-pricing of defective loans or inclusion of 'scratch and dent' collateral in SABR deal."

253.    In a June 25, 2007, telephone call, Menefee, Carroll, and a third Barclays employee discussed the securitization of these FPD loans in SABR 2007-BR1 (which had been issued two

months earlier, on April 12, 2007).  The three employees were discussing their prior experience securitizing FPD loans in the context of a decision whether to securitize a significant number of such loans in the forthcoming EQLS 2007-1 deal.  Menefee noted that, as to the FPD loans Defendants securitized in SABR 2007-BR1, "if you look at the foreclosure bucket, it's populated with those loans that we put in that were a payment behind at the time of securitization. So those loans have just gone straight down ...."

254.     Menefee further stated that he was "*willing to take it on the chin from [an investor in SABR 2007-BR1] because we did the right thing for the firm* by securitizing as many loans that were eligible from a counterparty that couldn't, you know, buy back the EPDs." The investor Menefee was referring to had complained about the poor performance of SABR 2007-BR1 within about a month of the deal's closing.  When discussing the SABR 2007-BR1 performance issues with that investor in a June 21, 2007, telephone call, Menefee represented to that investor that Barclays did not securitize FPDs in the deal, a statement he knew was false when he made it. Menefee instead falsely told the investor that "the EPD protection would have preceded the securitization, so that loans that would have suffered first pay default would have been put back to the originator."

255.     Defendants also securitized in SABR 2007-BR2, SABR 2007-BR4, and SABR 2007-BR5 at least 130 loans that New Century explicitly identified as scratch and dent.  New Century had included these loans in a scratch and dent loan pool it offered to sell Barclays in February 2007, for which the tape set forth in detail the defects affecting each loan.  Defendants declined to purchase the scratch and dent pool, but they acquired most of these loans when they foreclosed on the New Century warehouse line.   Defendants' investor and rating agency

presentations for these deals misrepresented that "Barclays does not support ... the inclusion of 'scratch and dent' collateral in SABR deals."

### B. Defendants Knew from their Diagnostic Review of Defaulted Fremont Loans that Loans that Experience Early Payment Delinquency Are Very Likely to Be Defective or Even Fraudulent.

256.    When Defendants securitized FPD, EPD, and other scratch and dent loans in the Subject Deals, they knew that they were not committing a merely technical violation of their representations to investors.  They understood that for a loan to become delinquent or go into default within the first few months after origination is a strong sign the loan may be fraudulent. At a minimum, it was an almost certain indicator that the loan had not been properly underwritten.

257.    As noted, Menefee himself claimed he could prove that all 40 of the FPD loans securitized in SABR 2006-FR3 were fraudulent.  He also acknowledged that the FPD loans Defendants securitized in SABR 2007-BR1 "*have just gone straight down*" into "the foreclosure bucket," which was mainly "populated with those loans that we put in that were a payment behind at the time of securitization."

258.    In early 2007, after noticing "*an unprecedented default rate of the SABR 2006-FR3 pool*," Defendants commissioned their due diligence vendor to conduct a "diagnostic review" of 499 Fremont-originated loans Barclays had securitized in various deals, which defaulted within the first six months of origination.  The purpose of the review was "to identify instances of proven or suspected misrepresentation, violation of prudent underwriting standards, and/or instances of early collection problems sufficient to require lender repurchase of the asset."

259.    The review found that only 65 of the 499 EPDs could be blamed on borrower-centered circumstances such as unforeseen hardships, medical issues, or income curtailment/loss. Another 54 defaults were deemed to result from Fremont's "aggressive underwriting" practices.

260.    As to the other 379 loans in the study, Defendants concluded that "*an overwhelming percentage of the loans exhibit material deficiencies.... Essentially default was inevitable* based upon poor/overly aggressive underwriting combined with a trend among the loans examined in that the majority contained a high loan to value, low FICO, and no asset verified lending."

261.    Defendants determined that these loans, almost all of which were securitized in SABR 2006-HE1, SABR 2006-HE2, SABR 2006-FR3, and SABR 2006-FR4, had significant defects when Defendants acquired them from Fremont.  These included 48 loans in which Fremont – in Defendants' own words – had completely "*ignored guidelines*" and had given "*no regard for borrower's ability to repay debt*."  Dozens more loan files were found to have been underwater at the time of origination; involved DTI ratios well above the guideline limits; involved straw buyers or non-arms-length transactions; misrepresented owner occupancy; or failed to document income or employment.

262.    Of the 379 loans containing these types of material defects, only 143 had even been reviewed in due diligence.  The other 236 loans had not been individually reviewed, as they had not been captured by Defendants' adverse selection criteria, notwithstanding their manifest and manifold defects.

263.    The results of the review did not surprise Defendants, who were well aware of "widespread" fraud in Fremont loan pools prior to securitizing any of these deals.  Nevertheless, Defendants did not disclose this knowledge to investors, but instead continued making standard representations about the loans in these deals that they knew were false at the time they made them.

## IV.    **Defendants Knew that their Representations as to the Value of Mortgaged Properties and the Validity of the Underlying Appraisals Were False.**

264.    When a mortgage is originated, an appraisal conducted by or on behalf of the originator becomes part of the loan file.  Valuation due diligence is the review of that appraisal

and the corresponding LTV or CLTV ratio. Barclays' employees, including Menefee, understood that the purpose of this process was to ensure that Defendants were accurately representing key loan data such as the property value and CLTV ratio, and also to validate Defendants' representation to investors that the loans they securitized were not underwater at the time of the securitization.

265. Defendants' valuation due diligence revealed that the property values of the loans they were securitizing in the Subject Deals were systematically overstated by the loan originators and that thousands of the loans were underwater at the time of securitization. Nevertheless, Defendants securitized thousands of loans known to have materially inflated appraisals, while knowingly misrepresenting to investors the property values for the loans and telling investors that the Subject Deals contained no underwater loans.

266. Defendants' valuation due diligence providers were located in states other than New York, and Defendants communicated with each of these firms through the mail and through interstate wires as part of their scheme to defraud. In particular, on information and belief, Defendants, located in New York City, sent and received mail and interstate wire communications to and from, for example, (i) ClearCapital, located in Truckee, California, (ii) CoreLogic, located in Westlake, Texas, (iii) Fidelity Hansen Quality, located in San Diego, CA, and (iv) ValuationStream, located in Reno, Nevada. These mail and interstate wire communications were at least incidental to an essential part of Defendants' scheme to defraud.

### A. Defendants' Valuation Due Diligence Process.

267. Defendants' valuation due diligence typically began by applying a collateral risk screen to the loan pool. The screening criteria were intended to stratify the loans into high and low risk categories based on factors exogenous to the property appraisal that Defendants and the due diligence firms believed could potentially affect property values.

268.    For loans deemed low risk under the screening criteria, Defendants purported to apply a valuation cascade that began with an automated valuation model ("AVM").  The results of the AVM were then compared against the value stated in the original appraisal.  If the AVM value was within 15% of the original value, the loan was deemed "within tolerance," and purchased, with no further valuation due diligence done.

269.    If the variance between the AVM value and the appraisal value was greater than 15%, the loan was deemed "out of tolerance," and the loan was supposed to proceed to the next step in the cascade, which was to obtain a broker price opinion ("BPO").  The BPO value was then compared to the original property appraisal value, and the variance was assessed against Defendants' 15% tolerance.  Once again, "within tolerance" loans received no further review, while "out of tolerance" loans proceeded to additional steps in the cascade.

270.    The next step in the process, known as "desk review" or "reconciliation," typically involved a review of the loan file as well as the prior stages of diligence by a neutral, licensed appraiser.  The appraiser arrived at his own property value based on his evaluation of the data, and once again this value was compared to the original appraisal.  Loans "out of tolerance" remained in the cascade for the final stage, the "tie out."

271.    The tie out involved a meeting or conference call among representatives from Barclays, the originator, and the due diligence provider.  The loan file and results of the previous levels of valuation due diligence were discussed, and the parties agreed on a consensus value for the property and whether the loan would be purchased or kicked out of the pool.

272.    For loans deemed high risk under the screening criteria, the same cascade was typically applied, except that the AVM was skipped, and the cascade began with a BPO.

273.    At each step of the valuation due diligence process, the vendor would also re-calculate the CLTV of the loan using the adjusted valuation and would recommend kicking the loan from the deal if the adjusted CLTV exceeded 100%, even if the loan fell within tolerance.

**B.    Defendants Learned of Declining Loan Quality and Defective Loans from Their Valuation Due Diligence Providers.**

274.    Defendants' valuation due diligence vendors repeatedly warned Defendants both about specific loan defects and about the general decline of the loan market.  Notwithstanding these warnings, Defendants continued securitizing thousands of loans with questionable appraisals.

275.    In November 2006, ValuationStream identified 631 loans slated for SABR 2007-NC2 as "very high property risk" and "scariest collateral."  Defendants securitized 496 of these loans anyway.

276.    When discussing the rising out-of-tolerance and defect rates in valuation due diligence in late 2006 and early 2007, a senior ValuationStream representative blamed, in part, the "craptacular loans" that sellers such as New Century were originating to keep up loan production as the application volume began to decline.

277.    On one occasion, ClearCapital informed Defendants that a loan slated for inclusion in SABR 2006-FR4 carried "the distinct aroma of default," as it had been refinanced four times, the borrower had a low FICO score of 550, and it was a stated income loan.  Menefee replied that he was going to "kick it out," but ultimately decided to securitize the loan anyway.

278.    Defendants' knew from the reports of their own due diligence vendors that some of the loans being proposed for inclusion in the Subject Deals had "the distinct aroma of default," constituted "very high property risk" or "scariest collateral," or were "craptacular loans."  Rather than kicking loans like these from the deals without the need for further discussion, Defendants

made every effort to contradict, overrule, or ignore their vendors' findings and to securitize as many loans as possible in each deal.

### C. Defendants Disregarded their Own Valuation Variance Tolerances and Securitized Loans Despite Knowledge of Significantly Overstated Appraisal Values or the Likelihood that Mortgaged Properties Were Underwater.

279. On numerous occasions, Defendants ignored the valuations determined by their vendors and securitized loans they knew were out of tolerance or underwater at the time of securitization, notwithstanding the fact that inclusion of those loans violated Defendants' representations to investors about the characteristics of the collateral pools.

280. As set forth on the annexed Table 9, the valuation due diligence results revealed that for thousands of loans that Defendants securitized in the Subject Deals, the difference between the purported value of the property as appraised by the originator and the value determined by Defendants was well over 15%, which was Defendants' own metric for assessing the reliability of the initial appraisal. In many cases, the difference was greater than 25%.

281. On deal after deal, Defendants repeatedly waived their own tolerances to securitize loans they knew had inflated property valuations.

282. In SABR 2006-FR4, numerous loans were securitized that were out of tolerance at every stage in the valuation cascade (AVM, BPO, reconciliation, and tie out). One loan had a BPO variance of -41.7%, a reconciliation variance of -30.6%, and a final consensus variance of -27.8%, yet it was securitized with no explanation.

283. In 8 SABR deals comprised of New Century loans, Defendants securitized 235 loans with BPO values that were out of tolerance. In these deals, Defendants securitized 696 loans with BPO values resulting in adjusted CLTV ratios over 100%, and approximately 121 additional loans, where the value estimates that Defendants' vendors calculated during reconciliation resulted in CLTV ratios over 100%.

284.     Similarly, Defendants securitized at least 9 loans in SABR 2007-BR2, 8 loans in SABR 2007-BR3, 11 loans in SABR 2007-BR4, and 21 loans in SABR 2007-BR5 that Defendants knew were out of tolerance at the tie-out stage of due diligence.

285.     On other occasions Defendants increased their variance tolerance to allow more loans with inflated appraisals to be securitized.  In one instance (WFHET 2006-3), the valuation tolerance was increased to 27.5% to maximize the number of loans Defendants would securitize, in response to pressure from the originator, Wells Fargo.

286.     In addition to the hundreds of out-of-tolerance loans included in the Subject Deals, Defendants also accepted hundreds of loans for securitization that they knew were underwater, while repeatedly representing to investors that the Subject Deals contained no underwater loans.

287.     In late 2006, Defendants directed ValuationStream to mark loans as "declined" even if the loan was within tolerance, if the loan had an adjusted CLTV greater than 100% based on the results of the appraisal review.  When Defendants realized that this substantially increased the kick out rate, Defendants waived in hundreds of "declined" loans with an adjusted CLTV greater than 100%.

288.     Through the reports and other communications from their valuation due diligence vendors, Defendants were aware of systematically overstated property values in the loan pools they securitized.  As was the case with their credit/compliance due diligence process, Defendants' valuation due diligence process gave Defendants knowledge about the securitized loans that contradicted their representations to investors.

**D.     Defendants Securitized Thousands of Loans without Any Appraisal Review.**

289.     At times, Defendants canceled the latter stages of the valuation cascade despite finding high rates of loans with inflated appraisals.  For a pool of loans securitized in SABR 2007-BR3, SABR 2007-BR4, and SABR 2007-BR5, Defendants' vendor recommended BPOs on 743

loans. Defendants did not order or obtain BPOs on any of these loans because their originator, New Century, was about to file for bankruptcy. Similarly, in ALBT 2007-OA1, Defendants' vendor recommended that Defendants order BPOs on loans that they had flagged as high risk, but Defendants canceled the job and securitized the loans with no further review because they wanted to bring the deal to market as quickly as possible.

290. For at least six of the Subject Deals,[17] Defendants conducted no meaningful valuation review on over 70% of the securitized loans. On these deals, Defendants used a collateral risk analysis tool, and if that tool generated a score of zero on a particular loan (which happened more than 70% of the time on these deals), the loan was securitized with no further appraisal review and not even an AVM. But this practice was contrary to Defendants' representations that they conducted a due diligence "[r]eview of 100% of original appraisals," and that "each original appraisal report is reviewed by experienced appraisers."

291. Defendants knew this tool did not (and was not intended to) measure property value and could not be used as a substitute for appraisal review to assess the accuracy of the values reported in the Offering Documents. They knew the tool had no capacity to evaluate whether the appraisal was conducted according to the relevant standards but simply provided a metric for comparing a stated value against publicly available data for a given zip code.

292. By relying on the originators' stated property values for the loans in these deals, Defendants represented to investors that the underlying appraisals were valid and reliable. But Defendants knew that on these deals they had systematically abandoned valuation due diligence and had no factual basis to represent that the underlying appraisals were valid or reliable. Indeed, the valuation diligence that they conducted on the approximately 30% of the loans in these pools

---

[17]   ALBT 2007-OA1, BCAP 2007-AA1, BCAP 2007-AA2, BCAP 2007-AA3, BCAP 2007-AA4, BCAP 2007-AA5.

showed systematically inflated appraisals in the loan pools, and Defendants knew that the remaining 70% of the pools were similarly rife with inflated appraisals.

## V. Defendants Repeatedly Misrepresented Their Due Diligence Process and Results to Investors and Rating Agencies.

### A. Defendants Misrepresented the Scope of their Credit/Compliance Due Diligence Process Both to Investors and to Rating Agencies.

293.    In addition to making false representations to investors about the characteristics of the loans securitized in the Subject Deals, Defendants also repeatedly misrepresented to investors and rating agencies the scope and comprehensiveness of their due diligence process.

294.    Defendants repeatedly referred to their due diligence process as "rigorous" and "comprehensive" and claimed that the process was designed to produce "an overall improved portfolio of loans." They represented the scope of their due diligence in various contexts, including in discussions with and presentations to investors and rating agencies about their securitizations that occurred in person, over the telephone, and via e-mail or instant messenger.

295.    Defendants attempted to persuade investors and rating agencies that they had taken effective, diligent steps to validate their representations about the loan-level characteristics, by falsely representing that Barclays "conducts comprehensive due diligence on each purchased pool which is more complete in scope and significantly more thorough than diligence conducted by other buyers of [home equity loans]." They also represented that they kicked out during their due diligence process all non-creditworthy and unduly risky loans.

296.    Defendants tried to convince the rating agencies that their due diligence efforts were effective and robust, because this would result in higher bond ratings, and less required credit enhancement in the capital structure of the deals, making the deals more profitable for Barclays (but riskier for investors). As Defendants themselves recognized in minutes of an October 2006

management meeting, "the rating agencies appreciate [Barclays'] due diligence efforts and are requiring lower enhancement levels relative to those of comparable programs.  By putting loans back to originators and identifying issues not previously highlighted, Barclays has gained credibility with the rating agencies."  And as Menefee stated in a July 12, 2007, telephone call, "*The rating agencies are just a thing to be manipulated*. Investors take their shot at manipulating them. And we do our best to coax them into more optimistic views."

297.    Defendants knew when they made them that these representations about the scope of their process were false.  Defendants knew that their due diligence process was neither rigorous, thorough, comprehensive, effective, nor complete, and that it did not produce an overall improved portfolio of loans.  Defendants knew that their due diligence process did not confirm the accuracy of their representations about the characteristics of the securitized loan pools but instead confirmed those representations to be false.

298.    Defendants also misrepresented to the rating agencies the comprehensiveness of their diligence on specific deals.  In SABR 2006-NC1 and SABR 2006-NC2, Defendants told rating agencies that they had "programmatically excluded" all loans from the pool that met certain heightened credit risk criteria, including interest-only loans with "low" FICO scores or with stated incomes.  In fact, 110 loans meeting these criteria (with more than $10.9 million in principal balance) were securitized in these two deals, without even being selected for or reviewed in due diligence.

299.    As noted, Defendants decided to conduct no credit/compliance due diligence on the whole loan pool they acquired from New Century in March 2007 or on the loans they acquired that month from the New Century warehouse line, which they securitized in SABR 2007-BR4.  Despite knowing this, a member of Menefee's team deliberately misrepresented in an email to

Moody's on June 4, 2007, that "the [SABR 2007-BR4] pool was subjected to the same level of diligence" as SABR 2007-BR3. (The two deals were issued one day apart.) Defendants knew this was a lie, because they had decided not to conduct due diligence on a significant portion of SABR 2007-BR4.

300. The June 4, 2007, email to Moody's went on to say that "Loans with credit and appraisal weakness were put-back to NC. Also, all FPD were put back to NC." Defendants knew these statements were false, as well. In addition to the March 2007 New Century pool and the loans from the New Century warehouse line, SABR 2007-BR4 also included loans from a New Century pool that Defendants acquired in February 2007, on which Defendants *had* conducted due diligence. Defendants had kicked a number of loans from the February 2007 pool, but Defendants knew they had not put back to New Century all loans with "credit and appraisal weakness," as they had securitized in SABR 2007-BR4 120 loans that had been graded EV3 or "EV2 per client" and as they knew there were loans with credit and appraisal weakness in the unreviewed portion of the February pool. Defendants also knew that they had not even put back to New Century all FPD loans in the February pool, because they securitized at least 16 loans ($4.2 million) in SABR 2007-BR4 that they had themselves identified as FPD loans.

301. Defendants also deliberately deceived investors as to the scope of their due diligence on the deal SABR 2007-BR5. As noted above (*see supra* ¶¶ 227–237), Defendants conducted *no* due diligence whatsoever on the New Century loan pools they acquired in March 2007, with a principal balance of over $1 billion, that they securitized in SABR 2007-BR5. Defendants nevertheless altered a presentation to investors to deceive them into believing that they actually had conducted due diligence on that deal.

302.   On August 10, 2007 (a month after the SABR 2007-BR5 deal was issued), a Barclays employee prepared a draft presentation to investors regarding Barclays' subprime RMBS deals, which referenced the percentages of loans subjected to due diligence, and kicked as a result of due diligence, on various deals.  The line for SABR 2007-BR5 was blank, and a cover email noted that the draft investor presentation did not "have due dili info for BR5 deal," presumably because no due diligence information existed on a deal as to which no due diligence had been conducted.

303.   Before finalizing the presentation and distributing it to investors, a Barclays employee manipulated the chart to make it appear as though due diligence had actually been performed on SABR 2007-BR5.  He did this by deleting the blank line for SABR 2007-BR5 and adding "/BR5" to the entry for SABR 2007-BR4, misleadingly implying that the due diligence performed on SABR 2007-BR4 (i.e., on the February 2007 New Century pool) also applied to SABR 2007-BR5.  On information and belief, Defendants delivered this doctored version of the presentation to investors.

304.   On numerous other deals, Defendants falsely represented to investors and rating agencies that they included in their due diligence selections "100% of loans" that met certain listed "parameters," such as Credit Grade C or C-, borrowers with a stated documentation loan with FICO scores under 550, or investment properties with LTV over 95%.  But Defendants knew that they had not in fact subjected all loans that met those criteria to due diligence.  This representation was meant to deceive investors and rating agencies into believing that the due diligence conducted on those deals was far more comprehensive than it actually was.

**B.      Defendants Repeatedly Misrepresented their Due Diligence Results Both to Investors and to Rating Agencies.**

305.    In addition to misrepresenting the scope of their due diligence process, Defendants systematically misrepresented to investors and rating agencies the results of due diligence they conducted on individual loan pools, to make the pools seem stronger and less risky than they actually were.

306.    On each Subject Deal, Defendants made presentations to investors and rating agencies that contained a page entitled "due diligence results."  There, Defendants explained that they relied on "third party due diligence providers to detail their loan level findings in individual asset summaries" and represented that any "loans deemed to be unacceptable are excluded from the purchased portfolio."  The page then set forth a table that was meant to summarize the due diligence results – that is, to inform investors and rating agencies of the magnitude of "unacceptable" loans that "its third party due diligence providers" identified in "loan level findings" during due diligence.

307.    These tables, however, were deliberately misleading and were designed to hide the extent of defects in the pool.  Defendants did not include in these presentations the actual due diligence results (such as the EV3 rates) that they had received from their vendors.  Instead, they only listed the "kickout rate" for each deal – the number (or principal balance) of the loans Defendants actually decided to exclude from the deal divided by the number (or principal balance) of loans in the initial pool.

308.    For example, in the investor presentation for SABR 2007-BR1, Defendants claimed only 9.28% of the pool had been found "unacceptable" for credit and compliance reasons.  However, Defendants failed to disclose that their due diligence vendor had actually graded nearly

42% of the loans in the diligence selection as EV3, meaning they were not appropriate for inclusion in the deal and should have been excluded, consistent with Defendants' representations.

309.    Defendants knew the "kickout rate" reported on these presentations failed to account for (a) loans receiving a final grade of EV3 that Defendants decided to "waive" into the deal, or (b) loans to which the vendors assigned a grade of EV3 but upgraded to EV2 in response to Defendants' instructions to waive the material defects, or (c) loans which Defendants identified as having significant credit risks through application of their "layered risk" criteria but securitized anyway.  Defendants nowhere disclosed the significant number of loans in the pool that fell into these three categories.  They therefore significantly understated the number of "unacceptable" loans discovered in due diligence.

310.    Meanwhile, by basing the "kickout rate" on the whole pool rather than just the far smaller due diligence selection, Defendants knowingly and misleadingly implied that the unreviewed portion of the pool contained no defective or "unacceptable" loans.

311.    By failing to disclose the EV3 rate for the due diligence selection, Defendants deprived investors and rating agencies of the opportunity to draw conclusions about the unreviewed portion of the pool from the results of due diligence.  Defendants never disclosed to investors the extensive knowledge they had that loans in the unreviewed portion of the pool would have been rated EV3 had they been subjected to due diligence.  *See supra* ¶¶ 196-199.

312.    Exacerbating the deceptive nature of these representations, Defendants steadfastly refused to disclose their vendors' actual due diligence results, even when investors specifically asked for them.  Any investor or rating agency that wanted to learn about the due diligence results was only told about the loans that Defendants actually chose to exclude from the deals, not about the EV3 loans and other defective loans that Defendants waived, upgraded, or ignored.

## VI. **Defendants' Fraudulent Scheme Affected Federally-Insured Financial Institutions and Victimized Other Financial Institutions.**

313.    As to each Subject Deal, Defendants' fraudulent scheme affected one or more federally-insured financial institutions ("FIFIs").

314.    As to each Subject Deal, Defendants intended to defraud or victimize one or more financial institutions ("FIs"), including by targeting money and property owned by, or in the custody or control of, such institutions by means of false or fraudulent pretenses, representations, or promises.

315.    As a threshold matter, a substantial percentage of the loans Defendants securitized or underwrote in the Subject Deals were originated by, and purchased directly or indirectly from, FIFIs acting as originators, such as Fremont Bank, Fremont Investment & Loan, Wells Fargo N.A., Chevy Chase Bank FSB, and IndyMac Bank FSB.   Defendants' fraudulent scheme and securitization machine primed the pump for these loans, creating demand for loans that were more and more risky and deficient, ultimately contributing to a bubble that, when it burst, led to one of the most severe financial crises in this nation's history, as well as the bankruptcy or distress of many of the FIFIs that originated the loans.

316.    Defendants' fraud also affected FIFIs and victimized FIs in other significant ways. In Barclays' initial offerings on all of the Subject Deals, Defendants actively marketed RMBS certificates to FIFIs and other FIs (including entities known by Defendants to be affiliates or subsidiaries of FIFIs).   Barclays' employees, including Menefee and Carroll, had regular contact with these institutions through interstate telephone calls and wire communications to try to persuade them to buy Barclays' RMBS.   Defendants assigned internal sales representatives to cover FIFIs and other FIs, and Barclays' employees made roadshow and other in-person

presentations to FIFIs and other FIs regarding, among other things, the loans Barclays securitized and its due diligence process.

317.    Numerous FIFIs and other FIs bought certificates in the Subject Deals on the basis of Defendants' representations about the loans.  In purchasing the RMBS certificates from Barclays, FIFIs and other FIs provided Defendants with funds they owned, or that were in their custody and control, in exchange for RMBS certificates.

318.    The FIFIs and FIs that purchased RMBS in the Subject Deals included, among many other institutions, ING Bank, LaSalle Bank National Association, Federal Home Loan Bank of Chicago, Huntington Bancshares, Inc., U.S. Central Federal Credit Union, The Bank of New York Mellon, Merrill Lynch Bank, Western Corporate Federal Credit Union, Catalyst Corporate Federal Credit Union, Federal Home Loan Bank of Seattle, Members United Corporate Federal Credit Union, Boston Federal Home Loan Bank, HSBC USA, Capital One, and Citibank.

319.    Many of the above-mentioned FIFIs and FIs were based in states other than New York.  In inducing these investors to invest in the Subject Deals, Barclays' employees located in New York communicated with the investors located in these other states over email, by phone, or by other means.

320.    On information and belief, in addition to buying Barclays' RMBS certificates in the initial offerings on the Subject Deals, many FIFIs and other FIs purchased Barclays' RMBS certificates in the secondary market for such securities.  On information and belief, others purchased tranches of collateralized debt obligations ("CDOs") backed by Barclays' RMBS or provided "repurchase" financing to other investors acquiring Barclays' RMBS, in which the financial institution took possession of the RMBS certificates as security for the proceeds it extended to the investor to buy the certificates.

321.    Barclays' employees, including Menefee, Carroll, and others involved in the Subject Deals, knew that, for each Subject Deal, initial purchasers, secondary purchasers, CDO purchasers, or repurchase financers included many FIFIs and other FIs.  They also knew that many investors in the Subject Deals bought RMBS using funds held in custodial accounts at FIFIs or other FIs.

322.    Defendants knew the false representations they made about the securitized loans and about Defendants' due diligence process subjected FIFIs and other FIs to materially increased risk of loss as to each Subject Deal.

323.    In perpetrating their fraudulent scheme while securitizing the Subject Deals, Defendants imposed risks on other transaction participants that were FIFIs.  Specifically, for the majority of the Subject Deals, FIFIs were or are among: (1) the trustee or trust administrator; (2) the servicer; (3) the custodian of the loan files; or (4) the cap trustee.  In these roles, the FIFIs receive(d) compensation for their role in the transaction or process(ed) payments and accounts affected by Defendants' fraud.

324.    The trustees and trust administrators have been exposed to loss or risks of loss as a direct result of Defendants' fraudulent scheme.  For many of the Subject Deals, the trustees (many of which are FIFIs) have been sued by investors on account of Defendants' systemic misrepresentations as to the underlying loan pools. (*See, e.g., BlackRock Allocation Target Shares v. Wells Fargo Bank, N.A.*, No. 14-CV-9371 (S.D.N.Y. Nov. 24, 2014) (concerning BCAP 2006-AA2, SABR 2006-FR1, SABR 2006-FR2, SABR 2006-FR3, SABR 2006-HE1, SABR 2006-HE2, and SABR 2006-NC3, among other Barclays securitizations).)  These suits have exposed the trustees to risks of loss and reputational harms.  The trustees have also expended resources in defending against these suits.

325.     As a result of Defendants' scheme to defraud, the servicers have also been affected and have been subjected to increased costs and increased risks of loss.  The servicers' costs and profits are tied, in part, to the outstanding balances of the loans they service, the amount of monthly payments they process and forward to the trusts, the late fees and penalties they collect on the underlying loans, or the amounts they spend or recover in pursuing loans in default, all of which are affected by the scheme.

326.     Despite knowing as of the time of securitization of widespread breaches of the representations in the MLPAs for the loans securitized in each of the Subject Deals, Defendants did not provide notice to the trustees or servicers of the breaches, as required under the terms of many of the PSAs.  This lack of notice affected the trustees and servicers, including those that were FIFIs, by depriving them of the opportunity to take timely action to protect their interests and by exposing them to potential liability and other costs.

327.     As a result of Defendants' scheme to defraud, the custodians of the loan files and the cap trustees for the Subject Deals have also been affected and have been subjected to increased costs and increased risks of loss.  The custodian's and the cap trustee's costs and profits are tied, in part, to the number and outstanding balances of the loans they service, which have been affected by the scheme.

328.     Defendants' false representations about the loans they securitized in the Subject Deals were widely disseminated and had foundational effects on a broad range and number of financial instruments held, generated by, or serviced by FIFIs.

## FACTS SPECIFIC TO DEFENDANT MENEFEE

329.     At all times during the Relevant Period, and concerning all facts and events alleged herein, Defendant Menefee was an employee of Barclays acting in the course and scope of his employment.   All of his actions and decisions are imputable and attributable to Barclays, and Menefee is also liable individually and in his own right for his actions and decisions concerning Defendants' scheme to defraud.

330.     Menefee was first a Director, then Managing Director (as of January 2007) in the ASG, as well as Vice President and Chief Accounting Officer of SABR.   He was managing agent, administrative agent, and attorney-in-fact for Sutton from 2003 to 2008. Barclays recruited Menefee in 2003 from Morgan Stanley to establish Barclays' subprime RMBS business.   Menefee and Carroll ran that business throughout the Relevant Period.

331.     Menefee was the head Barclays banker in charge of due diligence and securitization on all of Barclays' SABR deals and subprime agented deals, including the Menefee/Carroll Deals. As head banker, Menefee was in charge of, among other things:   conducting credit/compliance and valuation due diligence on the whole loan pools Barclays acquired and securitized; structuring the deals; working with rating agencies to rate the tranches in the deal; overseeing the preparation of all offering documents and other transactional documents; ensuring the accuracy of all representations, warranties, and other information in the offering and transactional documents; and communicating with investors about the securitized loan pools and about Barclays' subprime RMBS products.

332.     Menefee was closely involved in the preparation of the offering documents for all of the subprime Subject Deals and he knew the representations made in those documents about the

loan pools securitized in those deals.  In fact, he signed, among other deal documents, certifications attesting to the truth of those representations.

333.    As noted, Menefee served as an officer of Barclays' subprime securitization subsidiary, Defendant SABR.  In that capacity, he signed several registration documents, including registration statements filed with the SEC pursuant to which the ProSupps were issued.  Barclays' SABR deals could not have been issued without these signed registration statements.

334.    Menefee signed several other transactional documents concerning the SABR deals. On behalf of SABR, Menefee signed Underwriting Agreements, filed with the SEC, in which SABR (as the Depositor) represented to Barclays Capital (as the Underwriter) that the prospectuses and ProSupps did not contain any untrue statements of material fact or omit material facts necessary to make the statements therein not misleading.  Menefee also signed Officer's Certificates in which he certified, as an officer of SABR, that all representations of SABR under the Underwriting Agreement were true and correct.

335.    Despite making these certifications, Menefee knew that Barclays' offering documents were rife with misstatements of material facts and with material omissions.

336.    Menefee also prepared, or supervised the preparation of, numerous presentations to investors and rating agencies regarding the subprime Subject Deals, including deal-specific presentations and presentations about the SABR shelf as a whole.  Those presentations included various representations about the loan pools securitized in Barclays' deals, as well as about Barclays' due diligence.  These presentations included many statements that were false or misleading, and Menefee knew they were false or misleading when he made them.

337.    Menefee also regularly communicated directly with investors and rating agencies, in person (including at road shows and industry conferences), over the telephone, and over email.

During these communications he repeatedly made representations about the loans securitized in Barclays' deals and about Barclays' due diligence process.  Many of these representations were false or misleading, and Menefee knew they were false or misleading when he made them.

338.   Menefee knew that the loans securitized in the subprime Subject Deals that had been subjected to due diligence were of materially worse quality than he had represented.  Menefee also knew that the unreviewed loans in the subprime Subject Deals were of materially worse quality than he had represented.

339.   Menefee served as a key point of contact with the originators that supplied Barclays with subprime loans.  Menefee and others at Barclays viewed these originators as their clients, and he played a key role in developing, nurturing, and maintaining Barclays' relationships with these loan suppliers.  Menefee had particularly close business relationships with Fremont, New Century, and WMC.

340.   On numerous occasions involving the subprime Subject Deals, Menefee acceded to pressure from originators to maintain his relationships with them, including agreeing to their demands to limit due diligence selection sizes, minimize kickout rates, and maximize pull-through rates.  On most of these deals, Menefee and Carroll agreed, on behalf of Barclays, to "trade stips" that explicitly limited Barclays' due diligence selection sizes.  Menefee also regularly agreed to limit the number of loans Barclays kicked out of loan pool acquisitions based on defects discovered in due diligence.

341.   Menefee designed, oversaw, and executed nearly every aspect of Barclays' due diligence on the subprime Subject Deals.  Menefee selected and supervised all of Barclays' due diligence vendors on these deals.  He acted as the primary point of contact with all of these vendors,

communicating with them regularly over the course of a due diligence review, both in person and via telephone or email.

342.    For credit/compliance due diligence, Menefee devised the adverse selection criteria (which he knew did not capture all of the misrepresented loans in the pool), modified those criteria when originators demanded reduced sample sizes, and oversaw the drawing of the due diligence samples.  He also provided instructions to credit/compliance due diligence vendors as to how to conduct their due diligence, what types of underwriting exceptions to look for, and how to report their results.  Menefee also created and provided to the credit/compliance due diligence vendors the "Barclays' exception codes," or overlays, meant to identify layered risk and ability-to-pay issues in the reviewed loans.  He made decisions to securitize hundreds of loans flagged by these overlays as presenting ability-to-pay issues, among other significant risks.

343.    Menefee regularly received and reviewed credit/compliance due diligence reports identifying the loans in the selection the vendor rated as EV3, listing the underwriting exceptions discovered on those loans, describing the absence of legitimate compensating factors, and including the due diligence vendors' comments regarding the ability of the borrowers to repay their mortgages.

344.    Menefee often attended, in person or over the telephone, "tie-out" sessions with the originators, at which he negotiated with the lenders to finalize the purchased loan pools.  At times, Menefee personally reviewed loan-level asset summaries or loan files for EV3 loans or other loans flagged with underwriting exceptions.

345.    On those loan pools as to which Barclays conducted no credit/compliance due diligence, including the pools securitized in SABR 2007-BR4 and SABR 2007-BR5, Menefee was

fully aware that no due diligence had been conducted on the pools and in fact he directed the cancellation of the due diligence job.

346.    Menefee was also closely involved in surveillance and monitoring of the subprime Subject Deals and was aware of the performance of the loans in those deals, including the performance (and delinquency or default rate) of loans from the same originators as subsequent deals he oversaw.

347.    Menefee received the tape delta reports, detailing discrepancies between loan-level information appearing on the loan tapes provided by the originators and the information actually appearing in the loan files, and he made the decision not to correct the information in the loan tapes before providing it to rating agencies and investors.

348.    Menefee knew that his and Barclays' representations as to the value of the mortgaged properties in the subprime Subject Deals and as to the validity of the underlying appraisals were false.  For valuation due diligence, Menefee formulated Barclays' valuation due diligence cascade, and he chose the purported 15% tolerance band.  He also decided when to expand or ignore that purported tolerance band.

349.    Menefee regularly received and reviewed valuation due diligence reports identifying out-of-tolerance and underwater loans, and he repeatedly decided to securitize loans he knew had valuation defects.  Menefee also decided to securitize thousands of loans without performing any appraisal review.

350.    Menefee repeatedly and knowingly misrepresented Barclays' due diligence process (including the scope of due diligence) and due diligence results to investors and rating agencies.  On scores of occasions, he also knowingly decided to securitize defaulted, delinquent, and defective scratch and dent loans in the subprime Subject Deals.  Menefee knew that hundreds of

loans he decided to include in these deals had already experienced first pay or early pay default, or were otherwise scratch and dent, notwithstanding his repeated misrepresentations to investors that Barclays never included such loans in its SABR deals.  Menefee knew, both from his experience and from the diagnostic review of defaulted Fremont loans he commissioned and supervised in early 2007, that loans that experience early payment delinquency are very likely to have been defectively underwritten or even fraudulent.

351.    In sum, on the subprime Subject Deals, it was Menefee who decided, on behalf of Barclays:  which loans would be subjected to due diligence and which loans would not; which loans would be kicked from loan pool purchases and which loans would be purchased, notwithstanding their defects; and which loans would be securitized in which deals.  When Barclays securitized an EV3 loan in a subprime Subject Deal – whether because the EV3 was waived in, or upgraded to an EV2W, or recycled from a kickout in a previous deal, or omitted altogether from the due diligence selection – the decision to include that loan in the deal was almost always Menefee's.  The decision not to conduct additional due diligence in response to high EV3 rates in the diligence selection on these deals was also his.

352.    Menefee was aware investors in the subprime Subject Deals included FIFIs, either in the primary or secondary markets.  He was also aware that many of the investors were subsidiaries or affiliates of FIFIs.

## FACTS SPECIFIC TO DEFENDANT CARROLL

353.    At all times during the Relevant Period, and concerning all facts and events alleged herein, Carroll was an employee of Barclays acting in the course and scope of his employment. All of his actions and decisions are imputable and attributable to Barclays, and Carroll is also liable

individually and in his own right for his actions and decisions in connection with Defendants' scheme to defraud.

354.    During the Relevant Period, Carroll was a Managing Director and head of Global Securitized Asset Trading at Barclays Capital's U.S. ABS and Whole Loan Trading Division.  He was also Vice President and Chief Financial Officer of SABR.

355.    Barclays recruited Carroll in 2003 from Morgan Stanley to establish Barclays' subprime RMBS business.  In particular, Barclays hired Carroll to build a subprime mortgage loan trading business, which did not exist within Barclays before Carroll's hire.  Carroll and Menefee ran the subprime RMBS business line throughout the Relevant Period.  Carroll also ran the asset-backed securities secondary trading desk and the non-agency RMBS secondary trading desk.

356.    Carroll was the head Barclays trader on all of Barclays' SABR deals, including the Menefee/Carroll Deals.  As head trader, Carroll was responsible for acquiring from originators the whole loan pools securitized in these deals.  He determined on which subprime whole loan pools Barclays would bid, at what price, and on what terms.

357.    Carroll served as a key point of contact with the originators supplying Barclays with subprime loans.  Carroll viewed these originators as Barclays' clients, and he played a key role in developing, nurturing, and maintaining relationships with these loan suppliers. Carroll had particularly close business relationships with Fremont, New Century, and WMC.  Carroll communicated directly with originators, often leveraging his existing relationships with these companies to enable the trading desk to competitively bid for whole loan pools.

358.    On numerous occasions involving the subprime principal Subject Deals (as well as WFHET 2006-3 and WFHET 2007-1), Carroll agreed to the demands of originators to limit due diligence selection sizes, minimize kickout rates, and maximize pull-through rates.  On most of

these deals, Carroll agreed, on behalf of Barclays, to "trade stips" that Carroll negotiated, and that explicitly limited Barclays' due diligence selection sizes. Carroll also regularly agreed to limit the number of loans Barclays kicked out of loan pool acquisitions based on defects discovered in due diligence.

359.    Carroll also decided the timing of securitization in the subprime principal Subject Deals, and how the awarded pools would be hedged during the period between pool purchase and securitization. He also played a role in structuring the subprime principal Subject Deals.

360.    Carroll also decided whether Barclays would retain an economic interest in any of these deals, for example by retaining the equity or residual tranche(s) of a particular deal, and what the magnitude and terms of that economic interest would be. In this vein, he decided whether, when, to what extent, to whom, and on what terms Barclays would sell its economic interest in a particular deal, whether through a NIM security (the securitization and issuance of which he oversaw) or through the sale of a PNR interest.

361.    Carroll's trading desk "owned the risk" on any economic interest Barclays retained in these deals, as well as the risk on any purchased loan pools between the time of purchase and the time of securitization. Carroll's compensation was tied to the management of this risk. It was in Carroll's personal interest to securitize the loans he purchased for Barclays as quickly as possible and to minimize the risk Barclays retained in the deals.

362.    Carroll knew the representations made in the offering documents for all of the subprime principal Subject Deals about the loans securitized in those deals, and he signed, among other deal documents, certifications attesting to the truth of those representations.

363.    Carroll served as an officer (specifically, Vice President and CFO) of Barclays' subprime securitization affiliate, Defendant SABR. In that capacity, he signed several registration

documents, including registration statements filed with the SEC pursuant to which the ProSupps were issued. Barclays' SABR deals could not have been issued without these signed statements. Carroll also signed several other transactional documents in connection with the subprime principal Subject Deals.

364.    Carroll assisted in preparing and delivering presentations to investors and rating agencies regarding the subprime principal Subject Deals, including presentations on the SABR shelf as a whole. Those presentations included representations about the loan pools securitized in Barclays' deals, as well as about Barclays' due diligence. Many of the statements in these presentations were false or misleading, and Carroll knew they were false or misleading.

365.    Carroll knew that the loans securitized in the subprime principal Subject Deals, whether or not they had been subjected to due diligence, were of materially worse quality than he and Barclays had represented.

366.    Carroll knowingly directed the securitization of non-performing loans and knowingly misrepresented the credit quality to investors. He was fully aware of the characteristics of the loan pools he purchased for Barclays, and of the deterioration of loan quality over time, as reflected in higher EV3 rates and higher delinquency rates. He used that information to adjust the price Barclays would bid for the loan pools offered by the originators. Yet he never directed ASG to correct Barclays' false representations about loan quality.

367.    Carroll was in frequent contact with Menefee and was aware of the due diligence process and results on the subprime principal Subject Deals, including the size of the due diligence selection and how it was drawn, EV3 and kickout rates, and the reason for any kickouts. Carroll knew that the due diligence procedures Barclays was using on the subprime principal Subject Deals did not identify for review or exclusion all loans that violated Barclays' representations to

investors. Carroll nevertheless repeatedly made conscious decisions to securitize misrepresented collateral, in order to pass the risk of loss from default onto investors and away from Barclays, and to increase Barclays' profits on these deals.

368.     On those loan pools where Barclays conducted no credit/compliance due diligence, including the March 2007 New Century pools securitized in SABR 2007-BR4 and SABR 2007-BR5, Carroll was fully aware that no due diligence had been conducted on the pools and approved the decision not to conduct due diligence on those pools.

369.     Carroll was also involved in surveillance and monitoring of the subprime principal Subject Deals and was aware of the performance of the loans in those deals, including the performance (and delinquency or default rate) of loans from the same originators as subsequent deals that he oversaw.

370.     Carroll had access to information that loans had gone into first payment or early payment default.  On multiple occasions, Carroll knew Barclays purchased non-performing loans that it was unable to put back to the originators. On most of these occasions, Carroll knew these loans were included in the securities and that Barclays had represented that no EPD, FPD, or scratch and dent loans were included in the deals.  Sometimes, Carroll directly instructed Menefee to include such loans in securitizations, to protect the trading desk's bottom line.  Including these non-performing loans in the subprime principal Subject Deals was part of Carroll's strategy for reducing Barclays' risk at the expense of its investors.

371.     Carroll was aware investors in the subprime principal Subject Deals included FIFIs, either in the primary or secondary markets.  He was also aware that many of the investors were subsidiaries or affiliates of FIFIs.

<u>DEAL-SPECIFIC FACTS</u>

372.     The foregoing sections of this Complaint describe facts relating to the fraudulent scheme in which Defendants engaged with respect to all of the Subject Deals.  This section sets forth facts specific to each Subject Deal, providing additional details as to each deal regarding the fraudulent scheme.

## I.      New Century ("NC") Deals

373.     Beginning in 2004, Barclays extended a $1 billion warehouse line of credit to New Century to finance that lender's origination of subprime loans (*see supra* ¶¶ 231-235). The line of credit was secured by loans that New Century originated through the facility of Barclays' financing.  Barclays' $1 billion warehouse line of credit to New Century was active until around the time New Century filed for bankruptcy, in April 2007.

374.     In 2006, Barclays entered into a forward flow agreement with New Century, under which Barclays committed to purchasing $1 billion of newly-originated subprime loans per month for a year.  Barclays made its first $1 billion purchase under the forward flow agreement in November 2006, and made additional $1 billion purchases monthly through March 2007.  Barclays stopped making monthly purchases only after New Century filed for bankruptcy in April 2007.

375.     From March 2006 until early 2007, Barclays also extended $1 billion or more in financing to the loan aggregator Carrington Securities, L.P. (*see supra* ¶ 234).  Carrington used this financing to enter into forward purchase agreements with New Century and other originators, in which Carrington committed to acquire certain volumes of loans from them.  Barclays' financing to Carrington was secured by the loans Carrington acquired pursuant to the forward purchase agreements, including many New Century loans.

A.     **SABR 2006-NC1**

376.     SABR 2006-NC1 was securitized on May 3, 2006.  It consisted of 3,753 loans originated by New Century, with an aggregate scheduled principal balance, as stated in the ProSupp, of $806,374,743.

377.     Barclays drew a credit/compliance due diligence sample of 1,644 loans.  In final due diligence reports, Bohan rated 254 loans in the sample as EV3 (15.5% of the sample by loan count).  During due diligence, Barclays directed Bohan to waive material defects on another 36 loans, which Bohan designated as "EV2 per client"[18] (2.2% of the sample by loan count).  Taken together, Bohan identified at least 290 of the 1,644 loans it reviewed (17.6% by loan count) as being in breach of Barclays' representations.

378.     Barclays securitized 8 EV3 loans ($2.1 million balance) and another 17 "EV2 per client" loans ($3.6 million balance) in SABR 2006-NC1.  Barclays also securitized 5 loans ($572,150 principal balance) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

379.     The mortgage insurer Radian provided Barclays with monoline insurance on this deal.  In April 2006, before the deal closed, Radian requested the full due diligence results from Barclays.  Even though Radian had paid Barclays $750,000 to conduct due diligence on the deal, Menefee instructed his team not to share the full results with Radian, explaining "that is asking for trouble...."

380.     After devising due diligence selection criteria purportedly designed to identify the riskiest loans in the pool, Barclays proceeded to securitize in SABR 2006-NC1 $186.3 million of

---

[18] References throughout the Deal-Specific Facts to "EV2 per Client" include similar designations such as "OK per Client," "EV2 per Barclays," "Waived per Client," "EV2W," etc.

loans (23.1% of the deal) that it had identified as manifesting those very risks, without subjecting them to due diligence.

381.    Although Barclays substantially loosened its selection criteria after it became apparent that the due diligence selection would be much larger than New Century would allow in its trade stips, Barclays nevertheless deliberately misrepresented to rating agencies that it used the original, stricter criteria, and that it reviewed in due diligence "100%" of the loans in the pool meeting the specified criteria.   Specifically, Barclays misrepresented that it conducted due diligence on all interest-only loans, all loans to borrowers with FICO scores below 525, all first-lien loans with original balances greater than $700,000 or less than $75,000, and all loans with reported LTV between 95% and 100%.   Barclays falsely claimed to have used these factors as selection criteria for the due diligence pool when in fact Barclays securitized in SABR 2006-NC1, without review:

- 285 interest-only loans, with an $88.5 million balance;

- 157 loans to borrowers with FICO scores below 525, with a $28.8 million balance;

- 166 first-lien loans with original balances greater than $700,000 or less than $75,000, with a $26.1 million balance; and

- 92 loans with reported LTV between 95% and 100%, with a $16.7 million balance, without review.

382.    Barclays also knowingly misrepresented to rating agencies that it "programmatically excluded roughly 5.00% of the population for heightened credit risk" by kicking from the loan pool all loans having certain stated characteristics.   Barclays in fact securitized numerous loans in this deal that displayed such characteristics in the initial loan tape.

B.     **SABR 2006-NC2**

383.    SABR 2006-NC2 was securitized on May 31, 2006.  It consisted of 3,405 loans with an aggregate scheduled principal balance, as stated in the ProSupp, of $613,603,037.  All but two of the loans were originated by New Century and purchased by Barclays in January and February 2006; WMC originated the other two loans.

384.    For SABR 2006-NC2, Barclays drew two credit/compliance due diligence selections:  1,644 loans from the January 2006 pool and 750 loans from the February 2006 pool. In its final due diligence reports, Bohan rated 313 loans from the two selections as EV3 (13.1% of the samples by loan count).  During due diligence, Barclays directed Bohan to waive material defects on at least another 50 loans, which Bohan designated as "EV2 per client" (2.1% of the sample by loan count).  Taken together, Bohan identified 363 of the 2,394 loans it reviewed (15.2% by loan count) as being in breach of Barclays' representations.

385.    Barclays securitized 8 EV3 loans ($815,600 original balance) and another 26 upgraded "EV2 per client" loans ($4.1 million balance) in SABR 2006-NC2.  Barclays also securitized in this deal 31 loans ($6.4 million balance) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

386.    After devising due diligence selection criteria purportedly designed to identify the riskiest loans in the pool, Barclays proceeded to securitize in SABR 2006-NC2 $153.4 million of loans (22.8% of the deal) that it had identified as manifesting those very risks, without subjecting them to due diligence.

387.    Although Barclays substantially loosened its selection criteria after it became apparent that the due diligence selection would be much larger than New Century would allow in its trade stips, Barclays nevertheless deliberately misrepresented to rating agencies that it used the original, stricter criteria, and that it reviewed in due diligence "100%" of the loans in the pool

meeting the specified criteria. Specifically, Barclays misrepresented that it conducted due diligence on all interest-only loans, all loans to borrowers with FICO scores below 525, all first-lien loans with original balances greater than $700,000 or less than $75,000, all second-lien loans with borrower FICO scores less than or equal to 620, and all loans with reported LTV between 95% and 100%. Barclays falsely claimed to have used these factors as selection criteria for the due diligence pool when in fact Barclays securitized in SABR 2006-NC2, without review:

- 229 interest-only loans, with a $79.4 million balance;

- 39 loans to borrowers with FICO scores below 525, with a $5.7 million balance;

- 91 first-lien loans with original balances greater than $700,000 or less than $75,000, with a $13 million balance;

- 620 second-lien loans with borrower FICO scores less than or equal to 620, with a $6.5 million balance; and

- 113 loans with reported LTV between 95% and 100%, with a $20.1 million balance.

388. Barclays also knowingly misrepresented to rating agencies that it "programmatically excluded roughly 5.00% of the population for heightened credit risk" by kicking from the loan pool all loans having certain stated characteristics. Barclays in fact securitized in this deal numerous loans that displayed such characteristics in the initial loan tape.

389. Barclays also knowingly securitized in SABR 2006-NC2 FPD loans and other scratch and dent loans, despite representing to investors and rating agencies that such loans were not included in this or any other SABR deal.

390. Specifically, Barclays securitized in this deal 41 loans (with a principal balance of $6.3 million) that had missed their first payments, that Barclays had identified as FPD loans, and that Barclays had submitted to New Century for repurchase. New Century did not deny that the

loans had missed their first payments but convinced Barclays to keep them anyway, and Barclays securitized them in SABR 2006-NC2.

391.    The two loans in this deal originated by WMC were also scratch and dent, and in fact were recycled EV3s.  Barclays had previously kicked these two loans out in the course of due diligence for SABR 2006-WM1.  In a January 27, 2006, internal Barclays email (copying Menefee), a Barclays banker noted that these two loans would be excluded from the SABR 2006-WM1 deal, and described both as loans "to be repurchased." One of the loans was identified as an "FPD"; the other loan was identified as being in "Bankruptcy/Foreclosure." Nevertheless, both loans were securitized in SABR 2006-NC2.

### C.    SABR 2006-NC3

392.    SABR 2006-NC3 was securitized on October 31, 2006.  It consisted of 2,350 loans, all originated by New Century, with an aggregate scheduled principal balance, as stated in the ProSupp, of $430,021,521.

393.    For SABR 2006-NC3, Barclays drew a credit/compliance due diligence sample of 739 loans.  In its final due diligence reports, Bohan rated 155 loans as EV3 (21% of the sample by loan count).  During due diligence, Barclays directed Bohan to waive material defects on at least another 62 loans, which Bohan designated as "EV2 per client" (8.4% of the sample by loan count).  Taken together, Bohan identified 217 of the 739 loans it reviewed (29.4% by loan count) as being in breach of Barclays' representations.

394.    Barclays securitized 13 EV3 loans ($2.5 million original balance) and another 58 "EV2 per client" loans ($12 million original balance) in SABR 2006-NC3.  Barclays also securitized in this deal 26 loans ($3.2 million balance, or 1.1% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

395.     Despite Barclays' representations to rating agencies and investors that it conducted an appraisal review on 100% of the securitized loans in this deal, it in fact did not subject approximately 13.6% of the loans in this deal (320 loans) to appraisal review.

**D.     SABR 2007-NC1**

396.     SABR 2007-NC1 was securitized on January 30, 2007.  It consisted of 4,538 loans with an aggregate scheduled principal balance, as stated in the ProSupp, of $848,203,063. All loans were originated by New Century and were purchased by Barclays in October 2006.

397.     Barclays agreed to reduce its sample size in response to originator pushback.  After devising due diligence selection criteria purportedly designed to identify the riskiest loans in the pool, Barclays proceeded to securitize in SABR 2007-NC1 174 loans (original balance of $27.6 million, or 3.3% of the deal) that it had identified as manifesting those very risks, without subjecting them to due diligence.  In an October 4, 2006, email exchange, Menefee instructed a subordinate to loosen the selection criteria because the sample count came back as too high.

398.     Although Barclays substantially loosened its selection criteria after it became apparent that the due diligence selection would be much larger than New Century would allow in its trade stips, Barclays nevertheless deliberately misrepresented to rating agencies that it used the original, stricter criteria, and that it reviewed in due diligence "100%" of the loans in the pool meeting the specified criteria.

399.     In its final due diligence reports, Bohan rated 354 loans as EV3 (23.2% of the sample by loan count).  During due diligence, Barclays directed Bohan to waive material defects on at least another 304 loans, which Bohan designated as "EV2 per client" (19.9% of the sample by loan count).  Taken together, Bohan identified 658 of the 1,526 loans it reviewed (43.1% by loan count) as being in breach of Barclays' representations.

400.     Barclays securitized 1 EV3 and another 252 upgraded "EV2 per client" loans (with an original balance of $40.7 million) in SABR 2007-NC1.  It also securitized in this deal 342 loans (original balance of $62.7 million, or 7.5% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the cascade that they reached.

401.     Despite Barclays' representations to rating agencies and investors that it conducted an appraisal review on 100% of the securitized loans in this deal, it in fact did not subject approximately 1,246 of the loans securitized in this deal ($259.5 million original balance; 27.5% of the deal by loan count) to any form of appraisal review.

**E.     SABR 2007-NC2**

402.     SABR 2007-NC2 was securitized on February 27, 2007.  It consisted of 4,389 loans with an aggregate scheduled principal balance, as stated in the ProSupp, of $836,021,881.   All loans were originated by New Century and Barclays purchased all but 9 in November 2006.

403.     For SABR 2007-NC2, Barclays drew a credit/compliance due diligence selection of 1,382 loans.   In its final due diligence reports, Bohan rated 536 loans as EV3 (38.8% of the sample by loan count).  During due diligence, Barclays directed Bohan to waive material defects on at least another 181 loans, which Bohan designated as "EV2 per client" (13.1% of the sample by loan count).  Taken together, Bohan identified more than half of the loans it reviewed, 717 of the 1,382 (51.9% by loan count) as being in breach of Barclays' representations.

404.     Barclays securitized 37 EV3 loans and another 160 upgraded "EV2 per client" loans in SABR 2007-NC2.  It also securitized 306 loans (original balance of $53.6 million, or 7% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

405.     After devising due diligence selection criteria purportedly designed to identify the riskiest loans in the pool, Barclays proceeded to securitize in SABR 2007-NC2 264 loans (original

balance of $48.6 million, or 5.8% of the deal) that it had identified as manifesting those very risks, without subjecting them to due diligence.  Although Barclays substantially loosened its selection criteria after it became apparent that the due diligence selection would be much larger than New Century would allow in its trade stips, Barclays nevertheless deliberately misrepresented to rating agencies that it used the original, stricter criteria, and that it reviewed in due diligence "100%" of the loans in the pool meeting the specified criteria.

406.    Barclays securitized 124 loans in SABR 2007-NC2 that were identified on its appraisal due diligence reports as "Permanent KO" (i.e., kickout).  Barclays also securitized 496 loans that its due diligence vendor, ValuationStream, identified as part of a list of "very high property risk" loans, which the vendor also referred to as the "scariest collateral."  ValuationStream also identified 95 of the securitized loans as "suspect loans" and "of concern"; in a November 16, 2006, email, Barclays labeled these loans as "addl k/o" (i.e., additional kickouts), but it securitized them anyway.


## II.    Barclays Representation ("BR") Deals.

407.    Barclays securitized thousands of New Century loans, worth billions of dollars, in its five "SABR 2007-BR" deals that were issued in the first half of 2007.  Two of these deals also included loan pools that had been originated by WMC, and one included loans originated by Ameriquest.  The moniker "BR" referred to "Barclays' Representations," signifying that Barclays was directly making certain representations to the RMBS trust that the loan originator would normally have made.

408.    By February and March 2007, Defendants anticipated that New Century was heading towards bankruptcy.  As Menefee's supervisor explained at that time, "the f***ing place is on fire," and as Menefee himself put it, "save an act of God I think these guys [New Century]

are going to BK [bankruptcy] as quickly as you can imagine."  Defendants recognized that, once New Century became insolvent, Barclays would not be able to sell back to New Century loans that breached the representations New Century made about the loans.

409.    Meanwhile, Defendants were already well aware of serious problems with New Century loan originations.  Defendants learned of these problems, *inter alia*, through the due diligence they had conducted on prior New Century loan pools (e.g., the high EV3 rates) and through the poor performance of New Century loans Barclays had securitized in previous deals.

410.    In a March 3, 2007, email from a representative of Barclays' Global Financial Risk Management group ("GFRM") to members of Barclays' senior management, GFRM noted that "the New Century situation has worsened with announcements indicating a full year loss for 2006, which is out of step with statements previously made to us, and several regulatory investigations into the financial irregularities recently announced, as well as a review of certain stock sales. Overall, we have to be pretty unhappy at the quality of disclosures made to us. We have already commissioned a full legal review of our position but if this means a failure then we are primarily looking to manage out through collateral."

411.    As of February 2007, GFRM had put New Century on Barclays' internal "watch list," which it used to flag counterparties posing significant credit risks to Barclays.  This action did not, however, prompt Defendants to stop securitizing New Century loans or to tighten their due diligence procedures when securitizing loans from that originator.  To the contrary, after Barclays placed New Century on its watch list, Defendants *relaxed* their due diligence criteria for New Century loans, to pass the undisclosed risks of defective loans onto unwitting investors.

412.    Indeed, Defendants rushed to securitize as many New Century loans as possible during the period from April to July 2007, before those loans, thousands of which were already

delinquent, could become even more seriously delinquent.  In this rush, Defendants decided not to conduct *any* due diligence on several of the New Century loan pools Barclays securitized during this period, despite their knowledge that these pools contained significant defects.  Thus, Menefee and Carroll determined to "*tell the diligence guys to stand down*" to "*save the money*" (i.e., to avoid the cost of conducting due diligence on a New Century pool), and Menefee and his team directly instructed Bohan to cancel a due diligence job that had been scheduled for March 12, 2007, on a New Century pool.

413.    This instruction to cancel the March 12 due diligence job came after a Bohan employee sent Barclays on March 7, 2007, an announcement regarding the commencement of a "wide ranging immediate criminal investigation" into New Century by the United States Attorney's Office in Los Angeles for mortgage fraud, bank fraud, and wire fraud, among other potential violations. The Bohan employee wrote, referring to the upcoming due diligence job, "I trust this would not impact anything for next week."

414.    In a March 17, 2007, telephone call between a Barclays employee and a Barclays due diligence vendor, the Barclays employee admitted that Barclays was aware of the significant problems with New Century loans and was rushing to securitize the loans before "the whole castle tumbled."  As the employee explained, "every day that you get through without having to, you know, shut the doors, that's one more chance you have" to issue a deal.

A.      SABR 2007-BR1

415.    SABR 2007-BR1 was securitized on April 12, 2007.  It consisted of 5,028 loans with an aggregate scheduled principal balance, as stated in the ProSupp, of $969,463,956.  New Century originated most of the securitized loans, and it sold the bulk of them to Barclays in December 2006.  Ameriquest originated 280 of the securitized loans.

416.    For SABR 2007-BR1, Defendants drew a credit/compliance due diligence selection of 1,468 loans.  In its final due diligence reports, Bohan rated 617 loans as EV3 (42% of the selection by loan count).  During due diligence, Defendants directed Bohan to waive material defects on at least another 134 loans, which Bohan designated as "EV2 per client" (9.1% of the selection by loan count).  Taken together, Bohan identified more than half of the loans it reviewed, 751 of the 1,468 (51.2% by loan count), as being in breach of Barclays' representations.

417.    Defendants securitized 195 loans with the final due diligence grade of EV3 and an additional 132 upgraded "EV2 per client" loans (with a combined original balance of over $62 million).  They also securitized in this deal 112 loans (original balance of $19.2 million, or 2.2% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

418.    After devising due diligence selection criteria purportedly designed to identify the riskiest loans in the pool, Defendants proceeded to securitize in SABR 2007-BR1 $31 million of loans (3.2% of the deal) that they had identified as manifesting those very risks, without subjecting them to due diligence.  Defendants deliberately misrepresented to rating agencies that they reviewed in due diligence "100%" of the loans in the pool meeting the specified criteria.

419.    In pursuit of their aim to keep up loan volume to increase Barclays' profits, Defendants limited kickouts in due diligence on this deal.  In a December 18, 2006, telephone call regarding due diligence that had just been completed on a loan pool securitized in SABR 2007-BR1, a New Century employee noted, "we pulled things together reasonably well ... I think the frustration was just not knowing what the pull-through was going to be.  Everyone always gets their panties in a wad worrying about that stuff.  *And you always seem to come through and do*

*okay*, although I don't know what the final pull-through number was."  Menefee responded:

"That's a good track record.  *We want to be known as people who come through for you*."

420.    In a December 22, 2006, telephone call between Menefee and a New Century

employee concerning due diligence on a New Century loan pool that would be securitized in SABR

2007-BR1, Menefee agreed to limit Barclays' kickout rate to under 10%:

> **Menefee**: [W]e're still working through the credit exceptions. I know that the rate there looks like it's about 10%, which I would deem to be too high.... [D]oesn't sound like there is a lot of disagreement about the loans that have been flagged with exceptions so far. That being said, you know I don't want to get back to you with an 11% kickout rate....  You know, we were hoping to get to kind of a 90% plus pull-through rate ... 82 rather is just not gonna cut it.  So we know that.
>
> **New Century**: No, no worries. No, that's good news ... you made me feel so much better.

421.    Defendants repeatedly represented to investors that they did not securitize FPD

loans in this or any other SABR deal.  In a March 26, 2007, telephone call between Menefee and

an investor specifically relating to the collateral slated for SABR 2007-BR1, Menefee stated, "We

never securitize first-pay defaults."   And in a presentation on this deal that was delivered to

investors on April 24, 2007, Defendants represented that all loans that "were in violation of first

payment default provisions … were rejected and put back to the seller" and that "Barclays does

not support re-pricing of defective loans or inclusion of 'scratch and dent' collateral in SABR

deals."  Defendants knew these representations were false when they made them.

422.    By the time Defendants were ready to close on SABR 2007-BR1, they were aware

that scores of loans slated for inclusion in the deal had already gone into first-pay default.

Defendants had tried to put these loans back to New Century over the preceding months, but New

Century was unwilling or unable to repurchase them.  Rather than selling these delinquent loans

for a loss in the scratch and dent market, or keeping them on Barclays' balance sheet and bearing

the risk of loss from default, Defendants decided to securitize at least 125 of these FPD loans (with a principal balance of $21.8 million) in SABR 2007-BR1.

423.     Menefee and Carroll discussed these FPD loans, and made a plan to securitize them, in two March 9, 2007, phone calls.

424.     Defendants were aware that FPD loans such as the ones included in SABR 2007-BR1 had serious underwriting defects.  In a telephone call on June 25, 2007 (a few months after the close of the SABR 2007-BR1 deal), Menefee, Carroll, and a colleague discussed whether to securitize a collection of FPD loans in the forthcoming deal EQLS 2007-1.  In discussing that topic, Menefee reflected on Barclays' experience securitizing FPD loans in SABR 2007-BR1.  He remarked that those FPDs had performed very poorly: "lo and behold, if you look at the foreclosure bucket, it's populated with those loans that we put in that were a payment behind at the time of the securitization. So those loans have just gone straight down."

425.     Menefee also knew that inclusion of FPD loans in the security exposed investors to significant risk of harm.  Inclusion of the FPD loans in the deal was a deliberate decision aimed at protecting Barclays' bottom line notwithstanding that risk to investors.  As Menefee explained to Carroll, Barclays was "willing to take it on the chin from [an investor in the deal] because we did the right thing for the firm by securitizing as many loans that were eligible from a counterparty that couldn't, you know, buy back the EPDs."

426.     The investor Menefee referred to on this June 25, 2007, call had complained about the poor performance of SABR 2007-BR1 within about a month of the deal's closing. When discussing these performance issues with that same investor in a June 21, 2007, telephone call, Menefee falsely stated that Barclays had not securitized any FPD loans in the deal. He knowingly

misrepresented that "the EPD protection would have preceded the securitization so that loans that would have suffered first pay default would have been put back to the originator."

427.    In a telephone call with Carroll the same day (June 21, 2007) shortly after this investor call, Menefee recapped his discussion with the investor:

> **Menefee**: He wants us to buy loans out because they were delinquent.
> **Carroll**: Right.
> **Menefee**: And the print is horrendous. We securitized 14 percent of loans that were 0 to 29. Of that population, 27 percent have not made a payment. And that is bad.
> **Carroll**: Right.
> **Menefee**: But that's what we had.
> **Carroll**: Right.
> **Menefee**: It was a defunct originator on the other end of our EPD protection and we did what we had to do.
> **Carroll**: Right.
> **Menefee**: So. I mean, we can make a corporate decision to buy these loans out, but it's going to be very costly and it is an extraordinarily slippery slope.
> **Carroll**: Right.
> **Menefee**: If we start buying loans out of this deal –
> **Carroll**: Yeah, absolutely.
> **Menefee**: – do we buy loans out of every deal?
> **Carroll**: Absolutely.

428.    In other words, Barclays made a corporate decision, through Menefee and Carroll, not to buy out FPD loans it had knowingly securitized in SABR 2007-BR1 (effectively, remove loans from the deal post-securitization), to protect Barclays' own bottom line, knowing full well that this decision would expose investors to significant risk of harm.  Defendants were also motivated by the recognition that if Barclays made the unprofitable decision in this deal to buy out delinquent loans in response to investor pressure, it could be called upon to do the same with other deals that they knew were replete with comparable loans.  Instead of taking such steps, Defendants deceived investors and told them that no FPD loans were included in this deal.

B.      SABR 2007-BR2

429.    SABR 2007-BR2 was securitized on May 17, 2007.  It consisted of 5,461 loans with an aggregate scheduled principal balance, as stated in the ProSupp, of $1,099,706,087.  The loans were originated by WMC (3,443 loans) and New Century (2,018 loans), and Barclays acquired the bulk of them in January 2007 as part of pools slated for inclusion in both SABR 2007-BR2 and SABR 2007-BR3.

430.    From the pools of New Century loans Barclays securitized in SABR 2007-BR2, Defendants drew a credit/compliance due diligence selection of 1,377 loans; from the pools of WMC loans, they drew a selection of 2,182 loans.  In its final due diligence reports, Bohan rated 1,543 of these loans as EV3 (43.4% of the sample by loan count).  During due diligence, Defendants directed Bohan to waive material defects on at least another 407 loans, which Bohan designated as "EV2 per client" (11.4% of the selection by loan count).  Taken together, Bohan identified more than half of the loans it reviewed, 1,950 of the 3,559 (54.8% by loan count), as being in breach of Barclays' representations.

431.    Defendants securitized 334 loans with the final due diligence grade of EV3 and an additional 213 upgraded "EV2 per client" loans (with a combined original balance of over $98 million) in SABR 2007-BR2.  They also securitized in this deal 66 loans (original balance of $16.8 million, or 1.2% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

432.    After devising due diligence selection criteria purportedly designed to identify the riskiest loans in the pools, Defendants proceeded to securitize 66 New Century loans in SABR 2007-BR2 (principal balance of $12.4 million), and possibly also WMC loans, that they had identified as manifesting those very risks, without subjecting them to due diligence.  Defendants

deliberately misrepresented to rating agencies that they reviewed "100%" of the loans in the pool meeting the specified criteria.

433.    Despite Defendants' representations to rating agencies and investors that they conducted an appraisal review on 100% of the securitized loans in this deal, they in fact did not subject 1,556 of the loans securitized in this deal to any form of appraisal review.

434.    Contrary to Defendants' representations, Barclays also securitized at least 24 loans ($3.9 million) in SABR 2007-BR2 that it had itself identified as FPDs prior to securitization.

435.    Defendants also securitized hundreds of loans in this deal (and at least hundreds more in other BR deals) that they knew were already delinquent as of the closing date for the deal and that they contemplated would only become further delinquent and thereby cause losses to investors.  Defendants deliberately misrepresented to investors the extent to which delinquent loans were securitized in this deal.

436.    Defendants' plan was to securitize as many delinquent loans as possible in SABR 2007-BR2 (and other BR deals) before Defendants needed to report these loans as 30-59 days delinquent under their methodology for calculating and reporting delinquencies.  To that end, Defendants misleadingly represented in their ProSupp that only 0.9% of the deal (43 loans) were 30-59 days delinquent as of the closing date, when they knew that hundreds more loans had in fact already missed one or more payments as of the closing date of BR2.

437.    An internal Barclays "delinquency list" dated April 25, 2007 (a few weeks before the close of SABR 2007-BR2), identified hundreds of loans in Barclays' inventory that had missed one or more payments as of the date of the document and that were not then current.  Barclays securitized 387 of these delinquent loans in SABR 2007-BR2.

438.    Defendants' knowing securitization of these delinquent loans (many of which were New Century loans) was also contrary to their "Representations and Warranties Regarding the New Century Mortgage Loans" for this deal.  This document included Defendants' representations that for each of the mortgage loans "(i) All payments required to be made up to the Closing Date for the Mortgage Loan under the terms of the Mortgage Note, other than payments not yet 30 days delinquent, have been made and credited," and "no payment required under the Mortgage Loan has been 30 days or more delinquent at any time since the origination of the Mortgage Loan...."

439.    In a June 28, 2007, phone call with his supervisor, Menefee acknowledged that a large number of delinquent loans were securitized in this deal without disclosure to investors, explaining that "*we ... did the right thing for the firm, securitized a good portion of the loans that were 30-59 days delinquent.*"

440.    In March and April 2007, Carroll and Menefee had a series of interstate telephone conversations with a prospective investor interested in certain tranches of the forthcoming SABR 2007-BR deals.  Carroll and Menefee described to the investor the pool structure and due diligence process for SABR 2007-BR2, as well as the characteristics of the loan pool, in an effort to convince the investor to purchase certificates in that security.  Their efforts were successful, and the investor purchased several tranches of SABR 2007-BR2.  Within a few months after the deal issued, the investor contacted Barclays to identify 291 loans that it discovered were 30 or more days delinquent before the closing date of SABR 2007-BR2 (far more than the 43 disclosed in the ProSupp).  In a letter to Barclays dated October 22, 2007, the investor described the inclusion of these delinquent loans in the security as a material breach of Barclays' representations and demanded that Barclays buy out the 291 loans and substitute them with non-delinquent loans.

441.    Menefee responded to the investor by letter of November 7, 2007, in which he admitted that there were 144 such New Century loans in the deal (in fact, Barclays had securitized far more delinquent loans than that in the deal). He refused to buy out 23 of these loans but advised the investor that Barclays would re-purchase and substitute the other 121.  The investor balked in a letter of November 14, 2007, arguing that 291 loans were delinquent and also asking that Barclays at least buy out 129 of the 144 loans on Menefee's list.

442.    Menefee responded again by letter of November 26, 2007, demurring to the investor's entreaties and committing to repurchase and substitute only the loans identified in his November 7 letter.  In the end, Barclays bought out 120 delinquent loans from SABR 2007-BR2 – only 37 of which had been subjected to due diligence review, and 17 of those had been graded EV3 but securitized anyway.  It replaced these with 204 loans of equivalent principal balance, 146 of which were drawn from the New Century warehouse line, and only two of which had been subjected to due diligence.

### C.    SABR 2007-BR3

443.    SABR 2007-BR3 was securitized on June 13, 2007.  It consisted of 5,390 loans with an aggregate scheduled principal balance, as stated in the ProSupp, of $1,130,582,700.  The loans were originated by New Century (3,845 loans) and WMC (1,545 loans), and the bulk were acquired in January 2007 as part of pools slated for inclusion both in SABR 2007-BR2 and in SABR 2007-BR3.   The deal also included 347 New Century loans Barclays acquired in its February 2007 whole loan purchase, and over 1,100 New Century loans from its March 2007 purchase, as well as a smattering of loans from other New Century and WMC pools.

444.    Before securitizing SABR 2007-BR3, Defendants were well aware of significant problems with the New Century loan pools that they ended up putting in the deal, especially the March 2007 pool, which New Century offered for sale as it was heading towards bankruptcy.

Menefee characterized the collateral in the March 2007 pool on a February 27, 2007, call with Carroll as "look[ing] like sh*t," and he described the preliminary rating agency feedback on the pool as "atrocious." Carroll agreed that the pool was "going to look like sh*t."

445.   Defendants were aware that the March New Century pool contained large numbers of kickouts from prior pools that New Century was recycling into the new pool. In a March 1, 2007, telephone call, Menefee informed Carroll that, with regard to the March New Century pool, "there was a significant portion of the loans that we had previously kicked out that were included in this new pool."

446.   In a March 5, 2007, telephone call, Menefee and Carroll discussed whether to even buy the March New Century pool given its poor quality and the inability to put back defaulted loans to an originator which was likely to be defunct. Menefee initially resisted the purchase, explaining to Carroll that the March pool:

> *scares the sh*t out of me*. You have to think of it this way, you've got zero EPD protection, one. Not f***ing anything. So we need to have some reserves. I mean, I, you know, I want to be optimistic here, I really do, but *save an act of God I think these guys [New Century] are going to go to BK as quickly as you can imagine*.

447.   Carroll elaborated that he had spoken to Menefee's supervisor, who related a conversation that he, in turn, had had earlier in the day with the president of Barclays Capital. When the president had asked "why aren't we buying the March pool?" the supervisor had responded "what do you mean, you know, the f***ing place [New Century] is on fire." The president had then responded, "I want to have a relationship with this company. If we believe in the collateral and can stip everything we want to stip and want to buy the pool, tell John [Carroll] to go buy the pool." Four days later, Carroll proceeded to purchase the March 2007 pool for Barclays, a significant portion of which went into SABR 2007-BR3.

448.    Despite their previously-expressed concerns about the pool, Menefee and Carroll made a deliberate decision not to conduct any credit/compliance due diligence on that pool.  This decision is reflected in phone calls in which they together determine to "*tell the diligence guys to stand down*" to "*save the money*" [i.e., the cost of conducting due diligence], and in emails in which Menefee instructs Bohan to cancel a due diligence job that had been scheduled for March 12, 2007, on the New Century pool.   Menefee and Carroll also determined not to conduct any further valuation due diligence on the pool after Menefee learned that a significant percentage of the pool failed his collateral risk screen.

449.    From the January and February 2007 New Century whole loan pools that Barclays securitized in SABR-2007 BR3, Defendants drew a credit/compliance due diligence selection of 1,377 loans; from the pools of WMC loans, they drew a selection of 2,182 loans.  In its final due diligence reports, Bohan rated 1,543 of these loans as EV3 (43.4% of the sample by loan count).  During due diligence, Defendants directed Bohan to waive material defects on at least another 407 loans, which Bohan designated as "EV2 per client" (11.4% of the selection by loan count).  Taken together, Bohan identified more than half of the loans it reviewed, 1,950 of the 3,559 (54.8% by loan count), as being in breach of Barclays' representations.

450.    Barclays securitized 214 loans with the final due diligence grade of EV3 and an additional 152 upgraded "EV2 per client" loans (with a combined original balance of over $71 million) in SABR 2007-BR3.  It also securitized in this deal 167 loans (original balance of $48.3 million, or 3.1% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

451.    After devising due diligence selection criteria purportedly designed to identify the riskiest loans in the pool, Defendants proceeded to securitize in SABR 2007-BR3 at least 40 New

Century loans (original balance of $6.4 million), and possibly also WMC loans, that they had identified as manifesting those very risks, without subjecting them to due diligence.  Defendants deliberately misrepresented to rating agencies that they reviewed in due diligence "100%" of the loans in the pool meeting the specified criteria.

452.    Despite Defendants' representations to rating agencies and investors that they conducted an appraisal review on 100% of the securitized loans in this deal, they in fact did not subject 596 of the loans securitized in this deal to any form of appraisal review.

453.    Contrary to Defendants' representations, Barclays also securitized at least 48 loans ($10.3 million) in SABR 2007-BR3 that it had itself identified as FPDs prior to securitization.

454.    As in SABR 2007-BR2, Defendants securitized hundreds of loans in SABR 2007-BR3 that were already delinquent as of the closing date and that they contemplated would only become further delinquent and thereby cause losses to investors. Defendants deliberately misled investors in the ProSupp and other documents as to the extent to which delinquent loans were securitized in this deal.  The ProSupp disclosed that only approximately 0.80% of the securitized loans (40 loans) were delinquent as of the closing date.

455.    In May and June 2007, Defendants decided to adjust the composition of SABR 2007-BR3, -BR4, and -BR5 to make all three deals appear to have fewer delinquent loans than Barclays knew they actually had, in response to rating agency concern about the growing delinquency rate in New Century and WMC loan pools.

456.    In a June 4, 2007, call with Carroll, Menefee reported that, in response to the significantly higher delinquency rates, the rating agencies had adopted a new rule, to take effect the following month, "shutting off the spigot" on the inclusion in subprime RMBS of loans that were more than 60 days delinquent.  Referring to SABR 2007-BR3 and -BR4, both of which closed

in June, Menefee noted that Barclays is "trying to squeeze as much into June because these new rules take place in July. Trying to get as much into June as we can."

457.     By July 6, 2007, only weeks after the June 13, 2007, closing of SABR 2007-BR3, 973 loans in the deal were reported as delinquent – nearly 20% of the loans in the deal.

**D.     SABR 2007-BR4**

458.     SABR 2007-BR4 was securitized on June 14, 2007, the day after SABR 2007-BR3. It consisted of 5,072 loans with an aggregate scheduled principal balance, as stated in the ProSupp, of $1,004,035,087.  All of the loans were originated by New Century.

459.     Barclays purchased 3,782 of the loans in this deal in the February 2007 whole loan delivery.  From these loans, Defendants drew a credit/compliance due diligence selection of 1,269 loans.  In its final due diligence reports, Bohan rated 413 of the loans it reviewed as EV3 (32.5% of the selection by loan count).  During due diligence, Defendants directed Bohan to waive material defects on at least another 119 of these loans, which Bohan designated as "EV2 per client" (9.4% of the selection by loan count). Taken together, Bohan identified more than two-fifths of the loans it reviewed from the February 2007 New Century pool, 532 of the 1,269 (41.9% by loan count), as being in breach of Barclays' representations.

460.     Defendants securitized in this deal 27 loans that had received a final due diligence grade of EV3 and an additional 93 upgraded "EV2 per client" loans (with a combined original balance of over $23 million).  They also securitized in this deal 70 loans (original balance of $15.4 million, or 1.4% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

461.     After devising due diligence selection criteria purportedly designed to identify the riskiest loans in the February 2007 New Century pool, Defendants proceeded to securitize in SABR 2007-BR4 80 loans from that pool (original balance of $18.4 million) that they had

identified as manifesting those very risks, without subjecting them to due diligence.  Defendants deliberately misrepresented to rating agencies that Barclays reviewed in due diligence "100%" of the loans meeting the specified criteria.

462.    Barclays acquired another 202 of the loans in this deal in the March 2007 whole loan delivery.  As set forth in the discussion of SABR 2007-BR3, Defendants conducted no credit/compliance due diligence on the March New Century pool.  Defendants misrepresented to investors and rating agencies that they had conducted due diligence on this portion of the deal.

463.    The remaining 1,088 loans securitized in this deal were acquired when Barclays foreclosed on the New Century warehouse line of credit as that company faced insolvency and began breaching its covenants.

464.    While Defendants did not conduct credit/compliance due diligence on the March 2007 New Century whole loan pool (as already discussed), they did "programmatically kick" hundreds of loans from that pool which they identified using a set of adverse selection criteria, in order to persuade rating agencies to give the deal a more favorable rating.  Defendants knew that these adverse selection criteria did not identify for exclusion all loans from the pool with characteristics different from what they represented. Regardless, these "programmatically kicked" loans went back to New Century (which was still solvent at the time) and many became part of the collateral for the warehouse line.  When Defendants then determined to foreclose on that line just a few days later, they were aware that the collateral they were acquiring included hundreds of loans that they had previously kicked from the March 2007 pool.

465.    Likewise, Defendants were aware that the warehouse line included 100 loans on which Barclays had conducted due diligence in connection with prior deals and had kicked the

loans back to New Century; 91 of these 100 loans had been graded EV3 or "EV2 per client."  All 100 of these loans were ultimately securitized in SABR 2007-BR5.

466.     Defendants were also aware that the warehouse line contained hundreds of loans that New Century had explicitly labeled scratch and dent.  On February 16, 2007, New Century had sent Barclays a loan pool for bid that was expressly labeled "scratch and dent." The loan tape listed loans that had been previously repurchased by New Century (or that other banks had kicked out of New Century loan pools) and identified the specific issues with those loans that caused them to be scratch and dent.  Barclays declined to purchase that February 2007 scratch and dent pool,[19] but it ended up acquiring hundreds of those loans when it foreclosed on the New Century warehouse line.  At least 130 of these loans were securitized in SABR 2007-BR2, SABR 2007-BR4, and SABR 2007-BR5.

467.     In an internal Barclays email sent February 16, 2007, discussing this scratch and dent pool, a Barclays banker noted that "I am a stealth buyer of S&D."  Barclays management at the highest levels recognized in emails on March 8, 2007, that Barclays needed to re-underwrite (i.e., diligence) the loans from the warehouse line because of the high likelihood that "there may be material scratch and dent (loans we cant [*sic*] securitise and generally put back to the originator)."

468.     Menefee, Carroll, and others at Barclays discussed the warehouse line loans via email on March 15, 2007, in which Menefee was told that it was unlikely he would have time to conduct due diligence on the warehouse line loans before they were to be securitized.  Menefee initially suggested that in that event he would rather that Barclays not acquire the loans, but he and Carroll nevertheless proceeded to acquire them the next day.

---

[19]   Unlike other banks, Barclays had no scratch and dent shelf, and it repeatedly represented to investors that it did not securitize scratch and dent loans in principal deals.

469.     At Menefee's direction, Barclays conducted no due diligence on the loans acquired from the New Century warehouse line before securitizing them in SABR 2007-BR4 and SABR 2007-BR5.  As Defendants knew, the absence of due diligence on these loans was inconsistent with Barclays' representations to investors.

470.     SABR 2007-BR4 and SABR 2007-BR5 were accompanied by disclosures to investors that affirmatively described these securities as exclusively containing subprime, and not scratch and dent, loans.  Barclays' rating agency and investor presentations regarding SABR 2007-BR4 and SABR 2007-BR5 falsely stated that "Barclays does not support ... the inclusion of 'scratch and dent' collateral in SABR deals."

471.     Defendants were aware of the poor quality of the loans securitized in SABR 2007-BR4.  In a June 4, 2007, Bloomberg chat – about two weeks before the deal issued – two Barclays employees involved in the sale and marketing of SABR 2007-BR4 discussed the loans in the deal:

> **Employee 1**: what sabr is next? br4 or equifirst?
> **Employee 2**: br 4 ... we gotta clean out some of the older (read: bad) stuff before we roll out the gooder stuff ....

472.     Meanwhile, in an email the same day to the rating agency Moody's, Defendants deliberately misrepresented the nature and extent of credit/compliance due diligence they conducted on this deal.  Moody's asked Defendants, regarding the pools securitized in BR4: "[c]ould you also please send us the results from your due diligence process (or confirm this pool was subjected to the same one as BR3?)."  Defendants responded: "Yes, the pool was subjected to same level of diligence. Loans with credit and appraisal weakness were put-back to NC. Also, all FPD were put back to NC."

473.     These statements were false.  When Defendants made this representation to Moody's, they knew they had conducted no due diligence on the roughly 25% of the loans in the

deal coming from the March pool or the warehouse line.  Defendants also knew they had not put back to New Century all loans with "credit and appraisal weakness," as they had securitized 120 EV3 and EV2W loans from the February pool.  Defendants knew they had not even put back to New Century all FPD loans in the pool:  contrary to their representations, Barclays had securitized at least 16 loans ($4.2 million) in SABR 2007-BR4 that it had itself identified as FPD loans.

474.    In a follow-up call with Moody's on June 11, 2007, a Barclays employee once again misrepresented the extent of due diligence on SABR 2007-BR4, falsely claiming that Barclays performed due diligence on 100% of the New Century warehouse line loans included in the deal, when in fact Barclays had performed no credit/compliance due diligence on those loans.

475.    Moreover, despite Defendants' representations to rating agencies and investors that they conducted an appraisal review on 100% of the securitized loans in this deal, they in fact did not subject approximately two-thirds of the loans in this deal (3,316 out of 4,992) to any form of appraisal review.

        E.      SABR 2007-BR5

476.    SABR 2007-BR5 was securitized on July 10, 2007.  It consisted of 5,290 New Century loans with an aggregate scheduled principal balance, as stated in the ProSupp, of $999,680,439. Barclays acquired the loans in this deal in March 2007 as part of three separate pools.  The first pool was the remainder of the March whole loan delivery (*see supra* under SABR 2007-BR3). The second pool consisted of loans acquired from Barclays' warehouse line of credit to New Century (*see supra* under SABR 2007-BR4).  The third pool consisted of loans New Century sold to Carrington, which were financed through a warehouse line from Barclays, and which Barclays acquired from Carrington in March 2007.

477.    As described above, Defendants conducted *no* credit/compliance due diligence whatsoever on any of the three loan pools securitized in SABR 2007-BR5 despite their knowledge

of significant problems with New Century and significant defects in these three pools.  Defendants in fact acted affirmatively to prevent the typical due diligence review of any of the loans in this security.

478.   Recognizing the significant likelihood, based on past results, of loan quality problems, Defendants opted to avoid loan-by-loan review so as to allow even the most egregious loans to be securitized.  They determined to securitize these loan pools as quickly as possible, and to skip due diligence, to pass the risk from these loans away from Barclays and onto investors without delay.  As Carroll stated in one correspondence with Barclays' syndicate desk, "[n]eed to get BR5 out to protect against DQ risk."

479.   One hundred of the loans securitized in this deal that Barclays had acquired from the New Century warehouse line or had had in its inventory had been subjected to credit/compliance due diligence in connection with prior deals and had been kicked out of those deals.  Eighty-eight of these had been graded EV3 (original balance of $15.9 million), and another 3 were EV3 loans that Barclays had upgraded to "EV2 per client."

480.   Another 132 loans securitized in SABR 2007-BR5 had been designated "Diligence Declined" and kicked out in due diligence that Carrington conducted when acquiring the loans from New Century.

481.   As with credit/compliance due diligence, Defendants' appraisal due diligence on the pools securitized in SABR 2007-BR5 was non-existent.  Defendants conducted no appraisal due diligence of any kind on the pool acquired from the New Century warehouse line or on the pool acquired from Carrington, despite Menefee's determination that a significant portion of the New Century warehouse line loans "failed our appraisal screen for heightened collateral risk attributes."

482.   As for the 3,104 loans acquired from New Century in the March delivery and included in this deal, Defendants ordered AVMs but proceeded to securitize even those loans with dramatically inflated values.  Even after Defendants changed their normal 15% variance tolerance to 17.5%, hundreds of loans were still out-of-tolerance.  But Defendants did not conduct additional levels of valuation due diligence (such as BPOs) on these out-of-tolerance loans.  Instead, they securitized 127 of these out-of-tolerance loans in SABR 2007-BR5 ($25.3 million, or 2.4% of the deal by loan count).

483.   Defendants also securitized in SABR 2007-BR5 at least 60 loans (original balance of $14.5 million) that they had identified as FPD loans.  Defendants had initially attempted to sell many of these loans for a discount in the scratch and dent market, but they subsequently decided to securitize all of them.  Defendants represented to investors and rating agencies that Barclays did not securitize scratch and dent or FPD loans in this or other SABR deals.

484.   Despite knowing full well that they had conducted no due diligence on the pools that went into SABR 2007-BR5, Defendants misled investors about due diligence on the deal. Defendants did not inform investors in the ProSupp for SABR 2007-BR5 that they had totally abandoned their policies and conducted no due diligence on the loans; rather, they prevaricated that "the scope of the loan due diligence" conducted by Barclays "varies based on the credit quality of the mortgage loans."

485.   In addition, on August 10, 2007 (a month after the SABR 2007-BR5 deal was issued), a Barclays employee prepared a draft presentation to investors regarding Barclays' subprime RMBS deals, which referenced the percentages of loans subjected to due diligence, and kicked as a result of due diligence, on various deals.  The line for SABR 2007-BR5 was blank, and a cover email noted that the draft investor presentation did not "have due dili info for BR5 deal,"

presumably because no due diligence information existed on a deal as to which no due diligence had been conducted.

486.     Before finalizing the presentation and distributing it to investors, Defendants manipulated the chart to make it appear as though due diligence had actually been performed on SABR 2007-BR5.  They did this by deleting the blank line for SABR 2007-BR5 and adding "/BR5" to the entry for SABR 2007-BR4, misleadingly implying that the due diligence performed on SABR 2007-BR4 (i.e., on the February 2007 New Century pool) also applied to SABR 2007-BR5.  On information and belief, Defendants delivered this doctored version of the presentation to investors.

487.     Defendants also falsely represented to Moody's that they had "programmatically kicked" from the March whole loan pool all loans that met certain stated criteria.  Defendants securitized 203 loans in SABR 2007-BR5 (original balance of $28.5 million) that met the criteria they listed as having been programmatically kicked.

## III.    Fremont ("FR") Deals

### A.    SABR 2006-FR1

488.     SABR 2006-FR1 was securitized on February 23, 2006.  It consisted of 4,604 loans, all originated by Fremont, with an aggregate scheduled principal balance, as stated in the ProSupp, of $989,194,069.

489.     For SABR 2006-FR1, Barclays drew a credit/compliance due diligence sample of 2,547 loans.  In its final due diligence reports, Bohan rated 250 loans as EV3 (9.8% of the sample by loan count).  During due diligence, Barclays directed Bohan to waive material defects on at least another 164 loans, which Bohan designated as "EV2 per client" (6.4% of the sample by loan

count).  Taken together, Bohan identified 414 of the 2,547 loans it reviewed (16.3% by loan count) as being in breach of Barclays' representations.

490.    Barclays securitized 3 EV3 loans and another 146 "EV2 per client" loans ($33.6 million combined original balance) in SABR 2006-FR1.  Barclays also securitized in this deal 42 loans ($5.7 million balance, or 0.9% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the cascade that the loans reached.

491.    After devising due diligence selection criteria purportedly designed to identify the riskiest loans in the pool, Barclays proceeded to securitize in SABR 2006-FR1 $97 million of loans (9.8% of the deal) that it had identified as manifesting those very risks, without subjecting them to due diligence.  Barclays deliberately misrepresented to rating agencies that it reviewed in due diligence "100%" of the loans in the pool meeting the specified criteria.

492.    Bohan also discovered that, for a large number of the loans securitized in SABR 2006-FR1, there were significant discrepancies between the data appearing on the loan tape provided by the originator (which Barclays passed on to investors and rating agencies) and the data actually appearing in the loan files.  Bohan reported its findings to Barclays, but Barclays ignored the tape deltas and deliberately provided the inaccurate information on Fremont's loan tape to investors and rating agencies.

## B.    SABR 2006-FR2

493.    SABR 2006-FR2 was securitized on July 6, 2006. It consisted of 2,499 loans, substantially all of which were originated by Fremont, with an aggregate scheduled principal balance, as stated in the ProSupp, of $519,259,753.  Eight of the loans in the deal were originated by New Century.

494.    For SABR 2006-FR2, Barclays drew a credit/compliance due diligence sample of 1,797 loans.  In its final due diligence reports, Bohan rated 234 loans as EV3 (13% of the sample

by loan count).  During due diligence, Barclays directed Bohan to waive material defects on at least another 112 loans, which Bohan designated as "EV2 per client" (6.2% of the sample by loan count).  Taken together, Bohan identified 346 of the 1,797 loans it reviewed (19.3% by loan count) as being in breach of Barclays' representations.

495.    Barclays securitized 76 "EV2 per client" loans ($17.5 million original balance) in SABR 2006-FR2.  Barclays also securitized in this deal 1 loan ($628,000 balance) with an appraisal that was out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loan reached.

496.    After devising due diligence selection criteria purportedly designed to identify the riskiest loans in the pool, Barclays proceeded to securitize in SABR 2006-FR1 $33 million of loans (6.4% of the deal) that it had identified as manifesting those very risks, without subjecting them to due diligence.  Barclays deliberately misrepresented to rating agencies that it reviewed in due diligence "100%" of the loans in the pool meeting the specified criteria.

### C.    SABR 2006-FR3

497.    SABR 2006-FR3 was securitized on August 3, 2006. It consisted of 4,564 loans, all originated by Fremont, with an aggregate scheduled principal balance, as stated in the ProSupp, of $987,602,652.

498.    For SABR 2006-FR3, Defendants drew a credit/compliance due diligence sample of 2,382 loans.  In its final due diligence reports, Bohan rated 350 loans as EV3 (14.7% of the sample by loan count).  During due diligence, Defendants directed Bohan to waive material defects on at least another 262 loans, which Bohan designated as "EV2 per client" (11% of the sample by loan count).  Taken together, Bohan identified 612 of the 2,382 loans it reviewed (25.7% by loan count) as being in breach of Barclays' representations.  Barclays also securitized in this deal 10

loans ($728,433 balance) with an appraisal that was out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loan reached.

499.     In pursuit of their aim to keep up loan volume to increase Barclays' profits, Defendants agreed to limit kickouts.  In an April 27, 2006, voicemail that he left for a Fremont employee in connection with the tie-out of the loan pool securitized in SABR 2006-FR3, Menefee acknowledged that the kickout rate of 8.26% "might seem high based on the conversation" and that he "would like to see if we can adjust that down per the discussion we had."  In a subsequent telephone call the same day, an employee of Fremont asked Menefee, referring to EV3 loans: "Can you give me an idea of how many you overturned?" Menefee responded that he had overturned 42 loans. The Fremont employee responded: "Okay, I was trying to push for half. So, I guess 42 is okay."  Barclays securitized 39 EV3 loans and another 229 "EV2 per client" loans ($58.1 million combined original balance) in SABR 2006-FR3.

500.     After devising due diligence selection criteria purportedly designed to identify the riskiest loans in the pool, Defendants proceeded to securitize in SABR 2006-FR3 $2.5 million of loans that they had identified as manifesting those very risks, without subjecting them to due diligence.  Defendants deliberately misrepresented to rating agencies that they reviewed in due diligence "100%" of the loans in the pool meeting the specified criteria.

501.     Bohan also discovered that, for a large number of the loans securitized in SABR 2006-FR3, there were significant discrepancies between the data appearing on the loan tape provided by the originator (which Defendants passed on to investors and rating agencies) and the data actually appearing in the loan files.  Bohan reported its findings to Defendants, but Defendants ignored the tape deltas and deliberately provided the inaccurate information on Fremont's loan tape to investors and rating agencies.

502.     Defendants also securitized in SABR 2006-FR3 at least 82 recycled EV3 loans that they knew had been kicked out from previous deals.  Defendants had attempted to sell these 82 loans to the loan aggregator CBASS as part of a larger pool of Fremont loans that Barclays sold to CBASS in mid-2006. CBASS securitized that pool on Barclays' SABR shelf, in an agented deal called CBASS 2006-CB5 (not one of the Subject Deals), on which Barclays was the lead underwriter and which it issued on June 30, 2006.  CBASS kicked these 82 loans out of that deal based on delinquency issues and inflated appraisals, refusing to buy them from Barclays. Defendants then recycled them into SABR 2006-FR3 and securitized them without disclosing to investors what they had done.

503.     In a July 11, 2006, telephone call, a Barclays trader asked a Barclays banker about the 82 loans that CBASS had kicked out of CBASS 2006-CB5 and which Barclays was planning to securitize in SABR 2006-FR3.  55 of these loans had already missed three payments by that point in time; another 27 had "BPO issues."  Their discussion went as follows:

> **Barclays Trader**: I just want to make sure I have all the numbers correct as far as the number of loans that we pulled from the loan sale to CBASS, and which ones we put where, and so forth. Right now, I know that we have 55 that were basically the leftovers that are going into the FR3 transaction, right. So those 55 loans, correct me if I'm wrong, are comprised of both those loans that have BPO issues as well as the ones for 5/1 due date.
> **Barclays Banker**: No, that's wrong. 55 are 5/1 next dues. And then there's 27 that are BPO issues....
> **Trader**: Ok, and both of those are going into FR3, correct?
> **Banker**: Yes....

504.     By the time SABR 2006-FR3 issued, Defendants were already aware of serious problems with Fremont originations, including that the loans were defaulting and going into early delinquency at astronomical rates.  In a July 11, 2006, email, Menefee noted that "*[w]e are experiencing unprecedented early payment defaults with Fremont collateral.*"

505.   Menefee and Carroll were in fact fully aware that the Fremont pool securitized in SABR 2006-FR3 was rife with fraudulent loans, and that the unprecedented EPD and FPD rates were a strong indicator of fraud.

506.   In a July 12, 2006, telephone call, Carroll and Menefee discussed the poor performance of Fremont deals, and they acknowledged the inability of their due diligence selection criteria to identify all the fraudulent loans in the pool.  Menefee noted, with respect to a group of loans that had not been captured by the criteria: "*Those guys are just performing horribly.*" Despite having willingly loosened their selection criteria on numerous occasions to satisfy originator demands to limit kickouts, Menefee and Carroll did not tighten those criteria even after themselves acknowledging their inability to identify all fraudulent loans in the pool.

507.   In an August 4, 2006, telephone call to a due diligence provider, Menefee acknowledged the unprecedented rate of FPDs in Fremont pools and explained that the loans had defaulted either because they had been poorly underwritten or because they were fraudulent or because they were underwater: "We are seeing FPD rates hit an all-time high. There's a Fremont pool we bought recently and saw FPD at 6.6%.... Three, I think, primary influences. One is we're extending 100% financing to borrowers who truly just can't afford it ... and doing a bad job of evidencing that ability to repay because a lot of it is stated income.... The second influence, I believe, is just outright fraud....  Borrower, you know, never intended to make a payment....  We're seeing a lot of that.  The third issue ... is a situation where the borrower is buying the house in an area with deflating property values ... and their view is 'I no longer care ... I don't have any money in it so why do I care.'"

508.   In another call that same day with a Fremont representative, Menefee noted the "dramatic spike" in FPDs and acknowledged that it was almost certainly attributable to pervasive

fraud in Fremont's loan originations; he also observed that the FPDs occurred in both the reviewed and the unreviewed portions of the pool.  As he said to the Fremont representative: "What's weird to us is we look at these first-pay defaults. *They look like a cross section of the pool.*" Later in the call, Menefee said: "*yeah, it's fraud*... But why would it be so widespread? … I think every single originator is having this conversation."

509.     In a January 22, 2007, call with a colleague, Menefee observed that if he conducted due diligence on all of the loans that had gone into FPD, he would find fraud or other circumstances that breached Barclays' representations: "[W]e'll due diligence each one of those and put them back for a breach of a rep or a warranty. Right? *Because there's likely to be some kind of fraud if it was an FPD.*"

510.     Defendants repeatedly misrepresented to investors that Barclays did not securitize FPD loans in this (or any other) SABR deal.  In an October 11, 2006, telephone call with an investor discussing a number of Fremont deals, including SABR 2006-FR3, Menefee assured the investor that Barclays always put FPDs back to Fremont.  In a March 5, 2007, call with another investor discussing Fremont and New Century deals, Menefee said that "we have not ever securitized first pay defaults."   These statements were false.

511.     Defendants securitized in SABR 2006-FR3 at least 59 loans that they had identified as FPD loans.  These loans violated Fremont's representations to Barclays that each loan would make its first contractual payment – representations that Barclays passed on to investors in SABR 2006-FR3.

512.     Defendants securitized 40 of these 59 FPDs (original balance of $10.2 million) after Fremont refused to buy the loans back from Barclays. Barclays had missed the contractual deadline

for submitting these FPD loans to Fremont. Defendants decided to securitize them to pass on the risk of loss to unwitting investors.

513.     In an August 2, 2006, telephone call, in discussing whether to securitize these $10.2 million of FPD loans, Menefee noted to Carroll that if Barclays were to sell (rather than securitize) the FPD loans "we would lose 10 points on that .... We would sell those at 90, which appears to be the going rate" for scratch and dent loan sales.  Carroll responded, "[i]t's a million bucks. Leave them in the deal. Take it on the back end. If we pull them out of the deal, we take on 100% of the risk; we've sold 97% of the risk in the deal. Just leave them in."  In other words, to avoid losing $1 million by selling the defaulted loans at a 10% discount, Carroll and Menefee decided to securitize the loans and pass the risk of loss on these loans to the RMBS investors.

514.     In a telephone call between Menefee and Fremont on August 4, 2006, Menefee noted the "dramatic spike" in first pay defaults in Fremont deals, and averred that it was almost certainly attributable to pervasive fraud in Fremont's loan originations.  In another call that same day, referring to the FPD loans securitized in this deal that Fremont had refused to buy back, Menefee noted to Carroll that "[y]ou have to know 90% of the reason something like this would default [so soon after origination] is because of fraud." Carroll responded: "Yeah absolutely." Menefee: "And you don't think I could go and document fraud in 50 loans? Wrong. And I will. But I don't want to."

515.     Defendants also knew that loans that had gone into EPD or FPD were scratch and dent loans and knew that the inclusion of such loans in SABR 2006-FR3 violated their representations to investors and rating agencies that Barclays never included scratch and dent loans in its SABR deals.  In an August 2, 2006, call with Fremont, in which Menefee tried to convince Fremont to buy back the delinquent loans, Menefee remarked: "In fact, I've just been going

through a sale today where, ultimately, borrower never made another payment, we've ended up *selling those loans as scratch and dent*. And, you know, have taken a big hit on the loans." Later in the call, Menefee agreed to securitize the FPDs if their payment due date was the day prior: "[C]an you tell me which ones are due for 8/1? Because we won't even talk about those. Due for 8/1, *we'll just jam into the deal.*"

516.    Defendants did not disclose what they knew about the high EPD rates in Fremont collateral, about the existence of FPD loans in the deal, or about the likelihood of fraud.

517.    In including these defaulted and delinquent loans in SABR 2006-FR3, Defendants were serving their own interests to the exclusion of investors, and in fact they evinced a clear intent to harm investors in the deal.  In an August 15, 2006, telephone call:

> **Menefee**: What do you want me to do on these first pay defaults? ... The group of loans, 40 of them, that we forfeited our right to put back to Fremont because we notified them late?
> **Carroll**: Oh they're going to stay in the deal ....
> **Menefee**: [T]his is a situation which I think you know we averted a disaster but could have cost us a million dollars.
> **Carroll**: Well it still might.
> **Menefee**: It still might. Absolutely.
> **Carroll**: But I don't think I'll be here by that point.

518.    In other words, Defendants deliberately passed onto investors the risk of loss stemming from ten million dollars' worth of loans that were already in default, and that Defendants themselves believed were likely fraudulent, because they wished to avert the "disaster" of losing one million dollars.  Carroll celebrated this decision out of a recognition that he likely would be gone from Barclays by the time investors suffered the full extent of the harm caused by this decision.

519.    In multiple interstate communications discussing SABR 2006-FR3 and other Barclays' SABR deals, Defendants falsely represented that Barclays never securitized FPD loans

in this or any other SABR deals.  For instance, in a March 27, 2007, interstate email between Menefee (located in New York) and a Barclays salesperson located in Illinois, the salesperson reported to Menefee that an investor in SABR 2006-FR3 had inquired about the collateral performance of that deal, and had specifically asked about the presence of EPD loans in the deal. In a responsive interstate email communication, Menefee, with full expectation that the salesperson would pass the misrepresentation on to the inquiring investor, prevaricated that, "with respect to the EPD population, all EPDs were submitted back to Fremont (the FR3 pool is net of these loans)."  On information and belief, Barclays subsequently related this misrepresentation to the inquiring investor.

### D.    FHLT 2006-C

520.    Fremont Home Loan Trust 2006-C ("FHLT 2006-C") was an agented deal that Barclays securitized on Fremont's registered shelf on September 7, 2006.  It consisted of 7,806 residential mortgage loans, all originated by Fremont, with an aggregate principal balance, as stated in the ProSupp, of approximately $1,798,572,976.  Barclays served as the lead underwriter on the securitization.

521.    For FHLT 2006-C, Barclays drew a tiny credit/compliance due diligence sample, of only 303 loans (3.4% of the deal by loan count).

522.    In its final due diligence reports, Bohan rated 42 loans as EV3 (13.9% of the sample by loan count).  During due diligence, Barclays directed Bohan to waive material defects on at least another 19 loans, which Bohan designated as "EV2 per client" (6.3% of the sample by loan count).  Taken together, Bohan identified 61 of the 303 loans it reviewed (20.1% by loan count) as being in breach of Barclays' representations.

523.    Barclays securitized all 42 of the loans that Bohan identified as EV3 and all 19 of the loans upgraded to EV2 per client – resulting in a 100% pull through rate.  Barclays even

included 13 of these securitized EV3 loans on a "Final Kickout List" it sent to Fremont during due diligence.  Fremont did not remove these loans from the pool, and Barclays instead securitized them without disclosing to investors that the deal contained non-compliant loans.

524.    In addition to securitizing all 61 of the loans that were rated EV3 and "EV2 per client" in the course of due diligence that Barclays conducted specifically for this deal, Barclays securitized in this deal another 228 loans ($56.3 million) that it knew had been graded EV3 in due diligence that Barclays had conducted for prior principal securitizations (mainly SABR 2006-FR2 and -FR3) and had kicked out of those deals.  Barclays tracked loans that it kicked out in due diligence, and it knew Fremont was recycling kickouts into this deal.

525.    Barclays conducted no appraisal due diligence on FHLT 2006-C.

526.    Barclays did, however, securitize in this deal 47 loans (original balance of $11.5 million) it had subjected to appraisal due diligence in prior deals and had kicked out for being out-of-tolerance.  Barclays tracked loans it kicked out in valuation due diligence, and knew that Fremont was recycling valuation kickouts into this deal.

**E.    SABR 2006-FR4**

527.    SABR 2006-FR4 was securitized on December 12, 2006.  It consisted of 3,746 loans, all originated by Fremont, with an aggregate scheduled principal balance, as stated in the ProSupp, of $820,396,634. Barclays acquired the loans from Fremont in July 2006.

528.    For SABR 2006-FR4, Defendants drew a credit/compliance due diligence sample of 1,694 loans.  In its final due diligence reports, Bohan rated 359 loans as EV3 (21.2% of the sample by loan count).  During due diligence, Defendants directed Bohan to waive material defects on at least another 207 loans, which Bohan designated as "EV2 per client" (12.2% of the sample by loan count).  Taken together, Bohan identified 566 of the 1,694 loans it reviewed (33.4% by loan count) as being in breach of Barclays' representations.

529.    Defendants securitized 16 EV3 loans and another 168 "EV2 per client" loans ($51.8 million combined original balance) in SABR 2006-FR4.  Defendants also securitized 91 loans ($16.6 million balance, or 2.4% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

530.    After devising due diligence selection criteria designed to identify the riskiest loans in the pool, Defendants proceeded to securitize in SABR 2006-FR4 twenty-four loans ($4.4 million) that they had identified as manifesting those very risks, without subjecting them to due diligence.  Defendants deliberately misrepresented to rating agencies that they reviewed in due diligence "100%" of the loans in the pool meeting the specified criteria.

531.    As in earlier deals comprised of Fremont loans, including SABR 2006-FR3, SABR 2006-HE1, and SABR 2006-HE2, Fremont requested that Defendants limit kickouts in this deal to no more than 7% of the pool.  Through their course of dealings with Fremont, Defendants agreed to the 7% kickout cap, despite repeatedly telling investors and rating agencies that they did not ever agree to kickout caps, on this or any other deal.

532.    As reflected in a July 26, 2006, email chain between Menefee and Fremont discussing due diligence on the pool securitized in SABR 2006-FR4, Fremont convinced Menefee to overturn two loans that he had initially tried to reject. The Fremont employee stated, "still looking to get more loans in." Fremont followed up, "Paul, we are looking to get this up to a minimum of 93%. We are currently at 91%. Looks like about another 20mm." Fremont later wrote, "Were you able to add any more?"

533.    The following discussion occurred on a telephone call the next day (July 27) between Menefee and a Fremont employee concerning due diligence on the Fremont pool securitized in FR4:

**Menefee**: You know when I look at the kickout rate it's 8.36%. When I look at the finance disclosure loans – the ones that were in when we left, but are now not in – that's 96 basis points. So had we been able to, as we discussed, buy the ones that were underdisclosed finance charges, we'd have been right where you want to be. So you know its 7.4% kickout and I think that's probably close enough.... And you know, even 8.36 is comparable to where we've been. Last month we had a pull-through rate of 93.1%.... And in April we were at 92.3% so I think we've been very consistent....

**Fremont employee**: Oh, I know the give and take. And like I was telling [another Barclays employee], you have made tremendous effort. However, my supervisors, their feedback is they want to get up the execution to 93 ... Paul, I appreciate what you've done and I know it's a give-and-take ... and I try to just get the information to make the loans go through....

534.     In another call the same day with a Fremont employee, Menefee noted that "when we left your office, we thought that we were at, you know, 7.36% ... Close enough to 7 to, you know, feel good about the effort." Menefee further noted that had Fremont agreed to rebate certain loans it decided to remove from the offered pool, "that would have put us at your target."

535.     Notwithstanding their agreement to kickout caps, Defendants knew before this deal closed that the quality of the loans in the pool was quite poor.  As one Barclays salesperson stated in an email, *"I think the big rock is the deluge of Fremont garbage being put out there."*

536.     Barclays' valuation vendor ClearCapital described one loan included in the Fremont pool as carrying *"the distinct aroma of default."*  That loan had been refinanced four times within a short time, with each refinancing at significantly increased property values; the borrower had a FICO score of only 550; and the loan was a stated documentation loan. Menefee replied, "Let's kick it out." Nevertheless, in response to Fremont pushback, Defendants securitized the loan in SABR 2006-FR4.

537.     Defendants securitized at least 4 loans in this deal that they had identified as FPD loans, after Fremont declined to repurchase them.  In multiple interstate communications discussing SABR 2006-FR4 and other Barclays' SABR deals, Defendants falsely represented that

Barclays never securitized FPD loans in this or any other SABR deals.  For instance, in a March 5, 2007, telephone call with investors in SABR 2006-FR4, where rising EPD rates in Fremont deals and Barclays' repurchase demand of Fremont were discussed, Menefee falsely stated that "We have not ever securitized first pay defaults, and one of the provisions in our agreements is that the seller will repurchase loans where the borrower defaults on its initial payment to us. So, before the securitization has formed ...  we've either pulled them out, sold them separately, or put all of those back to Fremont."

538.    Additionally, Defendants deceived at least one investor regarding the underwriting guidelines that Fremont had used in originating the loans securitized in SABR 2006-FR4 and then covered up the fraud after the investor discovered it.  This investor initially resisted purchasing certificates in the deal in light of the poor performance of Fremont loans over the course of 2006.  On December 5, 2006, Menefee spoke with a representative of this investor and falsely represented that the Fremont loans in the deal had been underwritten in accordance with new, stricter guidelines that Fremont had recently adopted.   Menefee knew this statement was false, as he had signed off on the ProSupp for the deal, which confirmed that the loans in the deal had been underwritten under the old guidelines.   Nevertheless, assuaged by Menefee's assurances, the investor bought certificates in SABR 2006-FR4.

539.    By April 2007, the investor observed that SABR 2006-FR4 was performing terribly, and after conducting its own inquiries, it learned that the loans in SABR 2006-FR4 had not in fact been underwritten to new, stricter guidelines, as Menefee had avowed.  Furious at the deception, a representative of the investor called Carroll in April 2007 to reverse the purchase. The investor also asked for a copy of the recording of the December 5, 2006, call between Menefee and the investor, so that the investor could prove what Menefee had represented on the call about

the guidelines pursuant to which the Fremont loans had allegedly been underwritten.  Barclays falsely told the investor that no recording of the call existed.

540.    In an internal phone call between Carroll and Barclays' Compliance Group, Carroll admitted that Menefee's statement to the investor in December 2006, to the effect that the loans in the deal had been underwritten under new, stricter guidelines, was false, but he insisted that the investor should have followed what was written in the ProSupp rather than relying on Menefee's statements.   At Carroll's suggestion, Barclays then offered to repurchase the certificates from the investor, but only at the then-current market price, which was less than half of what the investor had paid for them.  The investor deemed the offered price too low and rejected it.   Determining that it could not easily prove what Menefee had misrepresented about the loans without a recording of the December 5, 2006, call, the investor ultimately kept the bonds and took the losses on them.

541.    In early 2007, due to the "unprecedented default rate of the SABR 2006-FR3 pool," Defendants commissioned a "diagnostic review" of 499 Fremont-originated loans Barclays had securitized in various deals, including in SABR 2006-FR4, and that had defaulted within the first six months of origination.  The purpose of the review was "to identify instances of proven or suspected misrepresentation, violation of prudent underwriting standards, and/or instances of early collection problems sufficient to require lender repurchase of the asset."

542.    The review found that only 65 of the 499 EPDs (13.1%) could be blamed on borrower-centered circumstances such as unforeseen hardships, medical issues, or income curtailment/loss.   Another 54 defaults were deemed to result from Fremont's "aggressive underwriting" practices.  As to the other 379 defaulted loans included in the study, Defendants concluded that "an overwhelming percentage of the loans exhibit material deficiencies.... *Essentially default was inevitable* based upon poor/overly aggressive underwriting combined with

a trend among the loans examined in that the majority contained a high loan to value, low FICO, and no asset verified lending."

543.     Defendants determined that these loans, many of which were securitized in SABR 2006-FR4, had significant defects when Barclays acquired them from Fremont.  These included 48 loans in which Fremont – in Defendants' own words – had completely "*ignored guidelines*" and had given "*no regard for borrower's ability to repay debt*."  Dozens more loan files were found to have been underwater at the time of origination; involved DTI ratios well above the guideline limits; involved straw buyers or non-arms-length transactions; misrepresented owner occupancy; or failed to document the borrower's income or employment.

544.     Following the diagnostic review, Barclays attempted to put some but not all of the misrepresented loans back to Fremont.  But it did not succeed.

545.     In a December 19, 2007, interstate email from Menefee to the head of Fremont, Barclays offered to release Fremont from "all outstanding and future claims arising directly from the transactions in which loans were purchased by Sutton from Fremont" (including the loans securitized in SABR 2006-FR3 and SABR 2006-FR4), in exchange for a cash payment to Barclays of $40 million.  On information and belief, Menefee and Barclays had no intention of using this money to buy the misrepresented loans out of the trust or to otherwise compensate the trust (and its certificateholders) for the increased risk of loss resulting from the securitization of these misrepresented loans.

546.     Indeed, contrary to their obligations to notify the trustee and other counterparties of any known breaches of representations, to which they agreed in the PSA for this deal, Menefee and Barclays instead sought to hide the misrepresentations from the trustee and the certificateholders and to keep the trustee out of their negotiations with Fremont.  In a March 11,

2008, interstate email, Fremont sought to bring Deutsche Bank, the trustee for SABR 2006-FR4, into its negotiations with Barclays on the repurchase requests stemming from Barclays' diagnostic review.  Menefee became irate that Fremont had reached out to the trustee. Counsel for Barclays wrote to a group of Barclays' personnel: "Unbelievable!" And Menefee wrote "This is outrageous."

547.    On information and belief, Barclays did not ultimately succeed in putting any of these defective and defaulted loans back to Fremont or in otherwise removing them from the trust. Instead, all of these loans remained in the deal, and investors in SABR 2006-FR4 suffered the substantial losses ensuing from Barclays' knowing securitization of loans as to which "*default was inevitable.*"


## IV.    WMC Mortgage ("WM") Deals

### A.    SABR 2006-WM1

548.    SABR 2006-WM1 was securitized on February 28, 2006. It consisted of 3,529 loans, all originated by WMC Mortgage Corporation, with an aggregate scheduled principal balance, as stated in the ProSupp, of $721,736,085.

549.    For SABR 2006-WM1, Barclays drew a credit/compliance due diligence sample of 1,256 loans.  In its final due diligence reports, Bohan rated 233 loans as EV3 (18.6% of the sample by loan count).  During due diligence, Barclays directed Bohan to waive material defects on at least another 81 loans, which Bohan designated as "EV2 per client" (6.4% of the sample by loan count).  Taken together, Bohan identified 314 of the 1,256 loans it reviewed (25% by loan count) as being in breach of Barclays' representations.

550.    Barclays securitized 92 EV3 loans and another 70 "EV2 per client" loans ($29.9 million combined original balance, or 4.6% of the deal) in SABR 2006-WM1.  It also securitized

117 loans ($26.1 million, or 3.3% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

551.    After devising due diligence selection criteria designed to identify the riskiest loans in the pool, Barclays proceeded to securitize in SABR 2006-WM1 212 loans ($85.1 million, or 11.7% of the deal) that it had identified as manifesting those very risks, without subjecting them to due diligence.  Barclays deliberately misrepresented to rating agencies that it reviewed in due diligence "100%" of the loans in the pool meeting the specified criteria.

**B.    SABR 2006-WM2**

552.    SABR 2006-WM2 was securitized on October 26, 2006.  It consisted of 5,162 loans, all originated by WMC, with an aggregate scheduled principal balance, as stated in the ProSupp, of $1,000,956,056.

553.    For SABR 2006-WM2, Barclays drew a credit/compliance due diligence sample of 1,590 loans.  In its final due diligence reports, Bohan rated 384 loans as EV3 (24.2% of the sample by loan count).  During due diligence, Barclays directed Bohan to waive material defects on at least another 86 loans, which Bohan designated as "EV2 per client" (5.4% of the sample by loan count).  Taken together, Bohan identified 470 of the 1,590 loans it reviewed (29.6% by loan count) as being in breach of Barclays' representations.

554.    Barclays securitized 112 EV3 loans and another 74 "EV2 per client" loans ($35 million combined original balance, or 3.6% of the deal) in SABR 2006-WM2.  It also securitized in this deal 379 loans (original balance of $67.7 million, or 7.3% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

555.    After devising due diligence selection criteria purportedly designed to identify the riskiest loans in the pool, Barclays proceeded to securitize in SABR 2006-WM2 30 loans (original

balance of $16.8 million, or 1.7% of the deal) that it had identified as manifesting those very risks, without subjecting them to due diligence.  Barclays deliberately misrepresented to rating agencies that it reviewed in due diligence "100%" of the loans in the pool meeting the specified criteria.

556.    Bohan also discovered that, for a large number of the loans securitized in SABR 2006-WM2, there were significant discrepancies between the data appearing on the loan tape provided by the originator (which Barclays passed on to investors and rating agencies) and the data actually appearing in the loan files.  For example, Bohan found that 297 loans had a higher DTI than reported and 9 loans had higher original LTV than reported.  Bohan reported its findings to Barclays, which ignored the tape deltas and deliberately provided inaccurate information on Fremont's loan tape to investors and rating agencies.

557.    A July 27, 2006, telephone call shows Menefee, on behalf of Barclays, acceding to pressure from WMC to limit kickouts and waive in EV3 loans on this deal:

> **WMC**: Is there any way you can look at all the EV3s –
> **Menefee**: Yeah, yeah absolutely –
> **WMC**: And find a way to get comfortable with some more? ... It's a long term relationship; it's never about one trade, but I want to do so much with you guys ... from a relationship perspective.
> **Menefee**: We don't think we're doing our jobs unless we look at all the EV3s ....
> **WMC**: There's a lot of EV3s to go through or the execution percentage is gonna be really sucky.
> **Menefee**: Well, there's a lot of time between now and tomorrow morning.
> **WMC**: I appreciate it, I know that you will do everything that you can. I appreciate it, buddy.

558.    Earlier in the day, Menefee had reassured WMC that, with regard to the low kickout rate on the pool, "all in, that stacks up to be the best pull-through rate of any pool that we've acquired from any seller in perhaps the past two years."

C.     SABR 2006-WM3

559.     SABR 2006-WM3 was securitized on December 1, 2006.  It consisted of 4,780 loans, all originated by WMC, with an aggregate scheduled principal balance, as stated in the ProSupp, of $998,949,119.

560.     For SABR 2006-WM3, Barclays drew a credit/compliance due diligence sample of 2,213 loans.  In its final due diligence reports, Bohan rated 555 loans as EV3 (25.1% of the sample by loan count).  During due diligence, Barclays directed Bohan to waive material defects on at least another 321 loans, which Bohan designated as "EV2 per client" (14.5% of the sample by loan count).  Taken together, Bohan identified 876 of the 2,213 loans it reviewed (39.6% by loan count) as being in breach of Barclays' representations.

561.     Barclays securitized 12 EV3 loans and another 187 "EV2 per client" loans ($40.2 million combined original balance) in SABR 2006-WM3.  Barclays also securitized in this deal 29 loans (original balance of $5.5 million, or 0.6% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

562.     After devising due diligence selection criteria purportedly designed to identify the riskiest loans in the pool, Barclays proceeded to securitize in SABR 2006-WM3 34 loans (original balance of $10.2 million, or 1% of the deal) that it had identified as manifesting those very risks, without subjecting them to due diligence.  Barclays deliberately misrepresented to rating agencies that it reviewed in due diligence "100%" of the loans in the pool meeting the specified criteria.

### D.     SABR 2006-WM4

563.     SABR 2006-WM4 was securitized on December 28, 2006.  It consisted of 7,379 loans, all originated by WMC, with an aggregate scheduled principal balance, as stated in the ProSupp, of $1,355,443,368.

564.     For SABR 2006-WM4, Barclays drew a credit/compliance due diligence sample of 4,316 loans.  In its final due diligence reports, Bohan rated 1,343 loans as EV3 (31.1% of the sample by loan count).  During due diligence, Barclays directed Bohan to waive material defects on at least another 537 loans, which Bohan designated as "EV2 per client" (12.4% of the sample by loan count).  Taken together, Bohan identified 1,880 of the 4,316 loans it reviewed (43.6% by loan count) as being in breach of Barclays' representations.

565.     Barclays securitized 51 EV3 loans and another 199 "EV2 per client" loans ($39.2 million combined original balance) in SABR 2006-WM4.  Barclays also securitized in this deal 117 loans (original balance of $22.5 million, or 1.6% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

566.     After devising due diligence selection criteria purportedly designed to identify the riskiest loans in the pool, Barclays proceeded to securitize in SABR 2006-WM4 58 loans (original balance of $16.3 million, or 1.2% of the deal) that it had identified as manifesting those very risks, without subjecting them to due diligence.  Barclays deliberately misrepresented to rating agencies that it reviewed in due diligence "100%" of the loans in the pool meeting the specified criteria.

## V.   HomEq ("HE") Deals

### A.   SABR 2006-HE1 and SABR 2006-HE2

567.   In 2006, Barclays issued two "HE" securitizations on its SABR shelf, each consisting of loan pools from multiple originators serviced by HomEq, a loan servicer that Barclays acquired in the second half of 2006.

568.   SABR 2006-HE1 was securitized on August 31, 2006.  It consisted of 4,393 loans with an aggregate scheduled principal balance, as stated in the ProSupp, of $768,771,113.  The loans were originated by Aegis Mortgage Corp. (2,129 loans), Fremont (1,856 loans), and Decision One Co. LLC (408 loans).  Barclays purchased all of these loans in May 2006.

569.   SABR 2006-HE2 was securitized on September 28, 2006.  It consisted of 5,576 loans with an aggregate scheduled principal balance, as stated in the ProSupp, of $1,024,802,507.  The loans were originated by Fremont (2,456 loans), New Century (2,435 loans), and Aegis (684 loans). Barclays purchased these loans in May and June 2006.

570.   For SABR 2006-HE1, Barclays drew a credit/compliance due diligence sample of 2,031 loans.  In their final due diligence reports, Barclays' vendors rated 476 loans as EV3 (23.4% of the sample by loan count).  During due diligence, Barclays directed its vendors to upgrade at least another 108 loans, which Bohan designated as "EV2 per client" (5.3% of the sample by loan count).  Taken together, Barclays' vendors identified 584 of the 2,031 loans they reviewed (28.8% by loan count) as being in breach of Barclays' representations.

571.   For SABR 2006-HE2, Barclays drew a credit/compliance due diligence sample of 2,255 loans.  In their final due diligence reports, Barclays' vendors rated 581 loans as EV3 (25.8% of the sample by loan count).  During due diligence, Barclays directed its vendors to upgrade at least another 99 loans, which Bohan designated as "EV2 per client" (4.4% of the sample by loan

count).  Taken together, Barclays' vendors identified 680 of the 2,255 loans they reviewed (30.2% by loan count) as being in breach of Barclays' representations.

572.    Barclays securitized 25 EV3 loans and another 95 "EV2 per client" loans ($20.4 million combined original balance) in SABR 2006-HE1.  Barclays securitized 17 EV3 loans and another 88 "EV2 per client" loans ($20.1 million) in SABR 2006-HE2.

573.    Barclays also securitized in SABR 2006-HE1 476 loans (original balance of $72.2 million, or 10.8% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.  In SABR 2006-HE2, the number was 507 loans (original balance of $96 million, or 9.1% of the deal by loan count).

574.    Barclays was aware of significant problems with the Aegis pool well before it securitized the loans in SABR 2006-HE1 and SABR 2006-HE2.  In an April 28, 2006, email, Barclays' valuation vendor warned Menefee that "Aegis is reportedly struggling, and *overall loan quality is reported to be VERY POOR.* The tie-out style of their team is also very confrontational, emotional, unprofessional and dishonest."   In response, Menefee did not abandon the pool or instruct Barclays' vendor to tighten its due diligence standards or review a larger sample; nor did he modify Barclays' standard disclosures to investors about the Aegis pool.  Instead, he responded that Barclays was "aware of the market sentiment around this name and believe that our performance expectations have been set accordingly."

575.    In internal emails from July 2006, Barclays employees discussed the astronomical number of FPD loans in the Aegis pool in particular, noting that more than 8% of the loans in the pool were in FPD at that time.  In a July 6, 2006, telephone call, Menefee discussed the poor quality of the Aegis loans, stating he had never seen an FPD rate as high as 8%.  Menefee stated that *"it's*

*about as bad as it can be"* due to "aggressively underwritten loans" in addition to "bad servicing." Again, Menefee did not abandon the pool or instruct Office Tiger to tighten its due diligence standards or review a larger sample; nor did he modify Barclays' standard disclosures to investors about the Aegis pool.  Instead, referring to SABR 2006-HE2, he said he was "interested in accelerating our next deal as an HE series deal to involve Aegis, Fremont, and Decision One" to "be out in front" of a $600 million pool Aegis would likely be securitizing on a standalone basis and servicing itself that could be "one of the worst we've seen this year."

576.    In its aim to keep up loan volume to increase its profits, Barclays also acceded to pressure from Aegis to limit kickouts, waive in EV3 loans, and improve pull-through rates.  In a May 11, 2006, call between Menefee and an employee of Aegis regarding tie-out of the part of the pool to be securitized in SABR 2006-HE1, Menefee reassured the Aegis employee that, *"I think at end of day ... we are going to get there and be just happy with the pull through rate and so forth ... I think in doing that we can probably reduce the population [of EV3s] and continue to whittle it down ... I feel as though we are going to get through all these issues just fine."*

577.    In pursuit of its aim to keep up loan volume to increase its profits, Barclays also agreed to limit its kickouts from the pool it acquired from Decision One.  On May 17, 2006, the Bohan project lead emailed his team of underwriters with Menefee's instructions to Bohan to scale back the extent of their underwriting edits on the Decision One credit/compliance due diligence review. The Bohan underwriters were instructed not to capture "evidence a loan may have been rejected from any previous pool ... or a higher than normal reject rate."

578.    In a May 26, 2006, telephone call, Menefee assured Decision One he was *"working to try to accept as many loans as we can ... I don't make any money kicking out loans ... We are embarrassed by bad pull throughs."*

579.    In connection with the due diligence on the Fremont loans securitized in SABR 2006-HE1 and SABR 2006-HE2, Fremont asked Barclays to sign a confidentiality agreement regarding borrower information.  Menefee apparently misunderstood the request as covering due diligence findings.  In a May 2, 2006, telephone call with Fremont, Menefee suggested there was no need for such an agreement because Barclays had no intention of disclosing to investors what it learned in due diligence about the Fremont loans: "What in the world would we possibly do? … I mean, wouldn't we really, really be shooting ourselves in both feet to, like, blast you?  We're going to face investors and say, you know, 'these are the best loans we've ever seen, and in large part because Fremont originated them, and we love those guys.'  That's the way this works.  Not like, oh my gosh, 'guess what we found.'"

### B.    SABR 2007-HE1

580.    SABR 2007-HE1 was securitized on January 30, 2007.  It consisted of 4,813 loans with an aggregate scheduled principal balance, as stated in the ProSupp, of $920,928,971. The loans were originated by WMC (4,342 loans) and New Century (471 loans), which Barclays purchased in October 2006.

581.    For the WMC and New Century pools combined, Barclays drew a credit/compliance due diligence sample of 3,304 loans.  In its final due diligence reports, Bohan rated 688 loans as EV3 (20.8% of the sample by loan count).  During due diligence, Barclays directed Bohan to waive material defects on at least another 597 loans, which Bohan designated as "EV2 per client" (18.1% of the sample by loan count).  Taken together, Bohan identified 1,285 of the 3,304 loans it reviewed (38.9% by loan count) as being in breach of Barclays' representations.

582.    Barclays securitized 5 EV3 loans and another 232 "EV2 per client" loans ($44.3 million combined original balance) in SABR 2007-HE1.  Barclays also securitized 326 loans

(original balance of $62.7 million, or 6.8% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the cascade that the loans reached.

583.    After devising due diligence selection criteria designed to identify the riskiest loans in the pool, Barclays proceeded to securitize in SABR 2007-HE1 35 New Century loans (original balance of $6.4 million, or 0.7% of the deal) that it had identified as manifesting those very risks, without subjecting them to due diligence.  Barclays deliberately misrepresented to rating agencies that it reviewed in due diligence "100%" of the loans in the pool meeting the specified criteria.

584.    Despite representing that in this deal it "[r]eviewed 100% of the loan files for appraisal," 238 of the loans securitized in SABR 2007-HE1 (4.9% of the pool by loan count) were not subjected to any appraisal due diligence.


## VI.    BCAP Deals

585.    Barclays' "BCAP" deals – including BCAP 2006-AA1, BCAP 2006-AA2, BCAP 2007-AA1, BCAP 2007-AA2, BCAP 2007-AA3, BCAP 2007-AA4, and BCAP 2007-AA5 – consisted of Alt-A loans sold to Barclays by originators such as Countrywide, IndyMac, Chevy Chase, and Wells Fargo.  Barclays issued these deals on its BCAP registered shelf.

586.    As with the SABR Subject Deals, in acquiring pools of Alt-A loans for securitization in the BCAP Subject Deals, the Barclays employees involved in those deals reviewed due diligence results that informed them that the loan pools contained high rates of materially defective loans. Yet Barclays typically reviewed only small samples of the loan pools securitized in the BCAP deals, and it failed to take steps to ensure that the unreviewed portions of the loan pools were free of loans that did not comply with Barclays' representations to investors. In addition, the Barclays employees working on due diligence for these deals waived in numerous loans that their credit/compliance and valuation due diligence vendors graded as materially

defective, to maximize the numbers of loans that were securitized and to maintain good relationships with the originators supplying Barclays with Alt-A loans.

587.    Barclays represented to investors that, for all of its BCAP deals, it conducted a credit/compliance due diligence review of a "10-25% selection of loan files."  In fact, it frequently reviewed a much lower percentage of loans, often as little as 5%.

588.    Barclays also represented to investors that, for all of its BCAP deals, it conducted valuation due diligence consisting of a "[r]eview of 100% of original appraisals," and that "each original appraisal report is reviewed by experienced appraisers."  In fact, approximately 75% of the loans securitized in the BCAP deals only received a risk assessment score, and not any form of appraisal review, much less any review by experienced appraisers.

589.    Barclays also represented to investors that, for all of its BCAP deals, it used a "+/-10%" tolerance band in due diligence, to determine the validity of the appraisal.  In fact, for most of the pools securitized in its BCAP deals, Barclays used a more forgiving 15% tolerance band.

### A.    BCAP 2006-AA1

590.    BCAP 2006-AA1 was securitized on August 31, 2006.  It consisted of 439 Alt-A loans, all originated by Countrywide, with an aggregate scheduled principal balance, as stated in the ProSupp, of $290,815,354.

591.    Countrywide's initial delivery tape only listed 370 loans.  From this tape, Barclays drew a due diligence sample of only 37 loans.  In its final due diligence reports, Clayton rated 6 of these 37 loans (or 16.2% of the sample by loan count) as EV3.  Barclays kicked all six of these loans.  However, it also directed Clayton to waive material defects on another 2 EV3 loans, which Clayton graded as "EV2W:  Material exceptions waived," and both of those loans were securitized. Taken together, Clayton identified 8 of the 37 loans it reviewed (21.6% by loan count) as being in breach of Barclays' representations.

592.     In BCAP 2006-AA1, Barclays was aware that Countrywide had only included a portion of the loans in the offered pool on the initial delivery tape and would "gross up" the pool through a subsequent delivery.  Barclays drew its due diligence selection only from the initial delivery tape and did not apply its selection criteria to the "grossed up" loans, instead securitizing those loans without any review.  Specifically, Barclays purchased 86 loans (19.6% of the total by loan count) that Countrywide added to the pool after Barclays drew its due diligence sample and securitized them in BCAP 2006-AA1 without any due diligence review.

593.     Barclays performed no valuation due diligence whatsoever on this deal, despite its representations that, on its BCAP deals, it "[r]eview[ed] 100% of original appraisals" in due diligence and that "each original appraisal report is reviewed by experienced appraisers."

**B.     BCAP 2006-AA2**

594.     BCAP 2006-AA2 was securitized on November 30, 2006. The deal consisted of 2,872 Alt-A loans with an aggregate scheduled principal balance, as stated in the ProSupp, of roughly $1,209,872,028. The loans in the deal came from two pools sold to Barclays by Countrywide and one pool sold to Barclays by IndyMac.

595.     Despite finding a high EV3 rate (16.2%) in the prior pool of Countrywide loans that it securitized (in BCAP 2006-AA1), Barclays reduced (rather than increased) its due diligence sample sizes in response to pressure from Countrywide for the two pools securitized in this deal, drawing from these pools a due diligence sample of only 23 loans, or 5% of the pools.  From the IndyMac pool securitized in BCAP 2006-AA2, Barclays drew a sample of 500 loans.

596.     In its final due diligence reports, Clayton rated 217 of the 523 loans it reviewed (41.5% of the sample by loan count) as EV3.  Barclays securitized 169 of these loans ($50.9 million original balance; 5.9% of the deal by loan count) in BCAP 2006-AA2, along with one EV3 loan

that it directed Clayton to waive material defects on, and that Clayton graded as "EV2W: Material exceptions waived."

597.    In BCAP 2006-AA2, Barclays was aware that both Countrywide and IndyMac had only included a portion of the loans in the offered pools on the initial delivery tapes and would "gross up" the pools through subsequent deliveries.  Barclays drew its due diligence selections only from the initial delivery tapes and did not apply its selection criteria to the "grossed up" loans, instead securitizing those loans without any review.  Specifically, Barclays purchased 40 Countrywide loans and 618 IndyMac loans (658 total loans, or 22.9% of the deal by loan count) that those originators added to the pools after Barclays drew its due diligence sample, and securitized them in BCAP 2006-AA2 without any due diligence review.

598.    This was a deliberate choice by Barclays. In an October 20, 2006, email, after receiving the added loans from IndyMac, one of the Barclays employees working on this deal noted that Barclays "will not be selecting additional dd samples based on the added loans."

599.    Barclays performed no valuation due diligence whatsoever on this deal, despite its representations that, on its BCAP deals, it "[r]eview[ed] 100% of original appraisals" in due diligence and that "each original appraisal report is reviewed by experienced appraisers."

**C.    BCAP 2007-AA1**

600.    BCAP 2007-AA1 was securitized on February 27, 2007.  The deal consisted of 2,304 Alt-A loans with an aggregate scheduled principal balance, as stated in the ProSupp, of $1,310,645,742. The loans in the deal came from pools Barclays acquired from Countrywide (1,036 loans) and IndyMac (1,268 loans).

601.    Despite finding as astronomical EV3 rate (41.5% by loan count) in the prior pool of IndyMac loans that it had securitized in BCAP 2006-AA2, Barclays reduced (rather than increased) its sample size on the IndyMac pool, in response to pressure from IndyMac.  From the

IndyMac pool, Barclays drew a due diligence sample of only 193 loans.  From the Countrywide pool securitized in BCAP 2007-AA1, Barclays drew a sample of only 85 loans.

602.    In its final due diligence reports, Clayton rated 32 of the 278 loans it reviewed (11.5% of the sample by loan count) as EV3.  Barclays directed Clayton to waive material defects on at least another 27 EV3 loans (9.7% of the sample by loan count) that Clayton graded as "EV2W:  Material exceptions waived."  Taken together, Clayton identified 59 of the 278 loans it reviewed (21.2% by loan count) as being in breach of Barclays' representations.

603.    Barclays securitized 13 EV3 loans and another 19 EV2W loans ($25.9 million combined principal balance) in BCAP 2007-AA1.

604.    In BCAP 2007-AA1, Barclays was aware that both Countrywide and IndyMac had only included a portion of the loans in the offered pool on the initial delivery tape and would "gross up" the pool through subsequent deliveries.  Barclays drew its due diligence selections only from the initial delivery tapes and did not apply its selection criteria to the "grossed up" loans, instead securitizing those loans without any review.  Specifically, Barclays purchased 234 IndyMac loans and 268 Countrywide loans (502 total loans, or 21.8% of the deal by loan balance) that those originators added to the pools after Barclays drew its due diligence sample, and securitized them in BCAP 2007-AA1 without any due diligence review.

605.    Barclays misrepresented to investors and rating agencies that it subjected 100% of the loans in this deal to appraisal review in which each appraisal was reviewed by experienced appraisers.  In fact, 2,033 of the loans securitized in BCAP 2007-AA1 (88.2% of the deal by loan count) received only a risk assessment predicated on factors extrinsic to the appraisal, and were not subjected to any appraisal review or valuation due diligence.  Another 10 loans were not even subjected to a rudimentary risk assessment.

606.    Of the approximately 10% of the loans in the deal that were subjected to appraisal review, Barclays securitized 38 loans ($28.7 million balance or 1.6% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

### D.    BCAP 2007-AA2

607.    BCAP 2007-AA2 was securitized on March 29, 2007.  The deal consisted of 4,519 Alt-A loans with an aggregate scheduled principal balance, as stated in the ProSupp, of $1,474,020,700. Countrywide originated 3,193 of these loans (70.7% of the deal), and Wells Fargo originated the remaining 1,326 loans (29.3% of the deal).

608.    From the pools securitized in BCAP 2007-AA2, Barclays drew a credit/compliance due diligence sample of only 433 loans, of which 224 were Countrywide loans and 209 were Wells Fargo loans.  In its final due diligence reports, Clayton rated 32 of the 433 loans it reviewed (7.4% of the sample by loan count) as EV3.  Barclays kicked all 32 of these loans.  However, it also directed Clayton to waive material defects on another 29 EV3 loans (6.7% of the sample by loan count) which Clayton graded as "EV2W:  Material exceptions waived," and 15 of those loans were securitized.  Taken together, Clayton identified 61 of the 433 loans it reviewed (14.1% by loan count) as being in breach of Barclays' representations.

609.    In BCAP 2007-AA2, Barclays was aware that Countrywide had only included a portion of the loans in the offered pool on the initial delivery tape and would "gross up" the pool through a subsequent delivery.  Barclays drew its due diligence selection only from the initial delivery tape and did not apply its selection criteria to the "grossed up" loans, instead securitizing those loans without any review.  Specifically, Barclays purchased 121 loans (2.7% of the deal by loan count) that Countrywide added to the pools after Barclays drew its due diligence sample, and securitized them in BCAP 2007-AA2 without any due diligence review.

610.     Barclays misrepresented to investors and rating agencies that it subjected 100% of the loans in this deal to appraisal review in which each appraisal was reviewed by experienced appraisers.  In fact, 3,159 of the loans securitized in BCAP 2007-AA2 (69.9% of the deal by loan count) received only a risk assessment predicated on factors extrinsic to the appraisal, and were not subjected to any appraisal review or valuation due diligence.  Another 683 loans (15.1% of the deal by loan count) were not even subjected to a rudimentary risk assessment.

611.     Of the approximately 15% of the loans in the deal that were subjected to appraisal review, Barclays securitized 76 loans ($36.3 million balance or 1.7% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

612.     Barclays also knowingly securitized in this deal nine loans that were delinquent at the time of securitization, despite representing in the ProSupp that all loans were current.

**E.     BCAP 2007-AA3**

613.     BCAP 2007-AA3 was securitized on May 31, 2007.  The deal consisted of 2,446 Alt-A loans with an aggregate scheduled principal balance, as stated in the ProSupp, of $1,231,983,746. The loans were originated by Wells Fargo (1,550) and Countrywide (896).

614.     From the pools securitized in BCAP 2007-AA3, Barclays drew a credit/compliance due diligence sample of only 461 loans, of which 209 were Countrywide loans and 252 were Wells Fargo loans.  In its final due diligence reports, Clayton rated 54 of the 461 loans it reviewed (11.7% of the sample by loan count) as EV3.  Barclays directed Clayton to waive material defects on at least another 29 EV3 loans (6.3% of the sample by loan count) that Clayton graded as "EV2W: Material exceptions waived."  Taken together, Clayton identified 83 of the 461 loans it reviewed (18% by loan count) as being in breach of Barclays' representations.

615.     Barclays securitized 4 EV3 loans and another 15 EV2W loans ($17.9 million combined principal balance) in BCAP 2007-AA3.

616.     In BCAP 2007-AA3, Barclays was aware that Countrywide had only included a portion of the loans in the offered pools on the initial delivery tapes and would "gross up" the pools through subsequent deliveries.  Barclays drew its due diligence selection only from the initial delivery tapes and did not apply its selection criteria to the "grossed up" loans, instead securitizing those loans without any review.  Specifically, Barclays purchased 151 loans (6.2% of the deal by loan count) that Countrywide added to the pools after Barclays drew its due diligence sample, and securitized them in BCAP 2007-AA3 without any due diligence review.

617.     Barclays misrepresented to investors and rating agencies that it subjected 100% of the loans in this deal to appraisal review in which each appraisal was reviewed by experienced appraisers.  In fact, 2,063 of the loans securitized in BCAP 2007-AA3 (84.3% of the deal by loan count) received only a risk assessment predicated on factors extrinsic to the appraisal, and were not subjected to any appraisal review or valuation due diligence.  Another 17 loans were not even subjected to a rudimentary risk assessment.

618.     Of the approximately 15% of the loans in the deal that were subjected to appraisal review, Barclays securitized 72 loans ($69.9 million balance or 2.9% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

### F.     BCAP 2007-AA4

619.     BCAP 2007-AA4 was securitized on June 29, 2007.  The deal consisted of 1,287 loans with an aggregate scheduled principal balance, as stated in the ProSupp, of $735,716,096. Countrywide originated 768 of these loans, Chevy Chase originated 510, and Wells Fargo originated the other 9.

620.     From the pools securitized in BCAP 2007-AA4, Barclays drew credit/compliance due diligence samples consisting of 390 loans in total.  In its final due diligence reports, Clayton rated 79 of the loans it reviewed (20.3% of the sample by loan count) as EV3.  Barclays directed Clayton to waive material defects on at least another 26 EV3 loans (6.7% of the sample by loan count) that Clayton graded as "EV2W:  Material exceptions waived."  Taken together, Clayton identified 105 of the 390 loans it reviewed (26.9% by loan count) as being in breach of Barclays' representations.

621.     Barclays securitized 23 EV3 loans and one EV2W loan ($16.1 million combined original balance) in BCAP 2007-AA4.

622.     In BCAP 2007-AA4, Barclays was aware that Countrywide had only included a portion of the loans in the offered pools on the initial delivery tape and would "gross up" the pools through subsequent deliveries.  Barclays drew its due diligence selection only from the initial delivery tape and did not apply its selection criteria to the "grossed up" loans, instead securitizing those loans without any review.  Specifically, Barclays purchased 117 loans (9.1% of the deal by loan count) that Countrywide added to the pools after Barclays drew its due diligence sample, and securitized them in BCAP 2007-AA4 without any due diligence review.

623.     Barclays misrepresented to investors and rating agencies that it subjected 100% of the loans in this deal to appraisal review in which each appraisal was reviewed by experienced appraisers.  In fact, 868 of the loans securitized in BCAP 2007-AA4 (67.4 % of the deal by loan count) received only a risk assessment predicated on factors extrinsic to the appraisal, and were not subjected to any appraisal review or valuation due diligence.  Another 225 loans (17.5% of the deal by loan count) were not even subjected to a rudimentary risk assessment.

624.    Of the approximately 15% of the loans in the deal that were subjected to appraisal review, Barclays securitized 48 loans ($38.1 million balance or 3.7% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

### G.    BCAP 2007-AA5

625.    BCAP 2007-AA5 was securitized on September 21, 2007.  The deal consisted of 324 Alt-A loans, all originated by Countrywide, with an aggregate scheduled principal balance, as stated in the ProSupp, of $278,342,242.

626.    Barclays drew a due diligence sample of 276 loans.  In its final reports, Clayton rated 73 of these loans as EV3 (26.4% of the sample by loan count).  Barclays directed Clayton to waive material defects on at least another 19 EV3 loans (6.9% of the sample by loan count) that Clayton graded as "EV2W:  Material exceptions waived."  Taken together, Clayton identified 92 of the 276 loans it reviewed (33.3% by loan count) as being in breach of Barclays' representations.

627.    Barclays securitized 9 EV3 loans and another 2 EV2W loans ($36 million combined original balance) in BCAP 2007-AA5.

628.    In BCAP 2007-AA5, Barclays was aware that Countrywide had only included a portion of the loans in the offered pool on the initial delivery tape and would "gross up" the pool through a subsequent delivery.  Barclays drew its due diligence selection only from the initial delivery tape and did not apply its selection criteria to the "grossed up" loans, instead securitizing those loans without any review.  Specifically, Barclays purchased 65 loans (20.1% of the deal by loan count) that Countrywide added to the pools after Barclays drew its due diligence sample, and securitized them in BCAP 2007-AA5 without any due diligence review.

629.    Barclays misrepresented to investors and rating agencies that it subjected 100% of the loans in this deal to appraisal review in which each appraisal was reviewed by experienced

appraisers.  In fact, 207 of the loans securitized in BCAP 2007-AA5 (63.9% of the deal by loan count) received only a risk assessment predicated on factors extrinsic to the appraisal, and were not subjected to any appraisal review or valuation due diligence.  Another 54 loans (16.7% of the deal by loan count) were not even subjected to a rudimentary risk assessment.

630.    Of the approximately 19% of the loans in the deal that were subjected to appraisal review, Barclays securitized 8 loans ($16 million balance or 2.5% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

## VII.   EquiFirst Deal (EQLS 2007-1)

631.    EQLS 2007-1 was securitized on June 27, 2007.  It consisted of 5,683 subprime loans, all originated by EquiFirst Mortgage Corporation, with an aggregate scheduled principal balance, as stated in the ProSupp, of $981,398,942.  At the time of securitization, EquiFirst was a wholly-owned subsidiary of Barclays, which acquired the originator in early 2007.  Barclays was the lead underwriter of this securitization, which it issued on its BCAP shelf.

632.    For EQLS 2007-1, Barclays drew a credit/compliance due diligence selection of 2,585 loans.  In its final due diligence reports, Bohan rated 650 loans as EV3 (25.1% of the selection by loan count).  During due diligence, Barclays directed Bohan to waive material defects on at least another 408 loans, which Bohan designated as "EV2 per client" (15.8% of the selection by loan count).  Taken together, Bohan identified more than two-fifths of the loans it reviewed, 1,058 of the 2,585 (40.9% by loan count), as being in breach of Barclays' representations.

633.    Barclays securitized 8 loans with the final due diligence grade of EV3 and an additional 370 upgraded "EV2 per client" loans (with a combined original balance of $54.7 million original balance, or 6.7% of the deal by loan count) in EQLS 2007-1.

634.    It also securitized in this deal 92 loans (original balance of $13.6 million, or 1.6% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.  Four of these out-of-tolerance loans were also marked "declined" in final due diligence reports, yet were securitized anyway.  Another 16 loans that were not out-of-tolerance at the last stage of due diligence but were marked as "declined" in final due diligence reports were also securitized.

635.    After devising due diligence selection criteria designed to identify the riskiest loans in the pool, Barclays proceeded to securitize in EQLS 2007-1 at least 221 loans ($37.5 million; 3.8% of the final pool by loan balance) that it had identified as manifesting those very risks, without subjecting them to due diligence.  Barclays deliberately misrepresented to rating agencies that it reviewed in due diligence "100%" of the loans in the pool meeting the specified criteria. Specifically, it represented that it reviewed 100% of loans with "Credit Grade C or C-" but in truth did not even use that criterion to generate its due diligence selection and securitized without review 176 loans (more than $32 million in principal balance) with the grade of C or C-.

636.    Barclays misrepresented to investors and rating agencies that it subjected 100% of the loans in this deal to appraisal review in which each appraisal was reviewed by experienced appraisers.  In fact, Barclays subjected only 31.3% of the loans in this deal (1,778 loans) to appraisal review or valuation due diligence. The remaining loans were securitized without any appraisal review, despite Barclays' knowledge, from the high rate of loans with inflated appraisals, that the unreviewed loans had a high likelihood of being out of tolerance.

## VIII.   Alliance Bancorp Deal (ALBT 2007-OA1)

637.    ALBT 2007-OA1 was securitized on May 30, 2007.  It consisted of 777 Alt-A loans, all originated by Alliance Bancorp, with an aggregate scheduled principal balance, as stated

in the ProSupp, of $319,128,991. All of the loans in the deal were option ARM loans (hence "OA").[20] Barclays was the lead underwriter on this agented securitization, and it issued the deal on the registered shelf of Alliance Bancorp's parent, Alliance Securities Corporation.

638. Initially, before Barclays received the lead underwriting mandate for this deal, Alliance chose Deutsche Bank to structure and serve as lead underwriter for the securitization. In reviewing the Alliance loan pool in credit/compliance due diligence, Deutsche Bank's head of due diligence remarked that "this is probably the most adverse pool of Option ARMs I've seen; it appears Alliance has originated this product to subprime borrowers." (The deal was marketed as comprised solely of Alt-A, not subprime, loans.) Deutsche Bank's due diligence team also discovered an unusually high number of compliance problems with the loans sampled in due diligence. The head of due diligence noted that the compliance defect rate of 6% was "more than twice the percentage we typically see in most pools ...."

639. After Alliance shifted the lead mandate to Barclays, Barclays' own due diligence results were consistent with Deutsche Bank's findings about the poor quality of these loans.

640. Barclays drew a credit/compliance due diligence sample of 417 loans. In its final due diligence reports, Clayton rated 93 of these loans as EV3 (22.3% of the sample by loan count). During due diligence, Barclays directed Clayton to waive material defects on at least another 45 EV3 loans (10.8% of the sample by loan count), which Clayton graded "EV2W: Material exception waived." Taken together, Clayton identified almost a third of the loans it reviewed, 138 out of 417 (33.1% by loan count), as being in breach of Barclays' representations.

---

[20] An option ARM loan is a monthly-adjusting adjustable-rate mortgage (ARM) which allows the borrower to choose between several monthly payment options, e.g., a 30 or 40-year fully amortizing payment, a 15-year fully amortizing payment, an interest-only payment, a minimum payment, or any amount greater than the minimum payment.

641.    Barclays securitized 76 loans with a final grade of EV3 and an additional 32 upgraded "EV2W" loans (with a combined original balance of over $46 million; 14.6% of the final pool by loan count) in ALBT 2007-OA1.

642.    Contrary to Barclays' representations that it conducted a due diligence "review of 100% of original appraisals" and that "each original appraisal is reviewed by experienced appraisers," over 70% of the loans selected for valuation due diligence in this deal were securitized without any appraisal review at all and without even receiving an AVM.  Barclays' valuation vendor recommended that Barclays order BPOs on dozens of loans in this deal that it had flagged as high risk, but Barclays canceled the job and securitized the loans with no further review because it wanted to bring the deal to market as quickly as possible.  It also securitized in this deal at least 76 loans ($30 million balance or 9.8% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached, and another 19 loans that were missing appraisals altogether.

643.    The deal was a catastrophic failure, having projected lifetime collateral losses of over $176 million, or more than 55% of its original balance.


## IX.    Ameriquest Deals (ARSI 2005-W5 and ARSI 2006-W2)

644.    Barclays had a close, long-term relationship with the subprime retail mortgage lender Ameriquest Mortgage Corporation and its wholesale affiliate Argent Mortgage Company. During the Relevant Period, Barclays extended billions of dollars in credit to Ameriquest to finance the origination of loans through a market value swap, the notional balance of which reached as high as $2.5 billion.

645.     Barclays was the lead underwriter on the agented securitizations ARSI 2005-W5 and ARSI 2006-W2, which consisted entirely of loans originated by Ameriquest.  Barclays issued the deals on the registered shelf of Ameriquest's affiliate, Argent Securities, Inc.

646.     Barclays employees leading the due diligence on these Ameriquest securitizations were aware early on of serious problems with Ameriquest's loan originations.  In March 2005, some of these employees attended a conference call to discuss recent news reports that Ameriquest mortgage brokers were falsifying home appraisal values and instructing borrowers to lie about their income on stated income applications.

647.     Rather than being prompted by this information to conduct extensive due diligence on these pools of Ameriquest loans before securitizing them, Barclays conducted only minimal diligence on the pools securitized in ARSI 2005-W5 and ARSI 2006-W2.  It also waived in at least hundreds of loans that it discovered in due diligence to have serious credit, compliance, or appraisal defects.

### A.     ARSI 2005-W5

648.     ARSI 2005-W5 was securitized on December 28, 2005.  It consisted of 10,552 loans, all originated by Ameriquest and sold to its Argent affiliate, with an aggregate scheduled principal balance, as stated in the ProSupp, of $2,000,000,246.

649.     For ARSI 2005-W5, Barclays drew a credit/compliance due diligence selection of 1,553 loans.  In its final due diligence reports, Clayton graded 198 of these loans as EV3 (12.7% of the sample).  Barclays kicked all of these loans from the deal.  However, during due diligence, Barclays directed Clayton to waive material defects on at least another 91 EV3 loans (5.9% of the sample by loan count), which Clayton denoted "client upgrade Credit Event 2," and it securitized 57 of these upgraded loans.  Taken together, Clayton identified 289 out of the 1,553 loans it reviewed (18.6% by loan count) as being in breach of Barclays' representations.

650.     Barclays also securitized in this deal at least 74 loans (original balance of $10.2 million) with appraisals that were out-of-tolerance by more than 15% at the last stage of the cascade that the loans reached, and another 40 loans that were missing appraisals altogether.

**B.     ARSI 2006-W2**

651.     ARSI 2006-W2 was securitized on February 27, 2006.  The deal consisted of 7,709 loans, all originated by Ameriquest and sold to its Argent affiliate, with an aggregate scheduled principal balance, as stated in the ProSupp, of $1,600,001,722.

652.     For ARSI 2006-W2, Barclays drew a credit/compliance due diligence selection of 934 loans.  In its final due diligence reports, Mortgage Ramp graded 150 of the loans as EV3 (16.1% of the sample by loan count).  During due diligence, Barclays directed Mortgage Ramp to waive material defects on at least another 152 EV3 loans (16.3% of the sample by loan count), which Mortgage Ramp graded "Overturned Evt Lvl 3s."   Taken together, Mortgage Ramp identified 302 out of the 934 loans it reviewed (32.3% by loan count) as being in breach of Barclays' representations.

653.     Barclays securitized 3 EV3s and 148 "Overturned Evt Lvl 3s" (combined original balance of over $33 million) in ARSI 2006-W2.  Barclays also knowingly securitized in ARSI 2006-W2 71 recycled EV3 loans (with a principal balance of $15.7 million) that Barclays had kicked out of ARSI 2005-W5 credit/compliance defects, and another 88 recycled loans (with a principal balance of $15.7 million) that it had kicked out of ARSI 2005-W5 for having out-of-tolerance appraisals.  Barclays did not disclose to investors that this deal contained loans that it had kicked out of a prior deal for material defects.

## X.     RFC Deal (RASC 2006-KS8)

654.     RASC 2006-KS8 was an agented deal that Barclays securitized on September 28, 2006.  It consisted of 3,764 loans with an aggregate scheduled principal balance, as stated in the ProSupp, of $588,673,962.  According to the ProSupp, the bulk of the loans were originated by HomeComings Financial Network, Inc. (a wholly-owned subsidiary of Residential Funding Corp. (RFC)) (25.4%), Decision One (14.7%), and Ownit Mortgage Solutions, Inc. (14.5%); no other lender originated more than 10% of the mortgage pool.  RFC was the sponsor of the deal, which Barclays, as lead underwriter, issued on the shelf of Residential Asset Securities Corp., another RFC affiliate.

655.     For RASC 2006-KS8, Barclays drew a credit/compliance due diligence selection of 886 loans.  In its final reports, Bohan rated 438 of these loans as EV3 (49.4% of the sample by loan count).  During due diligence, Barclays directed Bohan to waive material defects on at least another 32 loans, which Bohan designated as "EV2 per client" (3.6% of the sample by loan count). Taken together, Bohan identified more than half of the loans it reviewed, 470 out of 886 (53% by loan count), as being in breach of Barclays' representations.

656.     Barclays securitized 204 EV3 loans and an additional 25 "EV2 per client" loans (combined original balance of over $30 million, or 6% of the deal) in RASC 2006-KS8.  Barclays also securitized in this deal 55 loans (original balance of $9 million or 1.5% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the valuation due diligence cascade that the loans reached.  Of the 3,764 loans securitized in RASC 2006-KS8, 2,704 were subjected to no appraisal review.

657.     In pursuit of its aim to keep up loan volume to increase its profits, Barclays repeatedly agreed to securitize defective loans in RASC 2006-KS8.  In a September 20, 2006, telephone call between a Barclays employee and an employee of RFC regarding Barclays'

upcoming due diligence review of the loan pool to be securitized in RASC 2006-KS8, the Barclays employee noted that Barclays wanted to *"accept as many loans as possible."* He further explained that if a loan was flagged on "one criteria," Barclays would "easily be able to turn that over."

658.    At the close of due diligence on this deal, an RFC employee asked who at Barclays had made the decisions on which loans to kick, noting that the kickouts were an "extremely high ratio." Following a conversation with RFC, Barclays added back into the deal loans that it had previously sought to kick out. In an email from a Barclays employee to RFC, the Barclays employee noted that Barclays had added in $5 million of loans that "we took off the kick list after further consideration." The loans that Barclays added in were all EV3 loans that should not have been included in the deal, based on Barclays' representations.

## XI.    Wells Fargo Deals

### A.    WFHET 2006-3

659.    WFHET 2006-3 was securitized on December 21, 2006. The deal consisted of 6,284 loans, all originated by Wells Fargo, with an aggregate scheduled principal balance, as stated in the ProSupp, of $896,550,677. Wells Fargo was the sponsor of this agented deal, which Barclays as lead underwriter issued on the registered shelf of Wells Fargo Asset Securities Corp.

660.    For WFHET 2006-3, Barclays drew a credit/compliance due diligence selection of 1,804 loans. In its final due diligence reports, Bohan rated 272 of these loans as EV3 (15.1% of the sample by loan count). During due diligence, Barclays directed Bohan to waive material defects on at least another 193 loans, which Bohan designated as "EV2 per client" (10.7% of the sample by loan count). Taken together, Bohan identified 465 out of the 1,804 loans it reviewed (25.8% of the sample by loan count) as being in breach of Barclays' representations.

661.     In WFHET 2006-3, Barclays securitized 179 EV3 loans and an additional 183 "EV2 per client" loans (combined original balance of $57.4 million, or 5.8% of the deal by loan count) – that is to say, 362 out of the 465 (78%) defective loans identified by Bohan.  Barclays also securitized 480 loans (original balance of $78.7 million, or 7.6% of the deal by loan count) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

662.     In pursuit of its aim to keep up loan volume to increase its profits, Barclays repeatedly agreed to limit both the due diligence sample size and the kickout rate on this deal, and to securitize loans that Barclays discovered in due diligence were defective.

663.     In an internal Wells Fargo email from November 10, 2006, Wells Fargo employees noted that Barclays wanted to conduct due diligence on 36% of the pool chosen based on its adverse selection criteria. Wells Fargo deemed this unacceptable and successfully pushed Barclays to lower its review size to 25%.  One Wells Fargo employee instructed: "Push back on Barclays on this, please. If you hit resistance, remind them it is a securitization off our shelf …." A Wells Fargo employee responded: "We negotiated down to about 1200 loans … They are anxious to buy the next pool on Monday, and a possible upsize, so they didn't want to rock the boat."  (The due diligence sample later increased by about 600 loans (to 1,804 loans) after Wells Fargo upsized the pool with an additional 1,877 loans.)

664.     In a December 6, 2006, email, a Barclays employee informed Carroll and Menefee that Wells Fargo had just told him that Barclays' current EV3 rate of "2.51%" was unacceptable and that they expected the EV3 rate "to be around 1%."  Wells Fargo "made a comment that they value 1% kick-outs at the time of bid."  In response to an email from Wells Fargo again pressuring Barclays to limit kickouts, Carroll instructed Menefee: "Need to give a little if possible …."

665. In a December 8, 2006, telephone call between Menefee and a Barclays trader regarding 23 EV3 loans that Wells Fargo wanted Barclays to waive into the securitization, the trader related that Wells Fargo "said that as we build this relationship here, these 23 loans may be a sticking point in determining whether or not you guys are eligible in our eyes to bid next week." Menefee responded: "Those are exceptions to their underwriting guidelines.... This is bullsh*t dude.... Like we have to eat their sh*t loans, then f*** em.... It is outside of their guidelines.... What I think she is referring to are condition 3s. Where there are exceptions to their guidelines. We've already given them so much here."

666. Barclays, through Menefee, ultimately agreed to waive all 23 of these EV3 loans into the deal. In a December 8, 2006, internal Wells Fargo email exchange, a Wells Fargo employee noted that "I just spoke to [a Barclays employee] and he assures me that these [23 loans] will remain in the pool. He wanted me to let you know to eliminate the need for further discussion." A second Wells Fargo employee responded: "It's amazing what happens when you tell them they can't bid on your next pool . . ."

667. A few days later, on December 12, 2006, in an internal Wells Fargo email discussing the diligence process, a Wells Fargo employee asked how due diligence on WFHET 2006-03 "stack[ed] up to other deals? More appraisal reviews or drops than usual? It doesn't look unusually high to me on the drop side?" The Wells Fargo employee running due diligence responded: "I would say ultimately the results are similar to others, however, … we wouldn't have gotten there without having to call you and [another Wells Fargo employee] in to apply quite a bit of pressure."

## B. WFHET 2007-1

668. WFHET 2007-1 was securitized on March 30, 2007. The deal consisted of 3,528 loans, all originated by Wells Fargo, with an aggregate scheduled principal balance, as stated in

the ProSupp, of $543,808,148.  Wells Fargo was the sponsor of this agented deal, which Barclays as lead underwriter issued on the registered shelf of Wells Fargo Asset Securities Corp.

669.    For WFHET 2007-1, Barclays drew a credit/compliance due diligence selection of 1,385 loans.  In its final due diligence reports, Bohan rated 656 of these loans as EV3 (47.4% of the sample by loan count).  During due diligence, Barclays directed Bohan to waive material defects on at least another 49 loans, which Bohan designated as "EV2 per client" (3.5% of the sample by loan count).  Taken together, Bohan identified more than half of the loans it reviewed, 705 out of 1,385 (50.9% of the sample by loan count) as being in breach of Barclays' representations.

670.    In WFHET 2007-1, Barclays securitized 471 EV3s and an additional 42 "EV2 per client" loans (combined original balance of $69.1 million, or 14.6% of the deal) – that is to say, 513 out of the 705 (73%) defective loans identified by Bohan.  Barclays also securitized in this deal 14 loans (original balance of $1.7 million) with appraisals that were out-of-tolerance by more than 15% at the last stage of the due diligence cascade that the loans reached.

## CLAIMS FOR RELIEF

## CLAIM I: FIRREA CIVIL MONEY PENALTIES PREDICATED ON MAIL FRAUD (ALL CORPORATE DEFENDANTS AS TO EACH SUBJECT DEAL) (12 U.S.C. § 1833a; 18 U.S.C. § 1341)

671.    The allegations set forth above in paragraphs 1 through 670 of this Complaint are realleged and incorporated as if fully set forth in this paragraph.

672.    In connection with each Subject Deal, all of the Corporate Defendants, acting separately or in concert with one another, committed violations of 18 U.S.C. § 1341 (mail fraud) affecting one or more FIFIs, for which they are subject to a civil penalty.

673.    In connection with each Subject Deal, all of the Corporate Defendants, separately or in concert with one another, engaged in a scheme to defraud in which, acting knowingly or in deliberate ignorance of, or with conscious disregard of, the truth, they made false and misleading representations and omissions of material facts to investors and rating agencies.  In pursuit of this fraudulent scheme, the Corporate Defendants repeatedly engaged in dishonest and deceitful actions that deprived investors of something of value.

674.    In connection with each Subject Deal, all of the Corporate Defendants, separately or in concert with one another, had an intent to defraud one or more victims when, acting with an intent to deceive and in contemplation of actual harm to the property interests of their victims, they made false and misleading representations and omissions to investors and rating agencies.  When they made these representations and omissions, the Corporate Defendants knew that their statements were false, or else they were aware of a high probability that their statements were false and they consciously avoided confirming that suspicion.  The Corporate Defendants also knew at that time that a necessary consequence of their fraudulent scheme, if it were successful, would be injury to others, and they consciously intended for this injury to occur.

675.    In connection with each Subject Deal, all of the Corporate Defendants, separately or in concert with one another, knowingly used the mails in pursuit of their scheme to defraud when they, *inter alia*, caused to be deposited for delivery by the United States Postal Service, or by a private or commercial interstate carrier, *inter alia*, (1) final execution copies of the documents creating the Issuing Trusts to the Trustees, (2) prospectuses, ProSupps, and additional information regarding the securities that were mailed to investors and potential investors, and (3) confirmations and account statements mailed to investors.

676.    In connection with each Subject Deal, all of the Corporate Defendants, separately or in concert with one another, knowingly made representations and omissions to investors and rating agencies that were materially false.

677.    The misrepresentations and omissions made by the Corporate Defendants on each Subject Deal went to essential aspects of their bargain with RMBS investors, who provided funds to the Corporate Defendants in exchange for RMBS Certificates backed by loans with certain stated characteristics and which were purportedly originated in accordance with underwriting standards designed to ensure the ability of the borrower to repay the loans and the adequacy of the mortgaged property as collateral for the debt.  In each Subject Deal, the misrepresentations and omissions were not limited to a few loans, but related to significant percentages of the securitized loan pools.

678.    In connection with each Subject Deal, the Corporate Defendants' acts of mail fraud affected one or more FIFIs.

679.    In connection with each Subject Deal, the Corporate Defendants' acts of mail fraud actually and proximately resulted in pecuniary loss to one or more persons other than the Corporate Defendants.

680.    In connection with each Subject Deal, the Corporate Defendants derived pecuniary gain from their acts of mail fraud.

681.    For each violation of 18 U.S.C. § 1341 as to each Subject Deal, the Corporate Defendants are jointly and severally liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

**CLAIM II: FIRREA CIVIL MONEY PENALTIES PREDICATED ON MAIL FRAUD**
**(PAUL MENEFEE AS TO EACH MENEFEE/CARROLL DEAL)**
**(12 U.S.C. § 1833a; 18 U.S.C. § 1341)**

682.     The allegations set forth above in paragraphs 1 through 670 of this Complaint are realleged and incorporated as if fully set forth in this paragraph.

683.     In connection with each Menefee/Carroll Deal, Menefee committed violations of 18 U.S.C. § 1341 (mail fraud) affecting one or more FIFIs, for which he is subject to a civil penalty.

684.     In connection with each Menefee/Carroll Deal, Menefee engaged in a scheme to defraud in which, acting knowingly or in deliberate ignorance of, or with conscious disregard of, the truth, he made false and misleading representations and omissions of material facts to investors and rating agencies.  In pursuit of this fraudulent scheme, Menefee repeatedly engaged in dishonest and deceitful actions that deprived investors of something of value.

685.     In connection with each Menefee/Carroll Deal, Menefee had an intent to defraud one or more victims when, acting with an intent to deceive and in contemplation of actual harm to the property interests of his victims, he made false and misleading representations and omissions to investors and rating agencies.  When he made these representations and omissions, Menefee knew that his statements were false, or else he was aware of a high probability that his statements were false and he consciously avoided confirming that suspicion.  Menefee also knew at that time that a necessary consequence of his fraudulent scheme, if it were successful, would be injury to others, and he consciously intended for this injury to occur.

686.     In connection with each Menefee/Carroll Deal, Menefee knowingly used the mails in pursuit of his scheme to defraud when he, *inter alia*, caused to be deposited for delivery by the United States Postal Service, or by a private or commercial interstate carrier, *inter alia*, (1) final execution copies of the documents creating the Issuing Trusts to the Trustees, (2) prospectuses,

ProSupps, and additional information regarding the securities that were mailed to investors and potential investors, and (3) confirmations and account statements mailed to investors.

687.   In connection with each Menefee/Carroll Deal, Menefee knowingly made representations and omissions to investors and rating agencies that were materially false.

688.   The misrepresentations and omissions Menefee made on each Menefee/Carroll Deal went to essential aspects of Barclays' bargain with RMBS investors, who provided funds to Barclays in exchange for RMBS Certificates backed by loans with certain stated characteristics and which were purportedly originated in accordance with underwriting standards designed to ensure the ability of the borrower to repay the loans and the adequacy of the mortgaged property as collateral for the debt.   In each Menefee/Carroll Deal, the misrepresentations and omissions were not limited to a few loans, but related to significant percentages of the securitized loan pools.

689.   In connection with each Menefee/Carroll Deal, Menefee's acts of mail fraud affected one or more FIFIs.

690.   For each violation of 18 U.S.C. § 1341 as to each Menefee/Carroll Subject Deal, Menefee is liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(1),(2).

### CLAIM III: FIRREA CIVIL MONEY PENALTIES PREDICATED ON MAIL FRAUD
### (JOHN CARROLL AS TO EACH MENEFEE/CARROLL DEAL)
### (12 U.S.C. § 1833a; 18 U.S.C. § 1341)

691.   The allegations set forth above in paragraphs 1 through 670 of this Complaint are realleged and incorporated as if fully set forth in this paragraph.

692.   In connection with each Menefee/Carroll Deal, Carroll committed violations of 18 U.S.C. § 1341 (mail fraud) affecting one or more FIFIs, for which he is subject to a civil penalty.

693.     In connection with each Menefee/Carroll Deal, Carroll engaged in a scheme to defraud in which, acting knowingly or in deliberate ignorance of, or with conscious disregard of, the truth, he made false and misleading representations and omissions of material facts to investors and rating agencies.  In pursuit of this fraudulent scheme, Carroll repeatedly engaged in dishonest and deceitful actions that deprived investors of something of value.

694.     In connection with each Menefee/Carroll Deal, Carroll had an intent to defraud one or more victims when, acting with an intent to deceive and in contemplation of actual harm to the property interests of his victims, he made false and misleading representations and omissions to investors and rating agencies.  When he made these representations and omissions, Carroll knew that his statements were falser, or else he was aware of a high probability that his statements were false and he consciously avoided confirming that suspicion.  Carroll also knew at that time that a necessary consequence of his fraudulent scheme, if it were successful, would be injury to others, and he consciously intended for this injury to occur.

695.     In connection with each Menefee/Carroll Deal, Carroll knowingly used the mails in pursuit of his scheme to defraud when he, *inter alia*, caused to be deposited for delivery by the United States Postal Service, or by a private or commercial interstate carrier, *inter alia*, (1) final execution copies of the documents creating the Issuing Trusts to the Trustees, (2) prospectuses, ProSupps, and additional information regarding the securities that were mailed to investors and potential investors, and (3) confirmations and account statements mailed to investors.

696.     In connection with each Menefee/Carroll Deal, Carroll knowingly made representations and omissions to investors and rating agencies that were materially false.

697.     The misrepresentations and omissions Carroll made on each Menefee/Carroll Deal went to essential aspects of Barclays' bargain with RMBS investors, who provided funds to

Barclays in exchange for RMBS Certificates backed by loans with certain stated characteristics and which were purportedly originated in accordance with underwriting standards designed to ensure the ability of the borrower to repay the loans and the adequacy of the mortgaged property as collateral for the debt.  In each Menefee/Carroll Deal, the misrepresentations and omissions were not limited to a few loans, but related to significant percentages of the securitized loan pools.

698.     In connection with each Menefee/Carroll Deal, Carroll's acts of mail fraud affected one or more FIFIs.

699.     For each violation of 18 U.S.C. § 1343 as to each Menefee/Carroll Subject Deal, Carroll is liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(1),(2).

## CLAIM IV: FIRREA CIVIL MONEY PENALTIES PREDICATED ON WIRE FRAUD (ALL CORPORATE DEFENDANTS AS TO EACH SUBJECT DEAL) (12 U.S.C. § 1833a; 18 U.S.C. § 1343)

700.     The allegations set forth above in paragraphs 1 through 670 of this Complaint are realleged and incorporated as if fully set forth in this paragraph.

701.     In connection with each Subject Deal, all of the Corporate Defendants, acting separately or in concert with one another, committed violations of 18 U.S.C. § 1343 (wire fraud) affecting one or more FIFIs, for which they are subject to a civil penalty.

702.     In connection with each Subject Deal, all of the Corporate Defendants, separately or in concert with one another, engaged in a scheme to defraud in which, acting knowingly or in deliberate ignorance of, or with conscious disregard of, the truth, they made false and misleading representations and omissions of material facts to investors and rating agencies.  In pursuit of this fraudulent scheme, the Corporate Defendants repeatedly engaged in dishonest and deceitful actions that deprived investors of something of value.

703.     In connection with each Subject Deal, all of the Corporate Defendants, separately or in concert with one another, had an intent to defraud one or more victims when, acting with an intent to deceive and in contemplation of actual harm to the property interests of their victims, they made false and misleading representations and omissions to investors and rating agencies.  When they made these representations and omissions, the Corporate Defendants knew that their statements were false, or else they were aware of a high probability that their statements were false and they consciously avoided confirming that suspicion.  The Corporate Defendants also knew at that time that a necessary consequence of their fraudulent scheme, if it were successful, would be injury to others, and they consciously intended for this injury to occur.

704.     In connection with each Subject Deal, all of the Corporate Defendants, separately or in concert with one another, knowingly used the interstate wires in pursuit of their scheme to defraud when they, *inter alia*, (1) executed an interstate wire transfer of funds to the originator selling the loan pools to Barclays or the originator securitizing the loans on its own behalf; (2) electronically filed documents with the SEC; (3) electronically transmitted prospectuses, ProSupps, and additional information regarding the securities to investors and potential investors; and (4) communicated via telephone, email, or Bloomberg chat with originators, due diligence vendors, rating agencies, investors, prospective investors, and among Barclays employees to make representations concerning the Subject Deals, or to acquire and exchange knowledge contradicting those representations.

705.     In connection with each Subject Deal, all of the Corporate Defendants, separately or in concert with one another, knowingly made representations and omissions to investors and rating agencies that were materially false.

706.     The misrepresentations and omissions made by the Corporate Defendants on each Subject Deal went to essential aspects of their bargain with RMBS investors, who provided funds to the Corporate Defendants in exchange for RMBS Certificates backed by loans with certain stated characteristics and which were purportedly originated in accordance with underwriting standards designed to ensure the ability of the borrower to repay the loans and the adequacy of the mortgaged property as collateral for the debt.  In each Subject Deal, the misrepresentations and omissions were not limited to a few loans, but related to significant percentages of the securitized loan pools.

707.     In connection with each Subject Deal, the Corporate Defendants' acts of wire fraud affected one or more FIFIs.

708.     In connection with each Subject Deal, the Corporate Defendants' acts of wire fraud actually and proximately resulted in pecuniary loss to one or more persons other than the Corporate Defendants.

709.     In connection with each Subject Deal, the Corporate Defendants derived pecuniary gain from their acts of wire fraud.

710.     For each violation of 18 U.S.C. § 1343 as to each Subject Deal, the Corporate Defendants are jointly and severally liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

**CLAIM V: FIRREA CIVIL MONEY PENALTIES PREDICATED ON WIRE FRAUD**
**(PAUL MENEFEE AS TO EACH MENEFEE/CARROLL DEAL)**
**(12 U.S.C. § 1833a; 18 U.S.C. § 1343)**

711.     The allegations set forth above in paragraphs 1 through 670 of this Complaint are realleged and incorporated as if fully set forth in this paragraph.

712.     In connection with each Menefee/Carroll Deal, Menefee committed violations of 18 U.S.C. § 1343 (wire fraud) affecting one or more FIFIs, for which he is subject to a civil penalty.

713.     In connection with each Menefee/Carroll Deal, Menefee engaged in a scheme to defraud in which, acting knowingly or in deliberate ignorance of, or with conscious disregard of, the truth, he made false and misleading representations and omissions of material facts to investors and rating agencies.  In pursuit of this fraudulent scheme, Menefee repeatedly engaged in dishonest and deceitful actions that deprived investors of something of value.

714.     In connection with each Menefee/Carroll Deal, Menefee had an intent to defraud one or more victims when, acting with an intent to deceive and in contemplation of actual harm to the property interests of his victims, he made false and misleading representations and omissions to investors and rating agencies.  When he made these representations and omissions, Menefee knew that his statements were false, or else he was aware of a high probability that his statements were false and he consciously avoided confirming that suspicion.  Menefee also knew at that time that a necessary consequence of his fraudulent scheme, if it were successful, would be injury to others, and he consciously intended for this injury to occur.

715.     In connection with each Menefee/Carroll Deal, Menefee knowingly used the interstate wires in pursuit of his scheme to defraud when he, *inter alia*, (1) executed or caused to be executed an interstate wire transfer of funds to the originator selling the loan pools to Barclays or the originator securitizing the loans on its own behalf; (2) electronically filed or caused to be filed documents with the SEC; (3) electronically transmitted or caused to be transmitted prospectuses, ProSupps, and additional information regarding the securities to investors and potential investors; and (4) communicated via telephone, email, or Bloomberg chat with originators, due diligence vendors, rating agencies, investors, prospective investors, and among

Barclays employees to make representations concerning the Subject Deals, or to acquire and exchange knowledge contradicting those representations.

716. In connection with each Menefee/Carroll Deal, Menefee knowingly made representations and omissions to investors and rating agencies that were materially false.

717. The misrepresentations and omissions Menefee made on each Menefee/Carroll Deal went to essential aspects of Barclays' bargain with RMBS investors, who provided funds to Barclays in exchange for RMBS Certificates backed by loans with certain stated characteristics and which were purportedly originated in accordance with underwriting standards designed to ensure the ability of the borrower to repay the loans and the adequacy of the mortgaged property as collateral for the debt. In each Menefee/Carroll Deal, the misrepresentations and omissions were not limited to a few loans, but related to significant percentages of the securitized loan pools.

718. In connection with each Menefee/Carroll Deal, Menefee's acts of wire fraud affected one or more FIFIs.

719. For each violation of 18 U.S.C. § 1343 as to each Menefee/Carroll Subject Deal, Menefee is liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(1),(2).

## CLAIM VI: FIRREA CIVIL MONEY PENALTIES PREDICATED ON WIRE FRAUD
### (JOHN CARROLL AS TO EACH MENEFEE/CARROLL DEAL)
### (12 U.S.C. § 1833a; 18 U.S.C. § 1343)

720. The allegations set forth above in paragraphs 1 through 670 of this Complaint are realleged and incorporated as if fully set forth in this paragraph.

721. In connection with each Menefee/Carroll Deal, Carroll committed violations of 18 U.S.C. § 1343 (wire fraud) affecting one or more FIFIs, for which he is subject to a civil penalty.

722.    In connection with each Menefee/Carroll Deal, Carroll engaged in a scheme to defraud in which, acting knowingly or in deliberate ignorance of, or with conscious disregard of, the truth, he made false and misleading representations and omissions of material facts to investors and rating agencies.  In pursuit of this fraudulent scheme, Carroll repeatedly engaged in dishonest and deceitful actions that deprived investors of something of value.

723.    In connection with each Menefee/Carroll Deal, Carroll had an intent to defraud one or more victims when, acting with an intent to deceive and in contemplation of actual harm to the property interests of his victims, he made false and misleading representations and omissions to investors and rating agencies.  When he made these representations and omissions, Carroll knew that his statements were false, or else he was aware of a high probability that his statements were false and he consciously avoided confirming that suspicion.  Carroll also knew at that time that a necessary consequence of his fraudulent scheme, if it were successful, would be injury to others, and he consciously intended for this injury to occur.

724.    In connection with each Menefee/Carroll Deal, Carroll knowingly used the interstate wires in pursuit of his scheme to defraud when he, *inter alia*, (1) executed or caused to be executed an interstate wire transfer of funds to the originator selling the loan pools to Barclays or the originator securitizing the loans on its own behalf; (2) electronically filed or caused to be filed documents with the SEC; (3) electronically transmitted or caused to be transmitted prospectuses, ProSupps, and additional information regarding the securities to investors and potential investors; and (4) communicated via telephone, email, or Bloomberg chat with originators, due diligence vendors, rating agencies, investors, prospective investors, and among Barclays employees to make representations concerning the Subject Deals, or to acquire and exchange knowledge contradicting those representations.

725.     In connection with each Menefee/Carroll Deal, Carroll knowingly made representations and omissions to investors and rating agencies that were materially false.

726.     The misrepresentations and omissions Carroll made on each Menefee/Carroll Deal went to essential aspects of Barclays' bargain with RMBS investors, who provided funds to Barclays in exchange for RMBS Certificates backed by loans with certain stated characteristics and which were purportedly originated in accordance with underwriting standards designed to ensure the ability of the borrower to repay the loans and the adequacy of the mortgaged property as collateral for the debt.  In each Menefee/Carroll Deal, the misrepresentations and omissions were not limited to a few loans, but related to significant percentages of the securitized loan pools.

727.     In connection with each Menefee/Carroll Deal, Carroll's acts of wire fraud affected one or more FIFIs.

728.     For each violation of 18 U.S.C. § 1343 as to each Menefee/Carroll Subject Deal, Carroll is liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(1),(2).

## CLAIM VII: FIRREA CIVIL MONEY PENALTIES PREDICATED ON BANK FRAUD (ALL CORPORATE DEFENDANTS AS TO EACH SUBJECT DEAL) (12 U.S.C. § 1833a; 18 U.S.C. § 1344)

729.     allegations set forth above in paragraphs 1 through 670 of this Complaint are realleged and incorporated as if fully set forth in this paragraph.

730.     In connection with each Subject Deal, all of the Corporate Defendants, acting separately or in concert with one another, committed violations of 18 U.S.C. § 1344 (bank fraud) for which they are subject to a civil penalty, when they knowingly executed, or attempted to execute, a scheme or artifice (1) to defraud one or more financial institutions, and (2) to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the

custody or control of, one or more financial institutions, by means of false and fraudulent pretenses, representations, and promises.

731.    In connection with each Subject Deal, all of the Corporate Defendants, separately or in concert with one another, knowingly engaged in a deceptive course of conduct by making material misrepresentations and omissions intended to victimize one or more financial institutions by exposing them to loss.

732.    In connection with each Subject Deal, all of the Corporate Defendants, separately or in concert with one another, knowingly executed, or attempted to execute, a scheme or artifice intended to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and other property owned by, and under the custody or control of, one or more financial institutions.

733.    In connection with each Subject Deal, the Corporate Defendants' violations of 18 U.S.C. § 1344 actually and proximately resulted in pecuniary loss to one or more persons other than the Corporate Defendants.

734.    In connection with each Subject Deal, the Corporate Defendants derived pecuniary gain from their violations of 18 U.S.C. § 1344.

735.    For each violation of 18 U.S.C. § 1344 as to each Subject Deal, the Corporate Defendants are jointly and severally liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

**CLAIM VIII: FIRREA CIVIL MONEY PENALTIES UNDER FIRREA PREDICATED ON BANK FRAUD (PAUL MENEFEE AS TO EACH MENEFEE/CARROLL DEAL) (12 U.S.C. § 1833a; 18 U.S.C. § 1344)**

736.    The allegations set forth above in paragraphs 1 through 670 of this Complaint are realleged and incorporated as if fully set forth in this paragraph.

737.    In connection with each Menefee/Carroll Deal, Menefee committed violations of 18 U.S.C. § 1344 (bank fraud) for which he is subject to a civil penalty, when he knowingly executed, or attempted to execute, a scheme or artifice (1) to defraud one or more financial institutions, and (2) to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody or control of, one or more financial institutions, by means of false and fraudulent pretenses, representations, and promises.

738.    In connection with each Menefee/Carroll Deal, Menefee knowingly engaged in a deceptive course of conduct by making material misrepresentations and omissions intended to victimize one or more financial institutions by exposing them to loss.

739.    In connection with each Menefee/Carroll Deal, Menefee knowingly executed, or attempted to execute, a scheme or artifice intended to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and other property owned by, and under the custody or control of, one or more financial institutions.

740.    For each violation of 18 U.S.C. § 1344 as to each Menefee/Carroll Subject Deal, Menefee is liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(1),(2).

## CLAIM IX: FIRREA CIVIL MONEY PENALTIES UNDER FIRREA PREDICATED ON BANK FRAUD (JOHN CARROLL AS TO EACH MENEFEE/CARROLL DEAL) (12 U.S.C. § 1833a; 18 U.S.C. § 1344)

741.    The allegations set forth above in paragraphs 1 through 670 of this Complaint are realleged and incorporated as if fully set forth in this paragraph.

742.    In connection with each Menefee/Carroll Deal, Carroll committed violations of 18 U.S.C. § 1344 (bank fraud) for which he is subject to a civil penalty, when he knowingly executed, or attempted to execute, a scheme or artifice (1) to defraud one or more financial institutions, and

(2) to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody or control of, one or more financial institutions, by means of false and fraudulent pretenses, representations, and promises.

743.    In connection with each Menefee/Carroll Deal, Carroll knowingly engaged in a deceptive course of conduct by making material misrepresentations intended to victimize one or more financial institutions by exposing them to loss.

744.    In connection with each Menefee/Carroll Deal, Carroll knowingly executed, or attempted to execute, a scheme or artifice intended to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and other property owned by, and under the custody or control of, one or more financial institutions.

745.    For each violation of 18 U.S.C. § 1344 as to each Menefee/Carroll Subject Deal, Carroll is liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(1),(2).

## CLAIM X: FIRREA CIVIL MONEY PENALTIES PREDICATED ON FRAUDULENT BENEFIT FROM A TRANSACTION WITH A COVERED FINANCIAL INSTITUTION (ALL CORPORATE DEFENDANTS AS TO EACH SUBJECT DEAL) (12 U.S.C. § 1833a; 18 U.S.C. § 1005)

746.    The allegations set forth above in paragraphs 1 through 670 of this Complaint are realleged and incorporated as if fully set forth in this paragraph.

747.    In connection with each Subject Deal, all of the Corporate Defendants, acting separately or in concert with one another, committed violations of 18 U.S.C. § 1005 for which they are subject to a civil penalty, when, with the intent to defraud one or more financial institutions covered by that statute, they participated and shared in, and received (directly or indirectly) any money, profit, property, and benefits through one or more transactions, loans, commissions, contracts, or other acts of such financial institutions.

748.     In connection with each Subject Deal, the Corporate Defendants' violations of 18 U.S.C. § 1005 actually and proximately resulted in pecuniary loss to one or more persons other than the Corporate Defendants.

749.     In connection with each Subject Deal, the Corporate Defendants derived pecuniary gain from their violations of 18 U.S.C. § 1005.

750.     For each violation of 18 U.S.C. § 1005 as to each Subject Deal, the Corporate Defendants are jointly and severally liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

### CLAIM XI: FIRREA CIVIL MONEY PENALTIES PREDICATED ON FALSE STATEMENTS MADE TO INFLUENCE THE ACTIONS OF A COVERED FINANCIAL INSTITUTION (ALL CORPORATE DEFENDANTS AS TO EACH SUBJECT DEAL) (12 U.S.C. § 1833a; 18 U.S.C. § 1014)

751.     The allegations set forth above in paragraphs 1 through 670 of this Complaint are realleged and incorporated as if fully set forth in this paragraph.

752.     In connection with each Subject Deal, all of the Corporate Defendants, acting separately or in concert with one another, committed violations of 18 U.S.C. § 1014 for which they are subject to a civil penalty, when they knowingly made false statements and reports to one or more financial institutions covered by that statute, for the purpose of influencing the action of such institutions with respect to, (1) the loan of funds by the covered institution to RMBS trusts for the Subject Deals in exchange for RMBS Certificates, and (2) the purchase of RMBS Certificates in the Subject Deals.

753.     In connection with each Subject Deal, the Corporate Defendants' violations of 18 U.S.C. § 1014 actually and proximately resulted in pecuniary loss to one or more persons other than the Corporate Defendants.

754.    In connection with each Subject Deal, the Corporate Defendants derived pecuniary gain from their violations of 18 U.S.C. § 1014.

755.    For each violation of 18 U.S.C. § 1014 as to each Subject Deal, the Corporate Defendants are jointly and severally liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

* * *

756.    The Tables attached as appendices are fully incorporated into this Complaint, and the statements, descriptions, data, and other facts described in those Tables are alleged as if fully set forth in the body of the Complaint.

WHEREFORE, the United States requests judgment against all Defendants for the maximum penalty allowed under FIRREA, 12 U.S.C. § 1833a(b), together with pre-judgment and post-judgment interest and all allowable costs and attorneys' fees, and for any other relief the Court deems just and proper.

The United States respectfully demands a jury trial for all issues so triable.

Dated:    Brooklyn, New York
          December 22, 2016

ROBERT L. CAPERS
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201-1820

By: _____
    F. FRANKLIN AMANAT
    Senior Counsel
    KATHARINE E.G. BROOKER
    EVAN P. LESTELLE
    JOSEPHINE M. VELLA
    Assistant United States Attorneys
    Eastern District of New York
    (718) 254-7000
    franklin.amanat@usdoj.gov