UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
UNITED STATES OF AMERICA,         : 16-CV-7057 (KAM) (JO)
                 Plaintiff,       :
                                  :
       - versus -                 : U.S. Courthouse
                                  : Brooklyn, New York
                                  :
BARCLAYS CAPITAL, INC.,           :
     et al.,                      : June 8, 2017
                 Defendants,      :
------------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR INITIAL CONFERENCE
BEFORE THE HONORABLE JAMES ORENSTEIN
UNITED STATES MAGISTRATE JUDGE

A  P  P  E  A  R  A  N  C  E  S:


<u>For the Plaintiff</u>:            **F. Franklin Amanat, AUSA**
                                  **Evan Pays Lestelle, AUSA**
                                  **Josephine Vella, AUSA**
                                  **Katharine E. Brooker, AUSA**
                                  **Matthew Robert Belz, AUSA**
                                  U.S. Attorneys Office
                                  Eastern District Of New York
                                  271 Cadman Plaza East
                                  Brooklyn, NY 11201-1820
<u>For Defendant:</u>
     Barclays:                    **Jeffrey T. Scott, Esq.**
                                  **Karen Patton Seymour, Esq.**
                                  **Richard Howard Klapper, Esq.**
                                  **Leila R. Siddiky, Esq.**
                                  Sullivan & Cromwell
                                  125 Broad Street
                                  New York, NY 10004

                                  **David M. Zinn, Esq.**
                                  **Jesse Smallwood, Esq.**
                                  Williams & Connolly LLP
                                  725 12th St NW
                                  Washington, DOCUMENT 20005

APPEARANCES (Continued):


**For Defendant**:

   **Menefee**:                           **Dani R. James, Esq.**
                                    Kramer Levin Naftalis
                                        & Frankel LLP
                                    1177 Avenue Of The Americas
                                    New York, NY 10036

   **Caroll**:                             **Glen G. McGorty, Esq.**
                                      **Jared A. Levine, Esq.**
                                    Crowell & Moring, LLP
                                    590 Madison Ave
                                    20th Floor
                                    New York, NY 10022


**Transcription Service**:     **Transcriptions Plus II, Inc.**
                                    61 Beatrice Avenue
                                    West Islip, New York 11795
                                    laferrara44@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

3

                           Proceedings

 1          THE CLERK:  Civil Cause for Initial Conference,
 2  United States of America v. Barclay's Capital, Inc, et
 3  al., docket 16-cv-7057.
 4          Would you like the appearances or the sign-in
 5  sheet is good?
 6          THE COURT:  You know what?  Let me just put
 7  names to faces, if you could just -- I know some of you
 8  but not all of you.  Just go around the tables and
 9  introduce yourselves.
10          MR. AMANAT:  Good morning, your Honor.
11          Franklin Amanat from the United States
12  Attorney's Office on behalf of the United States.
13          THE COURT:  Good morning.
14          MS. BROOKER:  Good morning, your Honor.
15          Kate Brooker on behalf of the United States,
16  United States Attorney's Office.
17          THE COURT:  Good morning.
18          MR. BELZ:  Good morning, your Honor.
19          Matthew Belz on behalf of the government, also
20  from the United States Attorney's Office.
21          THE COURT:  Good morning.
22          MS. VELLA:  Josephine Vella, United States
23  Attorney's Office.
24          THE COURT:  Good morning.
25          MR. LESTELLE:  Good morning, your Honor.

4

                        Proceedings

 1          Evan Lestelle from the United States Attorney's

 2   Office on behalf of the United States.

 3          THE COURT:  Good morning.

 4          MR. KLAPPER:  Good morning, your Honor.

 5          Richard Klapper, Sullivan & Cromwell for the

 6   Barclays defendants.  That would be all of the defendants

 7   other than Mr. Caroll and Mr. Menefee.

 8          THE COURT:  Good morning.

 9          MR. ZINN:  Good morning, your Honor.

10          David Zinn, Williams and Connolly also for

11   Barclays.

12          THE COURT:  Good morning.

13          MR. SMALLWOOD:  Jesse Smallwood, Williams and

14   Connolly.

15          THE COURT:  Good morning.

16          MS. JAMES:  Good morning, your Honor.

17          Dani James from Kramer Levin on behalf of Mr.

18   Menefee.

19          THE COURT:  Good morning.

20          MR. MCGORTY:  Good morning, your Honor.

21          Glen McGorty of Crowell & Mooring on behalf of

22   John Carroll.

23          THE COURT:  I'm sorry, I was looking -- Mr.?

24          MR. MCGORTY:  McGorty, Glen McGorty of Crowell

25   & Mooring on behalf of John Carroll.

5

Proceedings

1          THE COURT:  Ah, yes, here you are.   Good
2   morning.
3          MR. MCGORTY:  Good morning.
4          MS. SIDDIKY:  Good morning.
5          Leila Siddiky on behalf of Barclays from
6   Sullivan & Cromwell.
7          THE COURT:  Good morning.
8          MR. SCOTT:  Good morning, your Honor.
9          Jeff Scott from Sullivan & Cromwell on behalf
10  of the Barclays defendants.
11         THE COURT:  Good morning.  Okay.  Let me just
12  look at my notes here.
13         Ms. Siddiky, I don't think I -- I don't have
14  you in my notes.  Have you entered a notice of
15  appearance?
16         MS. SIDDIKY:  No, I have not, your Honor.
17         THE COURT:  Okay. Would you do so please and
18  just give me the spelling of your name?
19         MS. SIDDIKY:  S as in Sam.
20         THE COURT:  Uh-hum.
21         MS. SIDDIKY: I-D as in dog, D as in dog, I-K-Y.
22         THE COURT:  I-K-Y.  And your first name?
23         MS. SIDDIKY:  Leila, L-E-I-L-A.
24         THE COURT:  Thank you.  All right, folks.
25         So let's get up to speed.  I've got your

6

Proceedings

1   proposed discovery plan.  What I am hoping to do today,

2   not do a deep dive into the case but just have you guys

3   who are, of course, much more familiar with it than I,

4   give me a sense of where you think the primary factual

5   disputes are, so that I can have a sense of what's likely

6   to come up in discovery and any discovery issues that

7   you've identified as something I may have to rule on and

8   then we're going to get to a discussion of the schedule.

9            So Mr. Amanat, are you going to speak for the

10   government or whoever wants to speak?

11            MR. AMANAT:  Do you prefer that we speak from

12   the podium or --

13            THE COURT:  I prefer always that you maintain

14   your comfort.

15            MR. AMANAT:  Okay, great.  Thank you.  Yes,

16   good morning.

17            The United States brought this suit at the end

18   of December of 2016.

19            THE COURT:  I'll just note we're joined by Ms.

20   Seymour.  Welcome.

21            MS. SEYMOUR:  Apologies for being late, your

22   Honor.

23            THE COURT:  Okay.  Go ahead, Mr. Amanat.

24            MR. AMANAT:  We filed our complaint on December

25   22nd, 2016 under the Financial Institutions Reform,

7

Proceedings

1  Recovery and Enforcement Act or FIRREA, seeking civil

2  penalties from Barclays and two of its former executives

3  on the basis of a number of predicate offenses including

4  mail fraud, wire fraud, bank fraud in violations of 18

5  USC 1005 and 1014.

6           THE COURT:  Forgive me for interrupting.  I'll

7  try not to do it too often but the mention of the

8  criminal statutes reminds me, I intended to ask whether

9  the government has provided notice to all victims of the

10  alleged offenses about today's proceeding?

11           MR. AMANAT:  We have not, your Honor.  This is

12  a --

13           THE COURT:  Please do so.

14           MR. AMANAT:  Yeah, FIRREA is a hybrid statute

15  that provides for civil penalties --

16           THE COURT:  I'm not talking about FIRREA --

17           MR. AMANAT:  Right.

18           THE COURT:  -- Mr. Amanat.  As the government

19  well knows --

20           MR. AMANAT:  Right.

21           THE COURT:  -- 18 USC 3771 requires notice to

22  every victim of a federal crime of any public court

23  proceeding involving that crime.  The complaint here

24  alleges the commission of several federal crimes.  I'm

25  sure you've identified all of the victims.  Going

8

Proceedings

1  forward, please provide advance notice to every

2  identified victim of the proceedings that they can be

3  present and be heard if they think that's appropriate for

4  them to do so.

5          MR. AMANAT:  We will do so, your Honor.

6          THE COURT:  Okay.

7          MR. AMANAT:  So we, as I said, brought suit in

8  December.  The complaint lays out in some detail the

9  evidence that the government developed against the

10 defendants over the course of the investigation that

11 preceded this action.

12         We have since the filing of this suit,

13 commenced discovery, both to the defendants and from the

14 defendants.

15         THE COURT:  I take it that's on consent,

16 everybody.  You know, to the extent that folks, you've

17 exchanged discovery demands prior to the 16(f)

18 conference, I take it that's on consent?

19         MR. AMANAT:  Yes.

20         MR. KLAPPER:  Yes, your Honor.

21         UNIDENTIFIED SPEAKER:  Yes, your Honor.

22         THE COURT:  All right.  Go ahead.

23         MR. AMANAT:  Both sides have exchanged

24 automatic disclosures and propounded discovery requests

25 on the other side, which the answers to which are

9

                    Proceedings

1   pending.  The -- our suit is predicated on 36 deals

2   referred to in the complaint as the subject deals, that

3   Barclays secured ties between December of 2005 and August

4   of 2007, these were residential mortgage-backed

5   securitizations, that were backed by mortgages amount to

6   31 billion dollars worth of assets backed these

7   securities.

8           And it is the government's contention as

9   alleged in some detail in the complaint, that the

10  securitization of all 36 of these deals was the produce

11  of a fraudulent scheme, conducted by Barclays and for

12  seven of the deals as well, the two individual

13  defendants, Paul Menefee and John Carroll.

14          THE COURT:  And they were CFO and chief

15  accounting officer?

16          MR. AMANAT:  No, no.  Paul Menefee was a banker

17  at Barclays who was the individual principally

18  responsible for overseeing the subprime principal

19  securitizations.  John Carroll was a trader at Barclays

20  who was primarily -- who was the individual primarily

21  responsible for the acquisition of the pools of subprime

22  whole loans that ended up being securitized in all of the

23  deals that, whose names begin with SABR, S-A-B-R.

24          THE COURT:  But wasn't one of them an officer

25  of SABR or both of them?

10

Proceedings

1          MR. AMANAT:  They were officers of SABR, yes.
2  They --
3          THE COURT:  That's what I --
4          MR. AMANAT:  I apologize.  I thought you had
5  asked if they were the CFO of Barclays.
6          THE COURT:  No, no, okay, of SABR.
7          MR. AMANAT:  Yes.  So the SABR entity --
8          THE COURT:  Sorry to interrupt, but counsel who
9  just entered, could you identify yourself?
10          MR. LEVINE:  Jared Levine with Crowell & Moring
11  for defendant John Carroll.
12          THE COURT:  Good morning, welcome.
13          MR. LEVINE:  Good morning.
14          MR. AMANAT:  Yes, so the SABR entities,
15  Securitized Asset Backed Receivables, LLC was a special
16  purpose vehicle that Barclays created for purposes of
17  holding these loans and being the sponsor of the
18  principal subprime securitizations.  Menefee was the
19  chief financial officer, and chief accounting officer of
20  SABR.  And Carroll also had a similar role in the
21  entities that were created to facilitate the
22  securitizations.
23          In the broader hierarchy of Barclays Capital,
24  Inc., which was the principal underwriter of these 36
25  deals, Menefee and Carroll were, you know, somewhere

11

Proceedings

1  between midlevel management a bit higher than that but

2  they were not certainly the CFO of Barclays Capital.

3          So it is our contention as I was saying that

4  there was a fraudulent scheme that transpired from 2005

5  to 2007 which as part of that fraudulent scheme involved

6  the commission of multiple acts of mail fraud, wire

7  fraud, bank fraud, in violations of 18 USC 1005 and 1014,

8  in connection with the securitization of these 36 deals.

9          And that as a result of this fraudulent scheme,

10 Barclays securitized in these 36 deals, tens of thousands

11 of mortgage loans, whose characteristics it

12 misrepresented to investors in the offering documents

13 such as the prospective supplement and other types of

14 communications and representations it made to investors

15 where it systematically misrepresented the quality of the

16 loans.  It represented them as having been underwritten

17 in accordance with underwriting guidelines and other

18 standards aimed at insuring the defendants -- the

19 borrowers' ability to pay when the defendants knew that,

20 in fact, the borrowers have no such ability to pay or had

21 less ability to pay than were being represented.

22          As of a result of these misrepresentations,

23 these subject deals performed catastrophically.  Over

24 half of the mortgage loans securitized in these 36 deals

25 defaulted and the investors in these deals incurred

Proceedings

1    billions of dollars in losses on their investments.

2            So it is on the basis of those -- and I am

3    summarizing, the complaint is long and quite detailed --

4            THE COURT:  Yes, I've read it.  Yeah.

5            MR. AMANAT:  -- but it is the government's

6    allegation on the basis of these misrepresentations and

7    these other elements of the fraudulent scheme, Barclays

8    and the two individual defendants violated the predicate

9    offenses which subjects them to civil penalty liability

10   under FIRREA.

11           In terms of the -- to answer your Honor's

12   question about where the factual disputes lie, obviously

13   from the perspective of the government, we have a very

14   strong case.  We've laid out in some detail in the

15   complaint, the basis for our allegations and in fact,

16   high level officials that Barclays, including the CEO of

17   Barclays have essentially admitted to the press, that

18   there were transgressions here on the part of Barclays

19   that are appropriate targets for legal liability and, you

20   know, according to the CEO in a statement he made about

21   this case, it --

22           THE COURT:  I can't help but notice, Mr.

23   Amanat, that in purporting to tell me about the factual

24   disputes, what you're telling me is all the ways that

25   you're right.

13

Proceedings

1          MR. AMANAT:  Okay.

2          THE COURT:  I was actually hoping you would

3    tell me about the factual disputes.

4          MR. AMANAT:  Okay.  So obviously one of the

5    biggest issues that the defendants have raised is whether

6    we can actually demonstrate scienter on the part of the

7    Barclays' officials.  That's obviously -- whenever the

8    government brings a fraud case, it needs to prove the

9    requisite scienter.

10         We believe we can.  They believe we cannot.

11   It's been a topic of discussion between the parties, both

12   during the investigative phase, there were some

13   discussions that we had, as well as since the suit was

14   brought.

15         There is -- the parties have also discussed a

16   difference of opinion as to who may have been affected by

17   Barclays fraud and how.  Under the statute, at least with

18   regard to the predicate offenses of mail fraud and wire

19   fraud, in order to obtain civil penalties based on mail

20   fraud and wire fraud, the government needs to show that

21   the mail fraud and wire fraud affected a federally

22   insured financial institution or what we call FIFI, F-I-

23   F-I, in the vernacular.

24         And so the parties have a -- I guess you would

25   describe it as both a philosophical dispute and a factual

14

Proceedings

1   dispute over whether FIFIs were affected by the

2   fraudulent scheme and if so, how.  And that's one of the

3   -- the legal aspects of that issue are part of what's

4   currently pending before Judge Matsumoto on the

5   defendants' motion to dismiss.

6           There are -- I mean those I think are the

7   major --

8           THE COURT:  Can I stop you there?

9           MR. AMANAT:  -- issues.

10          THE COURT:  Can I stop you there about the

11  issues of --

12          MR. AMANAT:  Sure.

13          THE COURT:  -- the FIFIs and the financial

14  institutions because I saw in your discovery plan that

15  there's a dispute about that.  Is there something that --

16  as I read the discovery plan, that defendants are saying

17  that you should have disclosed the identities of the

18  FIFIs that you claim were affected by the alleged fraud.

19  Have you identified them but just not disclosed them or

20  is it a problem of identifying them?  Is it a matter of

21  completeness?  What's the issue from your perspective?

22          MR. AMANAT:  From our perspective, the issue is

23  as follows, your Honor.  The government's position is

24  that FIFIs are affected by the defendants' fraud

25  categorically in the following sense.  In other words,

15

Proceedings

1   we've identified numerous categories in the complaint of

2   relationships, if you will, between third-party entities

3   and Barclays and have alleged that any entity that falls

4   within one of those categories is affected by the

5   fraudulent scheme.

6            So for example, initial purchasers of the

7   securities, secondary market purchasers of the

8   securities, originators who participated in the --

9   originators who sold loans to Barclays that were

10  securitized in the deal, trustee of the securities,

11  servicers.  There's six, seven categories enumerated in

12  the complaint that the government alleges any entity that

13  as a matter of fact, fell into one of those categories

14  with regard to one or more of the subject deals, was

15  affected by the fraudulent scheme.

16           And of course if those entities happened to be

17  a FIFI, then they're an affected FIFI and we've

18  identified --

19           THE COURT:  Have you identified who they are?

20           MR. AMANAT:  In the complaint, we listed about

21  a dozen of them and in our automatic disclosures --

22           THE COURT:  Have you identified all of them?

23           MR. AMANAT:  We have not identified all of

24  them, your Honor, because the statute in the government's

25  reading only requires that at least one FIFI be affected

16

Proceedings

1   by a deal --

2           THE COURT:  Sorry, I --

3           MR. AMANAT:  -- in order for there to be a

4   basis for the --

5           THE COURT:  Sorry, may I?

6           MR. AMANAT:  Yes, please.

7           THE COURT:  I wasn't asking if you've

8   identified them to the defendants.

9           MR. AMANAT:  Oh, we have --

10          THE COURT:  Apparently you have not --

11          MR. AMANAT:  -- not identified --

12          THE COURT:  Yes, have you internally identified

13  all of the affected FIFIs?

14          MR. AMANAT:  No, we have not, your Honor.  We

15  have identified affected -- we have identified at least

16  one affected FIFI for each subject deal but there are ---

17          THE COURT:  Have you disclosed to the

18  defendants all that you've identified?

19          MR. AMANAT:  Not yet, your Honor, no.

20          THE COURT:  Why not?

21          MR. AMANAT:  Well, they've propounded

22  interrogatories to us.  The answers aren't --

23          THE COURT:  What's the secret?

24          MR. AMANAT:  There's no secret, your Honor.

25          THE COURT:  All right.  So identify them.

17

Proceedings

1   Look, you have to -- all of them would be victims, right?

2          MR. AMANAT:  Not necessarily.

3          THE COURT:  Oh, why not?

4          MR. AMANAT:  Because --

5          THE COURT:  Describe --

6          MR. AMANAT:  -- the law --

7          THE COURT:  Excuse me.  Describe to me somebody

8   who would be an affected FIFI but not directly and

9   proximately harmed by the commission of the charged

10  offenses.

11         MR. AMANAT:  Sure.  Well, the case law, your

12  Honor, draws a distinction between affect and

13  victimization.  Victimization is a species of affect but

14  not the only one.  So, for example --

15         THE COURT:  Mr. Amanat, you misunderstand my

16  question.  I am not asking about FIRREA, I am really not.

17         MR. AMANAT:  Right.

18         THE COURT:  There are going to -- because you

19  have obligations under the Victims Rights Act --

20         MR. AMANAT:  Right.

21         THE COURT:  -- which I am sure you're diligent

22  about fulfilling, you can't fulfill them unless you've

23  identified those who fall into the category --

24         MR. AMANAT:  Right.

25         THE COURT:  -- of people or institutions who

18

                              Proceedings

1   are directly and proximally harmed by the commission of

2   the offenses described in the complaint.

3              You've identified some.  There may be some that

4   you haven't yet identified.

5              MR. AMANAT:  Right.

6              THE COURT:  But all of those that you've

7   identified must be given notice.  So word is out or will

8   be.  Is there any reason not to share the information

9   with the defendants?

10             MR. AMANAT:  Well, the information that we have

11  as to who was victimized is information that we obtained

12  from the defendants in the first instance.  So they have

13  the information.  In terms of --

14             THE COURT:  Mr Amanat?  Mr. Amanat?

15             MR. AMANAT:  Yes.

16             THE COURT:  Any reason not to share? Look, you

17  must under federal law, notify the victims.

18             MR. AMANAT:  Right.

19             THE COURT:  Every proceeding.  Any reason not

20  to tell the defendants here, the people we're providing

21  notice to?

22             MR. AMANAT:  No, your Honor.  We just haven't

23  compiled that --

24             THE COURT:  Okay, so --

25             MR. AMANAT:  -- full list yet.

Proceedings

1      THE COURT:  -- so do it.  And I understand,

2  look, the fact that it may not be complete yet after God

3  knows how long you have been conducting this

4  investigation and almost a decade after the offenses were

5  completed -- the alleged offenses, I should say, I don't

6  know why you wouldn't have this information but to the

7  extent you're still compiling it, okay, you can

8  supplement it.

9      But to the extent you have it, you have a pre-

10  existing obligation to provide notice to those

11  institutions and the people themselves, I don't see why

12  you wouldn't just turn it over to the defendants but in

13  any event, please do so.

14      MR. AMANAT:  Okay, your Honor.

15      THE COURT:  And as you identify others,

16  supplement it.

17      MR. AMANAT:  Very well, your Honor.

18      THE COURT:  Okay.  So I took you off on a

19  tangent.  You were starting to tell me about factual

20  issues that you think are disputes.  There's scienter.

21  There's identifying who is affected.  Anything else?

22      MR. AMANAT:  They've also raised the personal

23  jurisdiction issue as to three of the corporate entities

24  that we named as defendants.  They believe that there's

25  no -- I don't know if that's a factual dispute or a legal

Proceedings

1    dispute but it's in there.  It's a bit of both, I guess.

2         THE COURT:  Okay.  Well, is there a factual

3    dispute about where the institutions are or it's just a

4    question of the legal import of how the jurisdictional

5    laws affect them?

6         MR. AMANAT:  I think there are elements of

7    personal jurisdiction as to those three defendants that

8    are factual.

9         THE COURT:  Okay.  Is this something that you

10   think will be, as far as you're concerned, the subject of

11   discovery?

12        MR. AMANAT:  We've already propounded discovery

13   requests to the defendants aimed at fleshing out the

14   factual elements of that.

15        THE COURT:  All right.  Unless there's

16   something else you think I need to know to get up to

17   speed, I would like to turn over the floor to your

18   colleagues.  Anything else?

19        MR. AMANAT:  Those are the key points, your

20   Honor.

21        THE COURT:  Okay.  Who wants to speak for

22   Barclays?

23        MR. KLAPPER:  It's Richard Klapper of Sullivan

24   & Cromwell.

25        THE COURT:  Mr. Klapper, go ahead.

21

Proceedings

1       MR. KLAPPER:  Thank you, your Honor.  Let me
2  start with the last piece because in a way it's the
3  easiest.  There's only one defendant that we make a
4  personal jurisdiction motion to dismiss.  That's Barclays
5  PLC.  It's a bank holding company registered in the
6  United Kingdom located in London.

7       THE COURT:  And it does no business here in the
8  United States?

9       MR. KLAPPER:  It does.  It only owns
10 subsidiaries that do business.  It does not directly do
11 any business.

12      THE COURT:  I see.  Obviously the
13 jurisdictional issue is not before me.  So I am not going
14 to wade into it but do you anticipate it's going to have
15 any effect on the discovery process?

16      MR. KLAPPER:  No.

17      THE COURT:  Okay.

18      MR. KLAPPER:  I mean unless they propound
19 requests that go activities of the holding company in the
20 United Kingdom that we don't think are proper.  It's a
21 pretty straightforward legal question.

22      THE COURT:  But your jurisdictional position
23 will not affect the basic proposition that Barclays PLC
24 should be able to provide discovery in this case.

25      MR. KLAPPER:  Yes.

Transcriptions Plus II, Inc.

22

Proceedings

1          THE COURT:  Okay.  All right.  So let's move

2   on.  From your perspective, what are the factual issues

3   that are disputed here?

4          MR. KLAPPER:  Well, let me just start and say

5   as Mr. Amanat mentioned, there is a motion to dismiss

6   pending before Judge Matsumoto which --

7          THE COURT:  Yes.  When I ask a question, it's

8   usually a pretty good clue of what it is I want to know

9   about.

10          MR. KLAPPER:  Right.

11          THE COURT:  I actually do know there's a motion

12   to dismiss pending.  Any chance I could get you to answer

13   the question I asked?

14          MR. KLAPPER:  Sure.

15          THE COURT:  Okay.  Wonderful.

16          MR. KLAPPER:  The first disputed issue I

17   believe your Honor has now resolved which is the question

18   about the affected or victimized financial institutions

19   because this is a FIRREA case.  Either it's got to be a

20   victimized financial institution under the Bank Fraud

21   provision or it's got to be a --

22          THE COURT:  Moving onto the factual issues that

23   are in dispute, any chance I could get you to --

24          MR. KLAPPER:  Sure.

25          THE COURT:  -- describe those for me, please?

23

Proceedings

1          MR. KLAPPER:  Sure.

2          THE COURT:  Thanks.

3          MR. KLAPPER:  So scienter will definitely be an

4     issue.  There's been a two-year investigation.  So from

5     Barclays, the government has pretty much gotten most but

6     not all of what it has asked for and I think we're on our

7     way towards resolving some of the other issues.  There

8     may be issues as to audiotapes, just because they're so

9     difficult to listen to and go through.

10         THE COURT:  When you say there may be issues,

11    meaning discoverability or what they say?

12         MR. KLAPPER:  Burden.  Burden.  It's -- they've

13    received a lot of them --

14         THE COURT:  Uh-hum.

15         MR. KLAPPER:  -- during the course of the

16    investigation.  They've requested more.  We've had

17    discussions.  There's no ripe dispute but to the extent

18    that the number of hours that have to be listened to in

19    order to determine what's responsive to their requests is

20    too large, that may be a dispute with respect to

21    Barclays.

22         THE COURT:  I am honestly -- perhaps I

23    shouldn't be but I am surprised to hear that there's

24    going to be any objection to something that will take too

25    long, given the extraordinarily lengthy discovery period

24

Proceedings

1   you've all proposed but --

2              MR. KLAPPER:  Yes, and --

3              THE COURT:  -- maybe you'll persuade me.  Okay.

4              MR. KLAPPER:  Now the likely discovery disputes

5   are ones that come out of third-party requests.

6              THE COURT:  Uh-hum.

7              MR. KLAPPER:  So one of the reasons, probably

8   the sole reason for the length of the discovery period is

9   the government's case depends upon the description of

10  loans in the offering documents.  That requires looking

11  at loan files.  The government has apparently taken the

12  view that they can look at servicer files.  That is the

13  companies that service the loan after it's been made to a

14  borrower.

15             Our position is or at least we reserved the

16  position to take a look at those files and make sure that

17  they're adequate because the files of the originators,

18  those people who made the loans, tend to be more

19  expansive, contain more documents and are more relevant

20  to the question what did the person who made the loan

21  know about the borrower.

22             THE COURT:  I am missing something.  Are you

23  saying that because there may be a different set of

24  documents that will have more information --

25             MR. KLAPPER:  Correct.

25

Proceedings

1          THE COURT:  -- there should be some limit on

2   looking at another set of documents that may have less

3   information?

4          MR. KLAPPER:  No.  What it means is that while

5   we have produced to the government a large number of

6   servicer files, we will have to go out to the people like

7   Countrywide and some defunct entities like IndyMac and

8   request loan files.  Those entities in other cases have

9   at times objected to requests, at times they haven't.

10  We'll just have to see.  And it is a large number of loan

11  files.  There are in these 36 deals, a huge number of

12  loan files.

13         THE COURT:  Can you give me the order of

14  magnitude?

15         MR. AMANAT:  154,000 loans.

16         THE COURT:  Okay.

17         MR. KLAPPER:  They are -- the government is

18  proceeding by sampling.  We reserve the right to contest

19  that but that's how they're proceeding and between

20  sampling and looking at one category, one additional

21  category of loans, I believe they're up above 7,000 loans

22  that they propose to look at.

23         THE COURT:  When you say you reserve the right,

24  I didn't hear the rest of the sentence.  You reserve the

25  right to do what now?

26

Proceedings

1          MR. KLAPPER:  To contest the legitimacy of

2    taking the results from the sample and extrapolating it

3    to the whole.

4          THE COURT:  That's going to be an issue, an

5    evidentiary issue.

6          MR. KLAPPER:  Correct.

7          THE COURT:  Okay.  Not a discovery issue.

8    Okay.

9          MR. KLAPPER:  But the government is looking at,

10   we believe approximately 7,000 loans.

11         THE COURT:  And of course you're free in

12   advance of teeing up the evidentiary issue, I want to

13   make sure that no one is precluded from making an

14   argument before Judg Matsumoto based on some limitation

15   in discovery.

16          So obviously if you think that your ability to

17   defend against the claims will rely on a review of the

18   entire 154,000, if you think that's appropriate

19   discovery, you'll make that request and do it but

20   obviously you won't say they can't rely on sampling if

21   you're not willing to make the attempt to look at all of

22   the loans, right?

23         MR. KLAPPER:  Right.

24         THE COURT:  Okay.  And our schedule that we've

25   agreed with the government on provides that we will have

Proceedings

1   the right to designate those loans that we want to look

2   at in addition to the ones the government has proposed.

3           THE COURT:  There's sampling on both sides, as

4   opposed to just on one side.

5           MR. KLAPPER:  Right, sampling or targeted

6   looking at --

7           THE COURT:  Yes.

8           MR. KLAPPER:  -- particular things.

9           THE COURT:  Right.

10          MR. KLAPPER:  So one of the disputes may be

11  with third-parties from whom we need to get this

12  information.

13          THE COURT:  Okay.

14          MR. KLAPPER:  I don't know whether we're going

15  to have a dispute with the government over their

16  production of documents that they have collected in their

17  investigation.  We've had discussions with them.

18  Hopefully we'll be able to reach an agreement but they

19  have relied upon work that other United States Attorney's

20  Offices have done in investigating other entities and I

21  think where we've landed on this which may or may not be

22  something that's adequate is that they apparently have

23  files that relate to their investigation which include

24  documents that they obtained from other offices and

25  that's certainly is information, to the extent not

28

Proceedings

1  privileged, that we would want them to produce.  I

2  believe they're willing to produce that and are in the

3  process of doing that.

4           There may come a time where we want information

5  from the government that it's collected in other offices

6  who have investigated, let's say, rating agencies or if

7  they've investigated the originators that we may need.

8  That's not a current dispute but it may come up.

9           THE COURT:  Okay.

10          MR. KLAPPER:  There's also the issue, speaking

11  of rating agencies, of the third-parties like rating

12  agencies and whether or not they will be willing to

13  provide us with the information that we'll seek from

14  them.  We're --

15          THE COURT:  From the rating agencies.

16          MR. KLAPPER:  From the rating agencies.  One of

17  the reasons we can't be that clear about what we may want

18  is we haven't yet seen the total of what the government

19  has obtained.

20          THE COURT:  Uh-hum.

21          MR. KLAPPER:  So if the government has obtained

22  what we think is adequate, then we don't have to redo

23  their work but if we don't think it's adequate and we

24  need additional information from the rating agencies, we

25  may have to go to that.

29

Proceedings

1          These cases, your Honor, although this is a

2     fraud case, which makes it different from a lot of the

3     residential mortgage-backed securities cases, many of

4     which were more or less strict liability cases under the

5     securities laws, but fundamentally a lot of what we have

6     to do in this case is similar to other cases and there

7     have not been a huge number of disputes.  There have been

8     issues about borrower personal identification information

9     and the like, which had been worked out and we've been

10    working with the government on that issue and, in fact,

11    that's an issue in our proposed protective order that we

12    submitted yesterday.

13          But these have not been litigations that have

14    had a huge amount of discovery dispute.  It's a huge

15    amount of work, a huge amount of documents but not a huge

16    amount of disputes.

17          THE COURT:  Sounds like you're all going to be

18    working hard except me.

19          MR. KLAPPER:  Right.

20          MR. AMANAT:  I --

21          MR. KLAPPER:  Oh, I should mention --

22          THE COURT:  Which is fine with me.

23          MR. KLAPPER:  -- that we have had discussions

24    about interview memos that the government has taken,

25    that's not ripe to be able to say we're going to be

30

Proceedings

1   unable to resolve it but it is an open issue as to our

2   ability to obtain those.

3           THE COURT:  Okay.  All right.  Thank you.

4           Let me turn next to Ms. James.  You're

5   representing Mr. Menefee?

6           MS. JAMES:  Yes, your Honor.

7           THE COURT:  From your perspective, you know, I

8   know in a case like this the cases -- the claims against

9   the individuals can be sort of the tail and get

10  overlooked but I want to make sure I am not overlooking

11  anything.

12          Anything unique to your client that you think

13  hasn't been raised that I should know about to get up

14  third-party speed?

15          MS. JAMES:  I appreciate the opportunity, your

16  Honor.  I just want to make clear, I think it was

17  implicit in what Mr. Klapper said that in addition to

18  challenging scienter, I believe all defendants are going

19  to be challenging the falsity and materiality of some of

20  the government's alleged misrepresentations.

21          But with respect to Mr. Klapper's description

22  of the potential discovery disputes on behalf of Mr.

23  Menefee, I don't at this juncture, see anything

24  different.

25          THE COURT:  Well actually this is the first I'm

Proceedings

1  hearing that falsity, for example, is going to be

2  contested.  So the representations about the extent to

3  which the loans had been -- the due diligence had been

4  done, et cetera, you're saying that those representations

5  were not false.

6          MS. JAMES:  Correct, your Honor. I believe it's

7  the position of all of the defendants that many of the

8  statements and the offering documents that the government

9  is challenging were incorrect, were in fact accurate and

10 that is the reason that the parties are going to engage

11 in a reunderwriting exercise of the loans to resolve that

12 disputed fact.

13         THE COURT:  With respect to your client, I know

14 that the complaint attributes to your client specific

15 statements often in quotation marks, are those in

16 dispute?

17         MS. JAMES:  I think the government has quoted

18 selective portions of certain statements made by my

19 client.  I think what they mean and whether they were

20 false or material in any respect is quite certainly going

21 to be in dispute as --

22         THE COURT:  So the truth --

23         MS. JAMES:  -- is --

24         THE COURT:  -- the veracity of quoted

25 statements will be an issue.

Proceedings

1          MS. JAMES:  Correct, some of them, yes.

2          THE COURT:  But not the words that appear

3    between the quotation marks?

4          MS. JAMES:  The words that appear between the

5    quotation marks were derived from a document or

6    recording.  So those words do exist but we do have a

7    dispute over what they mean.

8          THE COURT:  They don't mean what they appear to

9    mean.

10         MS. JAMES:  That's correct, your Honor.

11         THE COURT:  Okay.  All right.

12         MS. JAMES:  And I think also there will be a

13   factual dispute about what precisely his role was in

14   reviewing certain of the loan pools, underlying certain

15   of the securitizations.  I think the government -- as the

16   complaint reads, there's a suggestion that he had his

17   hands in absolutely everything and I think that goes to

18   the scienter point --

19         THE COURT:  Okay.

20         MS. JAMES:  -- but I am not sure that that will

21   prove to be correct.

22         THE COURT:  And one other thing that I raise --

23   I always raise in circumstances where there's an

24   allegation of criminal conduct and individual defendants

25   in a civil case, I don't mean to suggest anything other

33

Proceedings

1   than that it's a potential issue and I recognize that

2   given the timing it's less likely but is there any -- do

3   you have any anticipation that Fifth Amendment concerns

4   or anything else is going to affect discovery in this

5   case?

6          MS. JAMES:  Not at this time, your Honor, no.

7          THE COURT:  All right.  From your perspective,

8   anything else I should know to get up to speed?

9          MS. JAMES:  No, your Honor.

10         THE COURT:  Let me ask you --

11         MS. JAMES:  Thank you.

12         THE COURT:  -- to turn it over to Mr. McGorty.

13  Same kinds of questions for you, Mr. McGorty about your

14  clients.

15         MR. MCGORTY:  And, your Honor, the same kinds

16  of answers.  You know, we would join with the bank's

17  analysis of the potential factual disputes.  With respect

18  to Mr. Carroll, you know, it's difficult to sort of

19  identify factual -- specific factual disputes

20  because there are so few specific facts alleged against

21  Mr. Carroll in the complaint despite it's length.

22         We do believe that materiality is an issue.  We

23  do believe that the falsity of some of the statements,

24  not -- and there are very few statements about Mr.

25  Carroll and from Mr. Carroll in the complaint but we're

34

Proceedings

1   not disputing the words but perhaps their meaning in the

2   actual case.

3           THE COURT:  Okay.

4           MR. MCGORTY:  So we would just join with the

5   arguments that have been raised.

6           THE COURT:  And same question about Fifth

7   Amendment or related concerns, anything that you think

8   will affect discovery?

9           MR. MCGORTY:  No, we do not, your Honor.

10          THE COURT:  Okay.  All right.

11          MR. KLAPPER:  Your Honor, if I could just ask

12  one --

13          THE COURT:  Yes, Mr. Klapper?

14          MR. KLAPPER:  -- additional point which both

15  the individuals and Barclays has and that is Mr. Amanat

16  has mentioned a singular scheme across all the deals.

17          THE COURT:  Uh-hum.

18          MR. KLAPPER:  These individuals, Mr. Menefee

19  and Mr. Carroll were not involved in many of the deals

20  and there will be a dispute as to how they could possibly

21  be part of a scheme that involved those deals.  As

22  Barclays defendants, there will be very much a dispute as

23  to the existence of any kind of scheme but certainly not

24  a scheme that crosses over subprime deals, deals that are

25  not subprime deals and deals where Barclays was solely

35

Proceedings

1    the underwriter and not the issuer of the securities.

2           So these issues are teed up in front of Judge

3    Matsumoto but they will be an issue continuing through

4    the case.

5           THE COURT:  I want to discuss with you the

6    discovery plan that you've submitted and look, let me

7    say, I get it that this is not a typical case, you know

8    -- I've got some lawyers waiting on the next case that is

9    more routine, so you know I didn't come in here expecting

10   that you get all the discovery done in six months.

11          That said, this is a really extraordinary

12   amount of time that you've planned out for a case of

13   exceptional importance to the public and I'm sure there

14   are a lot of people who quite understandably want to see

15   this resolved sooner rather than later.  I'm not going to

16   press you at the moment on your very long period for fact

17   discovery deadline -- in the fact discovery deadline. I

18   get it.  You've got a lot of sources of information to

19   get to and a lot of documents to collate but I want you

20   guys to be clear, I don't -- with a fact discovery period

21   of 14 months, I really don't anticipate being terribly

22   receptive to a request to extend it.

23          So please go forward with the expectation that

24   that's going to be a firm deadline.  I did want to

25   discuss the proposal to have expert discovery extend for

36

Proceedings

1  more than nine months after the close of fact discovery.

2  I take it there's a fair amount of expert work that yo

3  could be started on while you're doing fact discovery,

4  even if that's not the case, I'm quite honestly skeptical

5  about the need to take nine months after the completion

6  of fact discovery to exchange your expert reports.  Does

7  anybody want to tell me what you have in mind that's

8  going to take that long?

9        MR. KLAPPER:  Let me address that, your Honor.

10  Now first off, the analogous cases, the only one that's

11  gone to trial was the FHFA's case against Nomura in the

12  Southern District before Judge Cote.  that case was filed

13  in September of 2011 and went to trial in March of 2015,

14  so three and a half years later.

15        The case against Royal Bank of Scotland, a

16  similar case, a very large case, as Nomura was not that

17  large a case, smaller than this case, but RBS' case still

18  has not gotten to trial.  It was also filed in September

19  of 2011, so that's --

20        THE COURT:  It seems to me the sort of thing

21  that we ought to be aiming not to replicate.

22        MR. KLAPPER:  I agree, your Honor.  So then

23  what are the reasons why these take so long?  It's the

24  loan file reunderwriting process.  Getting the loans,

25  reunderwriting the loans.

37

Proceedings

1        THE COURT:  I'm not talking -- Mr. Klapper, we

2   seem to have this come up multiple times in such a short

3   period.  I ask a different question and I'm hoping you'll

4   answer the one I ask.  I am not asking about fact

5   discovery.  I said I am going to give you the period that

6   you've asked for on that but expert discovery -- you

7   haven't walked me through the kinds of expertise you

8   anticipate bringing to bare.

9        I imagine at least some of them could get --

10  some of your experts can get started before the full

11  completion of fact discovery and even if some of them

12  have to wait for all discovery, all of the fact discovery

13  to be completed, I don't understand why it is going to

14  take nine months for them to complete and exchange their

15  reports.

16        MR. KLAPPER:  The primary experts are those who

17  reunderwrite loan files.  So the testimony on the

18  reunderwriting of the loan files on both sides will be by

19  expert testimony.  That will begin as soon as we get the

20  loan files and will continue as we continue to get loan

21  files.

22        Once the affirmative reunderwriting expert

23  reports are issued, the experts on both sides for

24  reunderwriting, as well as experts on appraisals

25  because it tends to be -- appraisal valuations tends to

38

                    Proceedings
1   be an important issue, will be responding to those
2   reports and that takes a great deal of time.
3           Other experts such as --
4           THE COURT:  Well, walk me through that.  Why
5   does it take a great deal of time?
6           MR. KLAPPER:  Because you have to go and look
7   at the loan by loan analysis of the expert and go through
8   the files and see whether or not you agree with it or not
9   and that's a loan by loan process.  I mentioned 7,000
10  loans, it appears to be what the plaintiffs are planning
11  to do.  We may very well have a number of other
12  additional loans that will add to that.  That takes a
13  great deal of time.
14          Other experts such as people who will determine
15  what the effect of any alleged misrepresented feature of
16  the borrower or the loan need to have the results of that
17  work in order to determine whether or not it made a
18  difference.
19          So for example, if the loan to value according
20  to the plaintiff's expert, was really 105 percent, so the
21  loan was 105 percent of the value according to their
22  valuation, were loans that they've identified as having
23  those features, did they perform in any material way
24  better or worse than loans that they don't contend are
25  misrepresented?  They have to wait to see the results of

39

Proceedings

1    that in order to begin their work.

2           THE COURT:  See the results of what?

3           MR. KLAPPER:  The plaintiffs were -- in the

4    plaintiff's case, the defendants reunderwriting experts

5    conclusions as to which of the loans were misrepresented.

6           THE COURT:  This strikes me as one where as you

7    go along in discovery, your experts can get a great deal

8    of their work done because yes, there's obviously on each

9    side, a need to respond to the opinion of the opposing

10   expert which you won't get until you get it.

11          But even before that, your folks are going to

12   be able as you get the loan information, loan by loan, to

13   start working up what you think of the loan, what you

14   think of the materiality of the representations, right?

15   Because you'll have the facts and I take it -- if I am

16   incorrect about this assumption, I'll ask you to relook

17   at yours, I take it that you're not going to wait until

18   August 14th, 2018, when fact discovery is done to turn

19   all of this stuff over to your experts and start having

20   to look at loan by loan analysis.

21          MR. KLAPPER:  Experts on both sides will be

22   looking at the loan files as we obtain the loan files.

23          THE COURT:  Okay.  So well before the start of

24   the expert discovery period, your experts are going to be

25   doing their work, and are going to have a great deal

Proceedings

1   going on.

2         MR. KLAPPER:  Right.  And then there is a

3   deadline for the affirmative expert reports.  So all

4   affirmative expert reports.

5         THE COURT:  Right.

6         MR. KLAPPER:  Reunderwriting or any other

7   affirmative expert report comes after the end of

8   discovery to give a little bit of time for them to take

9   into account anything that was obtained at the end of

10  fact discovery.

11        THE COURT:  Uh-hum.

12        MR. KLAPPER:  Then there are the rebuttal

13  expert reports because you can't really start on the

14  rebuttal work -- you can review the loan files and we

15  will on both sides, I am sure, be reviewing the loan

16  files but you can't respond to the conclusions of the

17  experts whether they be valuation experts because they

18  will also be experts who purport to have automated

19  valuation algorithms where they're going to say okay,

20  this is the real value of the loan according to my black

21  box and then there will be people on the other side

22  criticizing that.  You won't know the results of that

23  either until you get the affirmative reports.

24        THE COURT:  I get that but, you know, if the

25  experts already have their views about what the opinions

41

Proceedings

1    should be, and then they see the opposing expert who has

2    a disagreeing view, they're already well on their way to

3    being able to explain why that expert is wrong because

4    they've already done their analysis.

5           Sure, you have to take into account the

6    methodology of the opposing expert and explain why you

7    disagree or if you still disagree after seeing the

8    report, I get that.  But you've set aside six months, at

9    least, if I am not mistaken, or is it more for rebuttal

10   opinions.  It seems like an extraordinarily long time.

11          MR. KLAPPER:  It's a long time because there

12   are a lot of loans.  These cases are, as much as the

13   government makes very broad assertions, these cases are

14   -- involve individual loans and even on a sampling method

15   there are going to be more than 7,000 and probably a lot

16   more than that, given what we're going to do as well,

17   loans and they take a while.

18          THE COURT:  All right.  Well, look, largely

19   because I defer to the fact that you all have a lot more

20   expertise in the issues in this case than I possibly can

21   at this point, I'm going to defer to your proposal but I

22   am looking at this as something that already has baked

23   into it the one or two or three requests for extensions

24   that I often see in civil cases and I am going to treat

25   it that way.

42

Proceedings

1          So please understand that if you're going to

2    ask for more time at any point, you're going to need to

3    give a very compelling reason and a very detailed

4    explanation of what you've done up to that point to

5    comply with the proposal that I'm sure you've all put a

6    lot of thought into to propose something that you can

7    live with.  I expect you do that because this is, you

8    know, for events that had such an important effect on the

9    national and global economy a decade ago, for us not to

10   be in a position to complete discovery until the end of

11   May 2019, is extraordinary.

12          I am not in a position to be able to tell you

13   that it's unwarranted but I am in a position to tell you

14   that having committed to it on all your parts, I am going

15   to expect you to live up to it.  All right.

16          I did want to address the issue of amending the

17   complaint.  I think to some extent and I'm having some

18   trouble finding it now in your proposal, to some extent

19   you've left that open-ended, have you not?

20          MR. AMANAT:  We have, your Honor.

21          THE COURT:  Yes, let's not do that.  I'm happy

22   to have you guys go back to the drawing board and come up

23   with a proposal but, you know, Mr. Amanat, the government

24   has been looking into this for how long?  Almost a

25   decade?

43

Proceedings

1          MR. AMANAT:  No.  Well, our investigation of

2   Barclays began in early 2014.

3          THE COURT:  The government has been looking

4   into what's been going on in this industry and --

5          MR. AMANAT:  Yes.  Since --

6          THE COURT:  -- this practice --

7          MR. AMANAT:  -- a couple of years before that.

8   That's correct, yes.

9          THE COURT:  So I assume you know what your

10  pleading needs to look like.

11         MR. AMANAT:  Absolutely.

12         THE COURT:  I assume you'll have a better

13  understanding after you've had the responses to your

14  initial document demands and interrogatories.

15         MR. AMANAT:  Right.

16         THE COURT:  I don't intend to leave this open-

17  ended so that sometime in 2019 you're adding new

18  allegations that require a new round of discovery.

19         MR. AMANAT:  Yes, we don't have any intention

20  to do that.  We certainly are not planning on adding any

21  additional defendants or any additional deals for

22  example.

23         THE COURT:  Right.  And there's one other thing

24  I wanted to add to that which is you put in your plan

25  that well, we'll do it in accord with the Federal Rules

44

Proceedings

1   of Civil Procedure.  Absolutely.  But it's not going to

2   be just Rule 15.

3            We're going to have a deadline, a presumptive

4   deadline so that any proposed amendment after that

5   deadline also has to satisfy the good cause standard

6   under Rule 16.  And to me, what makes the most sense is

7   sometime a couple of months after you receive responses

8   to the initial round of discovery demands, any reason

9   anybody can think of not to make that the presumptive

10  deadline?

11           MR. AMANAT:  In an earlier draft of this

12  document that the parties were discussing, the parties

13  had initially thought to put that deadline at the end of

14  November of this year --

15           THE COURT:  Uh-hum.

16           MR. AMANAT:  -- it was -- the reason we ended

17  up leaving it open-ended, it was then pointed out that we

18  were not likely to receive a decision on the defendants'

19  motion to dismiss until after that date.  And so the

20  parties ended up deleting the language about the deadline

21  for amending the complaint being the end of November in

22  favor of language that allowed the parties to kind of

23  revisit that issue once we get a decision from the judge

24  on the motion to dismiss.

25           But, you know, from the government's point of

45

Proceedings

1   view, we don't anticipate on our end adding any

2   additional parties or claims.  The only amendment that

3   the government is likely to make to the complaint will

4   either be an amendment to reform the complaint if need be

5   in response to a decision on the motion to dismiss --

6           THE COURT:  Right.

7           MR. AMANAT:  -- or alternatively, you know, I

8   guess the possibility of, you know, conforming the

9   complaint to the evidence that emerges in discovery as is

10  sometimes (indiscernible).

11          THE COURT:  And both of those clearly fall

12  within the good cause standard of Rule 16.

13          MR. AMANAT:  Sure.  The --

14          THE COURT:  So what I am really looking for is

15  something that puts a deadline on when you have to amend

16  your pleadings to conform to what you've learned in

17  discovery up to that point, understanding that most of

18  what we've done, I am happy to adopt that end of November

19  deadline --

20          MR. AMANAT:  The government has no objection.

21  The one issue that the parties discussed in regards to

22  this topic that could conceivably affect discovery is the

23  possibly that the defendants who of course haven't

24  answered yet because their answer is not due since they

25  moved to dismiss instead --

Transcriptions Plus II, Inc.

Proceedings

1           THE COURT:  Uh-hum.

2           MR. AMANAT:  -- may at some point in time

3    decide to bring in additional parties for their purposes.

4    And they haven't ruled out --

5           THE COURT:  Any --

6           MR. AMANAT:  -- the possibility of wanting to

7    do that.

8           THE COURT:  Anyone going to do that?

9           MR. KLAPPER:  No.

10          THE COURT:  You folks?

11          MS. JAMES:  No, your Honor.

12          MR. MCGORTY:  No, your Honor.

13          THE COURT:  Okay.

14          MR. AMANAT:  So --

15          THE COURT:  So but I do think in lieu of an

16   answer and I understand that you filed a motion to

17   dismiss, to shape everybody's expectations in discovery

18   and allow you all to meet the discovery deadline, whether

19   you label it answer or something else, I don't

20   particularly care, I think it would be useful to have a

21   document from each defendant that or each group of

22   defendants that does what an answer would do saying, you

23   know, this one is admitted, this one is denied, this one

24   we don't have information, so that the parties can shape

25   their discovery requests accordingly.  And I am going to

47

Proceedings

1    ask you to do that within 30 days.  Okay?

2              MR. KLAPPER:  Yes, your Honor.

3              THE COURT:  Okay.  All right.  Only because

4    hope spring's eternal but not because I have any

5    expectation of a positive result, settlement?  You must

6    have discussed it up until now or you wouldn't be here.

7              MR. AMANAT:  Yes, your Honor.  Prior to filing

8    suit, the parties actually engaged in about seven months

9    of --

10             THE COURT:  I'm sure, yes.

11             MR. AMANAT:  -- settlement discussions

12   intermittently over that time but obviously more

13   intensely towards the latter part of that period.  And

14   those discussions did reach the highest levels of both

15   the government and Barclays and ultimately proved not

16   fruitful which is how we ended up here.

17             As we previously communicated to the

18   defendants, the government continues to stand ready to

19   discuss settlement with them at any time and does

20   perceive settlement to be a -- certainly a viable and

21   preferable way to achieve resolution of this case on a

22   time frame that's sooner than what is anticipated by the

23   discovery plan.

24             But the ball is really in the defendants' court

25   and until we hear from them that they are interested in

48

Proceedings

1    resuming settlement discussions with us, we're obviously

2    proceeding with discovery and certainly are hopeful that

3    in the course of discovery the issues will be framed, the

4    parties positions will develop to a point where

5    eventually the parties can resume settlement discussions

6    again at some point, that the defendants consider

7    opportune.

8              MR. KLAPPER:  As Mr. Amanat said, there were a

9    lot of discussions, exchange of views and the like, and

10   the government decided to file this lawsuit.  We're

11   always willing to talk to the government but at this

12   point, we think that the better way to reach a resolution

13   is to go forward with the lawsuit, the motion to dismiss

14   the discovery that we are obtaining from the government

15   and there may come a time down the road where it will

16   make sense for both sides to talk but I don't think it's

17   quite the right time.

18             THE COURT:  Okay, look, a lot of cases more

19   routine than this, I would say guys, you need to just get

20   to the table.  I know you've been there and I'm not going

21   to add anything to that discussion that you haven't

22   thought of yourselves but keep your eyes open for an

23   opportunity and please let me know if there's anything

24   that can happen on my side, whether it's some sort of

25   court-sponsored settlement conference or mediation,

49

Proceedings

1   anything that I can do to facilitate getting you guys

2   back to the table, let me know but I am going to assume

3   that I will hear from you and I won't press you on it.

4   I'm always going to ask.

5           Is there anything else that anyone thinks we

6   should take up today that we haven't already discussed?

7           MR. AMANAT:  No, your Honor, we did -- the

8   parties did jointly file a proposed protective order

9   yesterday.

10          THE COURT:  Yes, I haven't taken a look at it

11  yet.

12          MR. AMANAT:  Yes.

13          THE COURT:  I'll --

14          MR. AMANAT:  It's long.  I am sure it will --

15          THE COURT:  I will take a look at it and let

16  you know if I have any concerns about it.  I'll enter the

17  schedule as we've discussed.  Just to recap the things

18  that I have in my notes of sort of our take-away, the

19  government is going to provide a victim notice going

20  forward and going to disclose the effective FIFIs and

21  financial institutions that you've identified thus far to

22  the defendants.

23          We'll set into the schedule that you've

24  proposed a presumptive amendment deadline of November

25  30th of this year.  Defendants are going to provide some

Proceedings

1   document response to the allegations in the complaint in

2   the way an answer would, thirty days from today. I think

3   that's it.

4          Anything else?

5          MR. KLAPPER:  Does your Honor wish that we

6   submit a revised plan that takes these issues into

7   account?

8          THE COURT:  No, I have my own standard format

9   for an order.  I will have it out.

10          MR. KLAPPER:  Okay, thanks.

11          THE COURT:  All right.  Thank you all.

12          MR. AMANAT:  Can I --

13          THE COURT:  Oh, yes, Mr. Amanat?

14          MR. AMANAT:  Can I just have one moment, your

15   Honor, to confer with my colleagues?

16          THE COURT:  Sure.

17   (Counsel and client confer)

18          MR. AMANAT:  Okay, yes, that's it, your Honor.

19   Thank you.

20          THE COURT:  Okay.  Thank you all. Have a very

21   good day.

22          MR. KLAPPER:  Thank you, your Honor.

23          MS. JAMES:  Thank you, Judge.

24              (Matter concluded)

25                  -o0o-

51

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **9th** day of **June**, 2017.

*Linda Ferrara*

Linda Ferrara

AAERT CET**D 656

Transcriptions Plus II, Inc.