UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____x
:
UNITED STATES OF AMERICA,                   :
:
*Plaintiff*,              :
:
vs.                              :
:
BARCLAYS CAPITAL, INC.; BARCLAYS            :      Civil Action No.:
GROUP US INC.; BARCLAYS US LLC;             :      1:16-cv-7057-KAM-JO
BARCLAYS BANK PLC; BARCLAYS PLC;            :
BCAP LLC; SECURITIZED ASSET BACKED          :
RECEIVABLES LLC; SUTTON FUNDING             :
LLC; PAUL K. MENEFEE; and JOHN T.           :
CARROLL,                                    :
:
*Defendants*.             :
:
_____x


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## PAUL K. MENEFEE'S MOTION TO DISMISS THE AMENDED COMPLAINT


KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
Tel: (212) 715-9100

*Counsel for Defendant Paul K. Menefee*

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

SUMMARY OF ALLEGATIONS CONCERNING MR. MENEFEE ....................... 3

    A.    Barclays' Credit Due Diligence for Subprime Loans ............................ 4

    B.    Barclays' Disposition of First Pay Defaults .......................................... 6

    C.    The Menefee/Carroll Deals .................................................................... 7

        1.    The FR Deals .............................................................................. 7

        2.    The BR Deals ............................................................................. 8

ARGUMENT ............................................................................................................ 10

I.    THE AMENDED COMPLAINT DOES NOT ADEQUATELY ALLEGE THAT
    MR. MENEFEE ACTED WITH FRAUDULENT INTENT ........................... 11

    A.    The Allegations in the Amended Complaint Belie Any Claim of Motive .......... 12

    B.    The Amended Complaint Fails to Allege Conscious Misbehavior ..................... 13

II.    THE AMENDED COMPLAINT DOES NOT ADEQUATELY ALLEGE THE
    FALSITY OR MATERIALITY OF MR. MENEFEE'S STATEMENTS TO
    INVESTORS ......................................................................................... 20

    A.    The FR Deals ........................................................................................ 21

    B.    The BR Deals ........................................................................................ 23

III.    CLAIMS BASED ON FR3 AND FR4 ARE TIME BARRED ....................... 25

CONCLUSION ........................................................................................................ 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atl. Gypsum Co. v. Lloyds Int'l Corp.*,
    753 F. Supp. 505 (S.D.N.Y. 1990) ...............................................................12, 13

*Batson v. Rim San Antonio Acquisition*,
    No. 15-cv-07576 (ALC), 2016 WL 6901312 (S.D.N.Y. Nov. 22, 2016) ..............................11

*DeBlasio v. Merrill Lynch*,
    No. 07-cv-318 (RJS), 2009 WL 2242605 (S.D.N.Y. July 27, 2009)......................................17

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    104 F. Supp. 3d 441 (S.D.N.Y. 2015).......................................................21

*Garrick-Aug Assocs. Store Leasing, Inc. v. Hirschfield*,
    652 F. Supp. 905 (S.D.N.Y. 1986) ...........................................................27

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001).......................................................................12, 13

*L-7 Designs, Inc. v. Old Navy, LLC*,
    647 F.3d 419 (2d Cir. 2011)...........................................................................11

*Lewis v. Del. Charter Guarantee & Trust Co.*,
    No-14-cv-1779, 2015 WL 1476403 (E.D.N.Y. March 31, 2015)
    (Matsumoto, J.) ..........................................................................................3 n.1

*Luce III v. Edelstein*,
    802 F.2d 49 (2d Cir. 1986)...............................................................................13

*In re Manulife Fin. Corp. Secs. Litig.*,
    276 F.R.D. 87 (S.D.N.Y. 2011) ...................................................................21

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).....................................................................12, 20

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
    822 F.3d 650 (2d Cir. 2016).....................................................................23 n.15

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999)......................................................................19

*In re UBS AG Secs. Litig.*,
    No. 07-civ-11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012),
    *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)..........................................................................................12, 13

*United States v. Altman*,
    48 F.3d 96 (2d Cir. 1995)............................................................................................25

*United States v. Bank of New York Mellon*,
    941 F. Supp. 2d 438 (S.D.N.Y. 2013).........................................................................11

*United States v. Kerik*,
    615 F. Supp. 2d 256 (S.D.N.Y. 2009).........................................................................28

*United States v. Lane*,
    474 U.S. 438 (1986)....................................................................................................26

*United States v. Maze*,
    414 U.S. 395 (1974)....................................................................................................26

*United States v. Victor Teicher & Co., L.P.*,
    726 F. Supp. 1424 (S.D.N.Y. 1989)...........................................................................28

*United States v. Wells Fargo Bank, N.A.*,
    972 F. Supp. 2d 593 (S.D.N.Y. 2013)..................................................................19 n.11

*Zigman v. Giacobbe*,
    944 F. Supp. 147 (E.D.N.Y. 1996) .............................................................................25

**Statutes**

12 U.S.C. § 1833a(c)(2) ...................................................................................................2

18 U.S.C. § 1344 .............................................................................................................2

Federal Rule of Civil Procedure 9(b)............................................................................20

Financial Institution Reform, Recovery & Enforcement Act ............................... *passim*

Defendant Paul K. Menefee respectfully submits this memorandum of law in support of his motion to dismiss all claims asserted against him in the Amended Complaint in this action.

## PRELIMINARY STATEMENT

After conducting a nearly two-year investigation, reviewing over 11 million documents and thousands of audio recordings produced by Barclays, and interviewing more than a dozen current and former Barclays employees – including Mr. Menefee for four days – the Government has compiled an investigatory record that overwhelmingly demonstrates that Mr. Menefee acted in good faith in connection with Barclays' securitization of subprime residential mortgage backed loans.  That record not only includes testimony by one of Barclays' due diligence vendors that Mr. Menefee was "honest," "careful," and "the fairest person he ever dealt with," but also data unequivocally demonstrating that under Mr. Menefee's supervision, Barclays excluded thousands of risky loans from its securities.  Nevertheless, the Government filed a sprawling Complaint in an effort to allege that Mr. Menefee violated the Financial Institution Reform, Recovery & Enforcement Act ("FIRREA"), through purported acts of mail, wire and bank fraud, by knowingly securitizing defective loans in Barclays' subprime residential mortgage backed securities ("RMBS") and misrepresenting the characteristics of those loans to investors.  But length is no substitute for sufficiency, which was plainly lacking, and all Defendants served the Government with motions to dismiss on April 21, 2017.

After receiving Defendants' motions, the Government filed an Amended Complaint.  With respect to Mr. Menefee, that Amended Complaint added a single allegation in connection with a single deal (SABR 2006-FR4), which the Government undoubtedly included in response to the argument that any claims against Mr. Menefee with respect to that deal were

time barred.  But the Government's inclusion of that single document not only fails to cure the Government's belated filing as to that deal, it shows that the Government has nothing to offer to overcome the fundamental pleading deficiencies that continue to pervade the Amended Complaint.

*First*, as explained in Barclays' Brief, the Amended Complaint fails to plead as a matter of fact or law that the alleged FIRREA predicate offenses "affected" federally insured financial institutions ("FIFIs"), as is required to plead mail and wire fraud, 12 U.S.C. § 1833a(c)(2), or targeted the types of financial institutions ("FIs") covered by the bank fraud statute, 18 U.S.C. § 1344.  (Barclays Br. at 14-27).  Indeed, the Amended Complaint does not identify a single FIFI that invested in, or had any other connection to, any of the Menefee/Carroll Deals.  Nor does it identify a single FI targeted by those deals.  The absence of such allegations is all the more telling now that the Government has amended its pleading after Barclays raised this deficiency in its motion to dismiss the original complaint.  This still-uncured failure to connect the necessary dots, standing alone, dooms the Government's Amended Complaint.

*Second*, the now 195-page Amended Complaint, supplemented by tables with hundreds upon hundreds of alleged misrepresentations, fails to allege the basic elements of the alleged predicate offenses.  While the Barclays Brief addresses the Amended Complaint's failure to allege a fraudulent scheme and the falsity and materiality of certain statements the Government contends were fraudulent (Barclays Br. at 28-30, 34-52), we address two additional defects here:  (i) the Amended Complaint's wholesale failure to demonstrate that Mr. Menefee acted with fraudulent intent; and (ii) the Government's baseless contention that Mr. Menefee misled investors in his direct communications with them.  Not only has the Government failed to show that Mr. Menefee had any motive whatsoever to defraud investors, the due diligence

- 2 -

process that he managed, which resulted in the exclusion of thousands of loans, only confirms his good faith.  And read in their entirety, the calls on which the Government relies – only snippets of which are quoted (or mis-quoted) in the Amended Complaint but which this Court may consider in full in deciding this motion – do not establish the falsity or materiality of any of Mr. Menefee's purported statements.

      *Finally*, as explained in the Carroll Brief, because SABR 2006-FR3 and SABR 2006-FR4 closed more than 10 years before the Government filed this action, any FIRREA claims based on those deals are time barred (Carroll Br. at 23-25).  As we set forth below, the handful of Mr. Menefee's post-closing communications relating to these deals do not revive the claims against him – and the sole new allegation concerning SABR 2006-FR4 does not and could not change the statute of limitations analysis with respect to that deal.

## SUMMARY OF ALLEGATIONS CONCERNING MR. MENEFEE[1]

      While the Amended Complaint alleges that the Defendants participated in a scheme to defraud investors in 36 RMBS (the "Subject Deals"), it alleges violations against Mr. Menefee with respect to only seven of those deals:  SABR 2006-FR3, SABR 2006-FR4, SABR 2007-BR1, SABR 2007-BR2, SABR 2007-BR3, SABR 2007-BR4, and SABR 2007-BR5 (collectively, the "Menefee/Carroll Deals").  To avoid duplication, we incorporate by reference

---

[1] For purposes of this motion, the Court must accept as true the well-pleaded factual allegations in the Amended Complaint; it need not accept any allegations that are merely conclusory.  In addition, the Court may consider "the full text of documents that are quoted in the complaint or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit," as well as "matters of which judicial notice may be taken."  *Lewis v. Del. Charter Guarantee & Trust Co.*, No-14-cv-1779 (KAM), 2015 WL 1476403, at *3 (E.D.N.Y. March 31, 2015) (Matsumoto, J.).  The documents on which the Amended Complaint, and this motion, rely are annexed to the Declaration of Dani R. James, dated June 1, 2017, and are cited herein as "Ex. ___."

the summary of allegations in the Barclays Brief and summarize here allegations relating to Mr. Menefee and the Menefee/Carroll Deals.

A.      **Barclays' Credit Due Diligence for Subprime Loans**

Mr. Menefee was a Director and later a Managing Director in Barclays' Asset Securitization Group ("ASG").  (Am. Compl. ¶ 333).  He ran the ASG banking desk, which was responsible for conducting credit, compliance and valuation due diligence on the subprime loans that Barclays acquired for securitization.  (*Id*. ¶¶ 64, 66, 334).  Mr. Menefee designed and oversaw Barclays' due diligence processes for these loans.  (*Id.* ¶¶ 64, 66, 344).  As the Amended Complaint makes clear, however, he was not responsible for bidding on or purchasing loans from originators, or for negotiating the terms or stipulations of the loan purchases.  (*Id*. ¶¶ 65, 79).

The due diligence processes that Mr. Menefee designed and managed were consistent with, and in some respects exceeded, industry standards.  For example, rather than relying on random sampling to identify loans for credit due diligence, Mr. Menefee employed adverse sampling to identify the most potentially risky loans for credit review.  (*Id.* ¶¶ 203-04, 345).  In addition, it was industry practice to code as EV3 loans that were not underwritten in accordance with originator guidelines, and therefore were ineligible for securitization.  (*Id*. ¶¶ 140-41, 164).  But Mr. Menefee instructed Barclays' due diligence vendors to also code as EV3 not only those loans that had exceptions to underwriting guidelines and warranted a closer review by Barclays to determine whether there were adequate compensating factors, but also loans that met Barclays' unique "layered-risk" factors, which were designed to screen out loans that borrowers might not be able to repay *even if the loans were guideline compliant*.  (*Id*. ¶¶ 181, 184 n.14, 345).  Under Mr. Menefee's supervision, Barclays rejected thousands of loans –

including loans that met underwriting guidelines and were thus eligible for securitization. (Am. Compl. Table 7). In fact, when one originator complained about Barclays' use of layered risk factors to exclude guideline-compliant loans, Mr. Menefee advised his diligence vendor there should be "no bending" to originator pressure. (Ex. 12, cited in Am. Compl. ¶ 507).[2]

Mr. Menefee selected and supervised Barclays' due diligence vendors and served as one of the primary points of contact for the subprime originators that sold loans to Barclays. (Am. Compl. ¶ 344). Barclays relied on its diligence vendors to compile information about the loans in individual asset summaries. (*Id*. ¶ 131, Ex. 1 at 16). Barclays reserved for itself the highly fact-intensive judgment about whether certain loans complied with guidelines and were otherwise appropriate for securitization. (*Id*.). Accordingly, Mr. Menefee frequently reviewed credit and compliance reports produced by Barclays' diligence vendors and attended tie-out sessions with vendors and originators to review the results. (*Id*. ¶¶ 85, 143-44, 346-47). Contrary to the suggestion in the Amended Complaint, given the limited role played by Barclays' due diligence vendors, the fact that Barclays in some instances purchased and securitized loans that had been designated EV3 by the vendor was a feature of – and not some fraudulent deviation from – Barclays' standard due diligence process.[3]

---

[2] This email is a striking example of the Government's misleading soundbite approach. The Government quotes Mr. Menefee's statement that "[w]e are experiencing unprecedented early payment defaults with Fremont collateral." (Am. Compl. ¶ 507). But it omits the preceding sentence, in which Mr. Menefee said there should be "no bending" for that very reason.

[3] Table 7 of the Amended Complaint purportedly shows "the number of loans to which Defendants' due diligence vendors gave a final rating of EV3 but that Defendants decided to securitize." (Am. Compl. ¶ 164; *see also id*. ¶¶ 176, 200). The Government's tally includes loans with EV3 vendor grades that Mr. Menefee either "waived in," or up-graded to EV2, after he reviewed the loan files. (*Id*. ¶¶ 165, 173). The Amended Complaint asserts that Mr. Menefee had "no justification" for the waivers or upgrades, but alleges no facts to support that assertion. (*Id*. ¶ 173). The table also admittedly "[i]ncludes loans that Barclays' due diligence providers

**B.      Barclays' Disposition of First Pay Defaults**

Under the terms of the mortgage loan purchase agreements ("MLPAs") pursuant to which Barclays purchased subprime loans from originators, Barclays had the right to seek repurchase by the originator of any loan that failed to make its first contractual payment to Barclays after Barclays acquired the loan ("first pay defaults" or "FPDs"). (Exs. 21 at § 9.04 & 22 at § 9.04). Not all FPDs, however, reflected a borrower's failure to pay. In some instances, borrowers mistakenly sent their payments to the servicer for the originator, as opposed to the servicer designated by Barclays upon acquiring the loans. If an originator failed to repurchase an FPD, Barclays had the option of selling the loan as a whole loan or including the loan in a securitization, which may nevertheless perform consistent with the default, loss and prepayment assumptions underlying the deal. The Offering Documents for Barclays' subprime securities did not make any representations about *excluding* FPDs from the deals or the number of such loans in the deals. To the contrary, the definition of "delinquent" – which extended only to those monthly payments "due on a date that is not made by the close of business on the *next* scheduled date" – plainly encompassed the possibility that loans that missed their initial payment were securitized. And the ProSupps disclosed the percentage of delinquent loans in each deal. (Declaration of Jesse T. Smallwood in Support of the Barclays Defendants' Motion to Dismiss the Amended Complaint, dated June 1, 2017 ("Smallwood Decl."), Ex. 15, FR3 ProSupp at S-35,

---

labeled 'EV4' based on layered risk factors or overlays." (*Id*., Table 7 at 2). And as the Government well knows, the table also includes loans that were coded EV3 because they were missing documents at the time of the vendor's review – a defect that might have been cured but not documented during the subsequent tie-out with Barclays. While Barclays provided the Government with documents identifying the loans graded EV3 due to missing documentation, that data is nowhere reflected in the Amended Complaint.

FR4 ProSupp at S-37; BR1 ProSupp at S-36, BR2 ProSupp at S-40, BR3 ProSupp at S-40, BR4 ProSupp at S-39, BR5 ProSupp at S-39).

### C.     The Menefee/Carroll Deals

#### 1.     The FR Deals

In 2006, Barclays issued four deals comprised of loans originated by Fremont (Am. Compl. Tables 1 & 3), only two of which – SABR 2006-FR3 and SABR-2006 FR4 (the "FR Deals") – are the subject of the Government's claims against Mr. Menefee.  Under Mr. Menefee's supervision, Barclays employed its typical credit due diligence process and used adverse selection to review thousands of loans in each deal (2,382 in FR3 and 1,694 in FR4). Barclays rejected an overwhelming percentage of the loans coded EV3 by the diligence vendor (89% in FR3 and 96% in FR4).  The remaining EV3 loans that were securitized (39 in FR3 and 16 in FR4) represented less than 1% of the loans in each deal.

After Barclays closed on the purchase of the loans backing FR3, Barclays identified 40 loans that failed to make their first payment to Barclays and sought their repurchase by Fremont.  (Am. Compl. ¶ 515).  Fremont, however, refused to repurchase them because Barclays had missed the contractual deadline for submitting the repurchase claim.  (*Id.*).  Over Mr. Menefee's objection, those 40 FPDs (along with 19 others) were included in the securitization.  (*Id.* ¶ 516 & Ex. 15).  As the Government well knows, Mr. Menefee continued to seek their repurchase after the deal closed and, in November 2006, as the result of the efforts of Mr. Menefee and his team, Fremont agreed to repurchase the 38 of the 40 loans that had not paid in full.  While the Amended Complaint alleges that at least 4 FPDs were also securitized in FR4, it does not allege anything about the facts and circumstances surrounding their inclusion in the deal, nor that Mr. Menefee was aware of that fact at the time.

- 7 -

In early 2007, as remittance data (also available to investors) revealed an increasing number of defaults in Fremont-originated loans, HomEq (then a subsidiary of Barclays) undertook a "diagnostic review" of nearly 500 Fremont loans that had defaulted within the first six months of origination, including some loans that had been securitized in FR4. The diagnostic review revealed that many of the loans had "significant defects." But the Amended Complaint does not allege that those "defects" were known by or knowable to Mr. Menefee before FR4 closed. In the wake of the diagnostic review, Barclays sought to put many of the loans back to Fremont under the MLPA. (Am. Compl. ¶¶ 545-48). "On information and belief," however, the Amended Complaint avers that Barclays did not succeed in putting back any of the loans to Fremont or "otherwise removing them from the trust." (*Id*. ¶ 551).[4]

### 2.   The BR Deals

Between April and July of 2007, Barclays underwrote five subprime RMBS that were backed, in whole or in part, by loans purchased from New Century Financial Corporation (the "BR Deals"). (*Id*. Tables 1 & 3). It was no secret in the market, and Barclays disclosed, that investing in subprime collateral had become even riskier by this time. Indeed, on April 2, 2007, New Century had filed for bankruptcy under the weight of increasing delinquencies and repurchase requests. Barclays repeatedly disclosed these developments in the Offering Documents for the BR Deals – for example:

> Recently, the subprime mortgage loan market has experienced increasing levels of delinquencies and defaults … [this] has caused certain loan originators, including New Century Financial

---

[4] Remittance data is typically provided to investors by the Master Servicer on a monthly basis and reflects the performance of the securities and the loans underlying the securities. The data is also available to the public through subscription services. (*See, e.g.,* Smallwood Decl., Ex. 15, FR3 ProSupp at S-39 (stating that pool data including delinquencies will be provided on a website)).

> Corporation … one of the original loan sellers, to cease operations
> or file for bankruptcy. In light of the foregoing, you should
> consider the heightened risks associated with investing in the
> offered certificates.

(Smallwood Decl., Ex. 15, BR1 ProSupp at S-20-21).  Because these deals were securitized after

New Century filed for bankruptcy, Barclays, rather than the originator, made the loan-level

representations to the trust and assumed the obligation to repurchase any loans that were found to

be in material breach of those representations – hence the name "BR," which stands for

"Barclays Representations."  (Am. Compl. ¶¶ 410-11).

   With the exception of BR5 and certain loan pools of BR3 and BR4, which are

discussed below, Barclays used adverse selection criteria to review thousands of loans backing

these securities (1,468 in BR1, 3,559 in BR2, 3,559 in BR3, and 1,269 in BR4).  Based on its

credit due diligence, Barclays rejected the overwhelming majority of loans that were coded EV3

by the diligence vendor (almost 70% in BR1, more than 78% in BR2, more than 86% in BR3,

and more than 93% in BR4).  The EV3 loans that Barclays included in these deals represented

less than 5% of the loan pools in BR1, BR3, and BR4, and just 6% of the loan pool in BR2.

   The collateral for three of the deals – BR3, BR4, and BR5 – included loans that

Barclays purchased from New Century in March 2007.  Although the Amended Complaint

alleges that Barclays performed no credit/compliance due diligence on the March 2007 pool (*id*.

¶¶ 451, 465), Barclays used rigorous screening criteria to "programmatically kick" the most

potentially risky loans from the pool.  (*Id*. ¶¶ 235, 467).   This was a *more* rigorous process than

Barclays typically employed in the acquisition of whole loans, as the loans meeting these criteria

were automatically kicked from the pool.

Some of the programmatically-kicked loans ended up on the New Century warehouse line, a short-term credit facility extended by Barclays to New Century that was secured by loans that New Century had originated but not yet sold.  When New Century filed for bankruptcy and was unable to satisfy its obligations under the facility, Barclays foreclosed on the loans securing the line, and some of those loans were subsequently securitized in BR4 and BR5.  (*Id*. ¶¶ 234, 466, 479).  BR5 also included New Century loans that Barclays had acquired from Carrington in March 2007.  Barclays did not re-review those loans in credit due diligence, relying instead on the processes that Carrington had employed when it initially bought the loans from New Century, and Barclays disclosed that fact to the rating agencies.  (Ex. 9, cited in Am. Compl. ¶ 490).

The Amended Complaint also alleges that Barclays securitized FPDs in all five BR Deals – including loans that Barclays had put back to New Century but that New Century was unwilling or unable to repurchase.  (Am. Compl. ¶ 425).  But those FPDs (125 in BR1, 24 in BR2, 48 in BR3, 16 in BR4, and 60 in BR5) represented a tiny percentage of the loans securitized in these deals (2% in BR1, 1% in BR5, and less than 1% in the other three deals).  (*Id*. ¶¶ 425, 437, 456, 476, 486 and Table 7).

## ARGUMENT

The Amended Complaint's length and seeming specificity are largely attributable to the Government's decision to quote from numerous calls, emails and disclosure documents.  Having made that tactical choice, the Government must abide the consequences of it.  As noted above, in assessing the sufficiency of the Amended Complaint, this Court may consider the full text of the calls, emails and disclosure documents on which the Government relies.  (*Supra* at 3 n.1).  And if those incorporated documents contradict the Amended Complaint's allegations, the

- 10 -

allegations need not be accepted as true, even for purposes of this motion. *E.g., L-7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 422 (2d Cir. 2011) (factual allegations are assumed to be true "unless contradicted by more specific allegations or documentary evidence . . . ."); *Batson v. Rim San Antonio Acquisition*, No. 15-cv-07576 (ALC), 2016 WL 6901312, at *3 (S.D.N.Y. Nov. 22, 2016). Here, this often-cited principle is more than mere boilerplate. The Government relies on cherry-picked excerpts of calls, emails and disclosure documents to try to plead that Mr. Menefee sought to defraud investors by securitizing defective loans and misrepresenting the characteristics of those loans in his communications with investors. As demonstrated below, among other pleading problems, the very documents on which the Government relies do not support – and in fact refute – these prima facie elements of the claims against Mr. Menefee.[5]

I.     **THE AMENDED COMPLAINT DOES NOT ADEQUATELY ALLEGE THAT MR. MENEFEE ACTED WITH FRAUDULENT INTENT**

Because the FIRREA claims against Mr. Menefee are based on alleged mail, wire and bank fraud, the Amended Complaint must allege facts that give rise to "a strong inference of fraudulent intent." *United States v. Bank of New York Mellon,* 941 F. Supp. 2d 438, 464 (S.D.N.Y. 2013) (quoting *S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.,* 84 F.3d 629, 634 (2d Cir. 1996)). The Amended Complaint fails to allege either motive or conscious misbehavior. Indeed, the allegations show that Mr. Menefee's interest was aligned with that of investors, undercutting any viable theory of motive, and the very calls cited in the Amended Complaint rebut any suggestion that he intended to defraud investors.

---

[5] The Barclays Brief demonstrates in arguments we incorporate that the Government's prolix complaint (i) does not establish that the alleged mail and wire fraud "affected" FIFIs or that the alleged bank fraud covered targeted FIs (Barclays Br. at 14-27); (ii) fails to adequately allege a fraudulent scheme (*id.* at 28-30); and (iii) fails to plead falsity and materiality with respect to the Offering Documents and other materials (*id.* at 34-52).

### A.     The Allegations in the Amended Complaint Belie Any Claim of Motive

To plead motive, the Government would have to allege that Mr. Menefee "benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000). *Accord, e.g.*, *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Not only does the Amended Complaint fail to identify *any* actual or even potential benefit to Mr. Menefee from the alleged fraudulent scheme, the allegations confirm that he only stood to lose if Barclays securitized "defective" loans that caused its securities to underperform.

There is no allegation, not even a conclusory one, that Mr. Menefee would personally profit or receive any other personal benefit as a result of the alleged fraudulent scheme. In addition, as the Government acknowledges, Barclays retained the equity tranche on the majority of the 36 RMBS, including, as the Government well knows, each of the Menefee/Carroll Deals. (*See* Am. Compl. ¶ 97). As the holder of the riskiest tranche, Barclays would have been the first investor to suffer losses if the loans failed to perform. In addition, because Barclays made the loan-level representations and assumed the repurchase risk on the BR Deals, Barclays had an extra financial incentive to carefully scrutinize the loans going into those deals. Securitizing "defective" loans would thus affect the value of Barclays' residuals on all of the Menefee/Carroll Deals, its repurchase exposure on the BR Deals, and its bottom line across the board. No doubt Mr. Menefee well understood that if the loans failed to perform, he would find himself out of a job. The Government's claim that Mr. Menefee participated in a scheme to securitize "defective" loans thus "defies not only economic reason but also common sense." *In re UBS AG Secs. Litig.*, No. 07-civ-11225 (RJS), 2012 WL 4471265, at *12 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 n.50 (2d Cir. 2014); *see also Atl. Gypsum Co. v. Lloyds Int'l Corp.*, 753 F. Supp. 505,

514 (S.D.N.Y. 1990) (plaintiffs failed to plead facts giving rise to a strong inference of fraudulent intent in support of mail and wire fraud claims because "Plaintiffs' view of the facts defies economic reason").

**B.** **The Amended Complaint Fails to Allege Conscious Misbehavior**

Where, as here, motive is wholly lacking, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142. Moreover, in a multi-defendant case such as this one, "a complaint must state with particularity facts giving rise to a strong inference that *each defendant* acted with scienter." *In re UBS AG Secs. Litig.,* 2012 WL 4471265, at *9 (emphasis in original). Allegations that refer to the defendants as a group – a pleading defect that continues to pervade the Amended Complaint – are insufficient. *Luce III v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986). *Accord, e.g.*, *In re UBS AG Secs. Litig.*, 2012 WL 4471265, at *9 ("A plaintiff may not rely upon blanket references to acts or omissions by all of the defendants" to plead fraud).

Here, the allegations, documents and statistics cited in the Amended Complaint – far from establishing fraudulent intent – confirm that Mr. Menefee managed a robust credit due diligence process that resulted in Barclays rejecting *thousands* of EV3 loans from the Menefee/Carroll Deals, including loans that were eligible for securitization. Indeed, Mr. Menefee designed a system that in certain respects *exceeded* industry standards and stood firm in his view that there should be no bending to pressure from originators to purchase and securitize defective loans. Notwithstanding his conscientious efforts to review the loans that Barclays purchased for securitization, the Government contends that Mr. Menefee intended to securitize as many loans as possible regardless of their characteristics, relying on the purported facts that (i) certain loans allegedly were not subjected to any diligence; (ii) Mr. Menefee told a due diligence

- 13 -

team to "stand down" and not review a certain loan pool in order "to save money"; (iii) Barclays

failed to diligence a small number of loans that met Barclays' adverse selection criteria; (iv) Mr.

Menefee entered into agreements with originators to cap the number of loans that were kicked

out of loan pools; (v) Mr. Menefee securitized FPDs; and (vi) Mr. Menefee securitized loans that

were identified as problematic during a subsequent diagnostic review. But none of these

allegations withstands scrutiny.

   *First*, the Government alleges that Barclays conducted no due diligence on (i)

loans that Barclays acquired from New Century in a March whole loan purchase ("March Pool"),

some of which were included in SABR 2007-BR3, SABR 2007-BR4 and SABR 2007-BR5 (Am.

Compl. ¶ 467); (ii) New Century loans in SABR 2007-BR5 that were previously acquired by

Carrington ("Carrington Loans") (*id*. ¶¶ 479-80); and (iii) loans acquired from the warehouse

line "at Mr. Menefee's direction" that were included in SABR 2007-BR4 ("Warehouse Loans")

(*id*. ¶ 472). In fact, the vast majority of these loans *were* subject to a careful selection process.

For the March Pool, Barclays employed programmatic kicks, a fact it disclosed to the rating

agencies. (*Id*. ¶ 490).[6] In other words, rather than using adverse selection criteria to identify the

population of potentially risky loans to review, Barclays used those criteria to exclude the entire

population outright. (*Id*.). This was a ***more*** rigorous process than Barclays typically employed

in the acquisition of whole loans.[7] For the Carrington Loans, Barclays relied on the similarly

---

[6] The Amended Complaint alleges that the "Defendants" falsely represented to Moody's that they
had programmatically kicked all of the loans meeting the selection criteria from the March New
Century pool because 203 loans meeting that criteria were included in the securitization. (*Id*. ¶
490). But the Amended Complaint does not allege that Mr. Menefee or anyone else at Barclays'
was aware of that fact at the time.

[7] In any event, the Amended Complaint acknowledges that Mr. Menefee "resisted" buying the
pool. (*Id*. ¶ 449). It was the president of Barclays Capital who directed Mr. Carroll to purchase

restrictive programmatic screening Carrington had employed and disclosed to the rating agencies that it was doing so.  (Ex. 9, cited in Am. Compl. ¶ 490).  Finally, with respect to the Warehouse Loans, it was Mr. Menefee who *pressed* Barclays to conduct due diligence on the loans before acquiring them.  (Ex. 8, cited in Am. Compl. ¶ 471).  And it was Mr. Menefee who, when told by his supervisor that Barclays might not have the opportunity to do so, said that he "[w]ould rather not own" the loans.  (*Id.*).  The fact that the loans were ultimately purchased cannot be attributed to Mr. Menefee and, more to the point, says nothing about his state of mind.[8]

> *Second,* the Government selectively quotes – four times no less – from a March 9, 2007 call as supposed proof of Mr. Menefee's deliberate decision not to conduct any credit/compliance due diligence on the March Pool in order "to save money."  (Am. Compl. ¶¶ 22, 233, 415, 451).  But Mr. Menefee's comment concerned a *different* pool of loans that Barclays *did not intend to buy* and that was *not even available for purchase* at that time:

> > Mr. Menefee:   We do need to direct people with respect to due diligence for the 25% that we're not buying.
> >
> > Mr. Carroll:   Okay.
> >
> > Mr. Menefee:   Do we want to just save that money?  Do we want to, you know, tell the due diligence guys to stand down at this point?  *Because we don't actually intend to buy that pool.*
> >
> > Mr. Carroll:   Well, we would buy it as soon as it's available.

(Ex. 7 at 3-4 (emphasis added)).

---

the pool, but only if Mr. Carroll could get comfortable with the collateral.  (*Id.* ¶ 450).  No inference can be drawn with respect to Mr. Menefee through the purchase of this pool.

[8] Notably it is far from clear that the email cited in the Amended Complaint even relates to the Warehouse Loans, as opposed to the March Pool.  But even assuming that it does, the email serves only to undermine the Government's claims of fraud for the reasons set forth above.

*Third*, the Government alleges that Barclays failed to diligence a small number of loans that met the adverse selection criteria in certain of the Menefee/Carroll Deals:  14 loans in SABR 2006-FR3, 24 loans in SABR 2006-FR4, 141 loans in SABR 2007-BR1, 66 loans in SABR 2007-BR2, 40 in SABR 2007-BR3 and 80 in SABR 2007-BR4.  (Am. Compl. ¶¶ 421, 435, 454, 464, 503, 534, and Table 8).  But the Amended Complaint does not allege, with respect to any of these deals, that Mr. Menefee – or anyone else – knew that these loans were not included in the due diligence sample, as opposed to having been excluded by unwitting mistake.[9]

*Fourth,* the Government alleges that Mr. Menefee made "agreements" with originators in connection with three of the Menefee/Carroll Deals – SABR 2006-FR3, SABR 2006-FR4, and SABR 2007-BR1 – to limit the number of loans that Barclays would reject, or "kick," during due diligence.  The Government's contention makes no sense.  While the Government alleges that the Defendants agreed to limit kick-outs to "keep up loan volume to increase Barclays' profits" (*id.* ¶ 502), if Barclays limited the kick-out rate to avoid rejecting defective loans, it would be Barclays that suffered the first losses associated with any resulting underperformance of the securities.  Thus, far from acceding to such requests, Mr. Menefee told a Barclays consultant – in an email cited by the Government – that there should be "no bending"

---

[9] The Amended Complaint does not allege that any of these loans would have been coded EV3 had they been reviewed, failed to comply with underwriting guidelines, or were otherwise ineligible for securitization.  (Am. Compl. ¶¶  421, 435, 454, 464, 503, 534; Table 7; Table 8).  Accordingly, the allegations do not bear on the accuracy of the representations in the Offering Documents.  The same is true with respect to the allegations regarding the inclusion of "recycled loans."  (Am. Compl. ¶¶ 448, 467-68, 482, 505; *see also* Barclays Br. at 42).  And to the extent the Government contends the representations to the ratings agencies that 100% of the loans meeting the adverse selection criteria were reviewed are not evidence of scienter but rather constitute other false statements employed as part of the alleged scheme, the Amended Complaint fails to adequately plead their materiality.  The Amended Complaint similarly fails to tie Mr. Menefee to any specific presentation relating to the Menefee/Carroll Deals.

to originator pressure to securitize loans that Barclays wanted to exclude based on its due diligence.  (Ex. 12, cited in Am. Compl. ¶ 507).

In any event, none of the cited calls or emails references any such "agreement" – not even in the soundbites quoted in the Amended Complaint.  (Am. Compl. ¶¶ 423, 502, 535-36 & Exs. 3, 10, 11, 17).  In fact, the July 27, 2006 call cited in the Amended Complaint flatly contradicts Government's assertion:  Despite Fremont's stated desire for a 7% kick-out rate, Mr. Menefee confirmed that the rate remained 8.36 %.  (Am. Compl. ¶537, Ex. 18 at 4).  *See, e.g., DeBlasio v. Merrill Lynch,* No. 07-civ-318 (RJS), 2009 WL 2242605 at *25 (S.D.N.Y. July 27, 2009) (dismissing fraud claims because plaintiffs' "contention is not supported by the documents upon which Plaintiffs rely").   And the January 21, 2007 email from a due diligence vendor complaining about the increase in "craptacular loans" – which the Government misleadingly quotes three times elsewhere in the Amended Complaint – notes that this increase was a "contributing factor to [the] rising kick rate" (Ex. 2, cited in Am. Compl. ¶¶ 8, 279, 281), a fact that further undermines the Government's accusation of agreed-upon kick-out caps.

*Fifth*, the Government alleges that Mr. Menefee knowingly securitized FPDs in some of the Menefee/Carroll Deals.  As an initial matter, the inclusion of FPD loans cannot possibly support a strong inference of fraud because, as explained above, there was no prohibition against securitizing FPDs, and the Offering Documents for the Menefee/Carroll Deals expressly disclosed the percentage of delinquent loans in each deal.[10]  Although the Government cites to a June 25, 2007 call to show that Mr. Menefee supposedly knew that "FPD loans such as the ones included in SABR 2007-BR1 had serious underwriting defects" (Am.

---

[10] For this reason, there is nothing sinister about Mr. Menefee's statement to his supervisor on June 28, 2007 (in connection with SABR 2007-BR2) that they "did the right thing for the firm, securitized a good portion of the loans that were 30 to 59 days delinquent."  (Am. Compl. ¶ 442).

Compl. ¶ 427, Ex. 6), the full transcript of the call makes clear that while Mr. Menefee noted the poor performance of the loans *in the month after the BR-1 closed*, he did not attribute that performance to any purported underwriting defects, let alone indicate that he knew of any such defects at the time.

The Government also claims that an August 2, 2006 call – in which Mr. Menefee discussed the inclusion of the forty FPDs in SABR 2006-FR3 that Fremont had refused to repurchase because Barclays had missed the contractual deadline for filing repurchase claims – evidences Mr. Menefee's intent to defraud investors. (Am. Compl. ¶¶ 249, 516). But the call actually *rebuts* any suggestion that Mr. Menefee sought to defraud investors by securitizing these loans. While Mr. Menefee explained to Mr. Carroll that the 40 loans were "technically not delinquent" and could therefore be included, he added, "***I just don't think we should put them in a deal.***" (Ex. 15 at 3, 5, cited in Am. Compl. ¶¶ 249, 516). When Mr. Carroll disagreed and told Mr. Menefee to "leave them in the deal," Mr. Menefee said he would continue to press Fremont to repurchase the loans (Ex. 15 at 7) – and he did. Try as it might, the Government cannot turn this unequivocal evidence of Mr. Menefee's good faith into evidence of fraud.

Nor can fraudulent intent be inferred from Mr. Menefee's comment on that call that if Barclays were to sell the FPD loans rather than securitize them, "we would lose 10 points on that . . . ." (*Id.* at 6). In response, Mr. Carroll said, "[i]t's a million bucks. . . . [l]eave them in the deal, *take them on the back end*." (Am. Compl. ¶ 516, Ex. 15 at 6) (emphasis added). As the call makes clear – and contrary to the Government's claim that "Carroll and Menefee decided to securitize the loans and pass the risk of loss on these loans to the RMBS investors" (Am. Compl. ¶ 516) – the two men were merely discussing the timing of any loss that *Barclays* might

- 18 -

sustain as the holder of the equity tranche if the loans ultimately impacted the performance of the security.

*Finally,* the Government alleges that the Fremont diagnostic review uncovered problems with loans that had been securitized in SABR 2006-FR3 and SABR 2006-FR4. But the Government's reliance on the diagnostic review to support an inference fraudulent intent is a classic example of pleading "fraud by hindsight." *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999). The Amended Complaint alleges that Barclays undertook this review in early 2007; determined that in originating some of the loans Fremont "had completely '*ignored guidelines'* and had given '*no regard for borrower's ability to repay debt'*"; and based on the results of the review, tried to put some of the misrepresented loans back to Fremont. (Am. Compl. ¶¶ 545, 547-48). But the Amended Complaint does not allege that Mr. Menefee or anyone else at Barclays was aware of the problems with these particular loans prior to their securitization in the FR Deals.

Whether or not the repurchase effort succeeded (*id.* ¶ 551), the mere fact that the review was undertaken shows good faith, not fraud, and undermines the central theory of the Amended Complaint. If, as the Government contends, Barclays and Mr. Menefee sought to securitize as many loans as possible without regard to the loan characteristics, there would have been no reason to commission a post-securitization review to identify loans that could be put back to the originator and then seek their repurchase.[11]

---

[11] The Amended Complaint alleges, solely "on information and belief" that Mr. Menefee and Barclays "had no intention" of using the money resulting from the repurchase claims "to buy the misrepresented loans out of the trust or otherwise compensate the trust (and its certificateholders) for the increased risk of loss resulting from the securitization of these misrepresented loans." (Am. Compl. ¶ 549). This and the Government's many other "information and belief" allegations are not entitled to any weight here. *United States v. Wells Fargo Bank, N.A.*, 972 F.

- 19 -

II.   **THE AMENDED COMPLAINT DOES NOT ADEQUATELY ALLEGE THE FALSITY OR MATERIALITY OF MR. MENEFEE'S STATEMENTS TO INVESTORS**

The Barclays Brief addresses why the Government does not state any claims based on purported misrepresentations in the Offering Documents and in presentations to rating agencies and investors.  It also explains why the Government's core premise – that none of the loans graded EV2W, EV3 or EV4 should have been securitized – is misleading and inherently flawed, and shows that the number of such loans that were securitized was, in any event, immaterial across the board.  (Barclays Br. at 39-41).  In this section, we address the Government's similarly flawed and central contention that Mr. Menefee made false statements to investors about FPDs in certain of the Menefee/Carroll Deals.  Read in their entirety, the calls and emails on which the Government relies do not establish the falsity or materiality of Mr. Menefee's communications with investors.

Because the FIRREA claims against Mr. Menefee are based on alleged mail, wire and bank fraud, the Government must satisfy Rule 9(b) by "(1) specify[ing] the statements that … are fraudulent, (2) identify[ing] the speaker, (3) stat[ing] where and when the statements were made, and (4) explain[ing] why the statements were fraudulent."  *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).  In addition, the alleged false statements must be material.  In the RMBS context, a variance of five percent or less "from the characteristics of the loans that are described in the prospectus supplement . . . was a common threshold" used in disclosure documents "between 2005 and 2007" – including in the Offering Documents for all of the

Supp. 2d 593, 619 n.17 (S.D.N.Y. 2013) ("Because the Government is empowered to investigate allegations of fraud before bringing suit and had access to all of the relevant facts before filing its complaint, it may not be allowed to rely on information and belief.").

Menefee/Carroll Deals – and that percentage has been held to constitute a materiality threshold as a matter of law.  *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 535 (S.D.N.Y. 2015).[12]

A.   **The FR Deals**

With respect to the FR Deals, the Government claims that Mr. Menefee told investors in a few instances that Barclays did not securitize FPDs, when in fact there were allegedly 59 FPDs in SABR 2006-FR3 and 4 FPDs in SABR-FR4.  (Am. Compl. ¶¶ 513, 514, 522, 541).  But as a full and fair reading of the materials cited in the Amended Complaint reveals, none of Mr. Menefee's purported statements was inaccurate in any material respect.

Concerning SABR 2006-FR3, the Government points to an October 11, 2006 call in which Mr. Menefee allegedly "assured" an investor "that Barclays always put FPDs back to Fremont."  (Am. Compl. ¶ 513).  But as the call transcript makes clear, Mr. Menefee and the investor were discussing ***SABR 2006-FR1*** and ***SABR 2006 FR2***, neither of which is alleged to have contained any FPDs.  (Ex. 13 at 7-8, 17, cited in Am. Compl. ¶ 513).  In the context of that conversation, Mr. Menefee's statement about FPDs was entirely correct.  *See e.g., In re Manulife Fin. Corp. Secs. Litig.*, 276 F.R.D. 87, 100 (S.D.N.Y. 2011) (dismissing fraud claims because plaintiffs' allegations "take statements out of context").  The Government also alleges that Mr. Menefee "prevaricated" in a March 27, 2007 email concerning SABR 2006-FR3 by advising a Barclays salesperson that "all EPDs were submitted back to Fremont (the FR3 pool is net of

---

[12] As noted in the Barclays Brief, the materiality threshold set in *Nomura* may not be the appropriate standard for evaluating every statement relating to the characteristics of loans backing RMBS.  (*See* Barclays Br. at 43).  Depending on the particular statement under consideration, the materiality threshold may be well above five percent.  Nevertheless, we refer to the *Nomura* standard here because the Amended Complaint fails to meet even this low bar for establishing the materiality of Mr. Menefee's purported misrepresentations to investors.

these loans)" (Am. Compl. ¶ 522), but the document reveals that the quoted statement was made

by someone other than Mr. Menefee. (Ex. 16, cited in Am. Compl. ¶ 522).

Mr. Menefee's statement on a March 5, 2007 call with an investor concerning

SABR 2006-FR4 was also accurate.  (Am. Compl. ¶ 513, Ex. 14).  After Fremont announced that

it had received a cease and desist letter from the FDIC and was exiting the subprime mortgage

business (Ex. 23 at Part III), an investor reached out to Mr. Menefee to discuss the loans in the

only deal in which that investor participated, SABR 2006-FR4.[13]  Referring to the Fremont

diagnostic review, Mr. Menefee explained, among other things, that Barclays was "digging

in[to]" the 2006 originations and looking for opportunities to put back to Fremont and other

originators any loans that had been fraudulently originated.  (Ex. 14 at 4-5, 7, cited in Am.

Compl. ¶ 513).  In response to the investor's inquiry concerning which Fremont deals contained

loans that were subject to repurchase claims, Mr. Menefee explained:

> In truth, it's -- in some ways it's all of them.  We have not ever
> securitized first pay defaults and one of the provisions in our
> agreements is that the seller will repurchase loans ones that, you
> know, where the borrower defaults on its initial payment to us.  So
> before the securitization is formed we have caused . . . we've either
> pulled them out, sold them separately, or put all of those back to
> Fremont.  So this is really just a re-underwriting of loans that have
> gone to early pay default and looking to the other reps and
> warranties end of the deal to get them to repurchase those.  The,
> you know, the early pay defaults.

(Ex. 14 at 22).

In the context of this conversation, Mr. Menefee's statement was neither false nor

misleading.  Barclays *had* put first pay defaults back to Fremont in connection with all of the

---

[13]  During the Government's investigation, Barclays produced trading data indicating that there
were two sales of SABR 2006-FR4 on December 18, 2016 – some three months prior to this call
– to a fund in care of the investment manager on the call.

Fremont deals (and by this time Fremont had agreed to repurchase those 40 FPDs that Mr.

Menefee knew had been securitized in FR3 that had not yet paid in full).[14]  And Barclays *was* re-

underwriting a different category of loans, loans that had experienced an early pay default – that

is, a failure to pay within the first three to six months of origination, as opposed to the first

payment due after Barclays acquired the loan – to see whether there were any breaches of the

representations and warranties in the MLPA that would support additional repurchase requests.

   In any event, the number of securitized FPDs would render any purportedly false

statements immaterial.  While the Amended Complaint alleges that 59 FPDs were securitized in

FR3 and "at least 4" FPDs were securitized in FR4 (Am. Compl. ¶¶ 514, 541), those tallies fall

well short of the 5% materiality threshold.[15]

### B. The BR Deals

   The Government's allegation that Mr. Menefee falsely told investors that there

were no FPDs in SABR 2007-BR1 – when in fact the deal included 125 FPDs – is similarly

deficient.  The Government relies on a comment by Mr. Menefee during a March 26, 2007 call

with an investor that "We never securitize first-pay defaults."  (Am. Compl. ¶ 424).  But the

Government does not adequately plead that Mr. Menefee – or anyone else at Barclays – knew at

that time that FPDs would be included in the deal, which did not close until nearly three weeks

later.  (Am. Compl. ¶ 418).  While the Amended Complaint alleges that Mr. Menefee and Mr.

---

[14] Although the Amended Complaint alleges there were "at least 4" FPDs securitized in FR4 (Am. Compl. ¶ 541), it does not allege that Mr. Menefee was aware of that fact at the time.

[15] Nor may the Government rely on these communications as purported evidence of fraudulent intent.  Coming as they did in October 2006 and May 2007, months after the FR Deals closed, the communications do not evince any intent by Mr. Menefee to defraud investors contemplating purchases in those two deals.  *Cf. United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658 (2d Cir. 2016) (requiring evidence of fraudulent intent contemporaneous with alleged misrepresentation).

Carroll "made a plan to securitize" these loans in two calls on March 9, 2007 (*id.* ¶ 426), the transcripts reveal that – far from planning to securitize New Century FPDs – the two men were discussing *selling* New Century FPDs, despite the fact that many of the loans had become current and were eligible for securitization.  (Exs. 4 & 5, cited in Am. Compl. ¶ 426).  And constituting a mere 2.5% of the loans in the deal, the 125 FPDs that were ultimately included in BR1 would not have rendered Mr. Menefee's statement materially false in any event.

The Amended Complaint says very little about Mr. Menefee in connection with SABR 2007-BR2.  It generally avers that the "Defendants" knowingly securitized "at least" 24 FPD loans in the security (Am. Compl. ¶ 437) – a plainly immaterial number – and that the "Defendants" securitized 387 loans that were delinquent as of April 25, 2007, weeks after the April 1, 2007 cutoff date.  (*Id.* ¶ 440; Smallwood Decl., Ex. 15, BR2 ProSupp at S-39).  But the Offering Documents contain no representations about first payment defaults; the delinquency disclosures plainly encompass the possibility that FPD loans *were* part of the pool; and Barclays expressly disclosed that there were approximately 50 loans in the deal that, as of the April 1 cutoff date, were 30 to 59 days delinquent as that term was defined in the Documents.  (Smallwood Decl., Ex. 15, BR2 ProSupp at S-40).  That 387 loans were purportedly deemed delinquent by some measure as of April 25, 2007, weeks after the cutoff date, in no way demonstrates the falsity of that representation.

While the Amended Complaint alleges that Messrs. Menefee and Carroll spoke with an investor in March and April 2007 about the pool structure and due diligence for SABR 2007-BR2, it does not allege that Mr. Menefee said anything about FPDs or delinquencies, let alone anything misleading or incorrect.  (Am. Compl. ¶ 443).  And though the investor later complained about the number of delinquent loans in the deal, the Government does not allege

- 24 -

that the investor's complaint stemmed from the conversation with Mr. Menefee months earlier. (*Id.* ¶¶ 444, 445).

With respect to SABR 2007-BR3, SABR 2007-BR4 and SABR 2007-BR5, the Government has not alleged that Mr. Menefee had any direct communications with investors about FPDs (or anything else).  Separate and apart from its failure to allege fraudulent intent, the Amended Complaint's failure to establish the falsity or materiality of Mr. Menefee's statements about FPDs with respect to any of the Menefee/Carroll Deals dooms this aspect of the Government's claims.

## III.   CLAIMS BASED ON FR3 AND FR4 ARE TIME BARRED

As explained in the Carroll Brief which we adopt and incorporate, SABR 2006-FR3 and SABR 2006-FR4 closed more than ten years before the Government filed this action and thus the FIRREA claims based on these two deals are time barred.  (Carroll Br. at 23-25).[16] Well aware of this obstacle, in an effort to save its wire and mail fraud claims – it cannot under any circumstances rescue its time-barred bank fraud claim (*id.*) – the Government purports to rely on a handful of communications by Mr. Menefee *after* each deal had closed.  But these post-closing communications do not get the Government around the limitations bar.

It is well settled that mailings made after a scheme has reached fruition cannot be considered "incident[al] to an essential part of the scheme."  *United States v. Altman*, 48 F.3d 96, 103 (2d Cir. 1995) (subsequent mailings "were insufficiently related to Altman's scheme to be said to be in furtherance of it," because "the looting of the estate was long past and the fraudulent accounting was completed").  *See also Zigman v. Giacobbe*, 944 F. Supp. 147, 155 (E.D.N.Y.

---

[16]  The Barclays Defendants have not sought dismissal on this ground because they entered into a tolling agreement with the Government.  Mr. Menefee and Mr. Carroll did not, and this argument therefore applies uniquely to them.

1996) (the subsequent monthly bank statements "are not mailed in furtherance of the alleged fraudulent scheme," and "are not incidental to an essential element of that scheme," because "each allegedly fraudulent transaction had already concluded by the time the monthly statement was issued").  While there is a narrow exception for post-scheme mailings or wirings that were designed to "lull" a victim into a false sense of security or "postpone their ultimate complaint to the authorities," *United States v. Lane*, 474 U.S. 438, 451-52 (1986), courts routinely hold that mailings or wires that "increase[] the probability" of detection do not qualify as "lulling" communications.  *United States v. Maze*, 414 U.S. 395, 403 (1974).   None of the post-closing communications cited in the Amended Complaint fits within this narrowly-defined "lulling" exception.

   **SABR 2006-FR3:**  The Amended Complaint cites a January 22, 2007 internal call in which Menefee told a colleague that Barclays would "due diligence" all of the loans that had gone into FPD" and, in so doing, would likely uncover "some kind of fraud" in origination. (Am. Compl. ¶ 512).  But this conversation hardly furthered Barclays' purported scheme to securitize defective loans.  If anything, the conversation shows that Barclays was undertaking an activity likely to expose it.  (*Id.*).  Nor do Mr. Menefee's purported March 5 and March 27, 2007 communications with investors save the Government's time-barred claims against him.  As explained above (*see supra* at 21-23), Mr. Menefee did not make any fraudulent statements in his March 5 call; and the March 27 communication was not only authored by someone else, but the Government has no basis for alleging, except on impermissible "information and belief," that the information in that email was even conveyed to an investor.  (Am. Compl. ¶ 522).

   **SABR 2006-FR4:**  Barclays' December 19, 2007 and March 11, 2008 emails with Fremont about settling the repurchase claims arising from the Fremont diagnostic review do

not render the Government's claims timely.  While the Government alleges "on information and belief" that Mr. Menefee and Barclays had no intention of using the settlement money to buy the misrepresented loans out of the trust and sought to "hide the misrepresentations from the trustee" (*Id*. ¶¶ 549-50), the cited documents show no such thing.  The December 19 email only conveys Barclays' offer to settle the dispute for $40MM; it says nothing about where that money would go.  (Ex. 19, cited in Am. Compl. ¶ 549).  And the March 11 email reflects nothing more than the outrage justifiably shared by Mr. Menefee and Barclays' counsel that Fremont would seek to disrupt confidential, ongoing settlement discussions by prematurely and unilaterally disclosing information to a third party.  (Ex. 20, cited in Am. Compl. ¶ 550).  Neither reflects an effort to "lull" any investor purportedly victimized by the alleged scheme.  *See e.g., Garrick-Aug Assocs. Store Leasing, Inc. v. Hirschfield*, 652 F. Supp. 905, 907 (S.D.N.Y. 1986) (granting motion to dismiss civil RICO claims based on mail fraud predicates where the mailings were not in furtherance of the scheme).

Finally, the Government  – in an effort to cure its statute of limitations problem concerning this deal – added to its Amended Complaint a reference to a Form 8-K that was signed by Mr. Menefee and filed with the SEC on December 28, 2006.  As alleged, the Form 8-K "attached" as exhibits the documents "that were executed and delivered in connection with the issuance of the Certificates."  (Am. Compl. ¶ 531, Ex. 24).  But this new allegation and referenced document in no way changes the statute of limitations analysis.  The filing of the Form 8-K on December 28, 2006 was not, and could not have been, "in furtherance of" the alleged fraud because the securitization had already closed on December 12, 2006.  The Form 8-K merely (and accurately) recites that "[o]n December 12, 2006," the Depositor "caused the issuance of" the Trust; that the Trust Certificates "were issued pursuant to a Pooling and

Servicing Agreement, dated as of November 1, 2006"; that Certificates were sold to Barclays "pursuant to an Underwriting Agreement, dated as of December 11, 2006"; and it attached these and other documents as exhibits.  (Ex. 24).

Nor does the Form 8-K fit the narrow definition of a "lulling" communication. *See United States v. Kerik*, 615 F. Supp. 2d 256, 269 (S.D.N.Y. 2009) ("Under limited circumstances, a subsequent act designed to 'lull' a victim into believing that no scheme occurred is sufficient to constitute a substantive act in furtherance of the scheme."); *United States v. Victor Teicher & Co., L.P.*, 726 F. Supp. 1424, 1435 (S.D.N.Y. 1989) (lulling communications "'[are] designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place'" (citations omitted)).  The legally required Form 8-K merely re-published some of the Offering Documents that were already available to investors by attaching those documents, in their entirety, as exhibits.  The filing of the Form 8-K contained no separate or additional communications to investors, and cannot plausibly constitute an act designed to lull a victim into a false sense of security.

## CONCLUSION

For the reasons set forth herein and in the Barclays and Carroll Briefs, the Court should grant Mr. Menefee's motion in its entirety and with prejudice.

Dated:  New York, New York
        June 1, 2017

                              Respectfully submitted,

        By:      /s/   Dani R. James

                              KRAMER LEVIN NAFTALIS & FRANKEL LLP
                              Barry H. Berke
                              Dani R. James
                              Kerri Ann Law
                              Marjorie Sheldon
                              1177 Avenue of the Americas
                              New York, New York  10036
                              Tel: (212) 715-9100

                              *Counsel for Defendant Paul K. Menefee*