**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

    Plaintiff,

       v.

BARCLAYS CAPITAL INC.; BARCLAYS
GROUP US INC.; BARCLAYS US LLC;
BARCLAYS BANK PLC; BARCLAYS PLC;
BCAP LLC; SECURITIZED ASSET
BACKED RECEIVABLES LLC; SUTTON
FUNDING LLC; PAUL K. MENEFEE; and
JOHN T. CARROLL,

    Defendants.

Case No. 1:16-cv-07057-KAM-JO

---

**REPLY IN FURTHER SUPPORT OF THE BARCLAYS DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT**

Karen Patton Seymour
Richard H. Klapper
Jeffrey T. Scott
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
seymourk@sullcrom.com
klapperr@sullcrom.com
scottj@sullcrom.com

Kannon K. Shanmugam (admitted *pro hac vice*)
David M. Zinn (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
kshanmugam@wc.com
dzinn@wc.com

*Counsel for Barclays Capital Inc., Barclays
Group US Inc., Barclays US LLC, Barclays
Bank PLC, Barclays PLC, BCAP LLC,
Securitized Asset Backed Receivables LLC,
and Sutton Funding LLC*

October 10, 2017

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

ARGUMENT ........................................................................................................4

I.    THE GOVERNMENT'S THEORY OF MAIL, WIRE, AND BANK FRAUD IS
      BOTH LEGALLY UNTENABLE AND INSUFFICIENTLY PLEADED .......................4

      A.    The Government Misstates Its Burden Under *Twombly* And *Iqbal* .......................4

      B.    The Government's 'Purchaser' Theory Is Invalid And Insufficiently
            Pleaded ........................................................................................................6

      C.    The Government's Unprecedented, Indirect Theories Are Invalid And
            Insufficiently Pleaded ..................................................................................9

II.   THE AMENDED COMPLAINT FAILS TO PLEAD THE BASIC ELEMENTS OF
      FRAUD .....................................................................................................13

      A.    The Government Obfuscates On Its 'Scheme' Theory ...........................................13

      B.    The Complaint Does Not Adequately Allege False Statements ............................15

            1.    Tables 4, 5, And 6 Fail To Satisfy Rule 9(b) .............................................15

            2.    The Complaint Does Not Support The Government's Falsity Claims ......18

      C.    The Complaint Does Not Adequately Allege Materiality ....................................22

      D.    The Opposition Confirms The Government's Failure To Plead Intent ................24

            1.    The Government Still Fails To Support Its Allegation Of Motive ...........25

            2.    The Opposition Still Does Not Identify Facts Constituting Strong
                  Circumstantial Evidence Of Conscious Misbehavior ...............................25

            3.    The Government's Concessions Negate A Strong Inference Of Intent .....28

III.  THE CLAIMS BASED ON 18 U.S.C. §§ 1005 AND 1014 SHOULD BE
      DISMISSED ...............................................................................................29

IV.   THE GOVERNMENT CANNOT CURE ITS IMPROPER INCLUSION OF
      DEFENDANTS BARCLAYS PLC, BARCLAYS GROUP US INC., AND
      BARCLAYS US LLC ...................................................................................31

Page

A.     The Government's New 'De Facto' Merger Theory Fails To Save Its Successor-In-Interest Claims ................................................................31

B.     The Opposition Fails To Demonstrate That Barclays PLC Is Subject To Personal Jurisdiction In New York ........................................................32

      1.     Barclays PLC Is Not Subject To General Jurisdiction In New York ........32

      2.     Barclays PLC Is Not Subject To Specific Jurisdiction In New York ........34

CONCLUSION.........................................................................................................35

# TABLE OF AUTHORITIES

Page

## CASES

*In re Aluminum Warehousing Antitrust Litigation*,
  90 F. Supp. 3d 219 (S.D.N.Y. 2015)...................................................................35

*Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009)...................................................................4, 5

*In re Autodesk, Inc., Securities Litigation*, 132 F. Supp. 2d 833 (N.D. Cal. 2000).....................16

*Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007)....................................................5

*United States ex rel. Bledsoe* v. *Community Health Systems, Inc.*,
  501 F.3d 493 (6th Cir. 2007) .................................................................13, 14

*Brown* v. *Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016) ....................................32

*City of Pontiac Policemen's & Firemen's Retirement System* v. *UBS AG*,
  752 F.3d 173 (2d Cir. 2014)...................................................................16

*Cohen* v. *SAC Trading Corp.*, 711 F.3d 353 (2d Cir. 2013)..........................................17

*Curtis & Associates, P.C.* v. *Law Offices of David M. Bushman, Esq.*,
  758 F. Supp. 2d 153 (E.D.N.Y. 2010) ...........................................................20

*Curtis* v. *Law Offices of David M. Bushman, Esq.*,
  443 Fed. Appx. 582 (2d Cir. 2011)...........................................................13, 15

*Daimler AG* v. *Bauman*, 134 S. Ct. 746 (2014).................................................32, 33, 34

*Dexia SA/NV* v. *Bear, Stearns & Co.*, 929 F. Supp. 2d 231 (S.D.N.Y. 2013)..............................25

*Elsevier* v. *Grossman*, 77 F. Supp. 3d 331 (S.D.N.Y. 2015) ..........................................35

*FHFA* v. *Nomura Holding America, Inc.*, ___ F.3d ___, No. 15-1872,
  2017 WL 4293322 (2d Cir. Sept. 28, 2017) ...................................................22, 24

*FHFA* v. *Nomura Holding America, Inc.*, 104 F. Supp. 3d 441 (S.D.N.Y. 2015) ......21, 22, 23, 24

*FHFA* v. *UBS Americas, Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012)...................................22, 23

*Gallelli* v. *Crown Imports, LLC*, 701 F. Supp. 2d 263 (E.D.N.Y. 2010)...................................35

*Glassman* v. *Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996) ......................................5

*In re Hellas Telecommunications (Luxembourg) II SCA*,
  524 B.R. 488 (Bankr. S.D.N.Y. 2015)...........................................................33, 34

Page

Cases—continued:

*Johnson* v. *Sequans Communications S.A.*, Civ. No. 11-6341, 2013 WL 214297
(S.D.N.Y. Jan. 17, 2013)...........................................................................................25

*Kalnit* v. *Eichler*, 264 F.3d 131 (2d Cir. 2001)..........................................................25, 26, 28

*Karoon* v. *Credit Suisse Group AG*, Civ. No. 15-4643, 2016 WL 815278
(S.D.N.Y. Feb. 29, 2016)......................................................................................34, 35

*Landesbank Baden-Wurttemberg* v. *Goldman, Sachs & Co.*,
478 Fed. Appx. 679 (2d Cir. 2012)..............................................................................25

*LaRoe* v. *Elms Securities Corp.*, 700 F. Supp. 688 (S.D.N.Y. 1988) ...........................................13

*Laydon* v. *Bank of Tokyo-Mitsubishi UFJ, Ltd.*, Civ. No. 12-3419,
2017 WL 1113080 (S.D.N.Y. Mar. 10, 2017) .......................................................................34

*Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ......................................................25

*In re LIBOR-Based Financial Instruments Antitrust Litigation*,
MDL No. 11-2262, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015).........................................33

*Loughrin* v. *United States*, 134 S. Ct. 2384 (2014) .............................................................9

*In re MRU Holdings Securities Litigation*, 769 F. Supp. 2d 500 (S.D.N.Y. 2011).......................25

*Novak* v. *Kasaks*, 216 F.3d 300 (2d Cir. 2000)................................................................25

*NYKCool A.B.* v. *Pacific International Services, Inc.*,
66 F. Supp. 3d 385 (S.D.N.Y. 2014)............................................................................33

*Pelt* v. *City of New York*, Civ. No. 11-5633, 2013 WL 4647500
(E.D.N.Y. Aug. 28, 2013)........................................................................................31

*Police & Fire Retirement System of City of Detroit* v. *SafeNet, Inc.*,
645 F. Supp. 2d 210 (S.D.N.Y. 2009)..........................................................................27

*In re ProShares Trust Securities Litigation*, 728 F.3d 96 (2d Cir. 2013)....................................20

*San Leandro Emergency Medical Group Profit Sharing Plan* v. *Philip Morris
Cos.*, 75 F.3d 801 (2d Cir. 1996) ...............................................................................25

*Schmuck* v. *United States*, 489 U.S. 705 (1989) ...............................................................18

*SEC* v. *Patel*, Civ. No. 07-39, 2009 WL 3151143 (D.N.H. Sept. 30, 2009) ................................16

Page

Cases—continued:

*Shaw* v. *United States*, 137 S. Ct. 462 (2016)..............................................................7, 9

*Societe Anonyme Dauphitex* v. *Schoenfelder Corp.*, Civ. No. 07-489,
    2007 WL 3253592 (S.D.N.Y. Nov. 2, 2007)................................................31, 32

*Sonera Holding B.V.* v. *Çukurova Holding A.Ş.*, 750 F.3d 221 (2d Cir. 2014)............33

*Teamsters Local 445 Freight Division Pension Fund* v. *Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)...........................................................................26, 27

*In re UBS AG Securities Litigation*, Civ. No. 07-11225, 2012 WL 4471265
    (S.D.N.Y. Sept. 28, 2012)....................................................................................28

*United States* v. *Agne*, 214 F.3d 47 (1st Cir. 2000) ...................................4, 9, 10, 12

*United States* v. *Autuori*, 212 F.3d 105 (2d Cir. 2000)....................................14, 23

*United States* v. *Bank of New York Mellon*, 941 F. Supp. 2d 438 (S.D.N.Y. 2013)..........6, 25

*United States* v. *Bouyea*, 152 F.3d 192 (2d Cir. 1998) ...........................5, 8, 11, 13

*United States* v. *Carollo*, Crim. No. 10-654, 2011 WL 3875322
    (S.D.N.Y. Aug. 25, 2011) .......................................................................................4

*United States* v. *Grass*, 274 F. Supp. 2d 648 (M.D. Pa. 2003) ................................13

*United States* v. *Heinz*, 790 F.3d 365 (2d Cir. 2015)..............................................12

*United States* v. *Krown*, 675 F.2d 46 (2d Cir. 1982) .........................................30, 31

*United States* v. *Pelullo*, 964 F.2d 193 (3d Cir. 1992).......................................11, 13

*United States* v. *Rubin/Chambers, Dunhill Insurance Services*,
    798 F. Supp. 2d 517 (S.D.N.Y. 2011)..............................................................29, 30

*United States* v. *Wells*, 519 U.S. 482 (1997) .....................................................30, 31

*Vladimir* v. *Deloitte & Touche LLP*, Civ. No. 95-10319, 1997 WL 151330
    (S.D.N.Y. Mar. 31, 1997) ......................................................................................5

*Volkswagenwerk Aktiengesellschaft* v. *Beech Aircraft Corp.*,
    751 F.2d 117 (2d Cir. 1984)................................................................................34

*Williams* v. *United States*, 458 U.S. 279 (1982) ....................................................30

Page

Cases—continued:

*Wiwa* v. *Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000) ................................................33

## STATUTES AND RULES

Financial Institutions Reform, Recovery, and Enforcement Act of 1989,
  Pub. L. No. 101-73, 103 Stat. 498 ................................................................. *passim*

  12 U.S.C. § 1833a(c)(2) ...........................................................................4, 6

Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67,
  109 Stat. 737 ........................................................................................16

Racketeer Influenced and Corrupt Organizations Act, Pub. L. No. 91-452, tit. 9,
  84 Stat. 941 (1970) .................................................................................25

1 U.S.C. § 1 ............................................................................................29

18 U.S.C. § 1005 ..................................................................................29, 30

18 U.S.C. § 1014 ..................................................................................30, 31

18 U.S.C. § 1344 ....................................................................................7, 9

N.Y. C.P.L.R. § 302(a)(1) ...........................................................................34

Fed. R. Civ. P. 8 .......................................................................................1

Fed. R. Civ. P. 9(b) .......................................................................... *passim*

## OTHER AUTHORITIES

Asset-Backed Securities, Securities Act Release No. 8518, 84 SEC Docket 1624,
  Item 6.05 (Dec. 22, 2004) ...........................................................................24

## INTRODUCTION

In its opposition, the government offers a boundless view of its authority under both FIRREA and the Federal Rules of Civil Procedure.  The government apparently believes that it, unlike other litigants, is not subject to the Federal Rules' pleading requirements.  It justifies bringing a fraud claim related to 36 securitizations issued or underwritten by three different Barclays businesses by invoking allegations regarding just one of those businesses, the subprime principal business.  Although its allegations regarding that business also suffer from critical deficiencies, it cannot use those allegations to sweep in 14 other, unrelated securitizations from Barclays' Alt-A and third-party business units.  Further, with respect to all 36 securitizations, the government's arguments give FIRREA no limits whatsoever.  Under the government's unprecedented interpretation of FIRREA, a defendant may face civil penalties ten years after the conduct at issue based on nothing more than tangential, incidental, and unspecified effects on federally insured financial institutions.  No court has construed FIRREA to provide the government such extraordinary authority, and this Court should not be the first.

In an attempt to obscure those deficiencies and others, the government repeatedly misstates the requirements of Rules 8 and 9(b).  To highlight just a few examples:  the government contends that it need not specify in its complaint whether it is alleging the existence of one fraudulent scheme, 36 fraudulent schemes, or some number in between.  It claims that Rule 9(b) does not require it to identify in its complaint which "representations" it alleges are false.  And it argues that it can survive a motion to dismiss simply by alleging in conclusory fashion that Barclays' conduct "affected" federally insured financial institutions without identifying which institutions were affected and how.  None of that can possibly be right.  It is particularly important for the Court faithfully to apply Rules 8 and 9(b) in this case, where the government asserts a jumble of claims involving hundreds of statements relating to 36 different securitizations across

(1)

three different businesses, implicating hundreds of third parties from which discovery may be necessary. As a matter of fundamental fairness, Barclays is entitled to know what it is defending against.

The government's opposition to Barclays' motion to dismiss simply doubles down on the complaint's most glaring flaws.

*First*, the government's expansive interpretation of the "affecting" requirement for FIRREA claims based on mail or wire fraud would negate important limitations on the statute's reach. The government's interpretation would sweep within FIRREA's ambit everyday transactions, including securities and credit transactions, even if they have only tangential connections to federally insured financial institutions. The government cites no authority supporting that overly expansive interpretation of FIRREA. As courts have recognized, FIRREA does not extend so broadly; remote and indirect effects on financial institutions do not give rise to FIRREA liability. Even as to its core "purchaser" theory, the government concedes that it has not alleged the facts necessary to evaluate the application of that theory to the securitizations at issue.

*Second*, the government has not alleged the essential elements of its fraud claims. Like its complaint, the government's opposition focuses almost exclusively on Barclays' subprime principal business. The government says virtually nothing about the other two Barclays businesses at issue in this case. That is no doubt why the government tried—unsuccessfully—to lump all three businesses into a single fraudulent scheme. The government implicitly acknowledges its failure to plead a unitary scheme, arguing that its complaint need not identify the number of alleged schemes. This Court and Barclays, however, cannot test the government's allegations of a fraudulent scheme under Rule 9(b) if the government does not disclose the scope of the alleged scheme or schemes.

The government's allegations of falsity, materiality, and intent also fail even with respect to the subprime principal business unit that is the focus of the complaint.  The government appends to its complaint more than a hundred pages of tables listing nearly 800 distinct "misrepresentations" and "representations."  The government thereby fails to satisfy Rule 9(b).  Those tables fail to identify the reasons that many of the statements contained therein are supposedly false; Table 6 is the worst offender, as the government refuses even to say *which* statements are false.  We are aware of no case in which a plaintiff successfully pleaded fraud in that manner, and the government cites none.  The government's principal theory of falsity—that Barclays misrepresented that its securitized loans generally complied with underwriting guidelines—is premised on the allegation that Barclays securitized loans that had received EV4, EV3, or EV2W due-diligence grades.  But the government concedes that those grades do not necessarily mean that a loan breached underwriting guidelines.  That concession dooms the government's central theory of falsity.  As to intent, the government concedes that Barclays had a financial interest in the performance of its securitizations—a concession that renders the government's allegation of fraudulent intent economically irrational.  The government also fails to make any specific allegations of intent as to the Alt-A and third-party securitizations.

*Third*, the opposition confirms that the government's claims against Barclays PLC, Barclays Group US Inc., and Barclays US LLC are based on impermissibly vague and unsubstantiated speculation about Barclays' corporate structure.  The government also still fails to provide any valid basis for exercising personal jurisdiction over Barclays PLC.

For the reasons set forth in Barclays' opening motion and the reasons set forth below, the government's amended complaint should be dismissed with prejudice.

## ARGUMENT

## I.   THE GOVERNMENT'S THEORY OF MAIL, WIRE, AND BANK FRAUD IS BOTH LEGALLY UNTENABLE AND INSUFFICIENTLY PLEADED

The government asserts that no court has dismissed a FIRREA complaint on the ground that "the Government has insufficiently alleged that the Defendants' fraud 'affected' a [federally insured financial institution]."  Gov't's Opp. to Defs.' Mots. To Dismiss ("Opp.") 16.[1]  But it does not dispute that its "affecting" theories are novel, and it cites no FIRREA case accepting such theories.  Nor does the government identify any case approving a FIRREA complaint based on allegations of "effects" on federally insured financial institutions as conclusory as the ones advanced here.  Each of the government's theories is invalid and lacks sufficient factual support.

### A.   The Government Misstates Its Burden Under *Twombly* And *Iqbal*

The government grossly mischaracterizes its burden to plead facts establishing that mail or wire fraud "affect[ed]" a federally insured financial institution.  12 U.S.C. § 1833a(c)(2).  The government's allegations on this central issue—which take up a mere four pages of its 196-page complaint—consist largely of conclusory assertions about effects on (mostly) unidentified institutions.  In arguing that it can satisfy its burden simply by alleging that, "as to each Subject Deal, Defendants' fraudulent scheme affected one or more [federally insured financial institutions]," Opp. 21 (quoting ¶ 316), the government ignores the Supreme Court's now-familiar command that a complaint must include sufficient "factual content [to] allow[] the court to draw the reasonable inference" that the alleged fraud affected federally insured financial institutions.  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  That "factual content" includes the identities of the financial institutions allegedly affected and the manner in which the alleged scheme caused an ef-

---

[1] Notably, under parallel criminal-law provisions, courts have held that the government's theories of effects on federally insured financial institutions are too indirect or speculative to sustain a conviction.  *See, e.g.*, *United States* v. *Agne*, 214 F.3d 47, 52 (1st Cir. 2000); *United States* v. *Carollo*, Crim. No. 10-654, 2011 WL 3875322, at *2 (S.D.N.Y. Aug. 25, 2011).

fect.  The government's "naked" and "formulaic" recitations of effects on federally insured financial institutions do not suffice.  *Id.* (citation omitted).  Moreover, to satisfy FIRREA, the government's allegations must plausibly establish an effect that is "sufficiently direct" and not "unreasonably remote."  *United States* v. *Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) (per curiam) (citation omitted).  The circumstances of this case—in which the government had two years of pre-filing discovery—call for careful application of these principles.  *See, e.g.*, *Glassman* v. *Computervision Corp.*, 90 F.3d 617, 628 (1st Cir. 1996) (stating that, where a plaintiff has had "full discovery," the court should "look more closely at the factual allegations to see if they support the legal conclusions pled"); *Vladimir* v. *Deloitte & Touche LLP*, Civ. No. 95-10319, 1997 WL 151330, at *2 (S.D.N.Y. Mar. 31, 1997) (same).

Relatedly, the government must specify which of its many "affecting" theories (or related bank-fraud theories) applies to any given securitization.  According to the government, as long as it generally alleges that an unidentified "effect" occurred with respect to an unidentified federally insured financial institution in each securitization, it can determine which of its theories applies to any given securitization in "discovery . . . before being put to its proof at trial."  Opp. 21-22.  The Federal Rules do not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions," *Iqbal*, 556 U.S. at 678-679, and a plaintiff cannot avoid dismissal by assuring a court that discovery will "weed[] out" the good claims from the bad, *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 559 (2007).  Those principles have special resonance here, where the government's claims relate to 36 different securitizations and will require expansive and expensive discovery.

Applying the proper pleading standards is particularly important because the government's conceded failure to identify which theory applies to which securitization makes it impos-

sible to disentangle the impact of any rulings by this Court on the issues presented by this motion.  If, for example, this Court concludes that some but not all of the government's "affecting" or bank fraud theories fail, neither this Court nor Barclays will have any way of discerning whether the government's claims with respect to particular securitizations fail.  That will undoubtedly lead to wasteful discovery concerning securitizations that should be dismissed, which is precisely why the government must meet its burden of properly pleading its claim.

**B.    The Government's 'Purchaser' Theory Is Invalid And Insufficiently Pleaded**

The government's core theory of the requisite "effect"—that Barclays' alleged mail or wire fraud "affected" federally insured financial institutions because some of them directly purchased certificates in the securitizations at issue—fails as a matter of law.  The government does not dispute that the phrase "affecting a federally insured financial institution" in Section 1833a(c)(2) is intended to "restrict coverage" to those offenses "meaningfully involving financial institutions."  Mem. in Supp. of Barclays Defs.' Mot. To Dismiss ("Mem.") 16 (quoting *United States* v. *Bank of New York Mellon*, 941 F. Supp. 2d 438, 454 (S.D.N.Y. 2013)).  Alleged mail or wire fraud does not meaningfully involve a financial institution simply because the institution happens to be among the myriad investors in an offering.  If it did, FIRREA would effectively vest in the Department of Justice authority to pursue civil claims for securities fraud, under an extended limitations period, with respect to virtually every public offering, displacing the authority of the Securities and Exchange Commission (SEC).  The government provides no basis to conclude that, in enacting FIRREA, Congress intended that extraordinary change.

The government attempts to recast Barclays' argument as one about "numerosity."  Opp. 18.  That is seriously misleading.  Barclays is not contending that the number of federally insured financial institution purchasers controls the "affecting" analysis, but rather that a defendant's act of mail or wire fraud does not "*meaningfully* involve" a federally insured financial institution

simply because, as alleged here, such institutions happened to be purchasers.  As Barclays explained in its opening memorandum, the connection to banking activities in that scenario is negligible.  *See* Mem. 16.  The government's interpretation of FIRREA is breathtakingly expansive, and this Court should reject it.[2]

Even if the government's "purchaser" theory of mail and wire fraud and of bank fraud were valid, the government has not adequately pleaded facts to support it.

As to mail and wire fraud:  *First*, the complaint fails to identify which federally insured financial institutions purchased certificates in which securitization, and how each of these institutions was affected by the scheme.  The complaint's conclusory allegations lump together not only allegations regarding federally insured financial institutions and *other* financial institutions, but also allegations regarding financial institutions' purchases with their own funds and purchases with customer funds in their custody—rendering it impossible to determine which allegations relate to which securitizations.  Mem. 19-21.  As to both categories of allegations, the government accuses Barclays of "conflat[ing] the allegations relating to the predicate offenses of bank fraud  .  .  .  with those relating to mail or wire fraud."  Opp. 22.  But it is the government that merged its "affecting" allegations related to mail and wire fraud with its allegations related to bank fraud, resulting in a jumble of allegations that do not provide adequate notice either to the Court or to Barclays.  *See* pp. 5-6, *supra*.

*Second*, in its opening memorandum, Barclays explained that, as a result of subordination in the securitizations at issue, the effects of any alleged misrepresentation would naturally vary

---

[2] The government similarly cites no precedent that construes the bank-fraud statute, 18 U.S.C. § 1344, to cover garden-variety securities fraud simply because a bank is one of the investors.  *See* Mem. 17-18.  Contrary to the government's argument, Opp. 86, the Supreme Court did not "expressly reject[]" that argument in *Shaw* v. *United States*, 137 S. Ct. 462 (2016).  *Shaw* involved a scheme to mislead a bank to convince it to transfer a depositor's funds to another bank—a quintessential banking-related crime.

from tranche to tranche and from investor to investor.  Mem. 20.  The government accuses Barclays of ignoring its allegation that "*[a]ll* investors who purchased certificates in the [securitizations], regardless of tranche, have suffered an actual loss or increased risk of loss."  Opp. 20-21 (citing ¶¶ 2, 24, 40).  But the government does not allege that all investors suffered an increased risk of loss either in the cited paragraphs or anywhere else in the complaint.  As a result, the government has not plausibly alleged that any federally insured financial institution purchaser suffered a loss or increased risk of loss so as to be "affected" under FIRREA.

*Third*, the government appears to allege that federally insured financial institutions were "affected" by the alleged mail or wire fraud when "affiliates" of those institutions purchased certificates in the securitizations at issue.  (¶ 319.)  Again, the complaint fails to identify any such institution or its "affiliates," and it otherwise provides no factual support that would render that conclusory allegation plausible.  Mem. 19 n.7.  The government argues that fraud directed against a federally insured financial institution's "subsidiary" can affect its parent.  *See* Opp. 23 (citing *Bouyea*, 152 F.3d at 195).  The complaint, however, speaks more broadly in terms of both "affiliates" and "subsidiaries" (¶ 319), and it does not identify a single affiliate or subsidiary.  Before subjecting Barclays and third parties to discovery involving purchases by "affiliates" of federally insured financial institutions, the government must allege facts rendering its allegations of effects plausible.  Its failure to do so requires dismissal of any claim based on its "affiliate" theory.

As to bank fraud:  the government has failed to offer sufficient factual allegations to support its "purchaser" theory of bank fraud.  Opp. 84-88.  The complaint fails to identify the deceived financial institutions and in particular fails to distinguish between situations where financial institutions purchased certificates themselves and situations where they merely released

funds in their custody at a customer's direction.  Mem. 21-22.  The opposition does nothing to cure these failures.  The bank-fraud claim must therefore be dismissed because, under Section 1344(1) and (2), the financial institution *itself* must be misled.  *See Shaw* v. *United States*, 137 S. Ct. 462, 466 (2016) (requiring that a defendant mislead a bank to satisfy Section 1344(1)); *Loughrin* v. *United States*, 134 S. Ct. 2384, 2394 (2014) (requiring that the false statement "go to [the] financial institution" to satisfy Section 1344(2)).  The government's allegation that "investors in the [36 securitizations] bought RMBS using funds held in custodial accounts at [federally insured financial institutions] or other [financial institutions]" (¶ 324), says nothing at all about whether financial institutions (as opposed to investors) allegedly were misled.

### C.  The Government's Unprecedented, Indirect Theories Are Invalid And Insufficiently Pleaded

Not content to limit its mail- and wire-fraud claims to its "purchaser" theory, the government tacks on a number of indirect theories that have no basis in precedent.  If accepted, its theories would render FIRREA limitless, sweeping within its ambit virtually every non-cash transaction in the Nation.  The remote nature of the government's theories requires dismissal of any claims based on those theories.  *See United States* v. *Agne*, 214 F.3d 47, 52 (1st Cir. 2000).

*Originators.*  The government's primary argument as to how Barclays' conduct "affected" federally insured financial institutions that originated loans is that Barclays exposed them to liability, "including to claims for repurchase of large numbers of loans for breaches of representations and warranties under the  .  .  .  MLPAs."  Opp. 27 (quoting ¶ 318).  But originators made those representations *before* and *independently of* securitization of the loans, and they were liable for breaches of the representations—to Barclays or eventually to investors—regardless of whether the loans were securitized.  Mem. 23-24.  Even if Barclays made no misrepresentations and securitized none of the purchased loans, originators would have had the same liability.  The

government ignores the crux of Barclays' argument, offering the *ipse dixit* assertion that Barclays' conduct "magnified" originators' exposure. *See* Opp. 27-29. That does not suffice.[3]

    *Secondary-market purchasers.* The government ignores Barclays' argument that the government cannot defeat a motion to dismiss by relying on allegations made on "information and belief." *See* Mem. 24 & n.13. For that reason alone, the government's secondary-market purchaser theory—based on purchases of at-issue certificates on the secondary market and purchases of collateralized debt obligations backed by certificates issued in the at-issue securitizations—is inadequately pleaded, as it is entirely dependent on such allegations. (¶ 323.)

    In any event, the government's theory is far too indirect, and its allegations far too conclusory, to satisfy FIRREA. The government cites no case in which downstream effects of an alleged fraud on a federally insured financial institution that had *no* relationship to the initial transaction were held to satisfy the "affecting" requirement. Even if that theory of remote effects were valid, the government does not allege, even in general terms, that Barclays' misrepresentations caused purchasers in the secondary market or purchasers of collateralized debt obligations to suffer loss or increased risk of loss. The government also does not identify the purchasers or circumstances of any such purchases (for example, whether a purchaser was the second, third, or fourth purchaser of a certificate), nor does it identify when the purchases at issue occurred (for example, whether the purchase occurred before or after securitized loans had defaulted). Absent

---

[3] The remaining two theories are patently defective. *First*, the government claims that "Barclays essentially conspired with" originators, "contributing to a financial crisis that in the end" led to the bankruptcy or distress of originators. Opp. 27 (citing ¶ 318). But it cites no facts plausibly suggesting that Barclays caused the financial crisis, and it cites no case recognizing "affecting" liability based on macroeconomic conditions. *Second*, the government claims that originators "benefited" from selling loans to Barclays. But it cites no authority holding that such benefits give rise to FIRREA liability, and the government's own description of the "affecting" test belies that proposition. *See* Opp. 16; *cf. Agne*, 214 F.3d at 51 (stating that "there must be some negative consequence to the financial institution").

such allegations, the government cannot plausibly establish that Barclays' alleged misrepresentations had any effect on those categories of purchasers.  That defect is all the more amplified as to purchasers of collateralized debt obligations; those obligations include many different certificates as collateral, and the government does not allege that Barclays' misrepresentations caused any loss or increased risk of loss to any federally insured financial institution that held unidentified obligations backed in part by unidentified certificates in the at-issue securitizations.

*Financers of purchases.*  As to financers of purchases, the government again ignores Barclays' argument that it cannot rely on allegations made on "information and belief."  Mem. 25.  This case proves the wisdom of that rule:  when Barclays asked the government in interrogatories to identify federally insured financial institutions that financed purchases of certificates in the securitizations at issue, the government was unable to name a single one.  The government also ignores *United States* v. *Pelullo*, 964 F.2d 193 (3d Cir. 1992), which indicates that fraud directed at a financial institution's customer would be too "remote" to affect the institution, even if the customer is thereby "prejudiced in its dealings with the institution."  *Id.* at 216.  *Pelullo* distinguished that remote situation from one involving fraud directed at a financial institution's subsidiary.  *Id.* at 215-216.  For that reason, the government's reliance on *Bouyea*, where the holding was based on the existence of a parent-subsidiary relationship, is misplaced.[4]  Nearly every significant financial transaction in this country is financed by a financial institution.  On the government's theory, a used car seller's fraudulent representation to a purchaser would give rise to FIRREA liability simply because a bank financed the car purchase.  The government cites no authority endorsing that novel theory.

---

[4] Although the government asserts that "nothing in the text or logic of [*Bouyea*] suggests that the same rationale would not render 'affected' a repurchase financer that lends money to an unaffiliated entity," Opp. 30, that assertion is incorrect:  *Bouyea* quoted *Pelullo*'s distinction between lending to a subsidiary and lending to an unaffiliated customer.  *See* 152 F.3d at 195.

*Trustees and trust administrators.*  The government's theory that federally insured financial institutions were "affected" as trustees for the securitizations at issue is equally invalid.  The government asserts that trustees "have been sued by investors on account of Defendants' systemic misrepresentations as to the underlying loan pools."  Opp. 31.  As Barclays noted, however, the complaint incorporated by reference in the government's complaint here demonstrates that the investors' claims are "on account of" the trustee's own alleged failure to perform a contract-based duty to investors.  Mem. 25-26.  The government responds that Barclays' alleged failure to comply with a contract-based notification requirement "contributed to the trustees' failure to comply with their [own] duties," Opp. 32 n.15, but Barclays' supposed failure to provide notification is not alleged to be mail or wire fraud.  The government also suggests that Barclays' alleged mail and wire fraud exposed trustees to "reputational harms," Opp. 32 (citing ¶ 327), but the complaint provides no factual support for that assertion, and such a speculative assertion cannot support the government's claim.  *See Agne*, 214 F.3d at 53 (rejecting argument that vague allegations of reputational harm satisfied a parallel statute with an "affecting" requirement).

*Servicers, custodians of loan files, and cap trustees.*  Finally, the government's theory of effects on federally insured financial institutions that served as servicers, loan-file custodians, and "cap trustees" (whatever those are) also fails.  (¶¶ 326, 328-330.)  The government relies exclusively on *United States* v. *Heinz*, 790 F.3d 365 (2d Cir. 2015) (per curiam), *cert. denied*, 136 S. Ct. 801 (2016).  Opp. 34.  In that case, however, the defendants were bank employees whose fraudulent conduct directly exposed the banks to a substantial fine.  *Heinz*, 790 F.3d at 367.  Here, by contrast, Barclays' alleged acts did not implicate servicers, custodians, or "cap trustees" in wrongdoing or expose them to liability.  Rather, the government asserts that those entities' costs and profits are tied to the number and outstanding principal balance of the loans they ser-

vice, and that Barclays' alleged misrepresentations somehow affected those metrics.  Opp. 34.
On that theory, any indirect financial effect on a financial institution that played a peripheral role
in a transaction in which there was fraud would give rise to FIRREA penalties.  In light of cases
such as *Pelullo* and *Bouyea*, that cannot be the law.  *See* p. 11, *supra*; *see also United States* v.
*Grass*, 274 F. Supp. 2d 648, 654-655 (M.D. Pa. 2003) (dismissing "affecting" count based on
"routine transaction costs" or "lost income" to a financial institution).

## II.   THE AMENDED COMPLAINT FAILS TO PLEAD THE BASIC ELEMENTS OF FRAUD

### A.   The Government Obfuscates On Its 'Scheme' Theory

Where a claim is predicated on mail, wire, or bank fraud, the alleged scheme or schemes
are "circumstances constituting fraud" and must be pleaded with particularity under Rule 9(b).
*See* Mem. 28-29; *Curtis* v. *Law Offices of David M. Bushman, Esq.*, 443 Fed. Appx. 582, 585 (2d
Cir. 2011); *LaRoe* v. *Elms Securities Corp.*, 700 F. Supp. 688, 695 n.6 (S.D.N.Y. 1988).

In its opening memorandum, Barclays argued that the government had not alleged a sin-
gle unitary scheme.  Mem. 28-30.  In response, the government claims that "it matters not"
whether its allegations constitute "one fraudulent scheme, or three, or 36."  Opp. 36.  That is
simply incorrect.  Rule 9(b)'s particularity requirement is intended to provide defendants with
"notice of the specific conduct with which they were charged," and it ensures that the scope of
discovery is commensurate with a plaintiff's particularized allegations.  *United States ex rel.
Bledsoe* v. *Community Health Systems, Inc.*, 501 F.3d 493, 503 n.11, 510 (6th Cir. 2007).  One of
the purposes of Rule 9(b) is to prevent plaintiffs "from engaging in fishing expeditions."  *Id.* at
503 n.11.  Here, a discovery excursion into 36 distinct securitizations would be positively ocean-
sized:  with respect to each securitization, the parties would need to, among other things, obtain
and re-underwrite thousands of loan files and obtain documents and testimony from numerous

individuals and entities.  By demanding that a plaintiff support the existence of one or multiple schemes with particularized allegations, Rule 9(b) promotes the efficient and orderly management and resolution of cases, both on dispositive motions and at trial.  The government should not be allowed to proceed past this stage on a complaint identifying 36 securitizations when it lacks sufficient allegations as to many of them.

The reason that the government seeks to allege (or leave open the possibility of) a unitary scheme is obvious:  the complaint has a dearth of allegations that would support a scheme to defraud involving the Alt-A and third-party businesses.  Rather than attempting to plead a narrower case with particularity, the government impermissibly seeks to merge the activities of the three disparate businesses into a single "unitary scheme" in order to append the Alt-A and third-party securitizations to this litigation.  That gambit should not succeed.  *See, e.g.*, *Bledsoe*, 501 F.3d at 514 (dismissing fraud allegations that were not adequately alleged to be part of a single, overarching scheme).

A scheme to defraud is "a plan to deprive a person of something of value by trick, deceit, chicane or overreaching."  *United States* v. *Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (internal quotation marks and citation omitted).  The complaint does not allege that any individual or business conceived or executed a fraudulent plan across all 36 securitizations.  To the contrary, the complaint concedes, and the government does not dispute, that three different businesses, staffed by different employees, were responsible for the securitizations, and that those businesses played different roles and applied different processes to different types of loans from different originators.  *See* Mem. 29 (citing ¶¶ 26, 64, 67-68, 70-73).  Although the complaint attempts to allege that Mr. Menefee and Mr. Carroll executed a fraudulent scheme in connection with seven subprime principal securitizations, it does not allege facts suggesting that they—or anyone

else—orchestrated a unitary scheme that included the Alt-A and third-party securitizations.  The government states that "the ASG Banking Group (run by Menefee) support[ed] the securitizations of [the Alt-A] deals in various ways" and that "due diligence on [the third-party] deals was mostly executed by the ASG Banking Group run by Menefee."  Opp. 39.  The complaint, however, does not contain any allegations suggesting that Mr. Menefee committed fraud with respect to the Alt-A or third-party securitizations.  The government has thus failed to plead a unitary scheme.  *See, e.g.*, *Curtis*, 443 Fed. Appx. at 586 (affirming dismissal because "[t]here are no facts alleged to support these implausible allegations of an overarching scheme or schemes, nor is a common intent properly pleaded").

In the alternative, the government seeks leave to amend the complaint (again) to allege three or 36 schemes.  Opp. 37 n.16.  In so doing, the government implicitly acknowledges that the complaint does not contain any such allegations.[5]  The government asserts that "Defendants do not contest that the Complaint plausibly alleges the existence of a fraudulent scheme as to each Subject Deal for purposes of pleading the first element of mail and wire fraud."  *Id.* at 36.  That is incorrect.  Barclays' opening memorandum states:  "The government must sufficiently allege each of th[e] critical elements for each of the 36 securitizations.  It has not done so."  Mem. 28.  Because the complaint does not adequately allege either a single fraudulent scheme covering the 36 subject securitizations, or three or 36 different schemes, it should be dismissed.

**B.      The Complaint Does Not Adequately Allege False Statements**

*1.      Tables 4, 5, And 6 Fail To Satisfy Rule 9(b)*

Although the government tries to cast "puzzle pleading" as an exotic doctrine, Opp. 9, it is nothing more than a label that courts apply to particularly opaque complaints that (1) fail to

---

[5] The government should not receive leave to amend its complaint a second time.  Its initial complaint followed years of investigation, and the government failed to fix its deficient scheme allegations when it amended the complaint in response to Defendants' initial motions to dismiss.

identify with specificity which statements are fraudulent or (2) fail to explain why those state-ments are fraudulent, *see In re Autodesk, Inc., Securities Litigation*, 132 F. Supp. 2d 833, 842 (N.D. Cal. 2000).  Contrary to the government's suggestion, Opp. 9, those well-established prin-ciples are rooted in Rule 9(b), not the PSLRA.  *See SEC* v. *Patel*, Civ. No. 07-39, 2009 WL 3151143, at *2 n.2 (D.N.H. Sept. 30, 2009) (stating that "[a] complaint which relies on shotgun or puzzle pleading does not meet Rule 9(b)'s particularity requirement" (emphasis and citation omitted)).  The government's incorporation into the complaint of the nearly 800 representations in Tables 4, 5, and 6, devoid of any explanation of why (or in many instances whether) the statements are fraudulent, falls far short of meeting its obligations under Rule 9(b).

The government concedes that it did not allege falsity for each individual representation in the tables, but it argues that it explained, "by category," the various "types of misstatements made in furtherance of Defendants' scheme to defraud."  Opp. 10.  None of the government's authorities permits a "categorical" approach to pleading fraud, and the Second Circuit has said the opposite:  fraud plaintiffs must "specifically identify *each* misrepresentation" and supply "an explanation of why the statements were fraudulent."  *City of Pontiac Policemen's & Firemen's Retirement System* v. *UBS AG*, 752 F.3d 173, 183 n.44 (2d Cir. 2014) (emphasis added) (internal quotation marks and citations omitted).

Moreover, the complaint fails even to identify why some "categories" are alleged to be false.  Table 6 is the worst offender:  it does not even identify which representations are alleged to be false, let alone provide reasons for the alleged falsity.  Table 6 contains supposed "repre-sentations" (not "misrepresentations") in "presentations distributed to investors and rating agen-cies."  (¶ 125.)  The complaint fails to identify which of those "representations" are alleged to be false and which are not.  The government maintains only that "*many* of the statements on Table

16

6" are misrepresentations.  Opp. 12 n.5 (emphasis added).[6]  At a bare minimum, Table 6 cannot support the government's claims, and the claims should be dismissed insofar as they rest on that table.

Tables 4 and 5 are also deficient.  In its opening memorandum, Barclays identified two examples (one from each table) that lacked an explanation of falsity.  For one example, the government responded by providing an explanation that does not appear in the complaint (and that is insufficient to boot).  *See* Opp. 13-14 n.6.  The government did not even bother to address the other.  Apparently aware that its responses to these deficiencies are insufficient, the government attempts to demonstrate the adequacy of its "categorical" pleading approach by walking through its allegations for one securitization, SABR 2007 BR-1.  But the government cannot avoid dismissal by plucking one securitization out of 36 and arguing that, because the allegations as to that securitization are well pleaded, the remaining allegations must be as well.[7]

Finally, the government suggests that any deficient fraud allegations should stand because the complaint contains other allegations that the government believes are adequate.  Opp. 13-14.  Allegations that do not satisfy Rule 9(b) cannot support a fraud claim, however, even if accompanied by other allegations that pass muster.  *See Cohen* v. *SAC Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013) (dismissing claim insofar as it was based on one of four alleged misrep-

---

[6] In an interrogatory, Barclays asked the government to identify which statements on Tables 4, 5, and 6 it alleges are materially false.  For Tables 4 and 5, the government responded that it believes that all of the representations are materially false.  As to Table 6, however, the government refused to identify the representations that it alleges are materially false.

[7] Even as to its cherry-picked securitization, the government's allegations are deficient.  Table 5 alleges that the pooling and servicing agreement for this securitization includes one of the still-unexplained contractual notice provisions.  (Table 5 at 26.)  Table 6 alleges that Barclays made two presentations in connection with the securitization (Table 6 at 7, 24), each containing multiple "representations."  The body of the complaint, however, addresses only two of those "representations" directly (¶ 424), leaving this Court and Barclays unenlightened as to whether the government believes that the others are false.

resentations).  The government has not satisfied Rule 9(b), and its claims must be dismissed in-

sofar as they rest on defective allegations.

### 2.     The Complaint Does Not Support The Government's Falsity Claims

Proceeding representation by representation, Barclays' opening memorandum detailed

the government's failure adequately to allege the element of falsity.  The government offers no

defense as to a number of its allegations.  Notably, it does not defend the adequacy of its allega-

tions specific to the 14 Alt-A and third-party securitizations, *see* Mem. 49-51, offering only a

single remark in a footnote about one Alt-A presentation.  Opp. 47 n.19.[8]  The government also

fails to defend the adequacy of its more general allegations regarding (1) the deliberate provision

of inaccurate information from the originators' loan tapes; (2) caps on kick-out rates; and (3) the

securitization of loans from poorly performing originators.  Mem. 50-52 & n.27, Apps. A, C.

The government's claims based on those allegations of falsity should be ignored.

As to the remaining allegations, the government's defense of the adequacy of those alle-

gations lacks merit.

### a.      Representations Concerning Credit Quality

The only actual representations about credit quality that the government identifies are that

the mortgage loans were originated or acquired "generally in accordance with" or "in accordance

with" originators' underwriting guidelines.  (Tables 4, 5; *see also* ¶¶ 105, 168.)  The government

argues that these representations are false across all 36 securitizations because Barclays included

---

[8] With respect to representations in one Alt-A presentation, the government concedes that the presentation took place after the initial offerings of the Alt-A securitizations, but it asserts that a false statement made after a transaction closed can form the basis for a fraud claim.  *See* Opp. 47 n.19.  The case the government cites, however, stands for the proposition that a mailing that was "essential to the perpetuation of [the] scheme" and that occurred after the victims already had been "dup[ed]" could satisfy the *mailing* element of mail fraud.  *Schmuck* v. *United States*, 489 U.S. 705, 712 (1989).  It did not hold that the *falsity* element can be satisfied by a statement made after the transaction closed.

loans in each securitization that a due-diligence vendor had given an EV3, EV4, or EV2W grade. (¶¶ 145-147); *see also* Opp. 42-43.  The government makes a critical concession, however, that dooms its argument:  a loan with such grades did not necessarily breach the originators' underwriting guidelines.  Opp. 42.  The government explains that loans may have received such grades for a variety of other reasons, such as because they were missing documents (that later may have been found) or because they hit upon Barclays' layered-risk criteria (which identified certain loans even if they were underwritten in compliance with guidelines).  (¶¶ 141, 181, 184 n.14.)

Perhaps recognizing that fundamental flaw, the government resorts to mischaracterizing Barclays' actual representations.  It suggests that Barclays represented that all of the loans were "creditworthy"; that all of the "borrowers had the ability to repay the mortgages in accordance with their terms"; and that Barclays securitized loans only "if they complied *both* with the originators' underwriting guidelines *and* Barclays' ability-to-pay criteria."  (¶ 168); Opp. 42.  None of the documents incorporated in the complaint, however, contains any of those purported representations.  The government's argument that Barclays' representations were false thus rests on the incorrect assertion that Barclays made such representations in the first place.

The government inexplicably devotes multiple pages of its opposition to defending its failure to conduct a forensic review of the securitized loans.  Opp. 40-42.  The government misses the point.  Barclays does not contend that a plaintiff could never adequately allege the falsity of representations about the credit quality of loans without independently re-underwriting all or some of them.  Rather, it contends that the government's complaint is deficient because it relies on due-diligence grades to demonstrate falsity when they do not do so according to the government's own allegations.  Although an independent forensic review is not necessarily required, adequately pleaded allegations are, and the government has failed to advance any here.

**b.      Representations Concerning Valuation And Appraisals**

The government also distorts Barclays' actual representations concerning valuation and appraisals.  The government insists that Barclays told investors that "the appraisals accompanying the mortgages provided reliable valuations"; that "those properties had sufficient equity to protect investors against losses in the event of default"; and that "none of the properties were underwater  .  .  .  at the time of the securitization."  Opp. 45-46.  Tellingly, the paragraphs of the complaint cited by the government do not identify any such representations, and they do not appear in the lengthy tables attached to the complaint.

Although Barclays made representations about loan-to-value ratios, those representations were limited by their plain text to the time of origination.  *See* Mem. 45, App. F.  The offering documents carried significant disclaimers, which highlighted that the representations were opinions of value and that the properties' appraised values at the time of origination could differ from "actual" or "current" values.  Mem. 44.  Although the government attempts to dismiss this point as a "silly" "trial argument," Opp. 47, the government's allegations must be assessed against the actual language in the documents at issue, not the government's characterizations of that language.  *See In re ProShares Trust Securities Litigation*, 728 F.3d 96, 103 (2d Cir. 2013).  By contrast, Barclays' valuation due-diligence results assessed the reasonableness of the properties' values "at the time of securitization" (¶ 282), not origination.  The government has thus failed to satisfy its burden to identify "*how* [Barclays'] statements were fraudulent or misleading." *See Curtis & Associates, P.C.* v. *Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 177 (E.D.N.Y. 2010), *aff'd*, 443 Fed. Appx. 582 (2d Cir. 2011).[9]

---

[9] The government erroneously contends that it is not obligated to plead subjective falsity.  *See* Opp. 48.  Courts have held that appraisals are statements of opinion and, as such, must be alleged to be objectively *and* subjectively false.  *See* Mem. 44-45.  Because appraisals are opinions of the appraisers, courts have held that it is the appraiser who must have subjectively disbe-

### c.      Representations Concerning Due-Diligence Practices

In its opening memorandum, Barclays showed that many of its descriptions of its due-diligence practices amounted to "mere puffery."  Mem. 47-48.  The government responds that Barclays' statements were more than puffery because "Barclays [allegedly] induced rating agencies and investors to rely on the alleged strength of their due diligence practices" by making more specific representations.  Opp. 51.  It then points to several examples of Barclays' representations about "programmatic[] exclu[sions]," first-payment defaults, and misapplication of due-diligence "parameters."  *Id.*  In its opening memorandum, however, Barclays showed that those specific representations were not false.  *See* Mem. 50-52 & n.27, App. C.  The government simply ignores Barclays' arguments on those representations.

Barclays also explained that the due-diligence summaries it included in presentations accurately identified the number of loans kicked out from securitizations.  *See* Mem. 48.  The government does not contest that fact.  Instead, it argues that the presentations' use of the word "unacceptable" is misleading because Barclays did not identify the number of loans receiving EV3, EV4, or EV2W grades.  *See* Opp. 49.  As discussed above, however, it is undisputed that the mere fact a loan received such a grade does not mean that the loan failed to comply with originators' guidelines and Barclays' representations to investors.  *See* pp. 18-19, *supra*.  Insofar as the government's claims rest on the allegation that Barclays' due-diligence summaries misled investors about the number of loans kicked out from securitizations, they should be dismissed.

---

lieved the appraisal.  *See, e.g.*, *FHFA* v. *Nomura Holding America, Inc.*, 104 F. Supp. 3d 441, 497 (S.D.N.Y. 2015), *aff'd on other grounds*, ___ F.3d ___, No. 15-1872, 2017 WL 4293322 (2d Cir. Sept. 28, 2017).  Moreover, to plead fraudulent intent, the government must allege that Barclays knew that the appraisers subjectively disbelieved the appraisals.  The absence of any such allegations requires dismissal of the government's claims insofar as they rest on alleged misrepresentations of property values.

## C.      The Complaint Does Not Adequately Allege Materiality

The government also cannot overcome its failure to plead the additional element of mate-

riality as to many of the alleged misrepresentations.  *See* Mem. 42-43, 46-47.  Although the ma-

teriality of an alleged misrepresentation ultimately involves both quantitative and qualitative fac-

tors, the Second Circuit has held that courts may apply a quantitative "threshold for materiality."

*FHFA* v. *Nomura Holding America, Inc.*, ___ F.3d ___, No. 15-1872, 2017 WL 4293322, at *45

(2d Cir. Sept. 28, 2017) (approving a 5% threshold in an RMBS case).  As Barclays has argued,

the government's allegations as to many of the securitizations at issue fail even a strict 5% mate-

riality threshold.  *See* Mem. 42-43, 46-47.

The government offers two responses.  *First*, it argues that Barclays' representations

about compliance with underwriting guidelines were materially false because Barclays knew that

originators had "systematically abandoned their underwriting guidelines."   Opp. 55 (quoting

¶ 201) (emphasis omitted).  The only allegations it cites for the proposition that originators sys-

tematically abandoned guidelines are the percentages of securitized loans with EV3, EV4, or

EV2W grades.  As discussed above, the government concedes that those grades do not demon-

strate that a loan breached underwriting guidelines.  *See* pp. 18-19.  Therefore, the securitization

of loans with such grades in no way demonstrates "systematic" abandonment of guidelines.

Even accepting the government's figures, moreover, only a miniscule number of such

loans were included in any given securitization.  For 25 of the 36 securitizations, the percentage

of loans with EV3, EV4, or EV2W grades was below 5%; for the remaining 11 securitizations,

the average rate was below 8%.  *See* Mem. 43, App. A.  Those rates are a far cry from those in

"systematic abandonment" cases, where plaintiffs claimed breach rates upwards of 45%, *see,*

*e.g.*, *FHFA* v. *Nomura Holding America, Inc.*, 104 F. Supp. 3d 441, 572 (S.D.N.Y. 2015), *aff'd,*

___ F.3d ___, No. 15-1874, 2017 WL 4293322 (2d Cir. Sept. 28, 2017), or 78%, *see, e.g.*, *FHFA*

v. *UBS Americas, Inc.*, 858 F. Supp. 2d 306, 332 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013). The government suggests that the relevant rate should be the number of EV3, EV4, or EV2W loans identified in "due diligence." *See* Opp. 55. But it concedes that the vast majority of such loans were kicked out of the securitizations. (*See* Table 7.) The government cites no authority assessing materiality by looking to unsecuritized loans. In other cases, courts looked to loans *actually included* in the securitization when assessing "systematic abandonment." *See, e.g.*, *Nomura*, 104 F. Supp. 3d at 572; *UBS Americas*, 858 F. Supp. 2d at 332.

*Second*, seeking to skate past the fact that only a small number of loans in many securitizations deviated from any given representation in the offering documents, the government argues that it is improper to assess each alleged misrepresentation "in isolation" and that the "materiality of Defendants' scheme to defraud investors" is based on an alleged mass of misrepresentations. Opp. 55-56. For example, it suggests that even if Barclays securitized an immaterial number of "out of tolerance" loans and EV3 loans, the combination of those immaterial representations could somehow satisfy the materiality requirement. *See id.* That argument is incorrect.[10] Contrary to the government's suggestion, the materiality requirement does not apply to the alleged scheme to defraud as a whole; rather, the Second Circuit requires proof of a material *misrepresentation* as an *element* of a fraudulent scheme. *See, e.g.*, *Autuori*, 212 F.3d at 115.

The government cites no authority endorsing its novel theory of materiality. By contrast, in a decision recently upheld by the Second Circuit, a district court assessed materiality in an RMBS case on a representation-by-representation basis, using 5% as the materiality threshold

---

[10] Even if the government's theory were correct, the complaint does not allege that more than 5% of the loans in every securitization were defective, let alone that Barclays knowingly securitized such loans. *See* Mem., App. A. Although Barclays does not concede that 5% is the applicable materiality threshold, that strict standard is a baseline against which the government's allegations should be assessed. *See* Mem. 43.

and rejecting specific alleged misrepresentations that did not meet that threshold.  *See Nomura*, 104 F. Supp. 3d at 558, 571.  That court based its analysis in part on the applicable SEC regulation, Regulation AB, which defines materiality on a representation-by-representation basis. Regulation AB provides that an issuer of a mortgage-backed security must make new representations about a mortgage pool if any single "material pool characteristic" changes "by 5% or more" from the date the prospectus supplement is published to the date the security is issued.  Asset-Backed Securities, Securities Act Release No. 8518, 84 SEC Docket 1624, Item 6.05 (Dec. 22, 2004); *see also Nomura*, 2017 WL 4293322, at *44 (stating, in assessing materiality, that the Second Circuit has "repeatedly cited" SEC guidance "with approval").

The government incorrectly suggests that Barclays' prospectus supplements disclosed a different measure of materiality, pointing out that most of those documents stated that "the final mortgage pool may vary plus or minus 5%."  Opp. 56; *see, e.g.*, Ex. 16 at 34 (SABR 2006-FR1). That statement does not speak to whether materiality should be assessed by aggregating small deviations in the dozens, if not hundreds, of statistical categories in an average RMBS prospectus supplement.  In the preceding sentence, which the government ignores, the prospectus supplements expressly refers to material variation in the disclosed "characteristics."  *See* Ex. 16.  That disclosure is consistent with Regulation AB, which makes clear that a separate assessment is required as to each individual representation.  Accordingly, this Court should dismiss the government's claims insofar as they rest on alleged misrepresentations with respect to immaterial numbers of loans, as identified in Appendix A of Barclays' opening memorandum.

### D.    The Opposition Confirms The Government's Failure To Plead Intent

The government incorrectly suggests that it need not plead facts giving rise to a "strong inference" of fraudulent intent.  *See* Opp. 56-57.  The "strong inference" standard is a longstanding Second Circuit requirement in cases subject to Rule 9(b), including FIRREA cases.  *See*

*United States* v. *Bank of New York Mellon*, 941 F. Supp. 2d 438, 464 (S.D.N.Y. 2013); *cf. Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (applying "strong inference" requirement in civil RICO case alleging criminal fraud).  As the government previously conceded in another FIRREA case, this standard " 'is comparative,' and courts evaluate the facts alleged along with any reasonable inferences favoring plaintiffs and compare them to plausible, nonculpable explanations for the defendant's conduct."  Gov't Mem. of Law at 42, *United States* v. *Bank of New York Mellon*, Civ. No. 11-6969 (S.D.N.Y. Oct. 12, 2012), Dkt. 47 (citation omitted).

### 1.   The Government Still Fails To Support Its Allegation Of Motive

In its opposition, the government adheres to the primary theory of motive from its complaint:  that Barclays sought "to increase its profits and its share of the RMBS market."  Opp. 76 (quoting ¶ 5).  But desire for profit and market share is common to all businesses and is insufficient to plead fraudulent intent.  *See* Mem. 31; *see also, e.g.*, *Landesbank Baden-Wurttemberg* v. *Goldman, Sachs & Co.*, 478 Fed. Appx. 679, 681 (2d Cir. 2012).[11]

### 2.   The Opposition Still Does Not Identify Facts Constituting Strong Circumstantial Evidence Of Conscious Misbehavior

Where, as here, a plaintiff fails to plead a cognizable motive, "the strength of the circumstantial allegations [of intent] must be correspondingly greater."  *Kalnit* v. *Eichler*, 264 F.3d 131,

---

[11] The government's attempt to recharacterize its complaint as alleging that Barclays had the motive to commit fraud to "avoid[] loss" and "receive higher credit ratings and to induce investors to invest in their RMBS," Opp. 75-76, also fails.  Courts, including the Second Circuit, have rejected such general motives.  *See Novak* v. *Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (desire to "sustain  .  .  .  the success of an investment" (citation omitted)); *San Leandro Emergency Medical Group Profit Sharing Plan* v. *Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) (desire to maintain "bond or credit ratings at the highest possible level"); *Johnson* v. *Sequans Communications S.A.*, Civ. No. 11-6341, 2013 WL 214297, at *18-*19 (S.D.N.Y. Jan. 17, 2013) (desire to raise funding); *In re MRU Holdings Securities Litigation*, 769 F. Supp. 2d 500, 515 (S.D.N.Y. 2011) ("desire to avoid loss to the corporation [and] to preserve a business relationship").  To the extent the government relies on *Dexia SA/NV* v. *Bear, Stearns & Co.*, 929 F. Supp. 2d 231 (S.D.N.Y. 2013), that decision overlooked the Second Circuit's holding in *San Leandro*, *supra*, that a desire to maintain credit ratings is too generalized to allege fraudulent motive.

142 (2d Cir. 2001) (citation omitted).  As the government acknowledges, "[w]hen the defendant is a corporate entity . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  Opp. 38 (quoting *Teamsters Local 445 Freight Division Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195-196 (2d Cir. 2008)).  Here, the government fails to allege facts creating a strong inference of intent by any Barclays employee as to the 36 securitizations.

The government's intent allegations suffer from the same defect as its scheme allegations:  the government attempts to build an inference of fraudulent intent for all 36 securitizations based on allegations that relate to only a small number of them.  Almost all the circumstantial evidence cited by the government concerns the subprime principal securitizations, and in particular, the seven "Menefee/Carroll deals."  *See* Opp. 71-73, 77-83; *see also* Mem., App. A (categorizing the alleged misrepresentations by securitization and business).[12]

The "most straightforward way" for a plaintiff to plead intent against a corporate defendant is to allege facts creating a strong inference that a specific, named person whose intent is attributed to the company had fraudulent intent.  *Dynex Capital*, 531 F.3d at 195.  The government concedes that it has not identified any specific employee harboring fraudulent intent for the 29 non-Menefee/Carroll deals.  *See* Opp. 77-78.  The absence of such allegations after a two-year investigation is telling.  To be sure, in certain circumstances a plaintiff may plead corporate intent without naming a specific employee, but to do so it must allege specific facts that "create a strong inference that someone whose intent could be imputed to the corporation acted with the

---

[12] Much of the government's discussion of intent simply recounts its falsity allegations, particularly those related to certain aspects of due diligence.  *See* Opp. 65-71.  For the reasons discussed above, those allegations do not show that Barclays made materially false representations, let alone that it did so knowingly.  *See* pp. 18-21, *supra*.  And, especially with respect to the Alt-A and third-party securitizations, those allegations concern a miniscule number of loans and thus cannot establish fraudulent intent.  *See* Mem., App. A.

requisite scienter."  *See, e.g.*, *Dynex Capital*, 531 F.3d at 195 (positing that the standard would be satisfied by an allegation that General Motors had announced that it had sold one millions SUVs when in fact it had sold none, as "so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false").  The government has not pleaded any such facts for the 29 non-Menefee/Carroll securitizations, including, most glaringly, the 14 Alt-A and third-party securitizations.  For example, as to the Alt-A securitizations, the government alleges that "Barclays" made various representations and that "Barclays" was aware of facts allegedly rendering those representations untrue (¶¶ 589-634), but it offers no allegation creating a strong inference that a Barclays agent intended to defraud investors when making those representations.[13]

Attempting to overcome that defect, the government claims that there are "scores of mentions of both Menefee and Carroll throughout the Complaint in connection with all of the subprime [securitizations]" and that Menefee and Carroll had some involvement in "supporting" all the securitizations.  Opp. 38-39, 62.  But descriptions of Menefee's and Carroll's positions within Barclays and conclusory allegations of "support" are insufficient to plead fraudulent intent.  *See, e.g.*, *Police & Fire Retirement System of City of Detroit* v. *SafeNet, Inc.*, 645 F. Supp. 2d 210, 235 (S.D.N.Y. 2009) (noting that "[p]laintiffs cannot successfully plead scienter based only on allegations related to the [defendants'] title and job responsibilities").[14]

---

[13] In fact, as discussed above, many of the statements cited by the government were made *after* Barclays had completed the Alt-A securitizations.  *See* n. 8, *supra*; Mem. 49.

[14] Aside from the Menefee/Carroll deals, the complaint, when read generously, makes allegations of fraudulent intent by anyone for only nine other securitizations.  *See* Mem., App. B.  The government's intent allegations as to those nine securitizations rely largely on distorted and incomplete readings of the cited e-mails and recordings.  *See id.*

As to the seven Menefee/Carroll deals, the government has failed to plead fraudulent intent for the reasons set forth in the individual defendants' motions to dismiss.  *See* Menefee Mem. 11-19; Menefee Reply Br. 2-5; Carroll Mem. 13-23; Carroll Reply Br. 6-10.

### 3.   The Government's Concessions Negate A Strong Inference Of Intent

What is more, the government's own concessions negate its allegations of intent.  *First*, the government's admission that Barclays retained the equity tranche "[o]n the majority" of the 36 securitizations (¶ 97) is fatal to its claim that Barclays sought to "securitize[] as many loans as possible . . . no matter how defective" (¶ 148).  It would have been "economically irrational" for Barclays to harm its own equity interests in the securitizations at issue by knowingly securitizing defective loans.  *See In re UBS AG Securities Litigation*, Civ. No. 07-11225, 2012 WL 4471265, at *12-*13 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Retirement System* v. *UBS AG*, 752 F.3d 173 (2d Cir. 2014); *see also Kalnit*, 264 F.3d at 140-141 (noting that, "[w]here plaintiff's view of the facts defies economic reason, it does not yield a reasonable inference of fraudulent intent" (alterations, internal quotation marks, and citation omitted)).  The government's retort that Barclays securitized bad loans to "get them off its books," Opp. 3, is also economically irrational:  Barclays would not have knowingly purchased bad loans only to have to "get them off its books."  The government also responds that it has not admitted that the equity tranche is the riskiest.  *See* Opp. 74 n.32.  But the government concedes that these tranches were the "residual" ones, and it does not deny that Barclays maintained a substantial financial interest in the performance of the loans underlying the securitizations.[15]

---

[15] The amended complaint describes the equity tranche as the "residual tranche" (¶ 97) and explains that "Barclays grouped the RMBS certificates into different tranches, or classes, organized in a hierarchical capital structure . . . in which . . . the subordinate tranches were paid later, and bore progressively higher rates of return and less protection from losses" (¶ 94).

*Second*, the government's acknowledgment that Barclays excluded nearly 70% of the loans allegedly graded as EV3, EV4, or EV2W during due diligence, *see* Mem. 32, further defeats its allegation that Barclays intended to "securitize as many loans as possible." (¶¶ 148, 152, 281.) In its opposition, the government now walks back that allegation, suggesting that Defendants "only *partially* defrauded their victims." Opp. 62. But that was not what the government alleged in the complaint (¶¶ 148, 152, 281), and its admission about the number of loans that Barclays kicked out of the at-issue securitizations defeats its allegations of fraudulent intent.

## III.   THE CLAIMS BASED ON 18 U.S.C. §§ 1005 AND 1014 SHOULD BE DISMISSED

*18 U.S.C. § 1005*. Section 1005 applies only to individuals acting as "officer, director, agent or employee" of a financial institution. As explained in Barclays' opening memorandum, although this language appears in the statute's first clause, Congress intended the limitation to carry through the succeeding clauses as well. The government does not dispute that the statute's unusual history limits the application of the second and third clauses to bank insiders. *See* Mem. 53 (collecting cases). Instead, the government contends that the fourth clause—which has the same language as the second and third—should carry a different meaning because Congress added it later as part of FIRREA.[16] To that end, the government suggests that the omission of "officer, director, agent or employee" in the fourth clause was "intended to reach a broader set of offenders in the wake of the Savings and Loan Crisis." Opp. 98. But the government provides no citation for that proposition. And it is contrary to the better-reasoned of the two district court opinions in this circuit to consider the scope of the fourth clause, which found "ample support in FIRREA's legislative history to find that Congress was concerned with regulating the conduct of bank insiders." *United States* v. *Rubin/Chambers, Dunhill Insurance Services*, 798 F. Supp. 2d

---

[16] The government also argues that Barclays' position is "contrary" to 1 U.S.C. § 1, *see* Opp. 97 n.42, but that statute states that the general definition of "whoever" applies "unless the context indicates otherwise."

517, 527 (S.D.N.Y. 2011).  In any event, the government offers no response to the point that the rule of lenity compels a consistent reading of all four clauses.  *See* Mem. 53.

The government separately argues that the Section 1005 claim satisfies Rule 9(b) because the complaint identifies 36 securitizations in which unspecified financial institutions purchased securities in unspecified transactions.  *See* Opp. 99.  As with the claims before it, such conclusory assertions wholly fail to meet the government's burden.  *See* pp. 4-9, 24-29, *supra*.

*18 U.S.C. § 1014*.  Section 1014 imposes criminal penalties for making a false statement to a financial institution to influence a loan or credit transaction.  As Barclays explained, Section 1014 does not apply to a covered institution's investment activities; it is "limit[ed]" to "specified credit" decisions, *United States* v. *Krown*, 675 F.2d 46, 50 (2d Cir. 1982), "made in connection with conventional loan or related transactions," *Williams* v. *United States*, 458 U.S. 279, 289 (1982).  Mem. 55.  The purchase of securities is plainly not a conventional lending activity, despite the government's efforts to recast a security as the equivalent of a loan.  *See* Opp. 100.

To the extent the government argues that other courts of appeals have adopted a broader reading of Section 1014, this Court is bound by *Krown*, which instructed that "the language of the statute, limiting it to the specified credit transactions, must be given effect."  675 F.2d at 50; *see also id.* at 51 (stating that "[t]he[] broad terms  .  .  .  can only refer to an [action] involving an advance or loan or other credit transaction listed in the statute").  The government implicitly concedes that the Second Circuit has not overruled *Krown*, arguing instead that *Krown* is inapposite because it did not involve the purchase of securities and preceded the Supreme Court's decision in *United States* v. *Wells*, 519 U.S. 482 (1997).  *See* Opp. 102.  As to the former point, however, that *Krown* did not present exactly the same facts does not render the court's interpretation

30

of the statute any less binding.  And as to the latter, *Wells'* holding that materiality is not an element of Section 1014 does not undermine *Krown*, explicitly or implicitly.

Even accepting the government's reading of the statute, moreover, the Section 1014 claim remains legally deficient.  The government fails to respond to the pleading deficiencies identified in Barclays' opening memorandum.  *See* Mem. 55.

## IV.  THE GOVERNMENT CANNOT CURE ITS IMPROPER INCLUSION OF DEFENDANTS BARCLAYS PLC, BARCLAYS GROUP US INC., AND BARCLAYS US LLC

### A.    The Government's New 'De Facto' Merger Theory Fails To Save Its Successor-In-Interest Claims

In the complaint, the government alleges only that Barclays PLC, Barclays Group US Inc., and Barclays US LLC are successors-in-interest to Barclays Capital.  (¶¶ 30-31, 33.)  With respect to Barclays Group US Inc. and Barclays US LLC, that conclusory allegation—made "[o]n information and belief"—is the government's *only* attempt to plead liability.[17]  That allegation is plainly insufficient to satisfy the government's pleading burden.  *See* Mem. 56-57.

In response, the government argues that Barclays Capital has engaged in a "de facto" merger with those three defendants.  But the government does not mention a "de facto" merger in its complaint and "cannot amend [its] complaint by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss."  *Pelt* v. *City of New York*, Civ. No. 11-5633, 2013 WL 4647500, at *8 (E.D.N.Y. Aug. 28, 2013) (citation omitted).  Even if the Court considers those unpleaded allegations, the government correctly concedes that Barclays Capital continues to operate, *see* Opp. 104, 106, defeating its entire argument.  *See Societe Anonyme Dauphitex* v. *Schoenfelder Corp.*, Civ. No. 07-489, 2007 WL 3253592, at *4 (S.D.N.Y. Nov. 2,

---

[17] As to Barclays PLC, it appears that the government also attempts to plead liability based on conclusory allegations that Barclays PLC supervised aspects of the operations of Barclays Capital.  *See* Opp. 103, 115-117.  Those conclusory allegations do not suffice.  *See* pp. 34-35, *infra*.

2007) (holding that a corporation that has not been legally dissolved must have been "shorn of its assets and . . . become, in essence, a shell" for a de facto merger to occur (citation omitted)).

**B.     The Opposition Fails To Demonstrate That Barclays PLC Is Subject To Personal Jurisdiction In New York**

*1.     Barclays PLC Is Not Subject To General Jurisdiction In New York*

The government tries to ignore that *Daimler AG* v. *Bauman*, 134 S. Ct. 746 (2014), "considerably altered the analytic landscape for general jurisdiction," and established that "except in a truly 'exceptional' case, a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business—the 'paradigm' cases." *Brown* v. *Lockheed Martin Corp.*, 814 F.3d 619, 627, 629 (2d Cir. 2016). This is not an exceptional case that would justify a different outcome. Barclays PLC is "at home" in the United Kingdom, where it is incorporated and has its principal place of business. Mem. 59-60; Smith Decl. ¶ 5. The government selectively quotes public documents to contend otherwise, but in so doing, it conflates Barclays PLC with the Barclays Group, a term that Barclays uses to describe its entire corporate family.[18] The government invokes statements about the Barclays Group being anchored in London and New York, but that says nothing about where Barclays PLC, the corporate parent, is located. Opp. 108-109. The government's remaining allegations that Barclays PLC held meetings in New York, was registered to do business there, and listed its shares on the New York Stock Exchange—mentioned for the first time in its opposition—do not render Barclays PLC "at home" in New York under *Daimler*'s demanding standard.

---

[18] The term "Group" is explained on Barclays' website: " 'Barclays' refers to any company in the Barclays PLC group of companies." Barclays, *SEC Filings* <www.home.barclays/barclays-investor-relations/investor-news/sec-filings.html>.

The government amended its complaint to allege that general personal jurisdiction can be exercised over Barclays PLC based on an agency or alter-ego theory under New York law. (¶ 33.)  Neither theory can establish general jurisdiction over Barclays PLC.

Before *Daimler*, New York law allowed a plaintiff to establish general personal jurisdiction over a defendant under an agency theory.  *See, e.g.*, *Wiwa* v. *Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000).  As the Supreme Court and the Second Circuit have indicated, that theory does not survive *Daimler*.  *See Daimler*, 134 S. Ct. at 759; *Sonera Holding B.V.* v. *Çukurova Holding A.Ş*, 750 F.3d 221, 225 (2d Cir. 2014).  Under pre-*Daimler* New York law, the agency theory "provide[d] jurisdiction over the principal where the subsidiary performs services that are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services."  *NYKCool A.B.* v. *Pacific International Services, Inc.*, 66 F. Supp. 3d 385, 392-393 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).  That theory would essentially expose parent corporations to general jurisdiction in any State in which they have a subsidiary—a result the Supreme Court found irreconcilable with its precedent.  *Daimler*, 134 S. Ct. at 759; *see also Sonera Holding*, 750 F.3d at 225 (stating that the agency theory "stacks the deck, for it will always yield a pro-jurisdiction answer" (citation omitted)).

The *only* case the government cites to support its argument that the agency theory survives *Daimler—In re Hellas Telecommunications (Luxembourg) II SCA*, 524 B.R. 488 (Bankr. S.D.N.Y. 2015)—has been strongly criticized as inconsistent with *Daimler*, *see In re LIBOR-Based Financial Instruments Antitrust Litigation*, MDL No. 11-2262, 2015 WL 6243526, at *27 n.43 (S.D.N.Y. Oct. 20, 2015).  Even in *Hellas*, the court determined that general jurisdiction existed only because the parent company defendant had a regional head office in New York.  524

B.R. at 508.  Barclays PLC, in contrast, has no New York office.  *See* Smith Decl. ¶ 5.  Even if an agency theory of general personal jurisdiction were valid after *Daimler*, therefore, the government has cited no authority demonstrating that it could constitutionally apply here.

The government's argument regarding an alter-ego theory similarly fails to establish general jurisdiction.  The government acknowledges that, for a court to find an alter-ego relationship sufficient to establish general jurisdiction, it must consider (1) whether the two entities have "nearly identical ownership interests"; (2) the "financial dependency of the subsidiary on the parent corporation"; (3) "the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities"; and (4) "the degree of control over the marketing and operational policies of the subsidiary exercised by the parent." *Volkswagenwerk Aktiengesellschaft* v. *Beech Aircraft Corp.*, 751 F.2d 117, 120-122 (2d Cir. 1984); *see also* Opp. 113.  Yet the only *Beech* factor the complaint addresses is Barclays PLC's ownership, and "[a]llegations of common ownership, without more, are insufficient to establish jurisdiction through an alter ego theory." *Laydon* v. *Bank of Tokyo-Mitsubishi UFJ, Ltd.*, Civ. No. 12-3419, 2017 WL 1113080, at *7 (S.D.N.Y. Mar. 10, 2017).  To accept the government's alter-ego theory here would turn all wholly owned subsidiaries into alter egos of their parents, swallowing the general rule.

### 2. *Barclays PLC Is Not Subject To Specific Jurisdiction In New York*

The government defends its assertion of specific jurisdiction against Barclays PLC by reciting generalized agency principles and repeating conclusory allegations—made only "[o]n information and belief"—that Barclays PLC exercised high-level control over Barclays Capital with respect to certain aspects of its RMBS business in New York.   Opp. 115-116. "[C]onclusory non-fact-specific jurisdictional allegations" are "insufficient to establish specific jurisdiction under [N.Y. C.P.L.R.] § 302(a)(1)."  *Karoon* v. *Credit Suisse Group AG*, Civ. No.

15-4643, 2016 WL 815278, at *4 (S.D.N.Y. Feb. 29, 2016) (citation omitted); *see also Gallelli* v.

*Crown Imports, LLC*, 701 F. Supp. 2d 263, 270 (E.D.N.Y. 2010) (noting that "[c]onclusory alle-

gations based only on information and belief are not sufficient" to establish personal jurisdiction

when the plaintiff has had the benefit of extensive discovery).  The government cites *Elsevier* v.

*Grossman*, 77 F. Supp. 3d 331 (S.D.N.Y. 2015), but that case premises specific jurisdiction on a

parent's exercise of "extensive control over [the party engaging in forum-related activities] in the

transaction underlying th[e] suit."  *Id.* at 345 (citation omitted).  The government does not dis-

pute that its complaint describes only typical oversight of a parent over its subsidiary (*see* ¶ 33),

which does not establish that Barclays PLC exercised extensive control over Barclays Capital

with respect to the 36 securitizations.  The government has failed to establish that Barclays PLC

is subject to specific jurisdiction in this forum.

*       *       *

This Court should not indulge the government's plea for yet more discovery to save its

claim against Barclays PLC, Barclays Group US Inc., and Barclays US LLC.  *See* Opp. 117.

The government has already had two years of "massive" pre-filing discovery, and it has had

months of further discovery—including interrogatories—since this case began.  *In re Aluminum*

*Warehousing Antitrust Litigation*, 90 F. Supp. 3d 219, 239-240 (S.D.N.Y. 2015) (denying juris-

dictional discovery).  Even after all that discovery, the government still cannot plead any facts

concerning the conduct of these three entities, and as to Barclays PLC it cannot even begin to

make out a *prima facie* case for personal jurisdiction.

## CONCLUSION

The Barclays defendants' motion to dismiss should be granted, and the complaint dis-

missed with prejudice.

35

Respectfully submitted,

/s/ Karen Patton Seymour    /s/ Kannon K. Shanmugam

Karen Patton Seymour     Kannon K. Shanmugam (admitted *pro hac vice*)
Richard H. Klapper       David M. Zinn (admitted *pro hac vice*)
Jeffrey T. Scott         WILLIAMS & CONNOLLY LLP
SULLIVAN & CROMWELL LLP   725 Twelfth Street, N.W.
125 Broad Street        Washington, DC 20005
New York, NY 10004      (202) 434-5000
(212) 558-4000        kshanmugam@wc.com
seymourk@sullcrom.com     dzinn@wc.com
klapperr@sullcrom.com
scottj@sullcrom.com       *Counsel for Barclays Capital Inc., Barclays*
             *Group US Inc., Barclays US LLC, Barclays*
             *Bank PLC, Barclays PLC, BCAP LLC,*
             *Securitized Asset Backed Receivables LLC,*
             *and Sutton Funding LLC*

October 10, 2017

**CERTIFICATE OF SERVICE**

I hereby certify that on October 10, 2017, the foregoing Reply in Further Support of the Barclays Defendants' Motion to Dismiss the Amended Complaint, and the declaration and exhibit thereto, were served on the Court and all counsel of record by electronic filing.  I further certify that all parties required to be served have been served.

/s/ Leila R. Siddiky
Leila R. Siddiky
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
siddikyl@sullcrom.com