**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA,**

*Plaintiff*,

-*versus*-

**BARCLAYS CAPITAL, INC.,** *et al.*,

*Defendants*.

**Civil Action No. 16-CV-7057 (KAM/JO)**

**(Matsumoto, J.)**
**(Orenstein, M.J.)**

# MEMORANDUM OF LAW
## OF PLAINTIFF THE UNITED STATES OF AMERICA
## IN OPPOSITION TO DEFENDANTS'
## MOTIONS TO DISMISS THE AMENDED COMPLAINT

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York

F. FRANKLIN AMANAT
MATTHEW R. BELZ
CHARLES S. KLEINBERG
EVAN P. LESTELLE
JOSEPHINE M. VELLA
Assistant United States Attorneys
Eastern District of New York
271A Cadman Plaza East
Brooklyn, NY  11201-1820
(718) 254-7000

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iv

GLOSSARY OF ABBREVIATIONS AND ACRONYMS ....................................................... xi

INTRODUCTION ....................................................................................................... 1

BACKGROUND .......................................................................................................... 3

ARGUMENT .............................................................................................................. 6

I.  APPLICABLE LEGAL STANDARDS ..................................................................... 6

    A.  Elements of Claims for Civil Penalties Under FIRREA ................................ 6

    B.  Pleading Requirements under Fed. R. Civ. P. 8 and 9 ................................ 7

    C.  Legal Standard under Fed. R. Civ. P. 12(b)(6) ........................................ 8

II.  THE COMPLAINT PLEADS FRAUD WITH SUFFICIENT PARTICULARITY UNDER FED. R. CIV. P. 9(B) AND IS NOT A "PUZZLE PLEADING." ............................. 8

III.  THE COMPLAINT SUFFICIENTLY ALLEGES THAT DEFENDANTS' MAIL AND WIRE FRAUD AFFECTED ONE OR MORE FIFIS AS TO EACH DEAL. ............. 14

    A.  The Complaint Sufficiently Alleges that FIFIs were Affected when they Purchased Certificates in the Subject Deals. ........................................... 17

    B.  The Complaint Sufficiently Alleges that FIFIs Were Affected when they Acted as an Originator, Repurchase Financer, Trustee, Servicer, or Custodian. .................. 26

IV.  THE COMPLAINT SUFFICIENTLY PLEADS MAIL AND WIRE FRAUD AS TO ALL SUBJECT DEALS. ...................................................................................... 34

    A.  Elements of Mail and Wire Fraud ....................................................... 34

    B.  The Complaint Pleads a Scheme to Defraud as to All Subject Deals. .......... 35

    C.  The Complaint Pleads the Falsity of the Representations the Defendants Made with Respect to Each Subject Deal. ...................................................... 39

        1.  The Complaint Pleads the Falsity of Defendants' Representations as to the Credit Quality of the Securitized Loans. ........................................ 40

        2.  The Complaint Pleads the Falsity of Defendants' Representations as to the Credit Quality of the Unreviewed Loans. ...................................... 43

        3.  The Complaint Pleads the Falsity of Defendants' Representations as to Property Valuations and Appraisals. ............................................ 45

        4.  The Complaint Pleads the Falsity of Defendants' Representations as to their Due Diligence Practices. .................................................... 49

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page ii

D. The Complaint Pleads the Materiality of Defendants' False Statements....................52

E. The Complaint Pleads Fraudulent Intent. ....................................................56

 1. Defendants Had Actual Knowledge of the Falsity of their Representations. ........64

 2. Defendants Knowingly Withheld Key Information from Investors and Rating Agencies. .....................................................70

 3. Defendants Failed to Rectify Problems in their Securitization Program.............72

 4. Defendants Had Both the Motive and the Opportunity to Defraud. .....................74

 5. The Complaint Pleads Fraudulent Intent as to Menefee and Carroll with Respect to the Menefee/Carroll Deals. ................................................77

V. THE COMPLAINT SUFFICIENTLY PLEADS BANK FRAUD AS TO ALL SUBJECT DEALS. ..............................................84

 A. Elements of Bank Fraud....................................................84

 B. The Complaint Sufficiently Alleges Barclays Committed Bank Fraud in Violation of 18 U.S.C. § 1344(1) and (2) as to All Subject Deals and Menefee and Carroll Committed Bank Fraud as to All Menefee/Carroll Deals.........................85

VI. THE MAIL, WIRE, AND BANK FRAUD CLAIMS AGAINST MENEFEE AND CARROLL AS TO SABR 2006-FR3 AND FR4 ARE NOT TIME-BARRED.....................89

VII. THE COMPLAINT SUFFICIENTLY ALLEGES PREDICATE OFFENSES UNDER 18 U.S.C. § 1005 AGAINST BARCLAYS AS TO ALL SUBJECT DEALS. ........................96

VIII. THE COMPLAINT SUFFICIENTLY ALLEGES PREDICATE OFFENSES UNDER 18 U.S.C. § 1014 AGAINST BARCLAYS AS TO ALL SUBJECT DEALS. ........................99

IX. DEFENDANTS BPLC, BGUS, AND BUSLLC ARE PROPERLY SUED. ........................103

 A. BPLC, BGUS, and BUSLLC are Proper Defendants as Successors-in-Interest to Barclays Capital, Inc. ..................................................103

 B. The Complaint Sufficiently Alleges Personal Jurisdiction against BPLC.................106

 1. There is General Personal Jurisdiction over BPLC in New York. ....................108

 2. There is Specific Personal Jurisdiction over BPLC in New York. ....................115

CONCLUSION.....................................................................117

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page iii

# TABLE OF AUTHORITIES

## Federal Cases

*Abu Dhabi Comm. Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155 (S.D.N.Y. 2009) .............77

*Acito v. IMCERA Grp.*, 47 F.3d 47 (2d Cir. 1995) ................................................................... 57

*Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696 (2d Cir. 2009)............................................ 105

*In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513 (S.D.N.Y. 2005) ................................................. 10

*Arnold Graphics Indus. v. Independent Agent Ctr.*, 775 F.2d 38 (2d Cir. 1985) .................................. 105

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................. 8, 16, 62

*ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007)........................................... 8

*AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202 (2d Cir. 2000) ........................................ 59

*Barber v. Thomas*, 560 U.S. 474 (2010) ........................................................................ 20

*BedRoc Ltd., LLC v. United States*, 541 U.S. 176 (2004) ................................................ 18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................... 8, 16

*Brookdale Univ. Hosp. & Med. Ctr. v. Health Ins. Plan*, No. 07-CV-1471 (RRM/LB),
   2009 WL 928718 (E.D.N.Y. Mar. 31, 2009) .........................................................76

*Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016) ........................................ 109

*Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41 (2d Cir. 2003) .................................. 105, 106

*Carpenter v. United States*, 484 U.S. 19 (1987) ..................................................... 35

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)......................................... 8

*Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010).............................. 116

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277 (S.D.N.Y. 2013) ............... 51

*Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353 (2d Cir. 2013) ....................... 10, 57, 60, 62, 74

*Daimler AG v. Bauman*, 134 S. Ct. 746 (2014) ......................... 107, 109, 110, 111, 114, 116

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) ................................................... 16

*Dexia SA/NV v. Bear, Stearns & Co.*, 929 F. Supp. 2d 231 (S.D.N.Y. 2013) ............ 11, 14, 41, 53, 54, 77

*DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81 (2d Cir. 2001) ................................ 107

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81 (2d Cir. 2013) ............................ 107, 117

*Elliott v. United States*, 332 F.3d 753 (4th Cir. 2003) ............................................. 103

*Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331 (S.D.N.Y. 2015) .................................. 116

*Emerald Asset Advisors, LLC v. Schaffer*, 895 F. Supp. 2d 418 (E.D.N.Y. 2012)................................ 116

*FHFA v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476 (S.D.N.Y. 2012)............................ 11, 13, 41, 42

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page iv

*FHFA v. Nomura Holding Am., Inc.*, 68 F. Supp. 3d 439 (S.D.N.Y. 2014) ........................................ 45-46

*FHFA v. Nomura Holding Am., Inc.,* 104 F. Supp. 3d 441, 563 (S.D.N.Y. 2015) ............................ 55, 56

*FHFA v. UBS Americas, Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012) ...................................... 41

*Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996) ........................................ 56

*Global-Tech Appliances, Inc. v. SEB, S.A.*, 563 U.S. 754 (2011) ....................................... 59

*Green v. Beer*, No. 06-CIV-4156 (KMW/JCF), 2009 WL 911015 (S.D.N.Y. Mar. 31, 2009) .............. 78

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) ............................................. 99

*Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014) ............................................ 109

*In re Hellas Telecomm. (Luxembourg) II SCA*, 524 B.R. 488 (Bankr. S.D.N.Y. 2015) ..................... 112

*In re Honeywell Int'l, Inc. Sec. Litig.*, 182 F. Supp. 2d 414 (D.N.J. 2002) ........................... 9

*Hotel Emp. & Restaurant Emp. Union, Local 100 v. New York Dep't of Parks & Rec.*, 311 F.3d 534 (2d Cir. 2002) ...................................................................................104

*IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049 (2d Cir. 1993) ............................... 7, 13

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ....................................................... 76

*Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 12-Civ.-3419 (GBD), 2017 WL 1113080 (S.D.N.Y. March 10, 2017) ..........................................................................114

*Leon v. Shmukler*, 992 F. Supp. 2d 179 (E.D.N.Y. 2014) ............................................. 118

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, MDL No. 11-2262, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ...........................................................................115

*Libutti v. United States*, 178 F.3d 114 (2d Cir. 1999) ...............................................115

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp.*, 902 F. Supp. 2d 329 (S.D.N.Y. 2012) .............. 51

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,* 797 F.3d 160 (2d Cir. 2015) ..........................................................7, 10, 11, 13, 48, 62, 71

*Loughrin v. United States*, 134 S. Ct. 2384 (2014) .......................................... 85, 88, 89

*Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986) ....................................................... 78

*In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204 (2d Cir. 2003) ...............................118

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702 (7th Cir. 2008) ........................... 62

*In re Marsh & McLennan Cos. Sec. Litig.,* 501 F. Supp. 2d 452 (S.D.N.Y. 2006) ....................... 38

*Mass. Mutual Life Ins. Co. v. DB Structured Products, Inc.*, 110 F. Supp. 3d 288 (D. Mass. 2015) ....... 45

*In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260 (E.D. Wash. 2007) ......................................9

*In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277 (S.D.N.Y. 2013) ...................7, 9, 11, 51

*Michael v. Clark Equipment Co.,* 380 F.2d 351 (2d Cir. 1967) ........................................ 37

*Neder v. United States*, 527 U.S. 1 (1999) ....................................................35, 52

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page v

*Nettis v. Levitt*, 241 F.3d 186 (2d Cir. 2001) .................................................................. 106

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC,* 709 F.3d 109
 (2d Cir. 2013) ........................................................................................................53, 54, 55

*New York Cent. & Hudson River R.R. v. United States*, 212 U.S. 481 (1909) ........................ 38

*New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201 (2d Cir. 2006) ...................................... 106

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ................................................ 50, 64, 70, 72, 74

*Old Republic Ins. Co. v. Hansa World Cargo Serv.,* 170 F.R.D. 361 (S.D.N.Y. 1997) ......................... 105

*Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2 (2d Cir. 1996) ...................................... 14, 53

*Ouaknine v. MacFarlane*, 897 F.2d 75 (2d Cir. 1990) .................................................... 11

*Patsy's Italian Restaurant, Inc. v. Banas*, 575 F. Supp. 2d 427 (E.D.N.Y. 2008) ................ 104

*PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105 (2d Cir. 1997) .................................. 111, 116

*Penguin Grp. (USA) Inc. v. American Buddha*, 609 F.3d 30 (2d Cir. 2010) ........................ 107

*Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341
 (S.D.N.Y. 2012) ........................................................................................................38

*Pereira v. United States*, 347 U.S. 1 (1954) .................................................................. 96

*In re PetSmart, Inc. Secs. Litig.*, 61 F. Supp. 2d 982 (D. Ariz. 1999) ................................ 10

*S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629 (2d Cir. 1996) .............. 60

*Schmuck v. United States*, 489 U.S. 705 (1989) ........................................ 35, 48, 92

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) .......................................... 11

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) .................................................................. 8

*SEC v. Patel*, No. 07-39, 2009 WL 2015794 (D.N.H. July 7, 2009) ................................ 10

*Shaw v. United States*, 137 S. Ct. 462 (2016) ........................................ 85, 86, 89

*Slayton v. Am. Express Co.*, 460 F.3d 215 (2d Cir. 2006) .......................................... 106

*Societe Anonyme Dauphitex v. Schoenfelder Corp.*, No. 07 Civ. 489, 2007 WL 3253592
 (S.D.N.Y. Nov. 2, 2007) ........................................................................................106

*Sonera Holding BV v. Cukurova Holding A.S.*, 750 F.3d 221 (2d Cir. 2014) ...................... 111

*In re Splash Tech. Holdings Inc. Sec. Litig.*, 160 F. Supp. 2d 1059 (N.D. Cal. 2001) .............. 10

*Suez Equity Investors, L.P. v. Toronto Dominion Bank,* 250 F.3d 87 (2d Cir. 2001) .............. 38

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190
 (2d Cir. 2008) ........................................................................................................38, 57, 62

*Transfield ER Cape Ltd. v. Industrial Carriers, Inc.*, 571 F.3d 221 (2d Cir. 2009) .............. 115

*United States ex rel. Escobar v. Universal Health Servs.*, 842 F.3d 103 (1st Cir. 2016) ......................... 53

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page vi

*United States ex rel. O'Donnell v. Countrywide Fin. Corp.*, 961 F. Supp. 2d 598 (S.D.N.Y. 2013),
   *rev'd on other grounds*, 822 F.3d 650 (2d Cir. 2016)...........................................15, 19, 20, 29, 32, 74

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016) ......... 32

*United States v. Agne,* 214 F.3d 47 (1st Cir. 2000) ................................................................. 33

*United States v. Allen*, 160 F. Supp. 3d 698 (S.D.N.Y. 2016)................................................... 25

*United States v. Amrep Corp.,* 560 F.2d 539 (2d Cir. 1977) .................................................... 79

*United States v. Andreadis*, 366 F.2d 423 (2d Cir. 1966)........................................................ 79

*United States v. Ashdown*, 509 F. 2d 793 (5th Cir. 1975)........................................................ 91

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) ............................................... 34, 35, 37

*United States v. Bank of Am. Corp.*, No. 3:13-cv-00446, 2014 WL 2777397
   (W.D.N.C. June 19, 2014)..............................................................................................103

*United States v. Bank of New York Mellon*, 941 F. Supp. 2d 438
   (S.D.N.Y. 2013) ......................................15, 19, 25, 26, 29, 30, 32, 33, 58, 60, 62

*United States v. Barel*, 939 F.2d 26 (3d Cir. 1991) ................................................................ 99

*United States v. Binday*, 804 F.3d 558 (2d Cir. 2015)..............................35, 52, 53, 56, 57, 64, 70, 72, 75

*United States v. Blosser*, 440 F. 2d 697 (10th Cir. 1971) ...................................................... 91

*United States v. Bonnette*, 781 F.2d 357 (4th Cir. 1986)...................................................... 102

*United States v. Boren*, 278 F.3d 911 (9th Cir. 2002) .......................................................... 101

*United States v. Bouyea*, 152 F.3d 192 (2d Cir. 1998) ....................................... 15, 19, 23, 30

*United States v. Carlo*, 507 F.3d 799 (2d Cir. 2007)...................................................... 59, 63, 75

*United States v. Catapano*, No. 05CR229 (SJ/SMG), 2008 WL 3992303 (E.D.N.Y. Aug. 28, 2008) .....91

*United States v. Chacko*, 169 F.3d 140 (2d Cir. 1999) .......................................................... 59

*United States v. Chandler*, 98 F.3d 711 (2d Cir 1996) .......................................................... 58

*United States v. Christensen*, 344 F. Supp. 2d 1294 (D. Utah 2004) ...................................... 98

*United States v. Crosby,* 294 F.2d 928 (2d Cir. 1961) ............................................................ 37

*United States v. Devillier*, No. 16-012-BAJ-RLB, 2016 WL 2621968 (M.D. La. May 5, 2016) ........... 98

*United States v. Dinome*, 86 F.3d 277 (2d Cir. 1996)............................................................64

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994)............................................................. 96

*United States v. Dupre*, 462 F.3d 131 (2d Cir. 2006) ............................................................ 63

*United States v. Edwards*, 566 F. Supp. 1219 (D. Conn. 1983) .............................................. 99

*United States v. Eisen*, 974 F.2d 246 (2d Cir. 1992) ...................................................... 90, 91, 92

*United States v. Evans*, 473 F.3d 1115 (11th Cir. 2006) ....................................................... 94

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page vii

*United States v. Ferguson*, 676 F.3d 260 (2d Cir. 2011) .................................................... 74

*United States v. Frequency Elec.*, 862 F. Supp. 830 (E.D.N.Y. 1994) ................................ 95

*United States v. Gibson*, 690 F.2d 697 (9th Cir. 1982).......................................................... 79

*United States v. Guadagna*, 183 F.3d 122 (2d Cir. 1999) .......................................... 58, 64, 70

*United States v. Heinz*, 790 F.3d 365 (2d Cir. 2015) ..................................... 16, 18, 26, 29, 34

*United States v. Hinton*, 127 F. Supp. 2d 548 (D.N.J. 2000).................................................. 86

*United States v. Johnson,* 130 F.3d 1352 (9th Cir. 1997) ....................................................... 33

*United States v. Johnson*, No. 2:11cr501-DN-PMW, 2015 WL 8967525 (D. Utah Dec. 15, 2015)...98, 99

*United States v. Karro*, 257 F.3d 112 (2d Cir. 2001)............................................................... 58

*United States v. Krilich*, 159 F.3d 1020 (7th Cir. 1998)......................................... 101, 102, 103

*United States v. Krown*, 675 F.2d 46 (2d Cir. 1982) ........................................................... 102

*United States v. Laljie*, 184 F.3d 180 (2d Cir. 1999) ....................................................... 85, 87

*United States v. McGraw-Hill Cos., Inc.*, No. 13-779, 2013 WL 3762259 (C.D. Cal. July 16, 2013) .....51

*United States v. Monostra*, 125 F.3d 183 (3d Cir. 1997)....................................................... 89

*United States v. Mullins*, 613 F.3d 1273 (10th Cir. 2010) ............................................... 16, 24

*United States v. Ortiz*, 906 F. Supp. 140 (E.D.N.Y. 1995) ................................................... 99

*United States v. Pelullo*, 964 F.2d 193 (3d Cir. 1992).................................................... 23, 24

*United States v. Philip Morris USA, Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) ............................ 37

*United States v. Pinto*, 646 F.2d 833 (3d Cir. 1981)............................................................ 102

*United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970)........................ 58, 59

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) ............................................................. 59

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ....................................................... 84, 85

*United States v. Rogers*, 9 F.3d 1025 (2d Cir. 1993) ............................................................ 90

*United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998).................................................. 58

*United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 798 F. Supp. 2d 517 (S.D.N.Y. 2011) ......... 98, 99

*United States v. Rutigliano*, 790 F.3d 389 (2d Cir. 2015) ............................................... 92, 95

*United States v. Sabatino*, 485 F.2d 540 (2d Cir. 1973) ..................................................... 100

*United States v. Serpico*, 320 F.3d 691 (7th Cir. 2003)................................................... 16, 24

*United States v. Trapilo*, 130 F.3d 547 (2d Cir. 1997) ......................................................... 35

*United States v. Van Brocklin*, 115 F.3d 587 (8th Cir. 1997) .............................................. 98

*United States v. Wade*, 266 F.3d 574 (6th Cir. 2001) ......................................................... 102

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page viii

*United States v. Walker*, 191 F.3d 326 (2d Cir. 1999) ............................................... 58

*United States v. Watts*, 934 F. Supp. 2d 451 (E.D.N.Y. 2013) ..............................64, 75

*United States v. Weaver*, 860 F.3d 90 (2d Cir. 2017) .............................................. 52

*United States v. Wells Fargo*, 972 F. Supp. 2d 593 (S.D.N.Y. 2013) ........ 15, 19, 24, 29, 98, 99

*United States v. Wells*, 519 U.S. 482 (1997)............................................... 100, 101

*United States v. Wells*, 63 F.3d 745 (8th Cir. 1995) ...................................... 101

*In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220 (S.D.N.Y. 2006)............................64

*Volkswagenwerk AG v. Beech Aircraft Corp.*, 751 F.2d 117 (2d Cir. 1984).................... 113, 114

*VTech Holdings Ltd. v. PriceWaterhouse Coopers LLP*, 348 F. Supp. 2d 255 (S.D.N.Y. 2004) ............. 8

*Williams v. United States,* 458 U.S. 279 (1982) .......................................... 103

*Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000) ................................ 111, 112

### State Cases

*Courtroom TV Nwk. v. Focus Media, Inc.*, 264 A.D.2d 351, 695 N.Y.S.2d 17 (1st Dep't 1999)..........116

*Fischbarg v. Doucet*, 9 N.Y.3d 375, 880 N.E.2d 22 (2007) ..................................... 116

*Fitzgerald v. Fahnestock & Co., Inc.*, 286 A.D.2d 573, 730 N.Y.S.2d 70 (1st Dep't 2001)................. 106

*Frummer v. Hilton Hotels Int'l Inc.*, 19 N.Y.2d 533, 227 N.E.2d 851 (1967) ..................... 111, 112, 113

*Holme v. Global Minerals & Metals Corp.*, 63 A.D.3d 417, 879 N.Y.S.2d 453 (1st Dep't 2009) ........ 106

### Federal Statutes

1 U.S.C. § 1 .................................................................................. 98

Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 498, tit. IX, § 951, *codified at* 12 U.S.C. § 1833a ................................... *passim*

12 U.S.C. § 1841 .............................................................................. 110

18 U.S.C. § 20 ................................................................................6

18 U.S.C. § 1005 ............................................................................ 1, 6, 23, 97

18 U.S.C. § 1014 ............................................................. 6, 100, 101, 102, 103

18 U.S.C. § 1341 ............................................................................ *passim*

18 U.S.C. § 1343 ............................................................................ *passim*

18 U.S.C. § 1344 ............................................... 6, 23, 84, 85, 86, 88, 89, 90

18 U.S.C. § 3293(2) .......................................................................... 16

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page ix

## Federal Rules

Fed. R. Civ. P. 8(a) ................................................................................... 7, 13, 16, 104

Fed. R. Civ. P. 8(d) ................................................................................................. 37

Fed. R. Civ. P. 9(b) ................................................... 2, 7, 8, 10, 11, 13, 40, 57, 99, 104

Fed. R. Civ. P. 12(b)(2) ................................................................................... 106, 107

Fed. R. Civ. P. 12(b)(6) ........................................... 1, 2, 8, 16, 40, 41, 45, 57, 63

Fed. R. Civ. P. 25(c) ............................................................................................ 115

Fed. R. Evid. 201(b)(2) ........................................................................................ 104

## State Rules

N.Y.C.P.L.R. § 302(a)(1) ................................................................................ 116, 117

## Federal Regulations

SEC Regulation AB, 17 C.F.R. § 229.1111 (March 8, 2005) ................................. 92

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page x

## GLOSSARY OF ABBREVIATIONS AND ACRONYMS

- AC – Amended Complaint

- ASG – Asset Securitization Group

- AVM – Automated Valuation Model

- BGUS – Barclays Group US Inc.

- BPLC – Barclays PLC

- BPO – Broker Price Opinion

- BUSLLC – Barclays US LLC

- CDO – Collateralized Debt Obligation

- CLTV – Combined Loan to Value Ratio

- DTI – Debt to Income Ratio

- EPD – Early-Pay Default

- FHFA – Federal Housing Finance Agency

- FI – Financial Institution

- FIFI – Federally-Insured Financial Institution

- FIRREA – Financial Institutions Reform, Recovery, and Enforcement Act of 1989

- FPD – First-Pay Default

- IHC – Intermediate Holding Company

- LTV – Loan to Value Ratio

- MLPA – Mortgage Loan Purchase Agreement

- PSA – Pooling and Servicing Agreement

- ProSupp – Prospectus Supplement

- RMBS – Residential Mortgage-Backed Securities

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page xi

## INTRODUCTION

The detailed allegations in the Complaint and its annexed Tables leave little doubt that Defendants perpetrated a massive and coordinated fraud as to the 36 residential mortgage-backed securities ("RMBS") identified in the pleading (the "Subject Deals").  More specifically, the Complaint pleads that the corporate Defendants ("Barclays") committed mail, wire, and bank fraud, as well as violations of 18 U.S.C. §§ 1005 and 1014, as to all Subject Deals, while Defendants Menefee and Carroll each committed mail, wire, and bank fraud as to all seven "Menefee/Carroll Deals."  As to each of these deals, Defendants systematically misrepresented to investors and rating agencies numerous material characteristics of the underlying loans.  Defendants also failed to disclose what they knew about the securitized loans (namely, the prevalence of defects in the loan pools), affirmatively concealing that information from investors and rating agencies.  This fraudulent conduct resulted in billions of dollars in losses to investors and provides ample basis for the Government's claims for civil penalties under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 498, tit. IX, § 951, *codified at* 12 U.S.C. § 1833a.

Defendants' motions to dismiss the Complaint completely lack merit.  The vast majority of their arguments are trial arguments inappropriate in a motion under Rule 12(b)(6): arguments questioning the strength of the Government's evidence, contending that scores of emails and phone calls quoted in the Complaint should be read differently, insisting that they acted in good faith, etc.  Other arguments nitpick various alleged pleading defects with no bearing on the outcome of the case.  The rest of the arguments range from irrelevant to meritless to patently frivolous.  Many are either offered without citation to precedent or based on clearly inapposite authority.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 1

In its Brief, Barclays describes the Government's claims as "unprecedented." Barclays Br. at 15. The Government's claims, however, are well-grounded in the text and judicial treatment of FIRREA and its predicates. The allegations in the Complaint, moreover, are sufficiently particular to satisfy the requirements of Rule 9(b) and sufficiently plausible to satisfy the requirements of Rule 12(b)(6). The pleading alleges facts which, when accepted as true, support all elements of the predicate offenses alleged under FIRREA. In particular, the pleading sufficiently alleges the falsity and materiality of Defendants' representations, and alleges Defendants made those misrepresentations with the intent to defraud investors in the Subject Deals, including but not limited to financial institutions. The Complaint also establishes that the mail and wire fraud violations "affected" a federally-insured financial institution, or FIFI, as to each Subject Deal.

What *is* unprecedented is Defendants' failure to accept responsibility for their actions in securitizing $31 billion of loans that were destined to fail, propagating those securities through a towering mound of lies and deceptions, and watching as more than half of the loans defaulted, resulting in billions of dollars in losses to investors. Barclays' CEO, James E. Staley, admitted, in public remarks about this case, that "they [the Government] have charged the banks with acting in the mortgage-backed security market in a way that created great harm to society. And I am the first to admit that there were transgressions, and that banks should pay a fine for those transgressions, including Barclays." The Government agrees. In this light, Defendants' motions can be understood as nothing more than a desperate ploy to delay their day of reckoning.

The Government looks forward to proving its claims at trial, and to holding Defendants accountable for their transgressions. But first, Defendants' motions to dismiss the Complaint must be denied in their entirety.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 2

## BACKGROUND

The Government filed its original Complaint (ECF No. 1) on December 22, 2016.  After Defendants gave notice of their intention to move to dismiss the original complaint and served briefs in support of those motions, the Government filed an Amended Complaint ("AC") (ECF No. 48) on May 11, 2017.[1]  Defendants then served their motions to dismiss.

As alleged in the Complaint, Barclays engaged in a scheme to defraud investors in the 36 Subject Deals by knowingly and systematically making false representations and material omissions about key characteristics of the mortgage loans Barclays securitized.  AC pp. 33-94. Barclays presented information about these key characteristics in publicly-filed offering documents and in other transaction documents, as well as in direct communications with investors and rating agencies.  AC pp. 33-44 & Tables 4-6.  Barclays knew the representations it made to investors and rating agencies about the loans securitized in the Subject Deals were false.  AC pp. 44-90.  Evidence of this knowledge is substantial:

1.      Barclays knew from the credit/compliance due diligence it conducted that its representations as to loan characteristics and quality were materially inaccurate.  AC pp. 44-71. Barclays conducted credit/compliance due diligence on portions of the loan pools it securitized, ostensibly to validate the representations and warranties it was making to investors about the characteristics of the loans in the underlying pools, and specifically about the credit and compliance risks of those loans.  AC ¶¶ 80-92, 137-195.  From its due diligence results, however, Barclays learned that the representations it was making were false.  AC pp. 54-71.

2.      Barclays knowingly securitized defaulted, delinquent, and defective "scratch and dent" loans, to get them off its books.  AC pp. 71-78.  While Barclays repeatedly and emphatically

---

[1] References here to "the Complaint" mean the Amended Complaint.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 3

told investors and rating agencies it never securitized loans that had gone into first-pay default ("FPD") or early-pay default ("EPD"), or other types of loans considered "scratch and dent," it knew this was a lie.  In many deals, when Barclays was unable to put back defective loans to originators (such as when the originators were going insolvent or when Barclays missed a contractual deadline), it securitized those defective loans anyway, despite knowing that those loans violated its representations to investors.  AC pp. 71-78.

3.       Barclays repeatedly misrepresented to investors the value of the mortgaged properties underlying the Subject Deals.  AC pp. 78-84.  Barclays told investors that appraisals accompanying the mortgage originations provided reliable valuations for those properties, that those properties had sufficient collateral value to protect investors against losses in the event of default, and that none of the properties included in the deals were underwater (i.e., had a combined loan-to-value ("CLTV") ratio greater than 100%) at the time of the securitization.  But Barclays conducted valuation due diligence on a significant percentage of the loans it securitized, and from the results of this due diligence it knew that, contrary to its representations, the originators' appraisals were systematically inflated and unreliable, many of the mortgaged properties did not have sufficient value to protect against losses, and thousands of properties were underwater at the time of securitization.  AC pp. 78-83.  Barclays also knew that, contrary to its representations, it securitized thousands of loans without any appraisal review at all. AC pp. 83-84.

4.       In addition to misrepresenting the characteristics of the loans backing the Subject Deals, Barclays also repeatedly lied to investors and rating agencies about its due diligence processes and results.   AC pp. 84-94.  For example, it repeatedly characterized both its credit/compliance and valuation due diligence processes as significantly more robust and thorough than it knew the processes actually were, to deceive investors and rating agencies into thinking

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 4

Barclays was actually doing an effective job of assessing and reporting the level of risk in each deal.  It deliberately misrepresented the adverse selection criteria it used to select a credit/compliance due diligence sample, the percentage of loans it subjected to true valuation due diligence, and the steps it followed in conducting each kind of due diligence.  AC pp. 84-88.  With respect to the rating agencies, Barclays deliberately deceived the agencies as to the thoroughness of its due diligence to get favorable treatment with respect to credit enhancement requirements in the capital structures of the deals.  AC pp. 84-88.  Barclays also repeatedly misrepresented the results of its due diligence, making it appear that its due diligence vendors had not found as many defective loans as they actually had.  AC pp. 88-90.

Barclays' fraudulent scheme victimized and defrauded every investor who purchased certificates in the Subject Deals, including many FIFIs and other financial institutions, or FIs.  AC pp. 90-94.  It also affected FIFIs who were involved in the Subject Deals in other ways, including as secondary and derivative purchasers of certificates in the Subject Deals, as well as originators, repurchase financers, servicers, trustees, and custodians of the deals.  AC pp. 90-94.

Menefee and Carroll were central figures in the fraudulent scheme, especially as to the Menefee/Carroll Deals.  Menefee was the head Barclays banker in charge of due diligence and securitization on all of Barclays' SABR deals and subprime agented deals, including the Menefee/Carroll Deals.  Carroll was the head Barclays trader on all of Barclays' SABR deals, including the Menefee/Carroll Deals.  Together, they made the fraudulent representations on those deals, as well as the decisions to securitize the misrepresented loans, which they knew from due diligence results and other sources were not creditworthy.  AC pp. 94-104, 113-134, 136-150.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 5

## ARGUMENT

I.    **APPLICABLE LEGAL STANDARDS**

A.    **Elements of Claims for Civil Penalties Under FIRREA**

FIRREA authorizes the United States to recover civil penalties for fraudulent conduct that affects or victimizes certain FIs.  12 U.S.C. § 1833a.  These penalties are available against any person or entity shown by a preponderance of the evidence to have violated one or more of several predicate criminal statutes.  Among the violations for which FIRREA civil penalties may be sought are:  (1) mail and wire fraud, 18 U.S.C. § 1341 and 1343 (*see* 12 U.S.C. § 1833a(c)(2) and Claims I through VI); (2) bank fraud, 18 U.S.C. § 1344 (*see* 12 U.S.C. § 1833a(c)(1) and Claims VII through IX); (3) fraudulently benefiting from a transaction with a FI, 18 U.S.C. § 1005 (*see* 12 U.S.C. § 1833a(c)(1) and Claim X); and (4) making false statements to influence the action of certain FIs, 18 U.S.C. § 1014 (*see* 12 U.S.C. § 1833a(c)(1) and Claim XI).  Under FIRREA, mail and wire fraud violations give rise to civil penalties only if the conduct affects FIFIs.  12 U.S.C. § 1833a(c)(2).  Violations of sections 1005, 1014, and 1344 apply to conduct directed at FIFIs as well as a broader universe of FIs, including federal home loan banks and branches of certain foreign banks.  *See* 18 U.S.C. §§ 20, 1005, 1014, 1344, and 12 U.S.C. § 1833a(c)(1).

If the Government can prove that a defendant "violate[d] any provision of law" listed among FIRREA's predicate offenses, then that defendant "shall be subject to a civil penalty in an amount assessed by the court"; this penalty ordinarily "shall not exceed $1,000,000," unless "any person derives pecuniary gain from the violation" or unless "the violation results in pecuniary loss to a person other than the violator," in which case the maximum penalty is "the amount of such gain or loss."  12 U.S.C. §§ 1833a(a), (b)(1), (b)(3)(A).

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 6

## B.    Pleading Requirements under Fed. R. Civ. P. 8 and 9

A plaintiff alleging fraud must satisfy both the general pleading requirements of Rule 8(a) and the special pleading standards of Rule 9(b).  Under Rule 8(a), "dismissal is improper as long as the complaint furnishes adequate notice of the basis of plaintiff's claim and relief could be granted under some set of facts consistent with the allegations."  *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 302 (S.D.N.Y. 2013) (internal quotation marks omitted).

Rule 9(b), meanwhile, merely requires a plaintiff to "state with particularity the circumstances constituting fraud....  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  The purpose of Rule 9(b) is "(1) to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based, … (2) to safeguard defendant's reputation and goodwill from improvident charges of wrongdoing, … and (3) to inhibit the institution of strike suits."  *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir. 1993) (internal quotation marks omitted); *MF Global,* 982 F. Supp. 2d at 310.  Rule 9(b) "does not require factual pleadings that demonstrate the *probability* of wrongdoing…. At the pleadings stage, the alleged fraud need only be *plausible* based on the complaint; it need not be more likely than other possibilities."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,* 797 F.3d 160, 174 (2d Cir. 2015) (emphasis in original).  Thus, to satisfy Rule 9(b), a complaint need only "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  *Id.* at 171.  Moreover, in assessing compliance with Rule 9(b)'s special pleading standards, the facts alleged in the complaint are viewed "in their totality, not in isolation."  *Id.*

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 7

### C.    Legal Standard under Fed. R. Civ. P. 12(b)(6)

Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also VTech Holdings Ltd. v. PriceWaterhouse Coopers LLP*, 348 F. Supp. 2d 255, 261 (S.D.N.Y. 2004) (issue "is not whether the plaintiff [] will prevail but whether the plaintiff is entitled to offer evidence to support its claims.").

In assessing Defendants' motions under Rule 12(b)(6), courts must accept a complaint's factual allegations as true and draw all inferences in plaintiff's favor. *See ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Beyond the well-pleaded allegations in the Complaint, a court may also consider those documents "incorporated in [the Complaint] by reference" and "matters of which judicial notice may be taken." *SEC v. Apuzzo*, 689 F.3d 204, 207 (2d Cir. 2012) (*quoting Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

## II.    THE COMPLAINT PLEADS FRAUD WITH SUFFICIENT PARTICULARITY UNDER FED. R. CIV. P. 9(B) AND IS NOT A "PUZZLE PLEADING."

Defendants' principal structural attack on the Complaint is that it fails to plead fraud with sufficient particularity to comply with Rule 9(b)'s special pleading requirements. *See* Barclays Br. at 35-37. Defendants argue that the complaint is a "puzzle pleading" that allegedly fails to "identify when or to whom [the misrepresentations] were made or why they supposedly are false,"

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 8

thereby requiring Defendants to "sift through the tables and the complaint … to 'match the statements up with the reasons they are false or misleading.'"  Barclays Br. at 35.  To dispense with this argument, the Court need look no further than one of the first decisions to assess a "puzzle pleading" argument, where the court concluded that "the Complaint certainly is not short, but if it is a puzzle, it is meant for a child and can be assembled readily. The issues are whether plaintiffs plead actionable misrepresentations with sufficient particularity and whether plaintiffs adequately plead scienter on the part of Honeywell and each Individual Officer."  *In re Honeywell Int'l, Inc. Sec. Litig.*, 182 F. Supp. 2d 414, 416 (D.N.J. 2002).[2]

No Second Circuit case has ever endorsed the dismissal of a complaint as a "puzzle pleading" in any context, and the cases discussing that notion have almost uniformly been brought under the Private Securities Litigation Reform Act of 1995 (PSLRA), a statute which imposes heightened pleading standards for certain private claims brought under the Securities Exchange Act of 1934.  The Government is not aware of any court that has rejected a FIRREA civil penalty complaint on the ground that it was a "puzzle pleading."

The cases cited by Defendants are, in any event, inapposite.  In each case, the court found that the plaintiffs failed to satisfy the PSLRA's heightened pleading requirements because it was difficult to (1) determine which statements were alleged to be false from long block quotations or (2) identify the specific reasons for falsity from a laundry list of allegations.  *See, e.g., In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1279-80 (E.D. Wash. 2007) (complaint "often rambles through long stretches of material quoted from Defendants' public statements … unpunctuated by any

---

[2]  "Indeed, Defendants' briefs in support of their motions to dismiss, which forcefully and directly attack [the Government's] allegations of wrongdoing, are themselves proof that Defendants have notice of the claims against them."  *MF Global*, 982 F. Supp. 2d at 310.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 9

specific reasons for falsity"); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005); *In re Splash Tech. Holdings Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1074 (N.D. Cal. 2001).

Unlike in those cases, the Complaint here does not allege long block quotations of misstatements but explains, by category, the precise types of misstatements made in furtherance of Defendants' scheme to defraud.  It then identifies, in the appended tables, each individual misstatement in each of those same categories and in each Subject Deal, by speaker, document, issuing date, page number, and sentence, leaving no uncertainty as to which specific misstatements Defendants are accused of.  *See* AC Tables 1, 4-6.  Nor does the Complaint allege a laundry list of reasons for falsity that do not link up with those misstatements.  Instead, it matches each misstatement identified in the body or appendices of the pleading with the specific reasons the statement is false or misleading.  The allegations of the Scheme to Defraud (Parts II through V), the Deal-Specific Facts section, and the specific due diligence data appended in Tables 7-9, particularize, on a deal-by-deal basis, the specific facts, e-mails, phone calls, and due diligence results evidencing Defendants' knowledge of the pervasive defects in each securitization and showing why each of the statements listed on the Tables was false or misleading.[3]

Contrary to Defendants' musings about "puzzle pleadings," Rule 9(b) requires only that a plaintiff pleading fraud specify the "time, place, speaker, and content" of the misrepresentations and explain why the misrepresentations are fraudulent.  *Loreley,* 797 F.3d at 171; *Cohen v. S.A.C.*

---

[3] *In re PetSmart, Inc. Secs. Litig.*, 61 F. Supp. 2d 982 (D. Ariz. 1999), and *SEC v. Patel*, No. 07-39, 2009 WL 2015794 (D.N.H. July 7, 2009), are also distinguishable.  In *PetSmart*, the plaintiffs "merely recite[d] the same allegations for every advance press release and subsequent SEC filing during the class period, with little differentiation."  61 F. Supp. 2d at 991.  In *Patel*, each of the plaintiff's claims "merely incorporate[d] by reference the 374 paragraphs of factual background followed by a recitation or paraphrase of the statute or rule on which it is based.  That is, none of the claims specifically identifies the conduct for which the SEC seeks to hold each defendant liable."  2009 WL 2015794, at *1-2.  Here, the Government did not "recite the same allegations" for every misstatement or just "incorporate by reference" the background of the Complaint.  Rather, the pleading particularizes facts showing the falsity of each misstatement for each deal with deal-specific facts and due diligence results.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 10

*Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *MF Global*, 982 F. Supp. 2d at 309 (complaint satisfies the requirements of 9(b) where it lists misstatements by category, identifies their source, and alleges reasons why they are false).  Moreover, "reference to an offering memorandum satisfies 9(b)'s requirement of identifying time, place, speaker, and content of representation where … defendants are insiders or affiliates participating in the offer of securities." *Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir. 1990); *see also Dexia SA/NV v. Bear, Stearns & Co.*, 929 F. Supp. 2d 231, 238 (S.D.N.Y. 2013).[4]  Even under Rule 9(b)'s pleading requirements, the Second Circuit does "not require the pleading of detailed evidentiary matter." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir.), *cert. denied*, 534 U.S. 1071 (2001); *see also FHFA v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 490 (S.D.N.Y. 2012); *Dexia*, 929 F. Supp. 2d at 238 ("However, the Amended Complaint's allegations, as well as the documents incorporated therein, present a picture of defendants' unsound mortgage origination and securitization practices so pervasive that a reasonable fact-finder could infer that those practices affected the securitizations at issue in this case….  Under these circumstances, the Complaint's allegations are sufficiently specific to satisfy Rule 9(b).").

As an example of how the Complaint amply complies with the particularity requirements of Rule 9(b), consider the allegations relating to SABR 2007-BR1.  The Complaint alleges specific

---

[4] Defendants make the fanciful argument that the Complaint should be dismissed because it does not identify when or to whom some of the representations were made. Barclays Br. at 35.  As a threshold matter, nothing in Rule 9(b) requires the Complaint to specify the recipient(s) of the identified misrepresentations by name; describing the category of persons subjected to the deception (*e.g.,* all investors in the deal) is sufficient to particularize the "circumstances constituting fraud."  *See Loreley,* 797 F.3d at 171; *MF Global*, 982 F. Supp. 2d at 309.  Regardless, the Complaint makes clear that the misrepresentations listed in Tables 4 and 5 for each Subject Deal were made in *offering materials* for the Subject Deal.  For example, Table 4 says that each of the misrepresentations recited in the Table was made in the Prospectus Supplement for that Subject Deal, and Table 5 says that the misrepresentations were made in the Mortgage Loan Purchase Agreements and Pooling and Servicing Agreements for the Subject Deals.  *See also* AC ¶¶ 101, 120.  These were all deal transaction documents that were publicly filed with the SEC, and therefore available to all investors on or about the issuance date of the Subject Deals, which occurred on the dates listed in Table 1 to the Complaint and in the Deal-Specific Facts section of the Complaint.  Likewise, Table 6 gives specific dates of each presentation and states whether the presentation was made to investors or to a rating agency.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 11

misstatements in the Prospectus Supplement, or ProSupp, *see* AC Table 4 at 35, and the Pooling and Servicing Agreement, or PSA, *see* AC Table 5 at 26, about the loans' compliance with underwriting guidelines, their compliance with applicable laws, and the borrowers' ability to repay their loans.  In the Deal-Specific Facts section for SABR 2007-BR1, the Complaint explains in paragraphs 418 through 420 why these statements are false based on the significant numbers of loans graded EV3 and EV2W that Defendants identified and securitized in the deal.  *See also* Table 7 (identifying the EV3 and EV2W numbers and rates identified during due diligence and securitized in SABR 2007-BR1); ¶ 311.  These explanations are further fleshed out in the parts of the Scheme to Defraud section that pertain to these types of representations.  *See* AC pp. 45-58.

The Complaint also particularizes two misrepresentations about loan-to-value (LTV) and CLTV ratios set forth in the ProSupp (Table 4 at 36), and in paragraph 420 explains that these statements were false because Defendants securitized a significant number of loans with highly inflated appraisals.  *See also* Table 9 (showing that Defendants securitized in SABR 2007-BR1 112 loans with a final variance in excess of -15%, and 692 loans with a final CLTV over 100%); AC pp. 78-83.  And the Complaint alleges that, in a presentation to investors about SABR 2007-BR1, dated March 2007, Barclays stated it rejected loans in first payment default ("FPD") status (Table 6 at 7);[5] while in paragraphs 424-31 the Complaint explains through a detailed recitation

---

[5] Defendants argue that the Complaint does not allege with particularity the falsity of Defendants' statements in presentations to investors and rating agencies, citing the Complaint's use of the word "representations" instead of "misrepresentations."  Barclays Br. at 36-37.  In paragraphs 125 through 132, however, the Complaint explains that Defendants made false statements to investors and rating agencies about various aspects of its due diligence process.  Table 6 details those false statements by category, sentence, and page number; it identifies the speaker—Barclays; and it states when, by date, the misrepresentation was made.  The title of Table 6—"Compendium of Representations"— does not mean that those statements are not alleged to be false, for the Complaint avers that, in presentations to investors and rating agencies, Defendants repeatedly "made numerous *misrepresentations*," "consistently *misrepresented*," and "*falsely stated*" various aspects of their due diligence process, including many of the statements on Table 6.  *See generally* AC ¶¶ 125-36; 296-315 (emphases added).  Paragraphs 296 through 315, in addition to the "Deal-Specific Facts" and due diligence results in the appended Tables, explain why the statements in Table 6 are fraudulent.  *See, e.g.*, Table 6 at 7 and ¶¶ 16, 17, 255-57, 260, and 424-31 about SABR 2007-BR1.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 12

of emails and phone conversations that Barclays intentionally securitized at least 125 FPDs in that deal. *See also* ¶¶ 16, 17, 255-57, 260.

As this example illustrates, the Complaint details the statements about SABR 2007-BR1 that are alleged to be fraudulent; it identifies that the Barclays employees involved in that deal, as well as the company more generally, are the relevant speakers; it identifies that the statements were made in SABR 2007-BR1's offering documents and in investor and rating agency presentations; and it explains why the statements are false. Despite Defendants' arguments to the contrary, this particularity is offered in the Complaint for deal after deal and misrepresentation after misrepresentation. The specificity of these allegations amply afford Defendants with "fair notice of the plaintiff's claim and the factual ground upon which it is based," and with more than enough information under Rules 8(a) and 9(b) to prepare their defenses. *IUE AFL-CIO Pension Fund,* 9 F.3d at 1057; *see JPMorgan Chase*, 902 F. Supp. 2d at 490.

Defendants take specific issue with the particularity of the allegations in the Complaint only as to a few of the Subject Deals, pointing to a handful of representations listed in Tables 4 through 6 (among the hundreds listed there) as to which they claim to be unable to discern how exactly the pleading alleges the falsity of the representations. Barclays Br. at 35-37. In assessing compliance with Rule 9(b)'s special pleading standards, however, the facts alleged in the complaint are viewed "in their totality, not in isolation." *Loreley,* 797 F.3d at 171. So even if Defendants were correct as to any of these specific representations (and they are not),[6] it would

---

[6] For example, Defendants contend that the Amended Complaint does not explain the basis for alleging the falsity of one representation in the ProSupp for SABR 2006-FR2, that "[t]he scope of the loan due diligence varies based on the credit quality of the mortgage loans." *See* Barclays Br. at 35-36 (*quoting* AC Table 4 at 19). But in the Deal-Specific Facts section for SABR 2006-FR2, the Government alleges that,

> [a]fter devising due diligence selection criteria designed to identify the riskiest loans in the pool, Barclays proceeded to securitize in SABR 2006-FR[2] $33

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 13

not be a basis to dismiss the Complaint, or any claim therein, nor would it affect the Government's right to relief. *See Dexia*, 929 F. Supp. 2d at 238-39 ("the 'central issue' in determining whether material misrepresentations have been sufficiently pleaded 'is not whether the particular statements, taken separately, were literally true, but whether Defendants' representations, taken together and in context, would have mis[led] a reasonable investor about the nature of the [securities]'" (*quoting Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 5 (2d Cir. 1996))).

## III.   THE COMPLAINT SUFFICIENTLY ALLEGES THAT DEFENDANTS' MAIL AND WIRE FRAUD AFFECTED ONE OR MORE FIFIS AS TO EACH DEAL.

For mail and wire fraud (18 U.S.C. §§ 1341, 1343) to serve as predicate offenses for civil penalty actions under FIRREA, the violation must "affect[] a federally insured financial institution," or FIFI. 12 U.S.C. § 1833a(c)(2). As alleged in the Complaint, numerous FIFI investors were affected by the enormous collateral losses incurred on the Subject Deals, including by being exposed to direct loss and increased risks of loss; many other FIFIs participated in key roles in connection with the Subject Deals, collaborating with or facilitating Barclays' fraud, and were also exposed to losses, increased costs, legal liabilities, and reputational harms. Specifically, the Complaint alleges that Defendants' mail and wire fraud violations affected FIFIs that (i) either directly or through a subsidiary purchased certificates in the Subject Deals, whether in the initial offerings (AC ¶¶ 319-22) or in the secondary or derivative markets (AC ¶¶ 323-24), (ii) originated

---

million of loans (6.4% of the deal) that it had identified as manifesting those very risks, without subjecting them to due diligence.

AC ¶ 499; *see also* AC Table 8 (showing that 96 loans, or $32,984,701 in principal balance, met Barclays' adverse selection criteria but were not subjected to due diligence). Thus the representation that "[t]he scope of [Barclays'] loan due diligence varies based on the credit quality of the mortgage loan" is false because Barclays did not actually adjust its due diligence to review a material number of loans securitized in SABR 2006-FR2 that it knew triggered its own adverse selection criteria. *See also* AC ¶¶ 226-27 (alleging Defendants did not adjust approach to due diligence in SABR 2006-FR2 even when they knew from previous deals that loans purchased from Fremont performed poorly).

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 14

the defective loans that Barclays securitized in the Subject Deals (AC ¶ 318), (iii) financed the purchase by others of certificates in the Subject Deals (AC ¶¶ 323-24) , or (iv) participated in the securitization as trustees, servicers, or custodians (AC ¶¶ 326-30).  Barclays' arguments that none of these FIFIs were affected by Defendants' fraudulent scheme, Barclays Br. at 14-27, are not only contrary to FIRREA's plain language and judicial construction, but are also, at best, trial arguments inappropriate at the pleadings stage, at which the only requirement is that the Government plausibly plead that FIFIs were affected by the mail and wire fraud.

As an initial matter, every court that has addressed the meaning of the phrase "affecting a FIFI," whether in the context of 12 U.S.C. § 1833a(c)(2) or of other similarly-worded provisions of FIRREA, has interpreted the phrase broadly.  Courts have uniformly held that a FIFI need not be a victim or object of the fraud to be "affected" by it, and that a FIFI is affected even when it is itself a perpetrator or instrumentality of the fraudulent scheme (this has come to be known as the "self-affecting" principle under FIRREA).  *See United States v. Wells Fargo*, 972 F. Supp. 2d 593, 630 (S.D.N.Y. 2013); *United States ex rel. O'Donnell v. Countrywide Fin. Corp.*, 961 F. Supp. 2d 598, 605 (S.D.N.Y. 2013), *rev'd on other grounds*, 822 F.3d 650 (2d Cir. 2016); *United States v. Bank of New York Mellon*, 941 F. Supp. 2d 438, 451 (S.D.N.Y. 2013).  In *Bank of New York Mellon*, the court reasoned that "if Congress had wanted to limit civil penalties to cases in which the financial institution was the victim, it obviously could have done so; instead, it chose a *singularly broad* term." *Id.* at 451 (emphasis added) (*citing United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998)).  Additionally, "courts regularly have concluded that a fraud affects an institution by embroiling it in costly litigation, whether because the fraud causes actual losses to the institution through settlements and attorney's fees or because it exposes the institution to realistic potential legal liability." *Bank of New York Mellon,* 941 F. Supp. 2d at 458.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 15

FIRREA contains another provision with language very similar to 12 U.S.C. § 1833a(c)(2) that has been the subject of far more judicial consideration: 18 U.S.C. § 3293(2), which was enacted as section 961(1) of FIRREA, extends the statute of limitations for criminal prosecutions of mail and wire fraud to ten years "if the offense affects a financial institution."[7] Explaining that "the verb 'to affect' *expresses a broad and open-ended range of influences*," the Second Circuit has held that "the plain language of § 3293(2) ... *broadly* applies to *any* act of wire fraud that affects a financial institution, provided the effect of the fraud is sufficiently direct." *United States v. Heinz*, 790 F.3d 365, 367 (2d Cir. 2015) (emphasis added). Thus, the Circuit concluded that FIFIs need not be "the object of the fraud" but could also be affected "as co-conspirators in the criminal conduct," or by incurring "significant payments and related fees" in facilitating the defendant's fraud. *Id.* at 367. Other courts have held that a FIFI is also "affected" for purposes of § 3293(2) if it is exposed to the risk of loss, even if it does not experience any actual loss. *See United States v. Serpico*, 320 F.3d 691, 694-95 (7th Cir. 2003); *United States v. Mullins*, 613 F.3d 1273, 1278-79 (10th Cir. 2010).

In any event, at the pleadings stage, all that is required is that the Complaint plausibly allege facts sufficient to state a claim for relief. *See Iqbal*, 556 U.S. at 678 (2009); *Twombly*, 550 U.S. at 570. Nothing in the Federal Rules, or in FIRREA itself, requires the Government to plead with particularity how the alleged mail and wire fraud "affected" a FIFI or to specify which FIFIs were affected. Defendants have cited no case, and we are aware of none, in which any court has ever dismissed at the pleadings stage a FIRREA claim for civil penalties, on the ground that the Government has insufficiently alleged that the Defendants' fraud "affected" a FIFI.

---

[7] Where the same term is used in different provisions of the same statute, it is "logical to assume that the term … would carry the same meaning with respect to both provisions." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003).

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 16

The Complaint's extensive allegations of the effects of Defendants' fraudulent scheme on the numerous FIFIs who invested or participated in the Subject Deals are more than sufficient to meet the minimal pleading standard that applies.  *See, e.g.,* AC ¶¶ 316, 325, 331, 682, 693, 702, 711, 722, 731.  Defendants' arguments do not address that standard at all but rather seek to have the Government prove its case on the pleadings.  This is inappropriate.

### A.   The Complaint Sufficiently Alleges that FIFIs were Affected when they Purchased Certificates in the Subject Deals.

Barclays contends that allegations that FIFIs purchased certificates in the Subject Deals, and were directly exposed to loss or risk of loss on their investments, are insufficient to satisfy FIRREA's "affecting a FIFI" requirement.  Barclays Br. at 15-21.  Barclays thus argues that even when "numerous FIFIs ... bought certificates in the Subject Deals on the basis of Defendants' representations about the loans" and "provided Defendants with funds they owned ... in exchange for RMBS certificates" (AC ¶ 320), and even though "Defendants knew the false representations they made about the securitized loans and about Defendants' due diligence process subjected FIFIs ... to materially increased risk of loss as to each Subject Deal" (AC ¶ 325), and even after "more than half of the underlying loans defaulted, causing investors in those deals to lose many billions of dollars, with hundreds of millions more in losses projected during the remaining life of the deals" (AC ¶ 2), FIFIs who bought the certificates were not "affected" by the fraudulent scheme.

The Court should swiftly reject this frivolous argument.  While the courts have been uniform that a FIFI need not be "the object of the fraud" to be affected by it, it could not be more obvious that a FIFI that *is* the object of the fraud, or that invests in the fraudulently-issued security, falls within the "*broad and open-ended range of influences*" subsumed within the word "affect."  *Heinz,* 790 F.3d at 367 (emphasis added).

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 17

Barclays seems to rest its argument largely on a numerosity component supposedly embedded in FIRREA's "affecting" requirement.  It posits, without support, that FIFIs "purchased only a small portion of the certificates," and it then suggests that "neither FIRREA's text nor its legislative history indicates that Congress intended for the requirement that the defendant's mail or wire fraud 'affect[] a [FIFI]' to apply to such a negligible banking connection."  Barclays Br. at 15-16.  Of course, the Complaint does not allege that FIFIs "purchased only a small portion of the certificates" but instead avers that "numerous FIFIs ... bought certificates in the Subject Deals on the basis of Defendants' representations about the loans" (AC ¶ 320).

The number of FIFI investors in any particular deal is ultimately irrelevant, however.  For contrary to Barclays' argument, the plain text of the statute refutes any numerosity requirement and makes it clear that as long as *at least one* FIFI is affected by the mail or wire fraud, the statutory predicate has been met.  The statute says "affecting *a* federally insured financial institution." 12 U.S.C. § 1833a(c)(1) (emphasis added).  It does not say "affecting numerous federally-insured financial institutions" or "affecting a meaningfully large number of federally-insured financial institutions." If Congress had wanted to impose a numerosity requirement, it could have done so.[8]

Consistent with the plain text of the statute, the relevant case law decisively repudiates Barclays' supposed numerosity requirement.  In cases in which courts have applied the "self-affecting" principle, the Government largely predicated its complaint on the notion that a single FIFI—the defendant itself—had been affected by the defendant's fraudulent conduct.  In each of the cases, the courts found this sufficient to satisfy the statutory requirement.  *See, e.g., Wells*

---

[8] Barclays cites snippets from FIRREA's legislative history to suggest (incorrectly) that Congress tacitly incorporated a numerosity requirement into 12 U.S.C. § 1833c(a)(1), ignoring "the preeminent canon of statutory interpretation" which "requires us to presume that the legislature says in a statute what it means and means in a statute what it says there.  Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (quotation marks, citations, and alterations omitted).

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 18

*Fargo*, 972 F. Supp. 2d at 621; *Countrywide,* 961 F. Supp. 2d at 605; *Bank of New York Mellon,* 941 F. Supp. 2d at 451-63.  In *Bouyea*, moreover, the defendant was not a FIFI, and there was no allegation or evidence that any institution the defendant defrauded was a FIFI.  Rather, the evidence showed that the defrauded institution was a wholly-owned subsidiary of a FIFI, which had lent its subsidiary the money for its transaction with the defendant.  The Second Circuit found this link between the defendant's conduct and this *one* FIFI to be "sufficient to support the finding that a financial institution was affected by the wire fraud."  *Bouyea*, 152 F.3d at 195.  Surely, if a single FIFI defendant or a single FIFI parent of a non-FIFI victim is sufficient to support the Government's invocation of FIRREA's civil penalty provision or limitations extender, then it is also sufficient for the Government to allege that "numerous FIFIs ... bought certificates in the Subject Deals on the basis of Defendants' representations about the loans."  AC ¶ 320.

Despite this precedent and the plain text of the statute, Barclays complains that allowing a single FIFI investor to satisfy the "affecting" requirement "would convert FIRREA's civil-penalties provision into an alternative mechanism for prosecuting civil securities fraud" and would amount to an "unprecedented expansion of FIRREA."  Barclays Br. at 15, 16.  These arguments are identical to those made in *Bank of New York Mellon*, which the court explicitly rejected.  941 F. Supp. 2d at 452-54.  Barclays also bizarrely argues that allowing the Department of Justice to pursue a civil remedy for fraud based on a "single purchase" by a FIFI would somehow "displac[e] the 'complete autonomy' of the Securities and Exchange Commission in the civil enforcement of the securities laws" (Barclays Br. at 16), ignoring that this case is not brought under any securities laws but is a civil penalty action for mail and wire fraud, which FIRREA explicitly vests the Department of Justice with the authority to bring.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 19

Finally, trying to coax the Court into imposing a numerosity requirement where none exists, Barclays half-heartedly invokes the so-called "rule of lenity," according to which statutes imposing criminal penalties are to be construed narrowly.  *See* Barclays Br. at 17.  But the rule of lenity does not apply here since the statute in question is not ambiguous.  *See Barber v. Thomas*, 560 U.S. 474, 488 (2010) ("[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute … such that the Court must simply guess as to what Congress intended.").  It also does not apply because the Government is seeking civil, rather than criminal, penalties.  *See Countrywide,* 33 F. Supp. 3d at 498 (rule of lenity has no application under FIRREA).

Barclays next contests the specificity and sufficiency of the Government's allegations that FIFIs were affected by the fraudulent scheme through their purchases of certificates in the Subject Deals.  Barclays Br. at 18-21.  These arguments lack merit.  Barclays suggests the Complaint insufficiently alleges that FIFIs who purchased certificates in the Subject Deals suffered an actual loss or increased risk of loss "sufficiently direct" to qualify as being "affected."  Barclays Br. at 19-20.  The gravamen of this objection appears to be that the Complaint fails to specify which tranches the FIFIs purchased in each deal and whether those tranches actually lost money.  This argument ignores the principle already discussed, that as long as the allegations of effect are plausible, nothing in FIRREA or the Federal Rules requires a complaint to provide that level of specificity about how the mail and wire fraud affected FIFIs.  It also ignores the allegation that "Defendants knew the false representations they made about the securitized loans and about Defendants' due diligence process subjected FIFIs ... to materially increased risk of loss as to each Subject Deal" (AC ¶ 325).  More to the point, it ignores the syllogism pervading the Complaint, which runs as follows:

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 20

1.  *All* investors who purchased certificates in the Subject Deals, regardless of tranche, have suffered an actual loss or increased risk of loss as the direct and proximate result of Defendants' fraudulent scheme.  (*See, e.g.,* AC ¶¶ 2, 24, 40.)

2.  FIFIs were among the investors who purchased certificates in the Subject Deals.  (*See* AC ¶ 320.)

3.  *Therefore*, FIFIs who purchased certificates in the Subject Deals, regardless of tranche, have suffered an actual loss or increased risk of loss as the direct and proximate result of Defendants' fraudulent scheme.  (QED)

Barclays' next objection, that "the Government does not allege that a [FIFI] purchased in each of the subject securitizations, much less identify which [FIFIs] purchased in each securitization" (*id.* at 18-19), also misses the mark.  As already discussed, FIRREA does not require that a FIFI be a victim of the mail or wire fraud or that it purchase any or each of the fraudulently represented instruments.  It merely requires that at least one FIFI be affected in some fashion by the alleged mail or wire fraud offense.  The Complaint amply satisfies this requirement when it alleges, among other things*,* that "as to each Subject Deal, Defendants' fraudulent scheme affected one or more [FIFIs]" (AC ¶ 316).  It then goes on to describe the various ways in which FIFIs were affected—some by purchasing certificates in one or more Subject Deals, some by originating the misrepresented loans securitized in one or more Subject Deals, etc.  The way in which FIFIs were affected by the fraudulent scheme understandably varies from deal to deal depending on the purchasers and participants in each transaction.  But there is simply no requirement (and Barclays has cited none) that the Government's theory as to how FIFIs were affected by the fraudulent scheme be the same for each Subject Deal, as long as it alleges (as it has) that for each mail and wire fraud offense there was at least one FIFI that was "affected" in some way.  Nor, as noted, is there any requirement that the Complaint parse out the precise way in which FIFIs were allegedly affected by each mail and wire fraud offense or that it identify which

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 21

FIFIs purchased which securitizations or which FIFIs were affected in other ways.  Simply stated, the Government is entitled to take discovery on these matters before being put to its proof at trial.

In a similar vein, Barclays protests that the Complaint "improperly lump[s] together federally insured financial institutions and *other* financial institutions, thus failing to demonstrate that a *federally insured* financial institution purchased in each securitization."  Barclays Br. at 19.  In addition to the rejoinder already set forth, Barclays conflates the allegations relating to the predicate offenses of bank fraud (Claims VII through IX) with those relating to mail and wire fraud (Claims I through VI).   As discussed elsewhere, the bank fraud claims require that one or more FIs (a broader universe than FIFIs) be victimized (a narrower construct than "affected") by fraud, whereas the mail and wire fraud claims require that a FIFI be affected by the offense.

Part VI of the Complaint, which contains the allegations about "affected FIFIs" and "victimized FIs," supports both the mail/wire fraud claims and the bank fraud claims.  Thus, whereas paragraph 316 alleges that "as to each Subject Deal, Defendants' fraudulent scheme affected one or more [FIFIs]" (an allegation germane to the mail/wire fraud claims), paragraph 317 avers that "as to each Subject Deal, Defendants intended to defraud or victimize one or more financial institutions ('FIs'), including by targeting money and property owned by, or in the custody or control of, such institutions by means of false or fraudulent pretenses, representations, or promises" (an allegation germane to the bank fraud claims).  In other words, while at least one FI is alleged to have been the victim of Defendants' bank fraud as to each Subject Deal (*see* AC ¶¶ 317, 735-36, 742-43, 747-48), the Complaint does not allege (nor is it required to) that FIFIs purchased certificates in each deal; rather, it alleges that in some deals FIFIs were affected by purchasing certificates, while in other deals they were affected through other involvement in the

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 22

transactions.  This approach does not "improperly lump together" FIFIs and FIs,[9] and there is no more a requirement that the complaint specify which FIs were targeted by the bank fraud as to each Subject Deal than there is a requirement that it specify which FIFIs were affected by the mail and wire fraud as to each deal.

Barclays also takes issue with the Complaint's allegations that some FIFIs were affected by Barclays' fraud when their "unidentified affiliates" purchased certificates in the Subject Deals.  *See* Barclays Br. at 19 n.7, citing AC ¶¶ 319, 355, 374 ("affiliates or subsidiaries of FIFIs").  Barclays argues, without citation, that "fraud directed at an affiliate may well have no effect on the [FIFI] itself."  *Id*.  Aside from the fact that this is a trial argument that ignores the pleading standard, the Second Circuit "easily reject[ed]" this argument in *Bouyea*, where it held that the defendant's fraud sufficiently affected a FIFI to invoke FIRREA's limitations extender where the victim of the fraud was a subsidiary of a FIFI.  *Bouyea*, 152 F.3d at 195.  *Bouyea* relied heavily on the Third Circuit's decision in *United States v. Pelullo*, 964 F.2d 193, 215-16 (3d Cir. 1992), which "quickly dispose[d] of the ... argument [that Congress meant to exclude fraud affecting a bank's subsidiary] for it assumes that a fraud perpetrated against a financial institution's wholly owned subsidiary cannot affect the parent, a clearly untenable assumption.... [I]nasmuch as this case involved a parent and a subsidiary it cannot fairly be argued that the effect on the parent ... was unreasonably remote ...."

---

[9] Barclays also conflates the mail/wire fraud and the bank fraud predicates when it challenges the Complaint's alleged failure to "distinguish between financial institutions' purchases of certificates 'with funds they owned' and purchases as conduits for investors with funds in their 'custody.'"  Barclays Br. at 20-21, *citing* AC ¶¶ 320, 324.  The reference in these paragraphs to funds in the "custody and control" of financial institutions, has nothing to do with FIFIs being affected by mail or wire fraud.  It relates solely to the claims under 18 U.S.C. § 1344(2), which defines bank fraud as consisting of a scheme or artifice to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody or control of, one or more financial institutions, by means of false and fraudulent pretenses, representations, and promises, as well as to the claim under 18 U.S.C. § 1005.  *See* AC ¶¶ 734, 741, 746, 751.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 23

Finally, Barclays contests the Complaint's reliance on FIFIs' purchase of certificates "in the secondary market for such securities," as well as their purchase of collateralized debt obligations ("CDOs") backed by the certificates in the Subject Deals.  Barclays Br. at 24-25, *citing* AC ¶ 323.  Barclays basically argues that the results of its fraud on these secondary and derivative purchasers are too "remote," "indirect," and "attenuated" to affect them for FIRREA purposes. *Id*.  Again, this is a trial argument.  Barclays' argument in any event has no basis in law or logic.

While many investors who bought certificates in the secondary market suffered significant losses (*see* AC ¶ 2), as did investors who bought CDOs backed by certificates in the Subject Deals, all that is required for fraud to "affect" a FIFI is for it to expose the FIFI to a potential risk of loss. *See, e.g., Mullins*, 613 F.3d at 1280 (since a "potential risk of loss is enough to prove a scheme to defraud a financial institution" the same must constitute an "effect" on that institution); *Serpico*, 320 F.3d at 695 (increased risk of loss sufficient to affect FI); *Wells Fargo*, 972 F. Supp. 2d at 621.

But whether those secondary and derivative investors actually lost money on their investments or were only exposed to a risk of loss based on materially misrepresented investments, there can be no question that these consequences were "meaningful" to the investors and were the direct and foreseeable result of Barclays' fraudulent conduct.  *See Mullins*, 613 F.3d at 1278-79 ("a new or increased risk of loss is plainly a material, detrimental effect on a financial institution, and falls squarely within the proper scope of [§ 3293(2)]").  This exposure ensued because Barclays engaged in a deliberate scheme to include misrepresented loans in the Subject Deals— loans which defaulted at unprecedented rates, depleting all the credit enhancement designed to protect investors, and leaving those investors on the hook for the losses incurred by the trusts.

Moreover, had Barclays told the truth about the loans backing the Subject Deals, it likely would not have been able to market the deals at all—at least not in the form or at the price offered.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 24

This connection is sufficiently direct to qualify as an effect on FIFI investors.  *See, e.g., United States v. Allen*, 160 F. Supp. 3d 698, 705-06 (S.D.N.Y. 2016) ("[I]f a juror concludes that a bank would have made different investment decisions if it had known of the fraud, then a juror could legitimately conclude that a bank was 'affected' within the meaning of FIRREA. Further, a reasonable juror in the instant case could have concluded that financial institutions insured by the Federal Deposit Insurance Corporation (FDIC) would, if they had known of Defendants' alleged fraud, have made different investment decisions or would have been otherwise 'affected.'").

What is more, Barclays itself posits that "the 'affecting' requirement incorporates principles of proximate causation," suggesting that the results of Barclays' fraud for secondary and derivative investors "affect" them for purposes of FIRREA if those results are reasonably foreseeable.  Barclays Br. at 20, *citing Bank of New York Mellon*, 941 F. Supp. 2d at 459-60.  The Complaint sufficiently alleges the foreseeability of such results.  Paragraph 324 avers that "Barclays' employees, including Menefee, Carroll, and others involved in the Subject Deals, knew that, for each Subject Deal, initial purchasers, secondary purchasers, CDO purchasers, or repurchase financers included many FIFIs and other FIs," while paragraph 325 alleges that "Defendants knew the false representations they made about the securitized loans and about Defendants' due diligence process subjected FIFIs and other FIs to materially increased risk of loss as to each Subject Deal."  *See also* AC ¶¶ 355 ("Menefee was aware investors in the subprime Subject Deals included FIFIs, either in the primary or secondary markets."); 374 (same as to Carroll).  These allegations are sufficient.  *See Bank of New York Mellon*, 941 F. Supp. 2d at 459-60 ("The touchstone of proximate causation is reasonable foreseeability, and it certainly was reasonably foreseeable that this alleged scheme, if uncovered, would result in these kinds of harms to the Bank.").

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 25

Barclays also intimates that the secondary and derivative investors could not have been affected by the fraudulent scheme because they were not privy to the specific misrepresentations that Barclays made in the ProSupps or at investor and rating agency presentations about the initial offerings for the Subject Deals. Barclays Br. at 24-25. Even if this were true (and nothing in the Complaint suggests that it is), Barclays again conflates an affected FIFI with a victim. As previously noted, to be "affected" one need not be a target or object of the fraud itself, and the law is quite clear that one can be affected by the fraud even if the fraudulent representations are directed entirely at someone else. *See, e.g., Bank of New York Mellon*, 941 F. Supp. 2d at 451.

**B.      The Complaint Sufficiently Alleges that FIFIs Were Affected when they Acted as an Originator, Repurchase Financer, Trustee, Servicer, or Custodian.**

In addition to alleging that Defendants' fraud affected FIFIs who invested in the Subject Deals, the Complaint alleges Defendants' mail and wire fraud affected FIFIs when they (i) originated the defective loans Barclays securitized in the Subject Deals (AC ¶ 318), (ii) financed the purchase by others of certificates in the Subject Deals (AC ¶¶ 323-24), or (iii) participated in the securitization as trustees, servicers, or custodians (AC ¶¶ 326-30). Barclays' arguments as to the numerous FIFIs serving these critical roles (Barclays Br. at 22-27) uniformly lack merit.

Barclays' argument with respect to FIFI originators is utterly baseless. *See Heinz,* 790 F.3d at 367 (FIFIs can be affected "as co-conspirators in the criminal conduct" or by "incurr[ing] significant payments and related fees" in facilitating defendant's fraud). As set forth in the Complaint, "a substantial percentage of the loans Defendants securitized or underwrote in the Subject Deals were originated by, and purchased directly or indirectly from, FIFIs acting as originators, such as Fremont Bank, Fremont Investment & Loan, GE Money Bank, Wells Fargo N.A., Chevy Chase Bank FSB, and IndyMac Bank FSB." AC ¶ 318. Contrary to Barclays'

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 26

unfounded suggestion that "such institutions in fact originated loans in only a distinct minority of the at-issue securitizations" (Barclays Br. at 23 n.11), 18 of the 36 Subject Deals were comprised at least partly of loans originated by FIFIs, and 8 of those deals were comprised *entirely* of FIFI-originated loans. *See* AC Table 3, "Originators" column.[10] In total, of the approximately 156,000 loans securitized across the Subject Deals, over 57,000, or roughly 37%, had been originated by FIFIs. *Id.* (*see* AC Table 7 for the total number of loans in each deal).

The Complaint posits that these FIFI originators were affected by Barclays' fraud in three basic, and overlapping, ways. First, it alleges "Defendants' fraudulent scheme exposed these entities to liability, including to claims for repurchase of large numbers of loans for breaches of representations and warranties under the [Mortgage Loan Purchase Agreements, or] MLPAs signed by these entities." AC ¶ 318. Second, and relatedly, it alleges that Barclays essentially conspired with these originators to create and securitize thousands of defective and non-creditworthy loans, insofar as "Defendants' fraudulent scheme and securitization machine primed the pump for these loans, creating demand for loans that were more and more risky and deficient," contributing to a financial crisis that in the end led to "the bankruptcy or distress of many of the FIFIs that originated the loans." *Id.* Third, the FIFI originators were affected when they benefited from Barclays' scheme (at least in the short term) in pushing Barclays to "buy as many of their shoddy loans as possible in order to shift the risk of default from the originators onto Barclays' RMBS investors." AC ¶ 4.

All of these effects on FIFI originators are more than plausible, and they rest on solid legal and factual ground. Barclays' arguments to the contrary lack merit. Barclays argues that the

---

[10] At the beginning of 2007, WMC, which was not then a FIFI, assigned its mortgage origination operations to GE Money Bank, which was a FIFI. For the 2007 Subject Deals listed on Table 3, the reference to WMC refers to the FIFI GE Money Bank.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 27

originators' own actions in breaching their representations in the MLPAs, not Barclays' fraudulent scheme, exposed these entities to liability. Barclays Br. at 23-24. Even if true, this is irrelevant, for the simple reason that the originators breached their representations with the full knowledge and expectation that Barclays would acquire and securitize their shoddy loans, repeating the originators' misrepresentations to the ultimate purchasers—the RMBS investors. In other words, even if the originators' own deceptive conduct could be said to have exposed them to a measure of liability, that exposure was magnified when Barclays compounded, concealed, facilitated, and disseminated their fraudulent representations, folding those representations into its own.

"As Barclays knew," avers the Complaint, "the origination standards of the lenders issuing these mortgages (companies such as Fremont, New Century, WMC, Countrywide, and IndyMac) were severely deteriorating during the Relevant Period, resulting in loans to borrowers with no ability to repay. Indeed, Barclays knew that such companies were routinely originating fraudulent loans …. Those companies then pushed to have Barclays buy as many of their shoddy loans as possible in order to shift the risk of default from the originators onto Barclays' RMBS investors." AC ¶ 4. "[I]n its relentless pursuit of new loans to feed its securitization machine, and in its active collaboration with originators to maximize loan volume, Barclays not only acquired and securitized billions of dollars of loans it knew had material defects, but it also extended billions of dollars in financing to lenders it knew were originating loans without regard to the ability of the borrowers to repay them (including, in many cases, loans that were fraudulent)." AC ¶ 5.

Defendants knew that the FIFI originators were offering them pools filled with "craptacular" loans, but they accepted and securitized those defective loans anyway to maximize volumes and enhance their relationships with the originators. *See, e.g.,* AC ¶ 9 ("Menefee complained about a Wells Fargo pool that '*we have to eat their sh\*t loans.*' Meanwhile, a Barclays

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 28

salesperson described *'the deluge of Fremont garbage being put out there.'"*); ¶ 11 ("Barclays sought to maximize the number of loans securitized and to minimize the number of loans kicked from each deal by knowingly securitizing loans that violated representations to investors. Its principal aim in conducting due diligence was not to validate the truth and accuracy of its representations to investors but to protect its own bottom line and its relationship with the loan originators whose substandard products were the lifeblood of Barclays' securitization machine."); ¶ 12 ("Barclays … repeatedly bent over backwards to please [the originators]…. In fact, Barclays frequently stipulated with originators to limit the size or composition of its due diligence selections, and on a number of occasions it even agreed to limit the percentage of loans that could be kicked out of a deal."); ¶ 279.

These allegations, and the dozens more like them that pervade the Complaint,[11] are more than enough to establish that the FIFI originators were "affected" by the fraudulent scheme. *See Heinz,* 790 F.3d at 367; *Wells Fargo*, 972 F. Supp. 2d at 621 (finding it irrelevant whether the FI was the defendant or simply a participant in the alleged fraud); *Countrywide*, 961 F. Supp. 2d at 605 (finding, under "a straightforward application of the plain words of the statute," which was "as unambiguous as it is dispositive," that Bank of America's misconduct as originator affected itself by exposing it to billions of dollars of liability to repurchase claims); *Bank of New York Mellon*, 941 F. Supp. 2d at 457 ("the mere fact that participation in a scheme is in a bank's best interest does not necessarily mean that it is not exposed to additional risks and is not 'affected.'").

Barclays next contests the claim that FIFIs who "provided 'repurchase' financing to other investors acquiring" certificates in the Subject Deals were also affected by Barclays' fraud. *See*

---

[11] *See, e.g.,* AC ¶¶ 20, 148-62, 184, 189-95, 209-13, 218-21, 246-54, 288, 295, 342-43, 360-61, 502, 504, 509, 511, 517, 518, 526, 535, 536, 537-38, 540, 549, 583, 601, 605, 608, 613, 620, 626, 632, 667, 668, 669-71.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 29

Barclays Br. at 25 (citing AC ¶ 323).[12]  Barclays' arguments as to these institutions are misguided. It complains that "the Government does not identify which financial institutions provided financing or which securities were purchased with such financing" (Barclays Br. at 25), again failing to cite any authority for the proposition that this type of evidentiary matter is required at the pleadings stage (it is not).  It then alleges a failure to specify "a direct connection between Barclays' alleged misstatements and any financial institution financer" and claims it is insufficient for the Complaint to "merely allege[] that financers were injured when investors did not repay their loan." *Id. Bouyea* easily disposes of this argument, for in that case the FIFI, Centerbank, had done nothing more than lend money to the defrauded institution, Center Capital, and the Second Circuit had no difficulty finding "that when Center Capital suffered a $150,000 loss as a result of Bouyea's fraudulent scheme, Centerbank was affected by [the] loss." *Bouyea*, 152 F.3d at 195. Although *Bouyea* involved a FIFI that lent money to its subsidiary, nothing in the text or logic of the court's opinion suggests that the same rationale would not render "affected" a repurchase financer that lends money to an unaffiliated entity that then invests in a Subject Deal.

Finally, Barclays argues that FIFIs acting in other significant roles in the securitizations— as trustees, trust administrators, servicers, loan file custodians, and cap trustees—could not have been affected by the mail or wire fraud on the Subject Deals.  *See* Barclays Br. at 25-27.  These arguments, too, lack merit.  The relevant allegation in the Complaint is relatively straightforward: paragraph 326 alleges that "in perpetrating their fraudulent scheme while securitizing the Subject Deals, Defendants imposed risks on other transaction participants that were FIFIs.  Specifically, for most of the Subject Deals, FIFIs were or are among: (1) the trustee or trust administrator;

---

[12] As explained in that paragraph of the pleading, a "repurchase financer" was a "financial institution [that] took possession of the RMBS certificates as security for the proceeds it extended to the investor to buy the certificates." AC ¶ 323.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 30

(2) the servicer; (3) the custodian of the loan files; or (4) the cap trustee.  In these roles, the FIFIs receive(d) compensation for their role in the transaction or process(ed) payments and accounts affected by Defendants' fraud."  The key phrases here are "imposed risks" and "receive(d) compensation"; as elaborated above, exposure to risk of loss or receipt of compensation for playing a role is all that is required for a FIFI to be affected under FIRREA.  Barclays' arguments to the contrary are without merit.

With respect to trustees and trust administrators, on 18 of the 36 Subject Deals, FIFIs (specifically, Wells Fargo Bank NA, HSBC Bank USA NA, and U.S. Bank NA) either served as trustee at the time of the securitization or else currently serve as the trustee or trust administrator. *See* AC, Table 3.  Of course, these trustees and trust administrators were hand-picked by Barclays. AC ¶ 58.  As to these deals, the Complaint alleges "the trustees and trust administrators have been exposed to loss or risks of loss as a direct result of Defendants' fraudulent scheme.  For many of the Subject Deals, the trustees (including some which are FIFIs) have been sued by investors on account of Defendants' systemic misrepresentations as to the underlying loan pools. (*See, e.g., BlackRock Allocation Target Shares v. Wells Fargo Bank, N.A.*, No. 14-CV-9371 (S.D.N.Y. Nov. 24, 2014) (concerning BCAP 2006-AA2, SABR 2006-FR1, SABR 2006-FR2, SABR 2006-FR3, SABR 2006-HE1, SABR 2006-HE2, and SABR 2006-NC3, among other Barclays securitizations).)  These suits have exposed the trustees to risks of loss and reputational harms. The trustees have also expended resources in defending against these suits."  AC ¶ 327.[13]

---

[13] In addition to the deals involved in the lawsuit cited in paragraph 327 of the Complaint, numerous investors have sued FIFI trustees in connection with many other Subject Deals.  *See, e.g., BlackRock Balanced Capital Portfolio (FI), et al. v. HSBC Bank USA, N.A.*, No. 14-cv-9366 (S.D.N.Y. Nov. 24, 2014) (FIFI trustee sued by investors in connection with BCAP 2006-AA2, BCAP 2007-AA5, FHLT 2006-C, WFHET 2006-3, and WFHET 2007-1); *Phoenix Light SF Limited, et al. v. Wells Fargo Bank, N.A.*, No. 14-cv-10102 (S.D.N.Y. Dec. 23, 2014) (FIFI trustee sued by investors in connection with SABR 2006-FR2 and SABR 2006-WM2); *National Credit Union Admin. Bd. v. HSBC Bank USA, N.A.*, No. 15-cv-02144 (S.D.N.Y. March 20, 2015) (FIFI trustee sued by investors in connection with BCAP 2006-AA2, FHLT 2006-C, and WFHET 2007-1); *National Credit Union Admin. Bd. v. Wells Fargo Bank,*

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 31

Barclays argues this sort of exposure is insufficient to affect the FIFI trustees, but its argument misses the mark.[14]  Fraudulent conduct that exposes a FIFI to the risk of litigation—whether or not that FIFI is the target of the fraud—is enough to affect the FIFI for purposes of FIRREA.  *See Countrywide*, 961 F. Supp. 2d at 605; *Bank of New York Mellon,* 941 F. Supp. 2d at 458-59 ("Courts regularly have concluded that a fraud affects an institution by embroiling it in costly litigation, whether because the fraud causes actual losses to the institution through settlements and attorney's fees or because it exposes the institution to realistic potential legal liability. Actual legal expenditures are tangible costs to the Bank that easily fall within the ambit of the term 'affecting.' That liability exposure is sufficient finds support in persuasive holdings that a bank can be 'affected' when a scheme exposes the bank to 'a new or increased risk of loss,' even without a showing of actual loss. The SAC sufficiently alleges here that BNYM has incurred actual losses in attorney's fees and been exposed to a realistic prospect of legal liability as a result of the fraud.").[15]

It is also well-established that fraudulent conduct exposing a FIFI to reputational harms, as is alleged here with respect to the trustees (AC ¶ 327), is sufficient to affect the FIFI for purposes of FIRREA.  *See, e.g., United States v. Agne,* 214 F.3d 47, 53 (1st Cir. 2000); *United States v.*

---

*N.A.*, 14-cv-10067 (S.D.N.Y. Dec. 22, 2014) (FIFI trustee sued by investors in connection with SABR 2006-FR3 and SABR 2006-HE2); *Royal Park Investments SA/NV v. HSBC Bank USA, N.A.*, No. 14-cv-08175 (S.D.N.Y. Oct. 10, 2014) (FIFI trustee sued by investors in connection with FHLT 2006-C).

[14] Barclays' citation (Br. at 26) to the Circuit's opinion in *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.,* 822 F.3d 650, 658-660 (2d Cir. 2016), is inapposite.  The Court of Appeals held there, in substance, that claims of mail and wire fraud based on breaches of contract require proof of fraudulent intent at the time the contract was negotiated, but that principle is not relevant here.  Nothing in *Countrywide* suggests that a FIFI trustee cannot be affected by the bank's fraudulent conduct for purposes of FIRREA simply because an element of that effect stems from its exposure to contractual liability directly resulting from the bank's fraud.

[15] Barclays argues that "the basis for a suit against the financial institution [trustee] is the *financial institution*'s purported failure to comply with its contract-based duties, not the *seller's* alleged fraud."  Barclays Br. at 26.  This argument ignores the allegation in the Complaint that Barclays' fraud, and in particular its failure to comply with its notice obligations under the PSAs, contributed to the trustees' failure to comply with their duties to protect investors and exposed the trustees to risk.  *See* AC ¶ 329.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 32

*Johnson,* 130 F.3d 1352, 1355 (9th Cir. 1997) (finding it sufficient for defendant's fraud to have affected a bank "in non-financial ways," such as "it damaged employee morale and customer relationships, marred the bank's reputation and influenced the bank's immediate and long-term operations and policies."); *Bank of New York Mellon*, 941 F. Supp. 2d at 459 ("It is difficult to fathom how BNYM could not have been affected when the scheme allegedly has led to the departure of a number of clients and to significant reputational harm for the Bank.").

With respect to servicers, on 10 of the 36 Subject Deals, FIFIs (specifically, IndyMac Bank FSB, OneWest Bank FSB, Bank of America NA, Wells Fargo Bank NA, and Chevy Chase Bank FSB) either were the loan servicers at the time of securitization or currently are.  *See* AC, Table 3. These servicers were also hand-picked by Barclays.  AC ¶ 58.  As to these deals, the Complaint alleges that "as a result of Defendants' scheme to defraud, the servicers have also been affected and have been subjected to increased costs and increased risks of loss.  The servicers' costs and profits are tied, in part, to the outstanding balances of the loans they service, the amount of monthly payments they process and forward to the trusts, the late fees and penalties they collect on the underlying loans, or the amounts they spend or recover in pursuing loans in default, all of which are affected by the scheme."  AC ¶ 328.  Similarly, with respect to loan file custodians and cap trustees, the Complaint alleges as follows:  "As a result of Defendants' scheme to defraud, the custodians of the loan files and the cap trustees for the Subject Deals have also been affected and have been subjected to increased costs and increased risks of loss.  The custodian's and the cap trustee's costs and profits are tied, in part, to the number and outstanding balances of the loans they service, which have been affected by the scheme."  AC ¶ 330.

Again, the key phrase in both allegations is that the FIFIs "have been subjected to increased costs and increased risks of loss," which is all that is required for a FIFI to be affected under

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 33

FIRREA.  Barclays claims (Barclays Br. at 26-27) that "this theory is far too attenuated to satisfy FIRREA," but it cites no law to support this position.  The impact of Barclays' fraudulent conduct on the servicers, custodians, and cap trustees is both direct and foreseeable, insofar as the fraud predictably resulted in a significantly larger loan default rate than would have occurred absent the fraud, and this default rate, in turn, dramatically impacted the costs and profits of these entities.  No more is required for the impact to be considered an effect under FIRREA.  *See Heinz,* 790 F.3d at 367 (FIFIs affected by "incurr[ing] significant payments and related fees" in facilitating defendant's fraud).

## IV.   THE COMPLAINT SUFFICIENTLY PLEADS MAIL AND WIRE FRAUD AS TO ALL SUBJECT DEALS.

### A.     Elements of Mail and Wire Fraud

The mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, "are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose."  *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000).  "[I]t is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading."  *Id.*  Mail fraud and wire fraud differ only in whether the fraud is committed by use of mail or interstate wires.  The elements of mail and wire fraud are (1) a scheme to defraud, (2) the making of a false statement (or the omission of information) in execution of the scheme, (3) materiality of the falsehood or omission, (4) an intent to defraud, and (5) use of the mail or wires that is at least incidental to an essential part of the scheme.  *See Neder v. United States*, 527 U.S. 1, 20-21 (1999); *Schmuck v. United States,* 489 U.S. 705, 710-11, 721 (1989); *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015)*, cert. denied,* 136 S. Ct. 2487 (2016); *Autuori,* 212 F.3d at 115, 118.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 34

**B.     The Complaint Pleads a Scheme to Defraud as to All Subject Deals.**

The first element of mail and wire fraud is the existence of a scheme to defraud, which involves "wronging one in his property rights by dishonest methods or schemes," thereby depriving a victim "of something of value by trick, deceit, chicane or overreaching." *Carpenter v. United States*, 484 U.S. 19, 27 (1987) (citations omitted).  The Government may meet its burden of proving a scheme to defraud through circumstantial evidence that would allow the finder of fact to reasonably infer a scheme.  *Autuori*, 212 F.3d at 115.  The scheme need not be successful for the defendant to be found guilty.  *See United States v. Trapilo*, 130 F.3d 547, 552 (2d Cir. 1997), *cert. denied*, 119 S. Ct. 45 (1998).  "[I]t suffices that a defendant intend that his misrepresentation induce a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision."  *Binday*, 804 F.3d at 579.

Here, over the course of sixty pages (AC pp. 33-94) and 233 paragraphs (AC ¶¶ 98-331), the Complaint comprehensively alleges a scheme by Defendants to misrepresent many material characteristics of the loans backing their securitizations and to deceive investors into purchasing certificates in those RMBS.  The Complaint catalogues the "dishonest methods and schemes," rife with "trick, deceit, chicane, [and] overreaching," that Defendants deliberately used across the Subject Deals to "wrong" investors in their property rights, by repeatedly lying to them and to rating agencies about the quality of the loans backing the RMBS and about the due diligence preceding each securitization.

The Complaint details how Defendants orchestrated a process for securitizing residential mortgage loans whereby (1) Defendants sold RMBS certificates on the strength of representations set forth in offering documents, in the MLPA and PSA, and in investor and rating agency presentations about loan characteristics and compliance with underwriting guidelines (AC ¶¶ 99-

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 35

132); (2) Defendants knew their representations as to loan quality were false, and specifically that the securitized loans were of materially worse quality than represented, both as to loans subjected to due diligence and as to unreviewed loans (AC ¶¶ 133-240); (3) Defendants knowingly securitized hundreds of defaulted, delinquent, and defective loans while lying to investors that such loans were never included in the Subject Deals (AC ¶¶ 241-266); (4) Defendants lied to investors about the value of the mortgaged properties backing the Subject Deals and the validity of the underlying appraisals, deliberately including in the securitizations hundreds of underwater loans and loans they knew had materially overstated appraisal values (AC ¶¶ 267-295); and (5) Defendants repeatedly misrepresented the scope and results of their due diligence to both investors and rating agencies, to deceive them into believing Defendants' due diligence was "rigorous" and "comprehensive" when they knew in reality their due diligence was a sham (AC ¶¶ 7, 296-315).

Defendants do not contest that the Complaint plausibly alleges the existence of a fraudulent scheme as to each Subject Deal for purposes of pleading the first element of mail and wire fraud. Instead, they contend the Complaint fails to state a claim for mail or wire fraud because the Government has not plausibly alleged *a single* fraudulent scheme that covers all 36 Subject Deals—ostensibly because three different Barclays business groups were responsible for different subsets of the 36 securitizations, with each business group staffed by different employees that did not all communicate with each other or use the same procedures.  Barclays Br. at 28-30.  This argument is as irrelevant as it is wrong.

It is irrelevant because, for purposes of civil penalties under FIRREA, it matters not whether the Defendants' mail and wire fraud was part and parcel of one fraudulent scheme, or three, or 36.  All that is required to satisfy the first element of mail and wire fraud as to any Subject Deal is a showing that there was at least one scheme to defraud, of which the predicate offense

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 36

relating to that deal was a part.  *See Autuori*, 212 F.3d at 115.  Neither the basis for a civil penalty with respect to a specific deal, nor the amount of that penalty, is in the least bit affected by the question whether the scheme perpetrated as to that deal was the same as the scheme perpetrated on another deal or whether it was part of a different scheme.[16]  *See United States v. Crosby,* 294 F.2d 928, 945 (2d Cir. 1961).

Nor does it matter whether the Barclays employees committing fraud as to one deal were the same as the employees committing fraud on another, or whether they perpetrated the fraud using the same means and methods.  *See id.*  Barclays is of course vicariously responsible for the actions of *all* of its employees, regardless whether those employees acted in concert or were aware of one another's conduct.  *See United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1118 (D.C. Cir. 2009) (because "a corporation only acts and wills by virtue of its employees, the proscribed corporate intent depends on the wrongful intent of specific employees"; thus, "to determine whether a corporation made a false or misleading statement with specific intent to defraud, [courts] look to the state of mind of the individual corporate officers and employees who made, ordered, or approved the statement.") (citation omitted); *Suez Equity Investors, L.P. v. Toronto Dominion Bank,* 250 F.3d 87, 100-01 (2d Cir. 2001) (holding that the scienter of an agent of a corporate defendant is attributable to the corporation as a primary violator); *In re Marsh & McLennan Cos. Sec. Litig,* 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("While there is no simple formula for how

---

[16] As set forth in the text, the Government intends to prove a unitary scheme that implicates all Subject Deals. In the event the Court were to find, however, that the number of fraudulent schemes somehow implicates the availability of civil penalties as to any deal, the Government would seek leave to amend the complaint to plead to allege, in the alternative, the existence of one scheme, three schemes, or 36 separate schemes.  *See* Fed. R. Civ. P. 8(d)(2), (3); *Michael v. Clark Equipment Co.,* 380 F.2d 351, 352 (2d Cir. 1967) ("The plaintiff is at liberty to refuse to be pinned down to a single theory of fraud; and inconsistency is not a tenable objection to a pleading.").

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 37

senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants.").

Moreover, any fraudulent scheme perpetrated by any Barclays employees is a fraudulent scheme perpetrated by Barclays itself.  *See, e.g., New York Cent. & Hudson River R.R. v. United States*, 212 U.S. 481, 495 (1909) (holding a corporation "can only act through its agents and officers" but can be "held punishable by fine because of the knowledge and intent of its agents to whom it has entrusted authority to act in the subject-matter … and whose knowledge and purposes may well be attributed to the corporation for which the agents act"); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.,* 531 F.3d 190, 195-96 (2d Cir. 2008) ("When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter. In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant. But it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant."); *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.,* 874 F. Supp. 2d 341, 372-73 (S.D.N.Y. 2012) ("courts in this jurisdiction consistently interpret" *Dynex* to hold that "an individual whose knowledge is imputed to the corporation [need not] also 'make' the material misstatement") (citing cases).

Defendants' argument is, in any event, wrong.  The Complaint, both in its lengthy description of the fraudulent elements common to all 36 securitizations (AC pp. 33-94) and in its description of the facts germane to each individual securitization (AC pp. 104-178), as well as in the appended tables, shows in detail how the nature of the fraud committed in all 36 securitizations was remarkably similar, if not identical.  In paragraphs 64, 67, 73, and 91, it describes the

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 38

connected relationship of the three employment groups cited in Barclays' Brief, alleging: (1) the principal subprime deals were managed and executed by the Asset Securitization Group (ASG) Trading Desk, run by Carroll, and the ASG Banking desk, run by Menefee; (2) the principal Alt-A deals were managed and executed by the RMBS Securitization Group, with the ASG Banking Group (run by Menefee) supporting the securitizations of these deals in various ways; and (3) the agented securitizations were managed and executed by the Home Equity Financing Group, while due diligence on these deals was mostly executed by the ASG Banking Group run by Menefee.

Moreover, the standard representations made to investors in all of these deals (*e.g.*, the loans complied with underwriting guidelines or had compensating factors) were well-known within all of the Barclays groups involved in RMBS.  The Complaint alleges that persons responsible for such activities as purchasing loan pools, conducting due diligence, waiving in loans, or failing to review more loans before securitizing them in the face of high EV3 rates, including Menefee and Carroll, also knew the representations that Barclays was making to investors.  *See* AC ¶¶ 60-63, 66, 68, 71-72, 80-88, 90-92, 100-01, 104, 118, 123, 133-35, 335, 365. The Complaint further alleges that Barclays' aim, across the 36 Subject Deals, was "to do more and more deals, and to securitize more and more loans, in order to increase its profits and its share of the RMBS market."  AC ¶ 5.  This is sufficient to substantiate a unitary fraudulent scheme, even assuming it were necessary to do so to sustain the Complaint.

### C.     The Complaint Pleads the Falsity of the Representations the Defendants Made with Respect to Each Subject Deal.

As discussed in the preceding section, Defendants' fraudulent scheme was built on a tower of lies, deceptions, half-truths, and misrepresentations to investors and rating agencies alike. Defendants nevertheless argue the Complaint insufficiently pleads the falsity of the statements

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 39

catalogued in it. *See, e.g.,* Barclays Br. at 34-52, Menefee Br. at 20-25, Carroll Br. at 9-11. Some of these arguments invoke Rule 9(b)'s pleading requirements, which have already been addressed in Part II, but others are better characterized as claim sufficiency arguments under Rule 12(b)(6). Regardless of how they are evaluated, Defendants' arguments are uniformly without merit.

> **1. The Complaint Pleads the Falsity of Defendants' Representations as to the Credit Quality of the Securitized Loans.**

Defendants argue the Government has insufficiently pled the falsity of Defendants' representations as to credit quality of the securitized loans because "it has not claimed that it reviewed even a single loan to determine whether it breached an originator's underwriting guidelines." Barclays Br. at 39. This argument is frivolous.

Instead of citing forensic reviews conducted by Government-retained experts, the Complaint does even better: it relies on contemporaneous due diligence reviews of loans, conducted by Barclays' own vendors, and it cites detailed credit, compliance, and valuation due diligence results as to each deal to show that Barclays' representations about loan quality were false. The overwhelming evidence of falsity found in these due diligence results is bolstered by the fact that more than half of the loans in the Subject Deals defaulted (AC ¶ 2), and by the scores of emails, phone calls, witness accounts, and other documents and data cited in the Complaint revealing systematic underwriting failures by originators.

Contrary to Barclays' argument, there is simply no requirement that the Complaint rely on or allege the results of an expert forensic review to sustain a claim of falsity under Rule 12. *See JPMorgan Chase*, 902 F. Supp. 2d at 489-90. In *JPMorgan Chase*, the defendant argued that the Federal Housing Finance Agency (FHFA) insufficiently alleged the falsity of the representations in its offering documents because the FHFA had conducted a forensic review of loan files from

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 40

only 3 out of 127 RMBS certificates at issue, which, according to the bank, "says nothing" about the certificates not sampled. *Id.* at 488. Citing *FHFA v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 332 (S.D.N.Y. 2012), which had rejected a similar argument, the court found that

> although *UBS I* acknowledged that the complaint in that case 'reli[ed] primarily' on the results of FHFA's forensic review to make a forceful case that the UBS Defendants falsely described the underwriting standards applied to Supporting Loans, *id.* at 332, the Opinion never suggested that such a review was essential to state a claim…. If Defendants were correct that in order to allege the falsehood of … group-level representations in connection with the offering of asset-backed securities, a plaintiff must conduct a detailed pre-complaint, asset-level analysis, it would be the rare complaint that would survive a motion to dismiss. Indeed, such a rule might constitute an insurmountable barrier … [and] also impose prohibitive costs on the would-be plaintiff, essentially requiring her to prove her case at the pleading stage ….

*JPMorgan Chase*, 902 F. Supp. 2d at 489-90 (quotation marks and citations omitted). The court found the pre-suit forensic reviews that FHFA had conducted in the UBS and JPMorgan Chase matters were not necessary to the claims but simply added to the other evidence cited in support of the allegations of falsity. *Id.* at 488; *see also Dexia*, 929 F. Supp. 2d at 237-38. As the court held, FHFA sufficiently alleged falsity as to all of the deals because its complaint "devote[d] over 60 pages to detailed allegations of falsehood, which touche[d] on each of the 103 Securitizations at issue." *Id.* at 490. In particular, the court explained "[t]he linkage to individual certificates is provided by other sections of the pleading, principally the loan performance and credit-rating histories of the certificates." *Id.* at 488.

Defendants' suggestion that a forensic review is required to sustain the falsity of their credit quality representations is particularly cynical given the Complaint's description of a "diagnostic review" Barclays itself conducted after loans securitized in SABR 2006-HE1, SABR 2006-HE2, SABR 2006-FR3, and SABR 2006-FR4 experienced "an unprecedented default rate." AC ¶ 261. As to most of the loans in that study, "Defendants concluded that '*an overwhelming percentage of*

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 41

*the loans exhibit material deficiencies.... Essentially default was inevitable* based upon poor/overly aggressive underwriting combined with a trend among the loans examined in that the majority contained a high loan to value, low FICO, and no asset verified lending.'" AC ¶ 263.  "Defendants determined that these loans … had significant defects when Defendants acquired them from Fremont.   These included 48 loans in which Fremont—in Defendants' own words—had completely '*ignored guidelines*' and had given '*no regard for borrower's ability to repay debt*.' Dozens more loan files were found to have been underwater at the time of origination; involved [debt-to-income, or] DTI ratios well above the guideline limits; involved straw buyers or non-arms-length transactions; misrepresented owner occupancy; or failed to document income or employment."  AC ¶ 264.  *See generally* AC ¶¶ 259-66.

Defendants next argue the Complaint should be dismissed because it fails to disclose which loans were graded EV3s on account of their failure to comply with underwriting guidelines, and which loans were graded EV3s because they failed Barclays' layered risk criteria measuring the borrowers' ability to pay.  Barclays Br. at 40-41.  Again, Defendants provide no authority for the notion that this sort of "detailed evidentiary matter" must be included in the Complaint.

In any event, the Complaint plausibly and sufficiently alleges that the inclusion of an EV3 loan in a securitization rendered false Barclays' representations as to the credit quality of that loan, regardless of whether it was graded EV3 because it failed to comply with originators' underwriting guidelines or because it ran afoul of Barclays' own layered risk criteria.  Indeed, Barclays repeatedly represented that loans were only securitized if they complied *both* with the originators' underwriting guidelines *and* Barclays' ability-to-pay criteria.  As the Complaint avers, "in selling certificates in the Subject Deals, Barclays repeatedly assured investors that it had excluded '*unacceptable*' loans and that the loans in the deals had been underwritten in accordance with loan

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 42

origination guidelines intended to ensure the borrowers' ability to pay."  AC ¶ 6.[17] Moreover,

Defendants' misrepresentations that underwriting guidelines were "primarily intended to assess

the ability and willingness of the borrower to repay," and that the mortgage loans were originated

"generally in accordance with" underwriting guidelines must be read together and in context.  As

the Complaint alleges with respect to these representations, "[t]aken together … Defendants were

assuring investors that, based on their review of the loan files, all of the loans in the deal were

made to borrowers who had the ability to repay the loans in accordance with their terms."  AC

¶ 179.  The allegations in the Complaint, supported by Table 7, which conveys the high rates and

numbers of EV3s identified in loan samples and securitized in each of the 36 Subject Deals, show

such assurances and representations to be false.

### 2. The Complaint Pleads the Falsity of Defendants' Representations as to the Credit Quality of the Unreviewed Loans.

Defendants next contend the Government cannot allege the falsity of Defendants'

representations as to loans not reviewed in due diligence because "Barclays fully disclosed its use

of sampling to investors," and the Complaint's allegations "seek to extrapolate to the entire pool

the results of a review of those loans believed to be the riskiest in the pool."  Barclays Br. at 41-

42 (emphasis omitted).  Defendants' argument is unavailing.

As a threshold matter, Barclays did not "fully disclose" its sampling method but instead

repeatedly misrepresented to both investors and rating agencies how it chose loans for due

---

[17] *See also* AC ¶¶ 128 ("Defendants also consistently misrepresented that, during their due diligence process on the Subject Deals, they refused to securitize non-creditworthy or unduly risky loans.  According to Defendants, during due diligence they conducted a 'comprehensive review of individual loan files,' which included a 'credit' review that identified (a) 'exceptions to sellers' underwriting guidelines,' (b) 'layered risk,' and (c) 'unacceptable risk factors that are unique to Barclays.'  Defendants misrepresented that their due diligence review further identified 'whether the loan has been underwritten *both* in accordance with the seller's guidelines *and* is acceptable to Barclays.'  Defendants misrepresented that deviations from these parameters would be permitted only upon the finding of "significant compensating factors."); 130 ("Credit review identifies: Exceptions to sellers underwriting guidelines, Layered Risk, and Unacceptable risk factors that are unique to Barclays."); 131; 164; 168; 181.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 43

diligence. *See generally* AC ¶¶ 296-307.  Defendants mischaracterize the Complaint, which does not "extrapolate to the entire pool the results" of due diligence Barclays conducted on adverse samples but which instead explains in detail how those results informed Defendants that their representations as to the unreviewed loans were false.  *See generally* AC ¶¶ 199-240.  For example:

- "Defendants knew that [their adverse selection criteria], like their credit/compliance due diligence process as a whole, failed to identify for review or exclusion all or even substantially all defective and non-securitizable loans," such as "loans that were missing key documents or failed to comply with applicable laws and regulations."  AC ¶¶ 205-06.

- "Defendants repeatedly manipulated their adverse selection criteria to appease originator clients…." AC ¶ 209.

- "Defendants knew that by limiting the size of due diligence selections in response to originator demands, they were securitizing without review large numbers of loans that, upon review, should have been kicked out of the deals."  AC ¶ 213.

- "Defendants knowingly failed to send to their due diligence vendors all of the loans that actually met their own adverse selection criteria.  Defendants instead passed over and securitized without review large numbers of loans that met the risk criteria they told rating agencies they used to select their sample."  AC ¶ 215; *see* Table 8.

These statements more than plausibly allege the falsity of Defendants' representations about the unreviewed loans.  In *FHFA v. Nomura Holding Am., Inc.*, 68 F. Supp. 3d 439, 479 (S.D.N.Y. 2014), the court found that high EV3 rates in an adverse sample meaningfully told Nomura of the poor quality of the unreviewed loans:  "Any reasonable jury would find that high kick-out rates would shake a reasonably prudent person's confidence in the … representation [that the mortgage loans were originated generally in accordance with underwriting guidelines], and thus constitute red flags."  Judge Cote went even further and noted that, in an adverse sample, a "kick-out rate substantially above 7-8% would cause a prudent man in the management of his own

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 44

property to question the accuracy of the Offering Documents." *Id.*[18]  Here, Barclays' EV3 rates

on the Subject Deals rose "substantially above 7-8%," with the rates from nearly all of the due

diligence samples exceeding 25%.  AC ¶ 200; Table 7.  Thus, as in *Nomura*, Barclays' EV3 rates

informed Defendants that significant numbers of defective loans would also be found in the

unreviewed portion of the pool, rendering false the representation that they were originated

"generally in compliance with" underwriting guidelines.

### 3. The Complaint Pleads the Falsity of Defendants' Representations as to Property Valuations and Appraisals.

In arguing the Complaint fails to state a claim based on the falsity of Defendants'

representations related to property valuations, Defendants contend they never represented that "the

appraisals accompanying the mortgage properties were reliable" or "that the properties had

sufficient value to avoid loss in the event of default."  Barclays Br. at 43.  While it is remarkable

to hear Barclays now suggest it never actually intended for investors and rating agencies to believe

the appraised values of the properties were reliable or provided adequate collateral for the debt,

Barclays' suggestion that it never made such representations is simply false.

The Complaint describes, in the Deal-Specific Facts as well as in Table 9, how Barclays

repeatedly misrepresented to investors the values of the mortgaged properties.  Barclays told

investors the appraisals accompanying the mortgages provided reliable valuations for those

properties, that those properties had sufficient equity to protect investors against losses in the event

---

[18] Defendants' citation to *dicta* in *Mass. Mutual Life Ins. Co. v. DB Structured Products, Inc.*, 110 F. Supp. 3d 288, 300 (D. Mass. 2015) (Barclays Br. at 41-42), is inapposite.  First, the court made clear that whether high "kick rates" in adverse samples raise a "red flag" for the rest of the pool is a "jury question," *id.*, which would make it inappropriate for determination on a Rule 12(b)(6) motion.  Second, unlike in *Mass. Mutual,* many of the loans here that were supposed to have been "kicked" *did* make it into the securitizations because Barclays "waived" them or changed them to "EV2 per client" and then securitized them. And third, Defendants' manipulation of their adverse sampling process informed them that significant numbers of unreviewed loans did not meet their representations to investors.  *See supra* and AC ¶¶ 199-240.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 45

of default, and that none of the properties were underwater (i.e., had a combined loan-to-value ratio, or CLTV, greater than 100%) at the time of the securitization. *See* AC ¶¶ 267-268, 289-295, 485, 504, 510, 529, 545-547, 577-578, 592-593.

Barclays also repeatedly represented that the securitized loans were originated pursuant to guidelines intended to assess the adequacy of the collateral. For example, for all SABR deals, Barclays told investors "ultimately, Barclays excludes any loans that exhibit unacceptable property condition or loans with a [Broker Price Opinion, or] BPO value exhibiting a 10% negative variance from the original appraisal" (Table 6 at 1) as well as "any loans that exhibit unacceptable property conditions or loans with a BPO value exhibiting heightened collateral risk factors" (AC Table 6 at 3, 4, 5, 6, 8, 9). For all Subject Deals, the Offering Documents represented that none of the loans in the pool had CLTV ratios greater than 100%, and that the values of the financed properties were sufficient to support the outstanding loan balances. AC ¶ 116. Similarly, the MLPAs and PSAs represented that "No Mortgage Loan has an LTV greater than 100%." AC ¶ 121.

Barclays also made representations to rating agencies about its valuation due diligence, including that: Barclays "reviewed 100% of the loan files for appraisals"; Barclays "conducted a review of the original appraisals using two layers of review to assess collateral risk factors" and "completed an extensive analysis of each loan that exceeded a negative BPO tolerance"; and Barclays "ordered a combination of BPOs and AVMs," and "on loans that exhibited AVM results with a negative tolerance of 15% or more, Barclays ordered [BPO]." Table 6 at 30.

All of these representations are more than plausibly alleged to be false. The Complaint alleges, for instance, that Defendants' valuation due diligence results showed that property valuations were systematically overstated by the originators, and that thousands of loans were underwater at the time of securitization. AC ¶ 268. The Complaint pleads the details of the

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 46

valuation due diligence results, including by identifying the numbers of loans Defendants' securitized even though they were out-of-tolerance at the last stage of due diligence review, or underwater based on the last due diligence value, each in contradiction to Defendants' representations. *See, e.g.*, AC ¶¶ 282-283, 286-87, Table 9. As summarized in Table 9, the Complaint alleges that, across the Subject Deals, Defendants securitized more than 4,400 loans that were out-of-tolerance by more than 15% at the last stage of valuation review, and 18,800 loans with final CLTV>100% based on the final value. AC Table 9. The Complaint pleads that valuation due diligence revealed to Defendants significant numbers of misrepresented loans in the pools, which Defendants securitized while knowingly misrepresenting their characteristics to investors. AC ¶ 268.

Defendants next argue Barclays' appraisal review did not render statements about property valuations false or misleading, because Barclays limited its representations to the values "as of origination," whereas the due diligence results related to the valuations from the 1 to 3 month period after origination. Barclays Br. at 44-45. This is a trial argument—and a silly one at that.[19] As shown above, Barclays made a variety of representations about the property valuations and its due diligence review, which were not limited to values of the appraisals at origination, including representations that it kicked out defective loans following an appraisal review. *See, e.g.,* AC

---

[19] Likewise, Defendants' arguments as to why other alleged misrepresentations were not false raise factual issues that are not appropriate for resolution on a motion to dismiss. Barclays Br. at 48-52. For instance, Defendants argue that certain representations about the BCAP deals were not false because some of those statements postdated the offerings. *Id.* at 49. But a false statement is still false, and can provide the basis for a fraud claim, even if the statement was made *after* a transaction was executed. *See, e.g., Schmuck*, 489 U.S. at 712. Defendants also argue that their representations about the rate of delinquent loans in several deals were not alleged to be false. Barclays Br. at 49-50 & n.9. Quite to the contrary, the Complaint alleges that these representations were false and misleading at the time they were made and cites significant evidence showing Defendants' knowledge of the falsity. *See, e.g.*, AC ¶¶ 438-442, 457-460 (discussing knowing securitization of delinquencies in SABR 2007-BR2 and BR3 and misrepresentations about same), Table 5 at 27-28 (citing misrepresentations about loan delinquencies in SABR 2007-BR2 and BR3).

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 47

¶¶ 268-95 and Tables 4-6.  These representations are alleged to be false, AC ¶ 268, and that allegation must be accepted as true for purposes of these motions.

Finally, Defendants contend the allegations as to valuation fail to state an actionable claim because they fail to plead "subjective falsity."  Barclays Br. at 45-46.  There is no requirement to plead subjective falsity.  The Federal Rules do "not require factual pleadings that demonstrate the *probability* of wrongdoing. At the pleadings stage, the alleged fraud need only be *plausible* based on the complaint; it need not be more likely than other possibilities."  *Loreley*, 797 F.3d at 174.

In any event, the Government has pleaded numerous ways in which Defendants subjectively knew that their representations about valuation were fraudulent.  Those ways include Defendants' own valuation due diligence results; Defendants' decisions not to subject thousands of loans to appraisal review despite representing that they subjected 100% of loans to appraisal due diligence (AC pp. 83-84 and Tables 5-6); Defendants' knowledge of pervasive valuation defects among the loan pools they securitized (AC ¶¶ 277-91); Defendants' knowledge of statements that loans they securitized were "very high property risk," "scariest collateral," "craptacular," and carried "the distinct aroma of default" (AC ¶¶ 278-279); Defendants' decision to increase their valuation tolerances to allow more loans to be securitized (AC ¶ 288); and Defendants' decisions to securitize at least dozens of loans in various deals they knew they or others had kicked out of previous loan pools for appraisal defects discovered in valuation due diligence (AC ¶¶ 505-506, 529, 657).  *See also* AC ¶ 23 ("Throughout the Relevant Period, Defendants at no point had a good faith belief that they were kicking out all of the '*unacceptable*' loans that they assured investors they were removing from the deals, or that the representations they were making as to the characteristics of the securitized collateral were actually true.").  To the extent there is a requirement that the Complaint plead "subjective falsity" as to valuation

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 48

representations (and there is not), these allegations, and many others like them, more than fit the bill.

### 4. The Complaint Pleads the Falsity of Defendants' Representations as to their Due Diligence Practices.

In arguing the Complaint fails to state a claim with respect to Defendants' misrepresentations about due diligence practices (Barclays Br. at 47-52), Defendants ignore many such misrepresentations described in the Complaint. Defendants do not, for instance, discuss the misrepresentations about Barclays' selection criteria (AC ¶¶ 126-28, 301-03, and Table 6), or the corresponding allegations (AC ¶¶ 215-17 and Table 8) showing that thousands of loans meeting those criteria were not reviewed in due diligence, despite Barclays' representations that it reviewed 100% of loans meeting those criteria. *See, e.g.,* AC ¶¶ 401, 408, 421, 435, 454, 464.

Defendants instead focus their arguments on the summaries of due diligence results included in investor and rating agency presentations, which purported to identify for their respective audiences the "unacceptable" rates of loans found in due diligence, but which actually depicted far lower rates of defective loans for these deals than the EV3 rates shown in due diligence reports. Barclays Br. at 48, citing AC ¶¶ 309-312. Defendants' argument that these reports were not actually misleading raises at best a factual issue not ripe for resolution on a 12(b)(6) motion. The Complaint plausibly alleges these representations to be false, based on the due diligence results for each deal (set forth on AC Table 7 and in the Deal-Specific Facts section), and that is all that is required at the pleadings stage.

Defendants also contend their representations to investors and ratings agencies about their due diligence practices, many of which the Complaint alleges were materially false or misleading, *see, e.g.*, ¶¶ 296-315, were "mere puffery on which a reasonable investor would not rely." Barclays

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 49

Br. at 47-48.  Defendants ignore the particularized facts alleged in the Complaint showing that these representations were not mere puffery but were deliberately designed to mislead and deceive so as to injure investors and benefit Barclays.  For example, paragraph 299 alleges:

> Defendants tried to convince the rating agencies that their due diligence efforts were effective and robust, because this would result in higher bond ratings, and less required credit enhancement in the capital structure of the deals, making the deals more profitable for Barclays (but riskier for investors).  As Defendants themselves recognized in minutes of an October 2006 management meeting, "the rating agencies appreciate [Barclays'] due diligence efforts and are requiring lower enhancement levels relative to those of comparable programs.  By putting loans back to originators and identifying issues not previously highlighted, Barclays has gained credibility with the rating agencies."  And as Menefee stated in a July 12, 2007, telephone call, *The rating agencies are just a thing to be manipulated. Investors take their shot at manipulating them. And we do our best to coax them into more optimistic views.*

Statements are not puffery where they are "misrepresentations of existing facts," or where the speaker "knew that the contrary was true."  *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (holding statements that inventory was "in good shape" or "under control" were "more than just … rosy predictions" because Defendants "knew that the contrary was true.").  For example, in *MF Global*, the defendant's public filings touted the Company's internal controls as "robust," "effective," "adequate," and "comprehensive," among other things.  *MF Global*, 982 F. Supp. 2d at 317.  The court held those misstatements to be actionable because the plaintiffs pled contrary information undermining their accuracy, showing that they were "misrepresentations of existing fact that are not puffery."  *Id.* at 318; *see also United States v. McGraw-Hill Companies, Inc.*, No. 13-779, 2013 WL 3762259 at *5-8 (C.D. Cal. July 16, 2013) (holding that Standard & Poor's statements about its independence and objectivity, which were "designed to induce customers to rely on the objectivity of its ratings," were not the "mere aspirational musings of a corporation

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 50

setting out vague goals for its future," but rather "specific assertions of current and ongoing policies that stand in stark contrast to the behavior alleged by the government's complaint.").[20]

Here, as in *MF Global* and *McGraw-Hill*, the Complaint alleges specific facts showing that Defendants' representations about the strength of their due diligence practices were false, and that they knew it.  "Defendants knew when they made them that these representations about the scope of their process were false.  Defendants knew that their due diligence process was neither rigorous, thorough, comprehensive, effective, nor complete, and that it did not produce an overall improved portfolio of loans.  Defendants knew that their due diligence process did not confirm the accuracy of their representations about the characteristics of the securitized loan pools but instead confirmed those representations to be false."  AC ¶ 300.  Far from mere puffery, Barclays induced rating agencies and investors to rely on the alleged strength of their due diligence practices by misrepresenting that they:

- "programmatically excluded" loans with heightened credit risk criteria while securitizing them anyway (¶ 301);

- "Put back" FPDs to originators that they intentionally securitized (¶ 303);

- Conducted due diligence on deals for which they conducted no credit or compliance diligence whatsoever (¶¶ 302, 304-06); and

- Included in their due diligence selections "100% of loans" that met certain listed "parameters" but in fact had not subjected all such loans to due diligence (¶ 307).

---

[20] The cases Defendants cite on this point are distinguishable.  In *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277 (S.D.N.Y. 2013), the court held that the defendant's general statements about its due diligence were puffery because the plaintiff did not "demonstrate with specificity why and how [the defendant] appreciated that [the statements were false and misleading]." *Id.* at 297.  Similarly, in *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp.*, 902 F. Supp. 2d 329 (S.D.N.Y. 2012), the defendant CEO's statement that he was "happy" with what he saw in his company's trading book was not actionable because it said nothing about the company's due diligence.  902 F. Supp. 2d at 341.  Here, however, as explained above, the Government has alleged specific facts evidencing why and how Defendants' knew their statements touting Barclays' due diligence practices were false and misleading.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 51

Defendants' knowledge contradicted their representations that Barclays' due diligence was "rigorous," "comprehensive," and designed to produce "an overall improved portfolio of loans."

### D.   The Complaint Pleads the Materiality of Defendants' False Statements.

Defendants next contend the Complaint fails to plausibly allege that their misrepresentations were *materially* false. Barclays Br. at 37-52; Menefee Br. at 20-25; Carroll Br. at 8-13. A "false statement is material if it has a 'natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it is addressed." *Neder*, 527 U.S. at 16; *United States v. Weaver*, 860 F.3d 90 (2d Cir. 2017) ("A statement is material if the 'misinformation or omission would naturally tend to lead or is capable of leading a reasonable [person] to change [his] conduct.'"). Indeed, the Second Circuit has upheld convictions for mail and wire fraud where the deceit "affected the victim's economic calculus" or "depriv[ed] the victim of 'potentially valuable economic information.'" *Binday*, 804 F. 3d at 570-76. "Because questions of materiality are inherently fact specific … a complaint may not be properly dismissed … on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 126 (2d Cir. 2013) (internal quotation marks omitted).

Defendants' principal strategy for undermining the materiality of the misrepresentations alleged in the Complaint is to disaggregate the various strands of the fraudulent scheme and to try to argue that each discrete piece of misinformation, examined in isolation, was immaterial to investors' decisions or losses. This, however, is not the law. Rather, the materiality of Defendants' falsehoods must be assessed holistically, the question being whether the total body of falsehoods Defendants made as to each deal, taken collectively, was material to investors' decisions. *See, e.g.,*

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 52

*United States ex rel. Escobar v. Universal Health Servs.*, 842 F.3d 103, 109-110 (1st Cir. 2016) (describing "the holistic approach to determining materiality laid out by the Supreme Court"); *Binday*, 804 F. 3d at 570-76.   Indeed, the "'central issue' in determining whether material misrepresentations have been sufficiently pleaded 'is not whether the particular statements, taken separately, were literally true, but whether Defendants' representations, taken together and in context, would have mis[led] a reasonable investor about the nature of the [securities]." *Dexia,* 929 F. Supp. 2d at 239 (quoting *Olkey,* 98 F.3d at 5).

Defendants specifically argue their representations regarding credit quality were not materially false because "Barclays disclosed that the loans were made to subprime or other non-prime borrowers with a significant risk of nonpayment"; "Barclays did not guarantee that the underwriting guidelines would successfully determine all borrowers' ability to repay"; and "Barclays … represent[ed] that 'the mortgage loans were originated or acquired *generally in accordance with* the underwriting guidelines…."   Barclays Br. at 38-39.   All of Defendants' arguments fail.

Contrary to Defendants' argument that these representations were not material, the Second Circuit has agreed that "misstatements of an underwriter's guidelines are not so obviously unimportant that they are immaterial as a matter of law." *New Jersey Carpenters*, 709 F.3d at 126 (internal quotation marks omitted).   As the Court explained, because "[i]nvestors would profit from their interests … only if the trust could recoup a sufficient portion of the balance on [the] loans," a "substantial likelihood exists that a reasonable investor would want to know whether those underwriting the loans had adhered to the procedures in places for evaluating the capacity and willingness of the borrowers to repay the loans and the adequacy of the collateral securing the loans." *Id.* (quotation marks omitted).   The same was true for investors of the Subject Deals.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 53

Barclays' purported disclosures of risks related to non-prime borrowers do not render their misrepresentations of ability to pay and compliance with guidelines immaterial as a matter of law. Indeed, most of Barclays' disclosures warn only that "less stringent" underwriting standards could potentially cause a heightened risk of loss on the mortgage loans (*see* Barclays Br. App. E), which courts have held are "insufficient to render not misleading the assertion in the offering documents that underwriting standards were 'generally' followed." *See, e.g., New Jersey Carpenters,* 709 F.3d at 126 ("neither being 'less stringent' than Fannie Mae nor warning that less verification may be employed for 'certain limited documentation programs' alerts investors to an alleged wholesale abandonment of underwriting standards."); *Dexia,* 929 F. Supp. 2d at 239 (explaining that the disclosure "that some mortgages were underwritten pursuant to guidelines *less stringent* than traditional underwriting standards and thus carried a heightened risk of loss," among others, "suggested to a reasonable investor not the systematic deviation from established underwriting standards alleged by plaintiffs, but rather a low level of occasionally non-compliant loans in the loan pools that could be subject to repurchase.") (emphasis added).

Moreover, the ProSupps for several of the Subject Deals,[21] and the PSAs and MLPAs for most of the Subject Deals,[22] stated unequivocally—without using the word "generally"—that the mortgage loans were "originated in accordance with" underwriting guidelines.  In any event, the word "generally," in Barclays' representations that "the mortgage loans were originated or

---

[21] *See, e.g.,* AC Table 4 at 3 (ARSI 2006-W2); 16 (RASC 2006-KS8); 26 (SABR 2006-NC1); 41 (SABR 2007-BR4); 43 (SABR 2007-BR5); 47 (SABR 2007-NC1); and 51 (WFHET 2007-1).

[22] *See, e.g.,* AC Table 5 at 2 (ARSI 2005-W5); 3 (ARSI 2006-W2); 9 (EQLS 2007-1); 10 (FHLT 2006-C); 11 (SABR 2006-FR1); 12 (SABR 2006-FR2); 13 (SABR 2006-FR3); 14 (SABR 2006-FR4); 16 (SABR 2006-HE1); 17 (SABR 2006-HE2); 19 (SABR 2006-NC1); 20 (SABR 2006-NC2); 21 (SABR 2006-NC3); 22 (SABR 2006-WM1); 23 (SABR 2006-WM2); 24 (SABR 2006-WM3); 25 (SABR 2006-WM4); 31 (SABR 2007-HE1); 32 (SABR 2007-NC1); and 33 (SABR 2007-NC2).

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 54

acquired generally in accordance with" underwriting guidelines, at best "indicated that certain immaterial exceptions might exist, not that a material number of the loans might substantially deviate from the guidelines, without compensating factors." *FHFA v. Nomura Holding Am., Inc.,* 104 F. Supp. 3d 441, 563 (S.D.N.Y. 2015), *appeal docketed*, No. 15-1874 (2d Cir. June 10, 2015). In addition, "saying that exceptions occur does not reveal what the [Complaint] alleges, namely, a wholesale abandonment of underwriting standards." *New Jersey Carpenters*, 709 F.3d at 125 (internal quotation marks omitted).

As in *Nomura* and *New Jersey Carpenters*, the Complaint alleges, and supports with specific due diligence results, the facts that "in the great majority of the Subject Deals, the EV3 rate was so high that Defendants knew that the originators form which they bought loans had *systematically abandoned their underwriting guidelines*." AC ¶ 201 (emphasis added); *see also* AC ¶¶ 185-86, 295, and Tables 7-9. Indeed, in most of Subject Deals, Defendants learned that at least one in every three reviewed loans was graded EV3 in due diligence. AC ¶ 200, Table 7.

Defendants also contend the percentages of EV3, EV4, and EV2W loans actually securitized in the Subject Deals were immaterial. Barclays Br. at 42-43. This is an example of Defendants' meritless attempts to disaggregate the various strands of the fraudulent scheme and to assess each strand in isolation. The materiality of Defendants' scheme to defraud investors is not predicated solely on the clandestine securitization of EV3s, EV4s and EV2Ws—rather, it implicates all of the misrepresented information that may have "affected the [investors'] economic calculus." *Binday*, 804 F. 3d at 570. This included Barclays' knowledge of defective loans in the unreviewed portions of loan pools and the presence of FPD, scratch and dent, underwater, and "out of tolerance" loans. Taken together, the misrepresentation and omission of such information undeniably deprived investors of "potentially valuable economic information." *Id.*

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 55

Indeed, contrary to Defendants' motion (*see* Barclays Br. at 43), Barclays represented to investors in 34 out of 36 Subject Deals that "the final mortgage pool may vary plus or minus 5%," suggesting that such a variance in the characteristics of the pool *as a whole* would be viewed as important to investors.[23]  *See Nomura,* 104 F. Supp. 3d at 534 (holding that Nomura's "Offering Documents themselves contemplate[d] that if 5% or more of the collateral was other than as represented, this would be viewed as important to investors.").[24]  As alleged in the Complaint, the EV3s, EV4s, and EV2Ws securitized, the defective loans Barclays knowingly securitized from the unreviewed parts of loan pools, and the securitized FPD, scratch and dent, underwater, and out-of-tolerance loans, taken together, exceed 5% of the mortgage loans pools for each of the Subject Deals.  *See, e.g.,* AC ¶¶ 376-674 and Tables 7-9.

### E.    The Complaint Pleads Fraudulent Intent.

As a pleading matter, fraudulent intent "may be alleged generally."  Fed. R. Civ. P. 9(b).  Some courts, including the Second Circuit, have nevertheless required private plaintiffs asserting certain civil claims sounding in fraud to plead specific facts that "give rise to a strong inference of fraudulent intent."  *Acito v. IMCERA Grp.*, 47 F.3d 47, 52 (2d Cir. 1995).[25]  We are aware of no

---

[23]   In the other two deals—WFHET 2006-3 and WFHET 2007-1—Barclays represented that the characteristics of the trust would not vary "materially" from the characteristics represented in the Prospectus Supplement.

[24]   Defendants cite *dicta* from *Glassman v. Computervision Corp.*, 90 F.3d 617, 634 (1st Cir. 1996), to argue that a 61% compliance rate is consistent with Barclays' representation that the loans were "generally" in accordance with underwriting guidelines.  Barclays Br. at 42.  *Glassman* is distinguishable on its facts because the plaintiffs there based their allegation on data from one portion of one quarter and, unlike here, "fail[ed] to allege anything meaningful about [defendant's] general practice."  Barclays' argument has in any event been soundly rejected.  In *Nomura*, the court explained that "the use of the word 'generally' can't bear the weight Defendants wish it to bear in this case.  *It could not and did not convey that roughly half the loans had substantially increased credit risk because they were not originated in compliance with their originators' guidelines, even after one accounts for exceptions to guidelines justified by compensating factors.*"  *Nomura,* 104 F. Supp. 3d at 563 (S.D.N.Y. 2015) (emphasis added).

[25]   Although courts discussing this "strong inference" requirement sometimes invoke Rule 9(b)'s special pleading requirements and use the language of "particularity" (*see, e.g., Cohen,* 711 F.3d at 359), this approach cannot readily be reconciled with that Rule's plain language, discussed *supra* in Part II.  A more analytically sound approach would be to understand the "strong inference" requirement in the context of Rule 12(b)(6)—that is to say, the

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 56

authority for the proposition that the "strong inference" requirement applies to a case such as this, which alleges criminal fraud predicates in support of civil penalty claims under FIRREA. Regardless, there can be no doubt the Complaint more than sufficiently alleges facts that "give rise to a strong inference of fraudulent intent." Before describing those allegations and responding to Defendants' specific arguments, we explain what fraudulent intent actually means, and how the courts have required that it be proved at trial.

To show fraudulent intent, "it is not necessary that a defendant intend that his misrepresentation actually inflict a financial loss—it suffices that a defendant intend that his misrepresentation induce a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision." *Binday*, 804 F.3d at 579. The Circuit has recognized intent to harm can be shown if the victim pays the defendant for the product deceptively sold. *See United States v. Walker*, 191 F.3d 326, 335-36 (2d Cir. 1999). Even exposing the victim to a *potential* loss is enough. *See United States v. Karro*, 257 F.3d 112, 117-18 (2d Cir. 2001); *United States v. Chandler*, 98 F.3d 711, 716 (2d Cir 1996). Sufficient intent to harm is also shown where the defendant deprives the victim of the ability to determine whether to make a sound business decision. For example, intent to harm a bank can be shown if the defendant "deliberately supplies false information to obtain a bank loan," the effect of which is "to deprive the bank of the ability to determine the actual level of credit risk and to determine for itself on the basis of accurate information whether, and at what price, to extend credit to the defendant." *United States v. Rossomando*, 144 F.3d 197, 201 & n.5 (2d Cir. 1998). The harm thus can be "to deny the victim the right to control its assets by depriving it of information necessary to make discretionary

requirement provides a tool for courts to assess whether a complaint "plausibly" alleges the defendant's fraudulent intent for purposes of stating a claim upon which relief may be granted. *See, e.g., Dynex*, 531 F.3d at 195-96.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 57

economic decisions." *Id.* "Where the false representations are directed to the quality, adequacy, or price of the goods themselves, the fraudulent intent is apparent because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain." *Bank of New York Mellon*, 941 F. Supp. 2d at 465 (quoting *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970)).

In the Second Circuit, "intent to defraud for purposes of the mail and wire fraud statutes comprises two principal parts: (1) intent to deceive and (2) contemplation of actual harm to the victim." *Bank of New York Mellon*, 941 F. Supp. 2d at 464. Intent to deceive can be proven indirectly, through evidence of a defendant's actions: "[D]irect proof of defendant's fraudulent intent is not necessary. Intent may be proven through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). Intent to deceive may also be shown through evidence that a defendant "was aware of a high probability that [the statements] were false, but consciously avoided confirming that suspicion." *United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007); *see Global-Tech Appliances, Inc. v. SEB, S.A.*, 563 U.S. 754, 766 (2011) ("[C]ourts applying the doctrine of willful blindness hold that defendants cannot escape the reach of these [criminal] statutes by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances."). "[W]here a necessary consequence of the scheme, if it were successful, would be injury to others, fraudulent intent may be inferred from the scheme itself." *United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006).[26]

---

[26] "We have presumed … that the requisite intent exists '[w]hen it is clear that a scheme, viewed broadly, is necessarily going to injure.'" *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 220-21 (2d Cir. 2000) (quoting *United States v. Chacko*, 169 F.3d 140, 148 (2d Cir. 1999)); *cf.* RESTATEMENT (SECOND) OF TORTS § 8A comment b (1965) ("If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result."). "Such a presumption is

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 58

Under this applicable law, the Complaint alleges facts raising a strong inference of fraudulent intent by Barclays as to all Subject Deals and Menefee and Carroll as to all Menefee/Carroll Deals.  Specifically, and as elaborated in the ensuing subsections, the Complaint pleads extensive facts showing (a) Defendants had actual knowledge their statements to investors and rating agencies were materially false or misleading, this knowledge coming from numerous sources, including their own due diligence, (b) Defendants intended their misrepresentations to induce their counterparties to enter into transactions without the relevant facts necessary to make informed economic decisions, by knowingly withholding key information from investors and rating agencies as to the quality of the securities, (c) Defendants acted with specific intent to harm the property interests of their victims, ignoring serious problems with the loans underlying their securitizations and failing to rectify problems in their securitization program, and (d) Defendants had both motive and opportunity to defraud their investors.

Any one of these showings, in itself, is enough to plead a strong inference of fraudulent intent.  *See Cohen*, 711 F.3d at 359 (to plead fraudulent intent, a plaintiff need only plead "those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, *or* a reckless disregard for the truth."); *Bank of New York Mellon*, 941 F. Supp. 2d at 464 (explaining, in FIRREA case, that "The Circuit has noted that the pleadings can allege the requisite strong inference by '(1) alleging facts to show that defendants had both motive and opportunity to commit fraud, *or* by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" (emphasis added; *quoting S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996)).

---

appropriate in circumstances such as these, where a large entity, firm, institution, or corporation is acting in a manner that easily can be foreseen to result in harm." *AUSA Life Ins.*, 206 F.3d at 221 (citing *Regent Office Supply Co.*, 421 F.2d at 1181).

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 59

A strong inference of fraudulent intent is also apparent from the scheme alleged in the Complaint, where Defendants' misrepresentations were directed to the quality of the RMBS they underwrote, issued, and sold, and where the impact of the scheme on investors was entirely foreseeable to Defendants. *Bank of New York Mellon*, 941 F. Supp. 2d at 459-60, 465 ("it certainly was reasonably foreseeable that this alleged scheme, if uncovered, would result in these kinds of harms to the Bank"; "Where the false representations are directed to the quality, adequacy, or price of the goods themselves, the fraudulent intent is apparent because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain."). *See also* AC ¶ 325 ("Defendants knew the false representations they made about the securitized loans and about Defendants' due diligence process subjected FIFIs and other FIs to materially increased risk of loss as to each Subject Deal.").

Moving beyond strong inferences, and contrary to Defendants' suggestions (*see* Barclays Br. at 30), the Complaint alleges significant *direct* evidence of Defendants' state of mind. Numerous emails and phone calls show Menefee, Carroll, and other Barclays officials discussing their knowledge of facts contradicting the representations they were making. Time after time, Barclays employees deliberately and methodically lied to investors and rating agencies, or failed to disclose information in their possession contradicting their representations, with the intention of benefiting Barclays. For instance, the Complaint details phone calls and emails reflecting a willingness by Menefee and others to waive in bad loans to appease Barclays' originator clients (AC ¶¶ 12, 155); phone calls discussing securitization of FPDs when they could not be put back to the originator, knowingly passing onto investors the risks from the undisclosed defective loans (AC ¶ 15); phone calls and emails agreeing to kickout caps (AC ¶¶ 159-61); internal phone calls discussing jamming defective loans into securitizations without investors noticing (AC ¶ 187);

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 60

internal discussions in which preference is given to protecting the firm at the expense of investors (AC ¶ 257); assertions by Menefee that "rating agencies are just a thing to be manipulated" (AC ¶ 299); an investor report altered to misrepresent a particular deal (SABR 2007-BR5) as having been subjected to due diligence when it in fact received no due diligence (AC ¶ 22); and the cancellation of due diligence on that deal after it became clear the originator would not accept putbacks (*id.*).

Defendants' briefs engage neither with this prevailing case law on fraudulent intent nor with the Complaint's overwhelming body of allegations supporting a strong inference (as well as direct evidence) of intent. Instead, focusing on a narrow set of allegations that they try to contradict with extraneous evidence, Defendants make trial arguments as to why certain documents quoted in the pleading do not mean what the Complaint alleges they mean, or as to why they allegedly did not have a motive to defraud investors. Barclays Br. at 31-32, 38-39, 43-44; Menefee Br. at 12-19; Carroll Br. at 13-23. These arguments uniformly lack merit and in any event do not provide a basis to dismiss on 12(b)(6) grounds.[27] *See Loreley*, 797 F.3d at 176 (holding the district court erred by "requiring Plaintiffs to show that their reading" of emails alleged in the complaint "was superior to the court's own benign reading, thereby imposing a *de facto* probability requirement at the pleadings stage."); *Cohen*, 711 F.3d at 360 (*Iqbal* "requires assertions of facts supporting a *plausible* inference of fraud—not of facts which can have no conceivable other explanation").

Barclays also argues the Complaint fails to "plead facts sufficient to demonstrate 'conscious behavior' evincing intent" because it does not identify any Barclays employees other than Menefee and Carroll and "contains few allegations as to Mr. Menefee (and none as to Mr.

---

[27] For example, Menefee argues that a March 27, 2007, email about SABR 2006-FR3 quoted in paragraph 522 of the Complaint "was made by someone other than Mr. Menefee." Menefee Br. at 21-22. However, the document on which Menefee relies (James Decl. Ex. 16) is not the email quoted in the Complaint. The correct document is BARC-DOJ-EDNY008634336, attached as Exhibit 1 to the annexed Declaration of F. Franklin Amanat ("Amanat Decl.").

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 61

Carroll).” Barclays Br. at 33. The former point misstates the law. *See supra* at 35-39; *Dynex,* 531 F.3d at 195-96 (“it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant”); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (“it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud”); *Bank of New York Mellon*, 941 F. Supp. 2d at 464. The latter point is baseless in view of the scores of mentions of both Menefee and Carroll throughout the Complaint in connection with all of the subprime Subject Deals. *See generally* AC ¶¶ 322-374 and *infra* section 5.

Defendants, especially Menefee, also argue they could not have harbored an intent to defraud the investors in the Subject Deals because they acted in “good faith,” for example by kicking out some loans that “may have been consistent with the originators’ underwriting guidelines,” including “nearly 70% of the loans graded EV3, EV4, and EV2W,” or because on occasion they resisted pressure from originators. Menefee Br. at 13, 18, 19; Carroll Br. at 15-16; Barclays Br. at 32, 34. Defendants essentially argue that because they only *partially* defrauded their victims and sometimes told the truth, they should not be responsible for the lies they did tell. This, again, is a trial argument inappropriate on a 12(b)(6) motion. And regardless of whether Defendants kicked out *some* defective loans, they still securitized tens of thousands more they knew had serious defects, and they still made many misrepresentations about the loans and about their due diligence processes.[28] Defendants are not being sued over the defective loans they

---

[28] *See* AC ¶¶ 11 (“Barclays sought to maximize the number of loans securitized and to minimize the number of loans kicked from each deal by knowingly securitizing loans that violated representations to investors. Its principal aim in conducting due diligence was not to validate the truth and accuracy of its representations to investors but to protect its own bottom line and its relationship with the loan originators whose substandard products were the lifeblood of Barclays’ securitization machine.”); 13 (“Barclays did kick some loans from the Subject Deals. Its aim in doing so, however, was not to protect its investors from the risk of loss but rather to serve its own interests and to make it appear that it was conducting meaningful due diligence. Indeed, Barclays’ leadership congratulated itself at management meetings for having persuaded rating agencies that its due diligence practices were comprehensive and

Plaintiff’s Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 62

kicked; they are sued over the defective loans they securitized. Moreover, the Complaint clearly explains that Barclays' aim in kicking some loans from the deals "was not to protect its investors from the risk of loss but rather to serve its own interests and to make it appear that it was conducting meaningful due diligence. Indeed, Barclays' leadership congratulated itself at management meetings for having persuaded rating agencies that its due diligence practices were comprehensive and effective, as a result of which the rating agencies required less credit enhancement in the deals, which made them more profitable for Barclays and riskier for investors." AC ¶ 13.

In any event, to sustain a claim of good faith there must be a showing the defendant had a good faith belief "in the truth of his or her representations," even if those representations turned out to be false. *See United States v. Dupre*, 462 F.3d 131, 139 (2d Cir. 2006); *Carlo*, 507 F.3d at 802. Defendants may be under the impression they can make such a showing at trial, but for purposes of assessing the sufficiency of the Complaint that hope is irrelevant. *See, e.g.,* AC ¶¶ 23 ("Throughout the Relevant Period, Defendants at no point had a good faith belief that they were kicking out all of the '*unacceptable*' loans that they assured investors they were removing from the deals, or that the representations they were making as to the characteristics of the securitized collateral were actually true."); 338 ("Despite making these certifications, Menefee knew that Barclays' offering documents were rife with misstatements of material facts and with material omissions.").[29] As described below, the Complaint amply alleges that Defendants all engaged in conscious fraudulent behavior.

---

effective, as a result of which the rating agencies required less credit enhancement in the deals, which made them more profitable for Barclays and riskier for investors.").

[29] *See Binday*, 804 F.3d at 579 (even though the defendant believed the real estate projects he misrepresented were viable, his belief "[did] not negate his intent to inflict a genuine harm on the victims by depriving them of material information necessary to determine for themselves whether to continue their development projects, thereby continuing or increasing their exposure to the risk of the projects' failure"); *United States v. Dinome*, 86 F.3d 277, 280-82 (2d Cir. 1996) (upholding jury instruction that "a belief by the defendant ... that no one would lose any money does not require a finding by you that the defendant acted in good faith. No amount of honest belief ... that no one will lose

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 63

## 1. Defendants Had Actual Knowledge of the Falsity of their Representations.

Intent to defraud is strongly inferred when Defendants' public statements are contrary to specific facts known to them. *See In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) (citing *Novak*, 216 F.3d at 312); *Guadagna*, 183 F.3d at 129 ("Intent may be proven through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false."). The Complaint sets forth extensive and detailed allegations demonstrating, as to each Subject Deal (including each Menefee/Carroll Deal), that Defendants (including Menefee and Carroll) had actual knowledge their statements to investors and rating agencies were false, or else they were aware of a high probability that the statements were false but consciously avoided confirming that suspicion. As set forth in the pleading, this knowledge came from many sources, including Defendants' own due diligence. These allegations alone give rise to a "strong inference" of fraudulent intent, but Defendants do not even address them in their briefs.

Defendants repeatedly made misrepresentations to investors, in their offering materials and elsewhere, as to the credit quality and other characteristics of the loans backing their securitizations. *See, e.g.*, AC ¶¶ 99-132, Tables 4-6. Defendants made these representations to assure investors the loans were creditworthy and the risks of their investments—which depended on the cash flows from the mortgage loans—were fully disclosed. AC ¶ 99. As for the representations Defendants made to rating agencies, it made those representations about the loans to get as favorable credit ratings as possible, which would allow Defendants to sell the loans for

---

money will excuse fraudulent actions ... to obtain money."); *United States v. Watts*, 934 F. Supp. 2d 451, 472-73 (E.D.N.Y. 2013) (defendant had "no right to present evidence regarding the irrelevant issue of his good-faith belief that the fraudulently obtained loans would ultimately be paid back"; thus, court excluded any argument or evidence "of [the defendant's] good-faith belief in the ultimate success or repayment of a fraud scheme.").

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 64

more profit. AC ¶ 299. But Defendants knew from their due diligence reviews (as well as from other information they obtained before securitizing the loans) that for many of the securitized loans, the representations they were making to investors about those loans were false.

**First**, Defendants' credit/compliance due diligence reviews revealed to Defendants (including Menefee and Carroll) that an extraordinarily high number of loans in the samples did not comport with Defendants' representations to investors. AC ¶¶ 200-202 and Table 7. Indeed, six of the 35 Subject Deals for which EV3 rates could be calculated had EV3 rates that exceeded 50%; another 5 Subject Deals had EV3 rates between 40% and 50%; and 7 more Subject Deals had EV3 rates between 30% and 40%. AC ¶ 200. As set forth in Table 7, the combined rates of EV3s and EV2Ws found in the due diligence samples ranged from a low of 14.1% (on BCAP 2007-AA2) to a high of 54.8% (on SABR 2007-BR2 and BR3).

The Complaint alleges Defendants (including Menefee and Carroll) knew from these due diligence results that the unreviewed loans contained high percentages of materially defective and misrepresented loans. AC ¶¶ 199-201, 341, 346-353, 368-73. Indeed, as alleged in the Complaint, Defendants' own documents reveal their knowledge that high due diligence defect rates showed that the non-reviewed portions of the loan pools also contained defective loans. AC ¶¶ 205-08, 213-14. Despite this knowledge, Defendants never disclosed the due diligence results to investors, but rather made misrepresentations about the securitized loan pools as a whole that they knew to be untrue. AC ¶¶ 168, 202. Defendants did not even kick all loans reviewed in due diligence and graded EV3 or EV2W. AC ¶¶ 164, 173. Instead, Defendants securitized vast percentages (and numbers) of the loans graded EV3 and EV2W across the Subject Deals. AC ¶¶ 167, 176, Table 7. Indeed, taking the securitized EV3s and EV2Ws together, Defendants securitized in the Subject Deals more than 6,000 loans worth *over $1 billion* that they reviewed in credit/compliance due

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 65

diligence and learned had material defects.  AC ¶ 178.  The Complaint further alleges Defendants knowingly securitized at least hundreds of loans they had previously reviewed in due diligence, graded EV3 or EV2W, and kicked out, but that were recycled into new loan pools that Defendants acquired and securitized.  AC ¶¶ 169-172.

**Second**, Defendants' valuation reviews revealed to Defendants that large percentages of loans in their samples did not meet the representations Defendants were making about the adequacy of the property values to secure the mortgage debt.  AC ¶¶ 268, 351-52.  As with their credit/compliance due diligence process, Defendants knowingly securitized thousands of these misrepresented loans, and also failed to review large numbers of loans in valuation due diligence, despite knowing of high defect rates among the reviewed loans.

As summarized in Table 9, the Complaint alleges that, across the Subject Deals, Defendants securitized more than 4,400 loans with appraisals overstating the property value by more than 15%, and more than 18,800 loans that were underwater.  The Complaint also alleges tens of thousands of securitized loans were not subjected to appraisal review at all, despite Defendants' knowledge of widespread appraisal defects in the securitized loan pools (and contrary to Defendants' representations that they reviewed 100% of the loans in appraisal due diligence).[30]

The Complaint also pleads other details of Defendants' valuation due diligence findings and shows how Defendants knew those findings contradicted their representations to investors

---

[30] *See* AC ¶¶ 293-295 (70% of the loans in ALBT 2007-OA1, BCAP 2007-AA1, BCAP 2007-AA2, BCAP 2007-AA3, BCAP 2007-AA4, and BCAP 2007-AA5 were not subjected to an appraisal review); ¶ 398 (320 loans securitized in SABR 2006-NC3); ¶ 404 (1,246 loans securitized in SABR 2007-NC1); ¶ 436 (1,556 loans securitized in SABR 2007-BR2); ¶ 455 (596 loans securitized in SABR 2007-BR3); ¶ 478 (3,316 loans securitized in SABR 2007-BR4); ¶ 484 (no appraisal due diligence conducted on the two warehouse pools securitized in SABR 2007-BR5); ¶ 528 (no appraisal due diligence conducted on the 7,806 loans securitized in FHLT 2006-C); ¶ 588 (238 loans securitized in SABR 2007-HE1 without appraisal review); ¶ 597 (no appraisal due diligence conducted on the 439 loans securitized in BCAP 2006-AA1); ¶ 603 (no appraisal due diligence conducted on the 2,872 loans securitized in BCAP 2006-AA2); ¶640 (only 1,778 of the 5,683 loans securitized in EQLS 2007-1 were subjected to an appraisal review); ¶ 660 (alleging that 2,704 loans securitized in RASC 2006-KS8 were not subjected to an appraisal review).

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 66

about the quality and characteristics of the loans they securitized (including representations that the property values were adequate collateral for the mortgages).  Among other examples, the Complaint pleads that nearly 500 loans securitized in SABR 2007-NC2 were described by Defendants' due diligence vendor as "very high property risk" and "scariest collateral" (AC ¶ 278); that Defendants securitized loans their valuation vendor described as "craptacular" and as carrying "the distinct aroma of default" (AC ¶¶ 279-280); that Defendants increased their valuation tolerance of 15% to 27.5% in one deal to allow more loans to be securitized (AC ¶ 288); that Defendants securitized dozens of loans in various deals they knew they or others had kicked out of previous loan pools for appraisal defects discovered in valuation due diligence (AC ¶¶ 505-506, 529, 657); and, that in several situations, Defendants decided not to conduct valuation due diligence on loan pools despite knowing of serious problems with the loans (AC ¶¶ 292-295.)

These findings and actions were contrary to Defendants' representations about the property valuations and about Defendants' due diligence processes, including representations that the loans were all acceptable investments, that the properties served as adequate collateral for the mortgages, and that Barclays had weeded out defective loans through a comprehensive and thorough due diligence review.  AC ¶¶ 102, 103, 106-07, 113, 116, 121, 129, 131, Tables 4-6.

**Third**, the Complaint also pleads Defendants' knowledge of information contradicting their representations, based on Defendants' data integrity or "tape delta" due diligence. Defendants (including Menefee) received "tape delta" reports identifying numerous factual discrepancies between loan-level data reported in the originator's loan tape and data reflected in the loan file.  AC ¶¶ 189, 350.  Despite knowing that key characteristics of the loans were falsely described on the originators' loan tapes, Defendants typically did not correct the data on the final tapes they provided to rating agencies and investors, instead using the uncorrected data as the basis

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 67

for the factual representations about the loans made in offering materials.  AC ¶¶ 190, 350.  The Complaint pleads the significant numbers of loans found to have misrepresented characteristics through "tape delta" due diligence on several Subject Deals, including many loans securitized in SABR 2006-FR1, SABR 2006-FR3, SABR 2007-BR3, SABR 2006-WM2, and SABR 2006-WM3.  *See, e.g.*, AC ¶¶ 191, 192, 194, 504, 560.

In addition to the due diligence results informing Defendants that misrepresented loans were pervasive throughout the securitized pools, the Complaint describes many other sources of information that Defendants possessed that contradicted their representations, as well as other evidence of Defendants' knowledge their representations were false.  For instance, the Complaint alleges Defendants securitized numerous loans they knew had experienced first payment or early payment default, or that were characterized as "scratch and dent" loans, in contradiction of their representations that they never securitized FPD, EPD, or scratch and dent loans in any of the Subject Deals.  AC ¶¶ 242-258, 349, 353, 372-73, 393-94, 425-27, 437, 456, 469.  In other deals, Defendants securitized large numbers of loans they knew were delinquent, while misrepresenting to investors the number of delinquent loans in those deals.  AC ¶¶ 438-45, 457-60.  Countless documents, many cited in the Complaint, evidence Defendants' knowledge of these facts.

The Complaint further alleges numerous examples of Defendants knowingly misrepresenting their due diligence process to rating agencies and investors.  For instance, in several deals, Defendants misrepresented to rating agencies that they had "programmatically excluded" all loans from the deals that met certain stated criteria, when in fact Defendants knew— because they decided which loans would be securitized in the Subject Deals—that they had not excluded all such loans from their securitizations.  AC ¶¶ 301, 353, 490.  On some deals, Defendants did not conduct *any* due diligence, contradicting their representations to investors and

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 68

rating agencies, or did not conduct as much due diligence as they said they had.  AC ¶¶ 230-240, 302, 348, 371, 404, 436, 445, 480, 484, 597, 603, 609, 614, 621, 627, 633, 640, 646.

The Complaint also alleges that, on many of the Subject Deals, Defendants falsely represented the criteria they used to draw their credit and compliance due diligence samples, which was supposed to identify categories of high-risk loans, and that thousands of loans meeting the high-risk criteria were securitized without due diligence review.  AC ¶ 307, 345, 353, 370.  Table 8 to the Complaint sets forth, for 19 of the Subject Deals, the numbers of loans meeting the purported criteria but that were not reviewed in due diligence.   The Complaint also alleges Defendants systematically misrepresented to investors and rating agencies the results of due diligence they conducted on individual loan pools, showing rates of defective loans that were far lower than the rates appearing on their own due diligence reports.  AC ¶¶ 308-315.  It also alleges Defendants misrepresented that they did not agree to limit kickouts and sample sizes, when they knew that they did agree to such limitations.  AC ¶¶ 148-162.

In sum, the Complaint alleges overwhelming direct evidence of Defendants' knowledge from a variety of sources of information contradicting their representations.  These allegations alone are more than enough to plead a strong inference of fraudulent intent.  *Novak*, 216 F.3d at 308-09, 311 (the strong inference requirement is satisfied where a complaint alleges that Defendants "knew facts or had access to information suggesting that their public statements were not accurate."); *Guadagna*, 183 F.3d at 129 (intent to defraud "may be proven through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false.").

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 69

2.      **Defendants Knowingly Withheld Key Information from Investors and Rating Agencies.**

The Complaint also shows how Defendants fraudulently intended that their misrepresentations induce their counterparties to enter into transactions without the relevant facts necessary to make informed economic decisions, by knowingly withholding key information from investors and rating agencies as to the quality of the securities they were selling.  *See Binday*, 804 F.3d at 579.  The following are only some of the examples of such allegations in the Complaint:

- Defendants repeatedly misrepresented to investors that they did not consent to kickout caps, despite their agreements with various originators to limit kickouts. AC ¶¶ 148-162.

- Defendants never informed investors that EV3 loans were securitized in the Subject Deals or that they had instructed their vendors to change EV3 loans to EV2 loans, which Defendants then securitized.  AC ¶¶ 168, 177.

- Defendants did not disclose to investors in FHLT 2006-C that the deal contained hundreds of recycled loans Barclays had kicked out of prior deals due to material defects.  AC ¶ 170.[31]

- Defendants never informed investors they had securitized loans where the borrower had no ability to pay, or that they knew, based on the prevalence of loans meeting layered risk criteria, that the originator had abandoned underwriting guidelines aimed at assessing fraud or a borrower's ability to pay.  AC ¶ 186.

---

[31] Defendants argue the Government does not "explain how the inclusion of 'recycled' loans constitutes fraud" because "[t]hose issues [with the loans] could well have been cured before the loan was included in a later securitization, and, once cured, the loan would not have breached the guidelines."  Barclays Br. at 42.  Defendants ignore the notion that, "at the pleadings stage, the alleged fraud need only be *plausible* based on the complaint; it need not be more likely than other possibilities."  *Loreley*, 797 F.3d at 174.  Defendants may believe they have alternative, innocuous explanations for why defective loans were recycled into other deals, but those are arguments for trial, not for a 12(b)(6) motion.  The Complaint in any event alleges facts showing that the Defendants intentionally securitized in several of the Subject Deals many "recycled" loans they knew from due diligence violated their representations to investors.  AC ¶¶ 10, 169-72, 394, 505-06, 657.  It further pleads that, after Defendants learned that these loans did not meet their representations to investors, they intentionally did not conduct any subsequent due diligence on them securitizing them, which would have made it *impossible* for Defendants to learn that any issues had been cured.  *See, e.g.*, AC ¶¶ 10 ("On a number of occasions, Barclays even recycled into its deals loans it had kicked out of previous deals due to their defects, *without conducting any additional due diligence on the loans*.") (emphasis added); 169 ("In one deal (SABR 2006-HE2), Menefee explicitly instructed the due diligence vendor to *ignore 'evidence a loan may have been rejected from any previous pool.*'"); 172 ("Defendants securitized 88 recycled EV3 loans in SABR 2007-BR5 … [but] *Defendants did not conduct due diligence on these loans*…, and Defendants knew that these loans had been kicked out from prior New Century pools."); 505-06.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 70

- Defendants did not disclose to investors or rating agencies their decisions not to review loans meeting their own selection criteria.  AC ¶ 307, Table 8.

- Defendants did not disclose their due diligence results in offering materials, AC ¶¶ 308-10, and refused to disclose due diligence results, even when investors specifically asked for them.  AC ¶ 315.

- In presentations to investors and rating agencies, Defendants did not include actual due diligence results (such as the EV3 rates) but instead listed the "kickout rate" for each deal, a misleading number that did not account for EV3 waivers, upgrades, and non-reviewed loans, making the pools seems less risky than they actually were. AC ¶¶ 308-315.

- Menefee instructed his team not to share full due diligence results on SABR 2006-NC1 with the monoline insurer Radian, which had paid Barclays to conduct due diligence on the deal, because "that is asking for trouble…."  AC ¶ 382.

- Defendants did not tell investors in SABR 2007-BR5 they had abandoned their policies and conducted no due diligence on the loans securitized in that deal. Defendants also altered presentations to investors to give the false appearance Barclays conducted due diligence on the deal when it had not been subjected to due diligence.  AC ¶¶ 487-88.

- In multiple communications, Defendants represented to investors they did not securitize first payment default loans in SABR 2006-FR3, despite having decided to securitize more than $10 million of such loans in that deal after Fremont (the originator) refused to buy them back from Barclays.  AC ¶¶ 513-522.

- In a telephone call, Menefee knowingly misrepresented to an investor in SABR 2006-FR4 that the securitized loans were underwritten in accordance with new, stricter underwriting guidelines Fremont had recently adopted.  After investing in the deal and discovering Menefee's statement was not true, the investor asked for a recording of the telephone call with Menefee; Barclays falsely told the investor no recording of the telephone call existed.  AC ¶¶ 542-44.

- Menefee reassured Fremont that Barclays had no intention of disclosing to investors what it learned in due diligence about the Fremont loans because we would be "really shooting ourselves in both feet to, like, blast" Fremont.  AC ¶ 583.

These allegations, which Defendants wholly ignore, are sufficient (in themselves) to plead

a strong inference of fraudulent intent.  *Binday*, 804 F.3d at 579; *Novak*, 216 F.3d at 308-09.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 71

### 3.      Defendants Failed to Rectify Problems in their Securitization Program.

The Complaint also alleges extensive facts showing how Defendants acted with the specific intent to harm the property interests of their victims, by failing to rectify problems in their securitization program in the face of mounting evidence the securitized loan pools were plagued with defects.  For example:

- Defendants securitized loans or loan pools they or their vendors described at various times as "craptacular" (AC ¶ 279), "garbage" (AC ¶ 539), "scares the sh*t out of me" (AC ¶ 449), "look[ing] like sh*t" (AC ¶ 447), "about as bad as it can be" (AC ¶ 579), or "sh*t loans" (AC ¶ 669), and without tightening their due diligence process.

- Long before they issued Fremont deals such as SABR 2006-FR3 and SABR 2006-FR4, Defendants were aware of serious problems with Fremont originations, including that the loans were defaulting and going into delinquency at astronomical rates, and also that fraud was widespread within Fremont pools.  Despite this knowledge, Defendants did not stop securitizing Fremont loans or change their due diligence practices with regard to Fremont loans.  Instead, they agreed with Fremont to limit kickouts, and also continued jamming EV3s and other misrepresented loans into the deals, including dozens of FPD loans they suspected of being fraudulent after Fremont refused to buy them back.  *See, e.g.*, AC ¶¶ 159-161, 507-519.

- Even as loan quality declined into 2007, Defendants continued to adjust their due diligence selection criteria downward to accommodate caps originators placed on sample size.  AC ¶ 212.

- Defendants were aware of pervasive problems with the loans they had securitized (including those not reviewed in due diligence) through surveillance and monitoring of their prior deals, which revealed delinquencies were spiking as early as the middle of 2006.  Defendants nevertheless took a business-as-usual approach to loan acquisition and securitization, and continued securitizing loans from the same originators whose previously-securitized loans were rapidly failing, while making the same standard representations about the loans that they knew to be false.  AC ¶¶ 222-29.

- After Barclays' risk management group put New Century on Barclays' internal "watch list," which it used to flag counterparties posing significant credit risks to Barclays and its investors, Defendants did not stop securitizing New Century loans or tighten their due diligence procedures. Instead, they relaxed their due diligence

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 72

criteria, and even decided not to conduct due diligence on multiple New Century loan pools they securitized.  AC ¶¶ 414, 465-72, 481, 484.

- Defendants canceled due diligence on a New Century loan pool they securitized, even after learning of a "wide ranging imminent criminal investigation" into New Century by the United States Attorney's Office in Los Angeles for mortgage fraud, bank fraud, and wire fraud, among other violations.  AC ¶ 416.

- In a March 2007 telephone call, a Barclays employee acknowledged Barclays knew of the significant problems with New Century loans and was rushing to securitize the loans before "the whole castle tumbled." Following this acknowledgement, Defendants proceeded to securitize several more deals consisting of New Century loans.  AC ¶ 417.

- Barclays' management at the highest levels recognized there was a high likelihood "there may be material scratch and dent (loans we can't securitise and generally put back to the originator)" on its "warehouse line" with New Century.  Despite this expectation, Barclays securitized loans from its warehouse line in various Subject Deals, without doing due diligence, and while misrepresenting that no scratch and dent loans were securitized in those deals.  AC ¶¶ 470-473.

- Before securitizing a pool of Aegis loans in the deals SABR 2006-HE1 and SABR 2006-HE2, Barclays was aware of significant problems with Aegis loans, including through its vendors' reports that "*overall loan quality is reported to be VERY POOR*," and Menefee's recognition that the Aegis pool is "about as bad as it can be" due to "aggressively underwritten loans" in addition to "bad servicing." Despite this knowledge, Barclays did not abandon the Aegis pool or even tighten its due diligence, but instead securitized the loans.   AC ¶¶ 578-79.

These allegations amply support a "strong inference" of fraudulent intent.  *See Novak*, 216 F.3d at 308-09; *Countrywide*, 961 F. Supp. 2d at 608 ("circumstantial evidence" alleged by the Government—that the defendant concealed information from the purchasers of misrepresented loans and that the defendant did nothing to rectify problems in the loan approval program in the face of mounting evidence that the program was producing defective loans—"amply" supported an inference of intent to defraud); *see also United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011) ("Red flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance.").

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 73

#### 4.      Defendants Had Both the Motive and the Opportunity to Defraud.

Defendants devote much of their fraudulent intent arguments to arguing they had no motive to commit fraud.  Barclays Br. at 31-32; Menefee Br. at 12; Carroll Br. at 13-16.  As already noted, however, fraudulent intent can be pled absent a showing of motive; motive is just one of several ways a plaintiff can raise a strong inference of fraudulent intent.  *See Cohen*, 711 F.3d at 359; *see also Novak,* 216 F.3d at 308-09.  Defendants' arguments are, in any event, both legally and factually flawed.

Defendants principally argue they could not have had the requisite fraudulent intent because they purportedly "retained the riskiest ownership interest in the vast majority of the 36 deals."  Barclays Br. at 31, 34; *see* Menefee Br. at 12-13; Carroll Br. at 14-16.  Setting aside that Barclays' characterization of its retained interest is factually incorrect,[32] this argument is irrelevant, and it does not negate an inference of motive or conscious misbehavior.  *See Watts,* 934 F. Supp. 2d at 471-73.

The Government need not allege that Defendants intended for the Subject Deals, or for investors in those deals, to lose money.  Instead, it is enough for the United States to allege, as it has here, that Defendants intended their misrepresentations to induce investors to purchase securities in the Subject Deals without facts necessary for them to make informed economic decisions about their investments.  *See Binday*, 804 F.3d at 579; *Carlo*, 507 F.3d at 802.  And

---

[32] All Defendants incorrectly characterize Barclays' residual position as the "riskiest tranche" and claim that as the holder of that tranche, "Barclays would have been the first investor to suffer losses if the loans failed to perform." Menefee Br. at 12; Carroll Br. at 15-16; Barclay Br. at 31.  Barclays even cites to material outside the pleadings to allege that it lost money on its residual positions in the Subject Deals.  But these characterizations and claims are not supported by the well-pled allegations in the Complaint.  *See* AC ¶ 97 ("On the majority of the Subject Deals (both principal and agented), Barclays held a short-term economic interest by retaining the equity or 'residual' tranche(s) of the deal; most of these residual interests generated significant income or profits for Barclays, whether through cash flows from the excess spread Barclays earned on the deals, or by selling its equity interest to a third party in a net-interest-margin ('NIM') security or through the sale of a post-NIM residual ('PNR') interest.").

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 74

regardless of how Barclays' economic interests in the deals performed for the company, by misrepresenting to investors the true risks of the loans underlying the Subject Deals, Barclays, at a minimum, avoided billions of dollars of losses by securitizing the loans it had purchased.  *See* AC ¶ 96 ("Barclays made money from its RMBS deals in numerous ways.  As a threshold matter, by securitizing the loans it purchased in principal deals, Barclays avoided tens of billions of dollars in collateral losses when a substantial percentage of those loans defaulted, by shifting the risk of those losses onto the investors whom it had fraudulently induced to purchase the certificates.").  Moreover, numerous allegations in the Complaint show that Defendants' economic interests were not aligned with their investors, as Defendants repeatedly took actions that they knew would harm investors, in order to protect or advance interests of "the firm."  *See, e.g.,* AC ¶¶ 96, 152-162, 187, 231-233, 238, 248-258, 281, 299.

Relying on *Kalnit v. Eichler*, 264 F.3d 131, 139-140 (2d Cir. 2001), and *Brookdale Univ. Hosp. & Med. Ctr. v. Health Ins. Plan*, Civ No. 07-1471 (RRM/LB), 2009 WL 928718, at *6 (E.D.N.Y. Mar. 31, 2009), Barclays argues that a general profit motive is insufficient, by itself, to establish fraudulent intent.  Barclays Br. at 31.  Carroll likewise cites *Kalnit*, and other authorities, for the unremarkable proposition that a "desire to maintain or increase executive compensation" is, by itself, insufficient to support the motive prong of fraudulent intent.  Carroll Br. at 14-15; *see also* Menefee Br. at 12.  These arguments miss the mark.

The Complaint goes far beyond alleging "a generalized profit motive that could be imputed to any company," *Brookdale,* 2009 WL 928718, at *6, and shows how Defendants engaged in active conduct aimed at maintaining a false appearance that the Subject Deals were sound investments.  It illustrates in detail Defendants' motive to misrepresent characteristics of the loans backing their securitizations, as well as their due diligence processes, to receive higher credit

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 75

ratings and to induce investors to invest in their RMBS, while reducing the level of credit enhancement built into each deal's structure. AC ¶¶ 13 ("the rating agencies required less credit enhancement in the deals, which made them more profitable for Barclays and riskier for investors"), 297-99 (Menefee: "The rating agencies are just a thing to be manipulated"), 339-40, 353, 367. The Complaint's allegations of motive also include averrals that Defendants used the Subject Deals as a means of avoiding loss, by removing defective loans from their books and passing on the undisclosed risks of those loans to investors. AC ¶¶ 249-250, 481. Defendants were also motivated to maintain their relationships with originators, even at the expense of their investors. *See supra* at 28-29 & fn.11. In sum, "Barclays was a willing and active participant in this [RMBS] business, eagerly seeking to do more and more deals, and to securitize more and more loans, in order to increase its profits and its share of the RMBS market. Indeed, in its relentless pursuit of new loans to feed its securitization machine, and in its active collaboration with originators to maximize loan volume, Barclays not only acquired and securitized billions of dollars of loans it knew had material defects, but it also extended billions of dollars in financing to lenders it knew were originating loans without regard to the ability of the borrowers to repay them (including, in many cases, loans that were fraudulent)." AC ¶ 5.

Courts have recognized that these types of non-garden variety motivations are sufficient to raise a strong inference of fraudulent intent based on motive. In *Dexia*, a case involving similar allegations of fraud against sponsors, depositors, and underwriters in the offerings of RMBS, the court found that allegations that defendants provided false information to credit rating agencies about the loans to receive inflated credit ratings were sufficient. 929 F. Supp. 2d at 241-42. Such allegations "suggest an improper motive beyond a general business motive for profits, as the Defendants' alleged improper conduct suggests that they had a motive to maintain the appearance

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 76

that the ... assets were safe and highly rated." *Id.* (internal quotations and citations omitted); *see also Abu Dhabi Comm. Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 179-180 (S.D.N.Y. 2009) ("plausible inference" of fraudulent intent shown based on motive and opportunity allegations that bank sought to maintain the appearance that structure asset vehicle assets were safe and highly rated).

### 5. The Complaint Pleads Fraudulent Intent as to Menefee and Carroll with Respect to the Menefee/Carroll Deals.

Menefee and Carroll argue the Complaint does not sufficiently plead fraudulent intent as to them with respect to the seven Menefee/Carroll Deals.  Menefee Br. at 11-19; Carroll Br. at 8-23.  Most of their arguments along these lines have already been addressed in preceding sections.  Their remaining arguments, which largely suggest that the Complaint fails to sufficiently allege their involvement in the seven deals, also lack merit.

The chief flaw in the individual defendants' arguments is their unwillingness to accept that, at least as to the Menefee/Carroll deals, they were the central actors in Barclays' fraudulent scheme. They made the fraudulent representations as well as the decisions to securitize the misrepresented loans.  These two also signed the deal transaction documents, personally endorsing the veracity of the representations made in those documents, even though they were each personally aware the representations were false.  AC pp. 94-104, 112-133, 135-149.

Menefee and Carroll argue the Complaint fails to identify which representations, knowledge, and actions are attributable to them as opposed to Barclays.  This is incorrect.  When Menefee and Carroll were both involved, the Complaint uniformly refers to "Defendants"; when only one was involved, the Complaint refers to him by name; when neither was involved, it uniformly refers to "Barclays."  In the Deal Specific Facts section of the Complaint, the allegations

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 77

relating to the Menefee/Carroll Deals refer to "Defendants" (i.e., they include Menefee and Carroll), while the allegations relating to all the other Subject Deals refer to "Barclays."[33]

Thus, Carroll's statement that "the Government never identifies a single statement (true, false, or otherwise) that Mr. Carroll ever made to any investor or rating agency" is false.  Carroll Br. at 9.  The Complaint describes in considerable detail the misrepresentations "Defendants" made as to the Menefee/Carroll Deals, including statements in Offering Documents that Menefee and Carroll personally endorsed.  *See, e.g.,* AC ¶¶ 99-132, 365-367.  Indeed, Menefee and Carroll both apparently ignored the sections of the Complaint captioned "Facts Specific to Defendant Menefee" (AC ¶¶ 332-55) and "Facts Specific to Defendant Carroll" (AC ¶¶ 356-74) which, in addition to setting forth considerable detail about the role of each within Barclays, recite facts linking each defendant both to the Fraudulent Scheme section and to the parts of the Deal Specific Facts relating to the Menefee/Carroll Deals.

Menefee and Carroll try to run from Barclays' misrepresentations as to the Menefee/Carroll Deals, but they cannot hide from them.  If a corporate officer "expressly or impliedly authorize[s] or ratifie[s]" a misrepresentation, that officer is liable for the fraud.  *United States v. Gibson*, 690 F.2d 697, 701 (9th Cir. 1982).  Authorization "may be found from the scope of the scheme or the facts and circumstances of the particular case."  *Id.; see also United States v. Amrep Corp.*, 560

---

[33] The one case Carroll cites to support his argument that the Complaint impermissibly lumps the Defendants together (Carroll Br. at 11) in fact found this argument "without merit."  *Green v. Beer*, No. 06-CIV-4156 (KMW/JCF), 2009 WL 911015, at *6 n.13 (S.D.N.Y. Mar. 31, 2009) ("elsewhere in the amended complaint, Plaintiffs specify the who, what, when, and where of their fraud claim with sufficient particularity to cure any confusion these scattered clumped allegations may cause. The amended complaint describes speakers by name; where a misrepresentation, omission, or mental state is attributed to more than one person, the amended complaint specifies that the allegation applies to all the people named. Accordingly, the amended complaint gives Defendants sufficient notice of the fraudulent actions for which Plaintiffs seek to hold Defendants either directly or vicariously liable.").  Likewise, *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986), which Menefee cites (Br. at 13), is distinguishable because there, unlike here, the pleading failed "to specify the time, place, speaker, and sometimes even the content of the alleged misrepresentations."

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 78

F.2d 539, 545 (2d Cir. 1977) ("Where, however, the prosecution introduces evidence of active and knowing participation by corporate officers, they are equally liable with the corporation."); *United States v. Andreadis*, 366 F.2d 423, 430 (2d Cir. 1966) (affirming mail fraud conviction of pharmaceutical company president who was "aware" of the falsity of "live endorser" testimony and "approved" the campaign).

The Complaint alleges "Menefee was closely involved in the preparation of the offering documents for all of the subprime Subject Deals [i.e., all of the SABR deals] and he knew the representations made in those documents about the loan pools securitized in those deals. In fact, he signed, among other deal documents, certifications attesting to the truth of those representations." AC ¶ 335. "Menefee served as an officer of Barclays' subprime securitization subsidiary, Defendant SABR. In that capacity, he signed several registration documents, including registration statements filed with the SEC pursuant to which the ProSupps were issued. Barclays' SABR deals could not have been issued without these signed registration statements." AC ¶ 336. Moreover, "Menefee signed several other transactional documents concerning the SABR deals. On behalf of SABR, Menefee signed Underwriting Agreements, filed with the SEC, in which SABR (as the Depositor) represented to Barclays Capital (as the Underwriter) that the prospectuses and ProSupps did not contain any untrue statements of material fact or omit material facts necessary to make the statements therein not misleading. Menefee also signed Officer's Certificates in which he certified, as an officer of SABR, that all representations of SABR under the Underwriting Agreement were true and correct." AC ¶ 337.[34] All of the misrepresentations

---

[34] *See also* AC ¶¶ 334 (Menefee's responsibilities included "*overseeing the preparation of all offering documents and other transactional documents; ensuring the accuracy of all representations, warranties, and other information in the offering and transactional documents*; and communicating with investors about the securitized loan pools and about Barclays' subprime RMBS products"); 339 ("Menefee also prepared, or supervised the preparation of, numerous presentations to investors and rating agencies regarding the subprime Subject Deals, including deal-

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 79

listed on Table 4 for the Menefee/Carroll Deals were made in ProSupps that Menefee signed; likewise, all of the misrepresentations listed on Tables 5 and 6 for the Menefee/Carroll Deals were representations that Menefee signed or made on behalf of Barclays.

Carroll, meanwhile, "knew the representations made in the offering documents for all of the subprime principal Subject Deals about the loans securitized in those deals, and he signed, among other deal documents, certifications attesting to the truth of those representations." AC ¶ 365. He "served as an officer (specifically, Vice President and CFO) of Barclays' subprime securitization affiliate, Defendant SABR. In that capacity, he signed several registration documents, including registration statements filed with the SEC pursuant to which the ProSupps were issued…. Carroll also signed several other transactional documents in connection with the subprime principal Subject Deals." AC ¶ 366.[35]

In particular, Carroll signed the registration statements for the SABR shelf and the BCAP shelf—covering all of the Menefee/Carroll Deals and indeed almost all of the Subject Deals. These registration statements served as templates for the deal-specific ProSupps that were subsequently issued, and they memorialized all the standard representations that Barclays would make on the subsequent deals, including those on Table 4. *See* AC ¶¶ 59-60. For example, the SABR registration statement, signed by Carroll (as well as Menefee), avers that "the mortgage loans were originated or acquired generally in accordance with the underwriting guidelines described in this prospectus supplement." SEC Registration Statement Form S-3, Securitized Asset Backed

---

specific presentations and presentations about the SABR shelf as a whole."); 340 ("Menefee also regularly communicated directly with investors and rating agencies, in person (including at road shows and industry conferences), over the telephone, and over email. During these communications he repeatedly made representations about the loans securitized in Barclays' deals and about Barclays' due diligence process.").

[35] *See also* AC ¶ 367 ("Carroll assisted in preparing and delivering presentations to investors and rating agencies regarding the subprime principal Subject Deals, including presentations on the SABR shelf as a whole. Those presentations included representations about the loan pools securitized in Barclays' deals, as well as about Barclays' due diligence.").

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 80

Receivables LLC, at S-38 (Oct. 23, 2006) (Carroll's signature at II-8; *see also* Amanat Decl. Ex. 17).   The BCAP registration statement, also signed by Carroll, contains the identical representation.   SEC Registration Statement Form S-3, BCAP LLC, at S-38 (Feb. 14, 2007) (Carroll's signature at Ex. 24.1; *see also* Amanat Decl. Ex. 18).

Carroll says "the Government has failed to even allege a connection between Mr. Carroll and any of the several hundred representations contained" in Tables 4 to 6, but this is disingenuous. Carroll Br. at 11.   Carroll's connection to the misrepresentations in Table 4—including those for all of the Menefee/Carroll Deals—was described in the preceding paragraph, but his connection to the misrepresentations in Table 5 is even more direct.   Specifically, all of the misrepresentations listed in Table 5 for the five SABR 2007-BR Deals were made in Representations and Warranties Agreements attached to the PSA for each deal, which Carroll signed as Managing Director of Barclays Bank PLC and which were filed with the SEC.   *See* AC ¶¶ 59, 61-62, 120-24.   These Agreements contain unqualified representations from Carroll on behalf of Barclays Bank, such as the following: "As to *each* New Century Mortgage Loan, BBPLC hereby makes the representations and warranties set forth in Exhibit I hereto to the Depositor as of the Closing Date…." PSA for SABR 2007-BR1 (Mar. 1, 2007), Ex. O, § 2 (emphasis added).   *See also* PSA for SABR 2007-BR2 (Apr. 1, 2007), Ex. O, § 2 (same); PSA for SABR 2007-BR3 (May 1, 2007), Ex. O, § 2 (same); PSA for SABR 2007-BR4 (May 1, 2007), Ex. O, § 2 (same); PSA for SABR 2007-BR5 (June 1, 2007), Ex. O, § 2 (same).   Carroll's unqualified representations about "each" of the loans in these deals incorporated a set of "representations and warranties with respect to each Mortgage Loan" that were attached as Exhibit I to that document; this attachment included all of the misrepresentations for these deals alleged in Table 5 of the Complaint.   The Complaint

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 81

thus more than sufficiently connects Carroll to the misrepresentations made as to all of the Menefee/Carroll Deals.

Menefee and Carroll also try to distance themselves from the knowledge of falsity discussed *supra* at 64-70, but their arguments are unavailing.  The Complaint alleges in detail that both men were personally aware of facts contradicting the representations they made.  *See, e.g.,* AC ¶¶ 334, 338 ("Despite making these certifications, Menefee knew that Barclays' offering documents were rife with misstatements of material facts and with material omissions."), 339 ("These presentations included many statements that were false or misleading, and Menefee knew they were false or misleading when he made them."), 340, 341, 343-354; 361, 368 ("Carroll knew that the loans securitized in the subprime principal Subject Deals, whether or not they had been subjected to due diligence, were of materially worse quality than he and Barclays had represented."), 369-73.

Indeed, the Complaint details how both men repeatedly conspired with each other, and with others at Barclays, to commit fraud with respect to the Menefee/Carroll Deals.  For SABR 2006-FR3, for example, the Complaint explains how Menefee and Carroll, among other acts, agreed with Fremont to limit due diligence kickouts, waived in hundreds of loans rated EV3, securitized dozens more that met the adverse selection criteria but were not reviewed in due diligence, ignored data discrepancies, recycled dozens of loans that had been kicked out of previous deals, and, most notably, securitized dozens of loans that were already in FPD at the time the deal issued.  AC ¶¶ 500-22; *see also* AC ¶¶ 15, 16, 249 (Carroll: "*just leave them in*").  Referencing numerous

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 82

emails and phone conversations, the Complaint shows how Menefee and Carroll were the chief decision-makers and prime movers behind this deal.[36]

The same is true for SABR 2006-FR4 (AC ¶¶ 530-51), SABR 2007-BR1 (AC ¶¶ 410-31), SABR 2007-BR2 (AC ¶¶ 432-45), SABR 2007-BR3 (AC ¶¶ 446-60), SABR 2007-BR4 (AC ¶¶ 461-478), and SABR 2007-BR5 (AC ¶¶ 479-90). Menefee and Carroll make a host of trial arguments purporting to question whether these allegations actually demonstrate conscious misbehavior, often pointing the finger at each other or at other Barclays employees. Carroll Br. at 20-23; Menefee Br. at 13-19. But at the pleadings stage, the only question is whether the allegations in the Complaint, taken as true, are enough to raise a strong inference of their scienter and personal involvement in the fraudulent scheme as to these Deals.[37] They undoubtedly do.

---

[36] Carroll tries to paint an innocuous picture of his role in SABR 2006-FR3, and particularly of his directive to Menefee to proceed with the securitization of 40 FPD loans, worth over $10 million, notwithstanding their repeated representations to investors that Barclays never included FPD loans in SABR deals. Carroll Br. at 17-19. Menefee likewise disavows any nefarious intention with respect to the inclusion of these loans but seems to finger Carroll as the one responsible for deciding to include them. Menefee Br. at 18. Regardless, both of them dispute the Complaint's characterization of the meaning of FPD, the rationale for including these 40 loans in the FR3 deal, and whether that clandestine inclusion was material to investors; they also argue that the offering materials for the deal did not contain a misrepresentation about the inclusion of FPDs. Carroll Br. at 17-19; Menefee Br. at 17-19. These are trial arguments inappropriate on a 12(b)(6) motion. Menefee and Carroll's innocuous description of FPDs is, moreover, incorrect in view of the evidence that both considered FPD to be an indicium of fraud. *See* AC ¶¶ 251 ("Menefee told Carroll that '[y]ou have to know that 90% of the reason something like this would default [so soon after origination] is because of fraud.' Carroll responded: 'Yeah absolutely.'"); 256 ("Menefee noted that, as to the FPD loans Defendants securitized in SABR 2007-BR1, 'if you look at the foreclosure bucket, it's populated with those loans that we put in that were a payment behind at the time of securitization. So those loans have just gone straight down ....'"); 259-66; 512 ("*Because there's likely to be some kind of fraud if it was an FPD*."). The key point is that within weeks (and sometimes days) of making direct representations to investors and rating agencies that there were no FPD loans in these deals, Menefee and Carroll decided to securitize dozens of such loans in FR3 and dozens more in SABR 2007-BR1. AC ¶¶ 241-57, 410-31, 500-522. Their aim in doing so was to protect the company's bottom line, even if it meant "tak[ing] it on the chin" from an investor. AC ¶ 257.

[37] Carroll correctly observes (Carroll Br. at 20 & n.8) that paragraph 17 of the Complaint erroneously describes a June 28, 2007, phone conversation that took place between Menefee and his supervisor, Michael Wade, as a conversation between Menefee and Carroll. But this minor error in the pleading (which in any event correctly describes the call in paragraph 442) has no impact on the Government's arguments.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 83

## V.   THE COMPLAINT SUFFICIENTLY PLEADS BANK FRAUD AS TO ALL SUBJECT DEALS.

The Complaint sufficiently pleads the predicate offense of bank fraud, under both 18 U.S.C. § 1344(1) and (2), as against Barclays for all Subject Deals and as against Menefee and Carroll for all the Menefee/Carroll Deals.[38]

### A.   Elements of Bank Fraud.

For bank fraud under § 1344(1), the government must first prove the defendant "engaged in a deceptive course of conduct by making material misrepresentations." *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007).  But unlike mail and wire fraud, the government must also prove "the defendant, through the scheme, intended to victimize the bank by exposing it to loss." *Id.*  A claim "under § 1344 is not supportable by evidence merely that some person other than a … financial institution was defrauded in a way that happened to involve banking, without evidence that such an institution was an intended victim." *United States v. Laljie*, 184 F.3d 180, 189-90 (2d Cir. 1999).  Nevertheless, a bank can be the intended victim even if the defendant did not intend to cause the bank financial harm, even if the bank did not ultimately suffer financial loss, even if causing harm to the bank was not the primary purpose of the fraud, and even if the object of the fraud is the bank's customer or client rather than the bank itself.  *See Shaw v. United States*, 137 S. Ct. 462, 466-69 (2016) ("the statute, while insisting upon 'a scheme to defraud,' demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss.").

---

[38] 18 U.S.C. § 1344 provides:
Whoever knowingly executes, or attempts to execute, a scheme or artifice —
    (1)  to defraud a financial institution; or
    (2)  to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 84

Claims under § 1344(2) do not require proof that the defendant intended to victimize the bank by exposing it to loss. *See Loughrin v. United States*, 134 S. Ct. 2384, 2389 (2014). Rather, such a claim requires proof a defendant "'knowingly executes, or attempts to execute, a scheme or artifice' with at least two elements. First, the clause requires that the defendant intend to obtain any of the moneys … or other property owned by, or under the custody or control of, a financial institution. Second, the clause requires that the envisioned result—*i.e.*, the obtaining of bank property—occur 'by means of false or fraudulent pretenses, representations, or promises.'" *Id.*

### B. The Complaint Sufficiently Alleges Barclays Committed Bank Fraud in Violation of 18 U.S.C. § 1344(1) and (2) as to All Subject Deals and Menefee and Carroll Committed Bank Fraud as to All Menefee/Carroll Deals.

The statutory requirement that the defendant "knowingly execute[], or attempt[] to execute, a scheme or artifice," is satisfied by showing the defendant "engaged in a deceptive course of conduct by making material misrepresentations." *Rigas*, 490 F.3d at 231; *see Shaw*, 137 S. Ct. at 467-69. We have already addressed at length, in the context of the mail and wire fraud predicates, how the Complaint plausibly and sufficiently alleges Defendants engaged in a fraudulent scheme to deceive investors (including those that were FIs) by making material misrepresentations to them and to rating agencies. *See supra* Part IV. Those arguments pertain equally to the bank fraud predicate and need not be reiterated here.

Barclays' only rejoinder to these arguments is its frivolous notion that it cannot be found to have executed "a scheme or artifice to defraud a financial institution" under section 1344(1) because the Complaint charges it with having defrauded multiple banks rather than just one. Barclays Br. at 29. This argument is particularly cynical in view of Barclays' position on the "affecting a FIFI" requirement, where it argued Defendants' mail and wire fraud could not be

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 85

found to have "affected a FIFI" when only one bank invested in the security, and where it tried to impose a numerosity requirement that Congress never intended.  *See supra* at 18.[39]

Barclays also intimates it cannot be charged with a 1344(1) predicate unless its scheme *specifically* targeted FIs and did not also reach other victims that were not FIs; it postulates that it is improper to charge bank fraud as part of a scheme to defraud *all* investors simply because some of the investors happened to be banks.  Barclays Br. at 18.  No precedent supports Barclays' claim that the bank must be the sole, or even the primary, target of the scheme to sustain a 1344(1) predicate; all that is required is that a bank be at least one of the intended victims.  Indeed, the Supreme Court expressly rejected Defendants' argument in *Shaw*, 137 S. Ct. at 468-69 (Government is not required to prove that harming bank's property interest was the purpose of the fraudulent scheme; all that is required is knowledge that the fraudulent scheme would deprive FIs of their property interests).

*Laljie*, meanwhile, stands for the proposition that a bank fraud claim "is not supportable by evidence merely that some person other than a … financial institution was defrauded in a way that happened to involve banking," but it made clear that such a claim is sustainable when there is "evidence that such an institution was *an* intended victim."  *Laljie*, 184 F.3d at 189-90.  The Complaint, however, does not predicate the 1344(1) claims on the fact that persons other than FIs were defrauded in a way that "happened to involve banking."  Rather, it follows a simple syllogism that Barclays conveniently ignores:  1.  Defendants intended to victimize through their fraudulent

---

[39] Barclays cites *United States v. Hinton*, 127 F. Supp. 2d 548, 554 (D.N.J. 2000), in support of its position (Barclays Br. at 29), but that case is inapposite.  Aside from the fact that *Hinton* was a criminal case where the issue was the defendant's Sixth Amendment right not to defend against a duplicitous indictment—issues not present here— *Hinton* involved a scheme targeting six different banks in which each bank was victimized by a separate fraudulent act (the opening of accounts under fictitious names and using false identification).  Here, by contrast, as to each Subject Deal all investors were victimized by the same acts.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 86

scheme *all* persons and entities investing in the Subject Deals.  *See supra* at 56-74 and AC pp. 33-90.  2.  FIs were among the persons and entities investing in the Subject Deals, and Defendants knew this.  AC ¶¶ 320-21, 324, 355, 374.  3.  Therefore, Defendants intended to victimize through their fraudulent scheme all FIs investing in the Subject Deals.

Barclays cannot, in any event, seriously argue the Complaint fails to plausibly allege that Defendants intended to defraud FIs when they executed their scheme to defraud all investors in the Subject Deals.  The Complaint alleges:

- "As to each Subject Deal, Defendants intended to defraud or victimize one or more financial institutions ('FIs'), including by targeting money and property owned by, or in the custody or control of, such institutions by means of false or fraudulent pretenses, representations, or promises." AC ¶ 317.

- "In Barclays' initial offerings on all of the Subject Deals, Defendants actively marketed RMBS certificates to FIFIs and other FIs (including entities known by Defendants to be affiliates or subsidiaries of FIFIs).  Barclays' employees, including Menefee and Carroll, had regular contact with these institutions … to try to persuade them to buy Barclays' RMBS.  Defendants assigned internal sales representatives to cover FIFIs and other FIs, and Barclays' employees made roadshow and other in-person presentations to FIFIs and other FIs regarding, among other things, the loans Barclays securitized and its due diligence process." AC ¶ 319.

- "Numerous FIFIs and other FIs bought certificates in the Subject Deals on the basis of Defendants' representations about the loans." AC ¶ 320.

- "Defendants knew the false representations they made about the securitized loans and about Defendants' due diligence process subjected FIFIs and other FIs to materially increased risk of loss as to each Subject Deal."  AC ¶ 325.

- "In connection with each Subject Deal, all of the Corporate Defendants, separately or in concert with one another, knowingly engaged in a deceptive course of conduct by making material misrepresentations and omissions intended to victimize one or more financial institutions by exposing them to loss."  AC ¶¶ 735, 742, 747.

Particularly when viewed in light of the previously-discussed "strong inference" of fraudulent intent pleaded throughout the Complaint (*see supra* at 56-84), these allegations are more than

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 87

enough to sustain a claim under section 1344(1) that Defendants "defraud[ed] a financial institution."

Barclays also argues the Complaint fails to state a claim under 1344(2), because it does not adequately allege Defendants intended to obtain funds owned by, or in the custody or control of, FIs.  That argument ignores the allegations in the Complaint, recited above, about how Barclays targeted funds owned by FI investors.  AC ¶¶ 317, 319.  Indeed, the false statements in the offering materials for the Subject Deals were "the mechanism naturally inducing a bank … to part with money in its control," an inducement "[t]hat occurs, most clearly, when a defendant makes a misrepresentation to the bank itself," as Barclays did here.  *Loughrin*, 134 S. Ct. at 2393-94.  The Complaint further alleges that "in purchasing the RMBS certificates from Barclays, FIFIs and other FIs provided Defendants with funds they owned, or that were in their custody and control, in exchange for RMBS certificates."  AC ¶ 320.  Further, the Complaint alleges Barclays employees knew "many investors in the Subject Deals bought RMBS using funds held in custodial accounts at FIFIs or other FIs."  AC ¶ 324.  These allegations, which must be accepted as true for purposes of this motion, are sufficient to state a claim under 18 U.S.C. § 1344(2).

Barclays is wrong when it posits that a bank cannot be defrauded under section 1344 if the bank entered into securities transactions on behalf of its clients.  Br. at 22.  It is a fundamental principle of banking law that money a client or customer deposits with a bank becomes the bank's property.  *See Shaw*, 137 S. Ct. at 466 ("for purposes of the bank fraud statute, a scheme fraudulently to obtain funds from a bank depositor's account normally is also a scheme fraudulently to obtain property from a 'financial institution,' at least where, as here, the defendant knew that the bank held the deposits, the funds obtained came from the deposit account, and the defendant misled the bank in order to obtain those funds"); *United States v. Monostra*, 125 F.3d 183, 187-88

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 88

(3d Cir. 1997) (defendant defrauded banks of their property even though he intended to defraud a company holding money in accounts at those banks, for "[w]hen [the company] deposited funds in its accounts with [the banks], those banks did not become the custodians of that money; rather, [the company] became a creditor of [the banks] in the amount of the deposits.").

*Loughrin*, the only case cited by Barclays, does not support its argument. *Loughrin* held that when prosecuting bank fraud under 1344(2), the Government need not show the defendant intended to defraud a FI (which is required in a prosecution under 1344(1)); all that is required under 1344(2) is that the defendant obtain property under the bank's custody or control (whether or not the bank actually owns the property) through means of a fraudulent misrepresentation. *Loughrin*, 134 S. Ct. at 2394. Although that case dealt with a depository bank, and the target of the fraud was the recipient of a forged check, nothing in *Loughrin* purported to render 1344(2) inapplicable to securities transactions effected by FIs using their own funds or their clients' funds. In fact, the statute itself provides for liability where the defendant obtains "any of the moneys, funds, credits, assets, *securities*, or other property owned by, or under the custody or control of, a financial institution." 18 U.S.C. § 1344(2). Moreover, the range of FIs that can be victimized under section 1344(2) is far broader than lending and depository institutions.

For the foregoing reasons, Barclays' arguments that the Complaint does not adequately allege violations of 18 U.S.C. § 1344(1) and (2) should be rejected.

## VI.   THE MAIL, WIRE, AND BANK FRAUD CLAIMS AGAINST MENEFEE AND CARROLL AS TO SABR 2006-FR3 AND FR4 ARE NOT TIME-BARRED.

Menefee and Carroll argue that when this action was filed on December 22, 2016, FIRREA's ten-year statute of limitations, 12 U.S.C. § 1833a(h), had already run as to SABR 2006-FR3 and SABR 2006-FR4, which had been securitized on August 3 and December 12, 2006,

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 89

respectively.[40]  Menefee Br. at 25-28; Carroll Br. at 23-25.  Their arguments lack merit, and all claims against the individuals as to SABR 2006-FR3 and SABR 2006-FR4 must stand.

The principal flaw in Menefee and Carroll's arguments is their incorrect assumption that the limitations period begins on the date when the deal issued and ends on the tenth anniversary of the issue date.  The upshot of this assumption is that the scheme to defraud "came to fruition" once the bank issued the RMBS.  This is wrong, for (1) it is no defense to a mail or wire fraud prosecution that the scheme to defraud began outside the limitations period, as long as it continued into the limitations period; (2) every mailing or wire transmission in furtherance of that scheme which occurred within the limitations period is a violation *not* barred by the statute of limitations; and (3) indeed, mailings and wire communications in furtherance of the scheme which occurred outside the limitations period are admissible to prove the existence of the scheme and defendant's intent to defraud.  *See United States v. Rogers,* 9 F.3d 1025, 1030 (2d Cir. 1993); *United States v. Eisen*, 974 F.2d 246, 263 (2d Cir. 1992) ("the statute of limitations in a mail fraud case runs from the date of the charged mailing, notwithstanding that defendant's actions concerning the scheme to defraud occurred before the statutory period"); *United States v. Ashdown*, 509 F. 2d 793, 798 (5th Cir. 1975); *United States v. Blosser*, 440 F. 2d 697, 699 (10th Cir. 1971) ("if the prohibited use of the mails was within the [limitations] period the prosecution is timely.... It is no defense that the scheme was formed earlier, and proof running back of the statute is admissible to show the scheme and intent if it is connected up with the scheme existing when the use of the mails occurred."); *United States v. Catapano*, No. 05-CR-229 (SJ/SMG), 2008 WL 3992303, at *9 (E.D.N.Y. Aug. 28, 2008).

---

[40] Barclays does not raise a statute of limitations argument as to these or any other Subject Deals on account of a tolling agreement that Barclays entered into with the government prior to suit.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 90

Here, the Complaint alleges multiple communications after December 22, 2006, by both Menefee and Carroll, that executed or evidenced their fraudulent scheme as to each deal.  As to SABR 2006-FR3, a deal in which Menefee and Carroll conspired closely with one another to securitize dozens of loans that had gone into first-pay default (FPD), the Complaint most notably alleges that in a March 5, 2007, call with an investor discussing Fremont and New Century deals including SABR 2006-FR3, Menefee knowingly lied when he told the investor that "we have not ever securitized first pay defaults."  AC ¶ 513.  It goes on to allege that

> In multiple interstate communications discussing SABR 2006-FR3 and other Barclays' SABR deals, Defendants falsely represented that Barclays never securitized FPD loans in this or any other SABR deals.  For instance, in a March 27, 2007, interstate email between Menefee (located in New York) and a Barclays salesperson located in Illinois, the salesperson reported to Menefee that an investor in SABR 2006-FR3 had inquired about the collateral performance of that deal, and had specifically asked about the presence of EPD loans in the deal.  In a responsive interstate email communication, Menefee, with full expectation that the salesperson would pass the misrepresentation on to the inquiring investor, prevaricated that, "with respect to the EPD population, all EPDs were submitted back to Fremont (the FR3 pool is net of these loans)."  On information and belief, Barclays subsequently related this misrepresentation to the inquiring investor.

AC ¶ 522.

As for SABR 2006-FR4, the Complaint alleges that on December 28, 2006, "Defendants filed with the SEC a Form 8-K (signed by Menefee as a Director of SABR) that attached 'certain agreements that were executed and delivered in connection with the issuance of the Certificates' for SABR 2006-FR4.  Those agreements included the PSA, which set forth various representations and warranties concerning the securitized loans (including those listed in Table 5 to this Complaint)."  AC ¶ 531.  *See Schmuck,* 489 U.S. at 711-12 ("Thus, although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 91

customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme.").

Menefee argues that the filing of the Form 8-K could not have been "in furtherance of" the fraud because the securitization had already closed on December 12.  Menefee Br. at 27.  This argument lacks merit.  Filing the Form 8-K was an essential step in the securitization process under SEC Regulation AB, 17 C.F.R. § 229.1111 (March 8, 2005) (*see* AC ¶ 63), and there could be no question that the wiring of the form was an essential part of the fraudulent scheme.  *See United States v. Rutigliano*, 790 F.3d 389, 400 (2d Cir. 2015); *Eisen*, 974 F.2d at 263.  Moreover, the Form 8-K attaches numerous documents, including the PSA and the MLPA, that contain key representations and warranties that are an essential part of the securitization—and of the fraudulent scheme.  In fact, all of the representations as to SABR 2006-FR4 that are listed on pages 14-15 of AC Table 5 were made in the PSA or MLPA for that deal and were filed with the SEC with the Form 8-K (i.e., transmitted to investors) on December 28, 2006, and therefore within the limitations period.

Moreover, despite having securitized several loans in this deal that they knew were FPDs, "in multiple interstate communications discussing SABR 2006-FR4 and other Barclays' SABR deals, Defendants falsely represented that Barclays never securitized FPD loans in this or any other SABR deals.  For instance, in a March 5, 2007, telephone call with investors in SABR 2006-FR4, where rising EPD rates in Fremont deals and Barclays' repurchase demand of Fremont were discussed, Menefee falsely stated that 'We have not ever securitized first pay defaults, and one of the provisions in our agreements is that the seller will repurchase loans where the borrower defaults on its initial payment to us. So, before the securitization has formed ...  we've either pulled them out, sold them separately, or put all of those back to Fremont.'"  AC ¶ 541.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 92

Additionally, the Complaint alleges Menefee and Carroll

> deceived at least one investor regarding the underwriting guidelines that Fremont had used in originating the loans securitized in SABR 2006-FR4 and then covered up the fraud after the investor discovered it.  This investor initially resisted purchasing certificates in the deal in light of the poor performance of Fremont loans over the course of 2006.  On December 5, 2006, Menefee spoke with a representative of this investor and falsely represented that the Fremont loans in the deal had been underwritten in accordance with new, stricter guidelines that Fremont had recently adopted.  Menefee knew this statement was false, as he had signed off on the ProSupp for the deal, which confirmed that the loans in the deal had been underwritten under the old guidelines. Nevertheless, assuaged by Menefee's assurances, the investor bought certificates in SABR 2006-FR4.

AC ¶ 542.  As the Complaint continues,

> By April 2007, the investor observed that SABR 2006-FR4 was performing terribly, and after conducting its own inquiries, it learned that the loans in SABR 2006-FR4 had not in fact been underwritten to new, stricter guidelines, as Menefee had avowed.  Furious at the deception, a representative of the investor called Carroll in April 2007 to reverse the purchase.  The investor also asked for a copy of the recording of the December 5, 2006, call between Menefee and the investor, so that the investor could prove what Menefee had represented on the call about the guidelines pursuant to which the Fremont loans had allegedly been underwritten. Barclays falsely told the investor that no recording of the call existed.

> In an internal phone call between Carroll and Barclays' Compliance Group, Carroll admitted that Menefee's statement to the investor in December 2006, to the effect that the loans in the deal had been underwritten under new, stricter guidelines, was false, but he insisted that the investor should have followed what was written in the ProSupp rather than relying on Menefee's statements.  At Carroll's suggestion, Barclays then offered to repurchase the certificates from the investor, but only at the then-current market price, which was less than half of what the investor had paid for them.  The investor deemed the offered price too low and rejected it. Determining that it could not easily prove what Menefee had misrepresented about the loans without a recording of the December 5, 2006, call, the investor ultimately kept the bonds and took the losses on them.

AC ¶¶ 543-44.  These allegations refute Menefee and Carroll's arguments as to the statute of

limitations on SABR 2006-FR4.  *See United States v. Evans*, 473 F. 3d 1115, 1120 (11th Cir. 2006)

("'[P]recedent is clear that letters designed to conceal a fraud, by lulling victims into inaction,

constitute a continuation of the original scheme of defraud.' That is, when the scheme includes not

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 93

only obtaining the benefit of the fraud but also delaying detection of the fraud by lulling the victim after the benefit has been obtained, the scheme is not fully consummated, and does not reach fruition, until the lulling portion of the scheme concludes.").

Finally, as to both SABR 2006-FR3 and SABR 2006-FR4, and prompted by the "unprecedented default rate of the SABR 2006-FR3 pool," Barclays commissioned a "diagnostic review" in early 2007 of 499 Fremont-originated loans that had defaulted within six months of origination. AC ¶ 545. This review, which Menefee and Carroll oversaw, found the loans had significant defects when Barclays bought them from Fremont, including "48 loans in which Fremont—in Defendants' own words—had completely '*ignored guidelines*' and had given '*no regard for borrower's ability to repay debt,*'" as to which "default was inevitable." AC ¶¶ 546-47. Over the course of 2007, Barclays tried to put some but not all of these loans back to Fremont, but it did not succeed. AC ¶ 548. Instead,

> In a December 19, 2007, interstate email from Menefee to the head of Fremont, Barclays offered to release Fremont from "all outstanding and future claims arising directly from the transactions in which loans were purchased by Sutton from Fremont" (including the loans securitized in SABR 2006-FR3 and SABR 2006-FR4), in exchange for a cash payment to Barclays of $40 million. On information and belief, Menefee and Barclays had no intention of using this money to buy the misrepresented loans out of the trust or to otherwise compensate the trust (and its certificateholders) for the increased risk of loss resulting from the securitization of these misrepresented loans.

AC ¶ 549. Also throughout 2007 and into 2008, and "contrary to their obligations to notify the trustee and other counterparties of any known breaches of representations, to which they agreed in the PSA for this deal, Menefee and Barclays instead sought to hide the misrepresentations from the trustee and the certificateholders and to keep the trustee out of their negotiations with Fremont. In a March 11, 2008, interstate email, Fremont sought to bring Deutsche Bank, the trustee for SABR 2006-FR4, into its negotiations with Barclays on the repurchase requests stemming from

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 94

Barclays' diagnostic review. Menefee became irate that Fremont had reached out to the trustee. Counsel for Barclays wrote to a group of Barclays' personnel: 'Unbelievable!' And Menefee wrote 'This is outrageous.'" AC ¶ 550.

These allegations, all of which the Court must accept as true for purposes of this motion, more than sufficiently establish that Menefee and Carroll had multiple communications well after December 22, 2006, that executed or evidenced their fraudulent scheme as to these two deals. A mailing, wire transmission, or other act "executes" a scheme to defraud if it fulfills a purpose of the scheme to defraud, such as, *e.g.*, to make an undeserved profit through deception. *See United States v. Frequency Elec.*, 862 F. Supp. 834, 838-40 (E.D.N.Y. 1994) (*quoting* BLACK'S LAW DICT. 509 (5th Ed. 1979) ("executes" means "to fulfill ... the purpose of ...")); *see also Rutigliano*, 790 F.3d at 400-01 (finding limitations period extended when defendant engaged, within the limitations period, in "measures of concealment" and other "corrupt intervention").

These allegations are further bolstered by the statements that Menefee and Carroll each "knowingly used the mails in pursuit of his scheme to defraud when he, *inter alia*, caused[41] to be deposited for delivery by the United States Postal Service, or by a private or commercial interstate carrier, *inter alia*, (1) final execution copies of the documents creating the Issuing Trusts to the Trustees, (2) prospectuses, ProSupps, and additional information regarding the securities that were mailed to investors and potential investors, and (3) confirmations and account statements mailed to investors," AC ¶¶ 690, 699, and each "knowingly used the interstate wires in pursuit of his scheme to defraud when he, *inter alia*, (1) executed or caused to be executed an interstate wire transfer of funds to the originator selling the loan pools to Barclays or the originator securitizing

---

[41] "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Pereira v. United States*, 347 U.S. 1, 8-9 (1954).

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 95

the loans on its own behalf; (2) electronically filed or caused to be filed documents with the SEC; (3) electronically transmitted or caused to be transmitted prospectuses, ProSupps, and additional information regarding the securities to investors and potential investors; and (4) communicated via telephone, email, or Bloomberg chat with originators, due diligence vendors, rating agencies, investors, prospective investors, and among Barclays employees to make representations concerning the Subject Deals, or to acquire and exchange knowledge contradicting those representations."  AC ¶¶ 719, 728.

The bank fraud analysis is not materially different, since the limitations period for bank fraud runs from the time the defendant takes any action in execution of the fraudulent scheme. Under the law of this Circuit, bank fraud is a "continuing offense[]," which is not "fully executed," and thus, not fully complete, until it has achieved its "central purpose[s]." *United States v. Duncan*, *42 F.3d 97, 103-05 (2d Cir. 1994)*.  The actions listed above as acts in execution of the scheme to defraud extend the limitations period for bank fraud just as readily as they do the period for mail and wire fraud, at least to the extent the scheme intended to victimize FIs among the many investors who bought certificates in SABR 2006-FR3 and SABR 2006-FR4—a subject which we have already addressed.

## VII.   THE COMPLAINT SUFFICIENTLY ALLEGES PREDICATE OFFENSES UNDER 18 U.S.C. § 1005 AGAINST BARCLAYS AS TO ALL SUBJECT DEALS.

Claim X of the Complaint asserts FIRREA civil penalty claims against Barclays under the predicate offense of 18 U.S.C. § 1005.  In particular, the fourth paragraph of section 1005, which was enacted as part of FIRREA in 1989 and can loosely be summarized as "fraudulently benefiting from a transaction with a financial institution," reads as follows:

> Whoever with intent to defraud … any financial institution referred to in this section, participates or shares in or receives (directly or indirectly) any money,

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 96

profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution—….

18 U.S.C. § 1005.  The covered FIs, listed in the first paragraph of section 1005, include national banks, insured banks, branches of foreign banks, and depository institution holding companies.

The Complaint more than sufficiently pleads the requisite intent to defraud FIs.  The Complaint also describes, plausibly and in detail, how Barclays received money and property from the FIs investing in the Subject Deals (either with their own money or with money under their custody and control) through the transactions in which Barclays sold them their certificates.  As to this claim, the Complaint alleges, in substance, that Barclays "with the intent to defraud one or more financial institutions covered by that statute, … participated and shared in, and received (directly or indirectly) … money, profit, property, and benefits through one or more transactions, loans, commissions, contracts, or other acts of such financial institutions."  AC ¶ 751.  These allegations are enough to sustain Claim X.

Barclays' argument (Barclays Br. at 52-53) that the claim should be dismissed because Section 1005 may only be violated by an officer, director, agent, or employee of the victimized bank (what it calls "bank insiders") is contrary to the plain language of the statute, and to the weight of the authority interpreting it, for at least five cases have explicitly rejected the argument that the fourth paragraph of Section 1005 is limited to "bank insiders."  *See United States v. Van Brocklin*, 115 F.3d 587, 597 (8th Cir. 1997); *United States v. Devillier*, No. CA 16-012-BAJ-RLB, 2016 WL 2621968, at *3 (M.D. La. May 5, 2016); *United States v. Johnson*, No. 2:11-cr-501-DN-PMW, 2015 WL 8967525, at *3-*4 (D. Utah Dec. 15, 2015); *Wells Fargo*, 972 F. Supp. 2d at 626-629; *United States v. Christensen*, 344 F. Supp. 2d 1294, 1296-97 (D. Utah 2004).[42]

---

[42] Barclays' position is contrary, moreover, to the interpretive rule in 1 U.S.C. § 1, that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise… the words 'person' and 'whoever' include

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 97

As recognized in these decisions, the fourth paragraph of Section 1005 states "whoever" commits the stated acts shall be guilty of an offense, in contrast to the language of the first paragraph, which provides "[w]hoever, being an officer, director, agent or employee…."  The difference is not accidental, since the fourth paragraph was added to the statute long after the first three, and it was deliberately intended to reach a broader set of offenders in the wake of the Savings and Loan Crisis of 1989 leading to FIRREA's enactment.  Clearly, if Congress wanted to limit the new fourth paragraph to bank insiders, it could easily have used the same language it used decades earlier when it enacted the first part of section 1005 and included a specific reference to "officer, director, agent or employee."  *See id.*

Against this significant authority, Barclays cites only one case holding that the fourth paragraph of section 1005 should be limited to bank insiders: *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 798 F. Supp. 2d 517, 528 (S.D.N.Y. 2011).  But as later cases have found, *Rubin/Chambers* was wrongly decided.  *Wells Fargo,* 972 F. Supp. 2d at 626-29, and *Johnson,* 2015 WL 8967525 at *3-*4, expressly disagreed with *Rubin/Chambers*' decision to deviate from the plain-language of the statute.[43]  These courts found that no deviation was warranted based on legislative history pertaining only to the first three paragraphs of Section 1005, since the fourth paragraph was added separately as part of FIRREA.  *Wells Fargo* went on to find that "paragraph four plainly does not present the 'rare' or 'exceptional' case in which 'literal application of a statute will produce a result *demonstrably* at odds with the intentions of its drafters' or 'thwart the *obvious*

---

corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."

    [43] *Rubin/Chambers* itself acknowledged that "from a strictly textual perspective, it would seem beyond debate" that the fourth paragraph was not limited to bank insiders.  798 F. Supp. 2d at 524.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 98

purpose of the statute.'" 972 F. Supp. 2d at 629 (*quoting Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).  That reasoning should be followed here.[44]

Barclays also argues Claim X should be dismissed because the allegations in support of it do not satisfy Rule 9(b).  It argues the Complaint "does not specify which 'financial institution' was involved, or what the 'transaction, loan, commission, contract, or any other act'" was for each securitization.  Barclays Br. at 54.  These arguments, most of which were dealt with in Part II above, are also without merit.  It cannot be seriously contended that the Complaint fails to specify the "transactions" involved in the section 1005 offenses—the transactions are, of course, the Subject Deals, as to which Barclays induced FIs to purchase certificates through its fraudulent representations.  And again, nothing in Rule 9(b) or in FIRREA requires that the Complaint identify specific FI investors.

## VIII.  THE COMPLAINT SUFFICIENTLY ALLEGES PREDICATE OFFENSES UNDER 18 U.S.C. § 1014 AGAINST BARCLAYS AS TO ALL SUBJECT DEALS.

Claim XI asserts FIRREA civil penalty claims against Barclays predicated on 18 U.S.C. § 1014, for false statements made to influence the actions of certain FIs, including FIFIs and many other types of entities.[45]  Unlike with mail or wire fraud, § 1014 does not require a showing of

---

[44] Barclays' citations to *United States v. Barel*, 939 F.2d 26, 39 (3d Cir. 1991), *United States v. Ortiz*, 906 F. Supp. 140, 144-146 & n.2 (E.D.N.Y. 1995), and *United States v. Edwards*, 566 F. Supp. 1219, 1222 (D. Conn. 1983), are irrelevant because they do not relate to the fourth paragraph of § 1005 and are based on legislative history and textual interpretation relevant to the second and third paragraphs of the statute that are inapplicable to the fourth paragraph.

[45] Specifically, 18 U.S.C. § 1014 provides:

Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of [covered financial institutions], upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, or insurance agreement or application for insurance or a guarantee, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 99

either (a) materiality of the misrepresentations, *United States v. Wells*, 519 U.S. 482, 489-499 (1997), or (b) intent to defraud, *United States v. Sabatino*, 485 F.2d 540, 544-45 (2d Cir. 1973). It only requires showing "intent to influence" a covered institution upon, *inter alia*, any "application," "purchase," or "loan." *Wells*, 519 U.S. at 499. The Complaint predicates Claim XI on the fact that Barclays "knowingly made false statements and reports to one or more financial institutions covered by that statute, for the purpose of influencing the action of such institutions with respect to, (1) the loan of funds by the covered institution to RMBS trusts for the Subject Deals in exchange for RMBS Certificates, and (2) the purchase of RMBS Certificates in the Subject Deals." AC ¶ 756.

Barclays argues 18 U.S.C. § 1014 does not apply to the false statements at issue here because the offense applies only to "specified credit transactions" and not where a FI makes "investments." This argument fails, for multiple reasons. First, the transactions at issue here *are* credit transactions. Specifically, the RMBS certificates are debt instruments that entitle the holders to interest payments based on the income received by trusts from the mortgage loan collateral, and they repay principal according to the terms of the certificates. AC ¶¶ 56, 93; *see* Barclays Br. at 5 ("As the name indicates, a residential mortgage-backed security is a *debt instrument* backed by residential mortgage loans."). Accordingly, the false statements Barclays made were made "upon" a form of credit transaction: the issuance of mortgage bonds. Whether characterized as a "loan" of funds to the RMBS trusts by FIs (the mortgage bondholders) or a "purchase" of RMBS by FIs (AC ¶ 756), such conduct falls within the plain, unambiguous terms of Section 1014.

Second, Barclays' argument fails because the artificial distinction it tries to draw between a FI's "lending" and "investment" activities is unsupported by the plain language of the statute. *See* 18 U.S.C. § 1014. It is also contrary to the Supreme Court's ruling in *Wells* that section 1014

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 100

is unambiguous and should be interpreted in accordance with its plain terms.  *See Wells,* 519 U.S. at 498-99 (refusing to read "materiality" element into section 1014 where the element did not appear in the unambiguous statutory language);[46] *see also United States v. Krilich*, 159 F.3d 1020, 1028 (7th Cir. 1998) (the text of Section 1014 is "not ambiguous" and "the Supreme Court reminded us not to add elements to § 1014.").  By its plain terms, section 1014 covers knowing false statements made to covered FIs upon "any" of a variety of transactions, including any "purchase" or "loan."  The transactions at issue here fall within the plain terms of section 1014.

Several Courts of Appeals have rejected arguments—like those Barclays makes here—that section 1014 should be read narrowly to apply only to statements made in connection with conventional lending transactions.  *See, e.g., United States v. Boren*, 278 F.3d 911, 914-15 (9th Cir. 2002) ("The statute's reach is not limited to false statements made with regard to loans, but extends to *any* application, commitment or other specified transaction."); *United States v. Wade,* 266 F.3d 574, 580 (6th Cir. 2001) ("[I]f we were to interpret 18 U.S.C. § 1014 to include only those transactions seeking to create debtor/creditor relationships, it would impermissibly render other terms of the statute superfluous."); *Krilich*, 159 F.3d at 1028 (Section 1014 not limited to statements made to obtain loans or other extensions of credit;[47] *United States v. Bonnette*, 781

---

[46] The transactions at issue in *Wells*, in which the Supreme Court upheld defendant's conviction under section 1014, involved the sale of rights to receive future income streams from underlying assets.  *See United States v. Wells,* 63 F.3d 745, 747 (8th Cir. 1995) (noting that the charged false statements related to defendant's sale of "its rights to receive the future lease payments [from its copier leasing business] to a financial institution … for a lump sum payment").

[47] In *Krilich*, defendant argued that his conviction for making false statements upon the withdrawal of trust funds from a bank was not actionable under section 1014, on the ground that the offense applied only to "lending transactions."  159 F.3d at 1028.  The court of appeals rejected this argument, observing that the text of the statute is "straightforward and broad," covering false statements in a variety of different types of transactions.  Indeed, as the court noted, several of the covered entities in the statute—including Government regulators—do not make loans.  Accordingly, "[i]f their inclusion in the statute is to have meaning, then § 1014 ***must*** cover statements that are not designed to influence an extension of credit—indeed, must cover statements that have nothing to do with the payment of money."  *Id.*

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.,* No. 16-CV-7057 (KAM/JO) (EDNY)
Page 101

F.2d 357, 365 (4th Cir. 1986); *United States v. Pinto*, 646 F.2d 833, 838 (3d Cir. 1981) ("'Advance,' as used in 18 U.S.C. § 1014, should not be so narrowly construed as to apply solely to funds extended in a loan situation. The statute refers to both 'advance' and 'loan.' If 'advance' was only to refer to a loan, the term 'advance' would be rendered meaningless.").

The cases Barclays cites are inapposite.  Contrary to Barclays' claim, *United States v. Krown*, 675 F.2d 46, 50-51 (2d Cir. 1982), did not involve the meaning of "purchase" and nowhere held that that term "can only refer to an [action] involving an advance or loan or other credit transaction."  Barclays Br. at 55.  *Krown* was decided before the Supreme Court's instruction in *Wells* that section 1014 should be interpreted according to its plain terms, and it nowhere held that section 1014 cannot reach transactions involving securities.  It instead held that insufficient evidence was produced in that case to show that defendants' passing of worthless checks to a meat supplier constituted false statements upon an "advance," "loan," "application," or "commitment." In any event, as discussed above, the "purchase" of RMBS here by FIs *did* involve credit transactions.

Likewise, *Williams v. United States,* 458 U.S. 279, 284-85 (1982)—which held that a bad check is not a false statement or overvalued security for purposes of section 1014—does not prohibit the application of that section to the transactions here.  Numerous decisions following *Williams* have rejected efforts to limit the scope of section 1014 based on *Williams*' *dicta* to the effect that "at no point was it suggested" in the legislative history "that the statute should be applicable to anything other than representations made in connection with conventional loans or related transactions." *Id.* at 288-89; *see, e.g.*, *Elliott v. United States*, 332 F.3d 753, 763 (4th Cir. 2003) (receipt of funds from forged checks actionable under section 1014 after *Williams*); *Krilich*, 159 F.3d at 1028-29; *see also United States v. Bank of Am. Corp.*, No. 3:13-cv-00446, 2014 WL

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 102

2777397, at *7 (W.D.N.C. June 19, 2014) (involving section 1014 claims in connection with "purchases" by bank of RMBS and noting that "as the Fourth Circuit found in *Elliott* and the Seventh Circuit found in *Krilich*, it would appear that section 1014 does in fact reach the making of false statements to a federally insured banking institution for the purpose of influencing '*in any way*' action on 'any … purchase,' 18 U.S.C. § 1014, which would include fraud in inducing a bank to purchase of securities.").

## IX.   DEFENDANTS BPLC, BGUS, AND BUSLLC ARE PROPERLY SUED.

### A.   BPLC, BGUS, and BUSLLC are Proper Defendants as Successors-in-Interest to Barclays Capital, Inc.

Two of the Barclays Defendants—holding company Barclays Group US Inc. ("BGUS") and intermediate holding company Barclays US LLC ("BUSLLC")—are sued as "successor-in-interest to Barclays Capital with respect to the conduct of Barclays Capital giving rise to the claims alleged in this Complaint."  AC ¶¶ 30, 31.  A third Barclays Defendant—overall parent company Barclays PLC ("BPLC")—is sued in part as a successor-in-interest to Barclays Capital, in addition to other bases for inclusion discussed in the next section.  AC ¶ 33.[48]

As alleged in the Complaint, "according to Barclays' website, BPLC is in the midst of a corporate restructuring, as a result of which the functions, assets, operations, and liabilities of Barclays Capital either have already been, or are on the verge of being, merged into an operating division of BPLC."  AC ¶ 33.  That website explains that as part of the corporate restructuring, which has now been completed (*see* Amanat Decl. Ex. 2), all of the corporate and investment banking operations of the "Barclays Group" (an umbrella term Barclays uses to refer to BPLC and

---

[48] The corporate Defendants are sued "jointly and severally," AC ¶¶ 685, 714, 739, 754, 759, so the inclusion of these Defendants is meant not to increase the total civil penalty assessed against the corporate Defendants for their collective fraudulent conduct but rather to ensure that the assets of all the corporate Defendants will be available to the Government to collect the penalty the Court ultimately assesses against them.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 103

all of its subsidiaries and affiliates) have been merged into an operating division of BPLC known as "Barclays International." *See* Amanat Decl. Ex. 3.[49] Although the website is vague as to how exactly Barclays Capital fits into this new structure, nowhere is Barclays Capital mentioned in the "Business Structure," "Investment Bank," or "About Us" sections of the website; nor does Barclays Capital currently seem to have its own website. *See id.* Exs. 3, 4, and 5.

Barclays' website states that "in the US, Barclays implemented a new corporate structure in July 2016 with the launch of an Intermediate Holding Company (IHC), which is a bank holding company that sits beneath Barclays Bank PLC and consolidates Barclays' US subsidiaries." *See id.* Ex. 3. Meanwhile, Barclays Capital's official Statement of Financial Condition dated December 31, 2016, explains that Barclays Capital no longer files its own federal income tax returns but "is included in the federal consolidated income tax return of BGUS." *See id.* Ex. 6, at 10, 29. The Statement goes on to explain that Barclays Capital's current operations are almost entirely funded through borrowing from both BGUS and BUSLLC, as well as Barclays Bank PLC. *Id.* at 31-32.

Barclays argues these allegations are insufficient to state a claim against BPLC, BGUS, and BUSLLC on a theory of successor liability. Barclays Br. at 56-59. It is wrong. As a threshold matter, "pleadings of successor liability are subject to the lenient pleading requirements of Rule 8(a), not the more rigorous standards of Rule 9(b)." *Old Republic Ins. Co. v. Hansa World Cargo Serv.,* 170 F.R.D. 361, 376 (S.D.N.Y. 1997).

---

[49] *See Patsy's Italian Restaurant, Inc. v. Banas*, 575 F. Supp. 2d 427, 443 n.18 (E.D.N.Y. 2008) ("It is generally proper to take judicial notice of articles and Web sites published on the Internet.") (citing, *inter alia*, Fed. R. Evid. 201(b)(2) and *Hotel Emp. & Restaurant Emp. Union, Local 100 v. New York Dep't of Parks & Rec.*, 311 F.3d 534, 549 (2d Cir. 2002)).

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 104

Under New York law, Company A becomes liable as successor to Company B when there is a "de facto merger" between A and B or when A buys B and operates as a "mere continuation" of B.  *See Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 702 (2d Cir. 2009); *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 n.3 (2d Cir. 2003).  "A de facto merger occurs when a transaction, although not in form a merger, is in substance a consolidation or merger of seller and purchaser."  *Id.* at 45 (citation omitted); *see also Arnold Graphics Indus. v. Independent Agent Ctr.*, 775 F.2d 38, 42 (2d Cir. 1985).  The hallmarks of a de facto merger are "(1) continuity of ownership; (2) cessation of ordinary business by the predecessor; (3) assumption by the successor of liabilities ordinarily necessary for continuation of the predecessor's business; and (4) continuity of management, personnel, physical location, assets, and general business operation." *Nettis v. Levitt*, 241 F.3d 186, 193-94 (2d Cir. 2001) (*per curiam*), *overruled on other grounds by Slayton v. Am. Express Co.*, 460 F.3d 215 (2d Cir. 2006).

"These factors are analyzed in a flexible manner that disregards mere questions of form and asks whether, in substance, it was the intent of the successor to absorb and continue the operation of the predecessor." *Nettis*, 241 F.3d at 194. "The purpose of the doctrine of de facto merger is to avoid the patent injustice which might befall a party simply because a merger has been called something else." *Cargo Partner*, 352 F.3d at 46 (citation omitted). Moreover, "[n]ot all of these elements are necessary to find a de facto merger." *Fitzgerald v. Fahnestock & Co., Inc.*, 286 A.D.2d 573, 574-75, 730 N.Y.S.2d 70, 71 (1st Dep't 2001). While there must be continuity of ownership, *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 211 (2d Cir. 2006), it is not necessary, for example, that the predecessor entity be dissolved. *Societe Anonyme Dauphitex v. Schoenfelder Corp.*, No. 07 Civ. 489, 2007 WL 3253592, at *4 (S.D.N.Y. Nov. 2, 2007); *Holme v. Global Minerals & Metals Corp.*, 63 A.D.3d 417, 418, 879 N.Y.S.2d 453, 454 (1st Dep't 2009).

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 105

Here, Barclays' own website supports the conclusion that there has been a de facto merger between Barclays Capital and BGUS, BUSLLC, or BPLC, given that Barclays Capital has explicitly been "consolidated" into its parent holding companies, which have provided continuity of ownership, management, personnel, physical location, assets, and general business operations, and meanwhile Barclays Capital seems to have disappeared from Barclays' own characterization of its corporate structure.  That Barclays Capital may not yet have been legally dissolved but continues to "operate" using funds borrowed from its parent holding companies, does not preclude a finding that there has been a de facto merger.  At the very least, the allegations in the Complaint, when taken as true and understood in the context of publicly-available information of which the Court can take judicial notice, provide a sufficient basis to allow discovery as to the relationship between Barclays Capital and the three parent entities.[50]

### B.     The Complaint Sufficiently Alleges Personal Jurisdiction against BPLC.

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Penguin Grp. (USA) Inc. v. American Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010).  Where, as here, there has not yet been full discovery, the plaintiff need only make "legally sufficient allegations of jurisdiction" through its pleading and affidavits, to survive a motion to dismiss.  *Id.* at 35; *see also Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013).  On a Rule 12(b)(2) motion, the pleadings and affidavits must be construed in the light most favorable to the plaintiff, resolving all doubts in the plaintiff's favor.  *See DiStefano v. Carozzi North Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).

---

[50] The Government has propounded discovery requests on both Barclays Capital and BPLC aimed at probing these relationships, but these defendants' responses to date have been inadequate.  The Government intends to probe further through follow-up requests as well as deposition testimony.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 106

Boldly, BPLC—which touts itself in Annual Reports and other public documents as being "firmly anchored" in New York—argues the claims against it should be dismissed because it is not subject to personal jurisdiction in this State, or anywhere else in the United States. Barclays Br. at 59-61. In support of this argument, Barclays principally relies upon the Supreme Court's decision in *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014).

But *Daimler* is readily distinguishable, and its holding does not prevent the exercise here of either general or specific personal jurisdiction. In *Daimler*, the Court held that due process precluded the exercise of general personal jurisdiction in California over a German corporation (Daimler) for claims brought by workers at Daimler's Argentina subsidiary. As the Court found, the mere fact that a second Daimler subsidiary (incorporated in Delaware with its principal place of business in New Jersey) distributed Daimler-manufactured vehicles to independent dealerships throughout the United States, including in California, was not enough to subject the German parent corporation to jurisdiction in California for all purposes.

The facts here bear no resemblance to those in *Daimler*. Aside from the fact that the Government's claims are based on the conduct of BPLC and its agents occurring largely in New York, BPLC's general contacts with New York are far more direct, substantial, and continuous than those of Daimler in California. BPLC repeatedly describes itself as being "firmly anchored" and "headquartered" in New York; it has many New York-based subsidiaries and agents conducting business on its behalf in New York (including those operating out of its acres of office space in Manhattan); it conducts hundreds of millions of dollars of business in New York every year; and it is even the corporate sponsor of the major sports venue in Brooklyn, which is named the "Barclays Center" (a picture of which appears prominently on BPLC's own website, *see* Amanat Decl. Ex. 7). As discussed in detail below, the Government has made a *prima facie*

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 107

showing that personal jurisdiction may be exercised over BPLC either on the basis of general or specific jurisdiction. At a minimum, the Government should be afforded the opportunity to complete jurisdictional discovery from BPLC, so this dispute may be resolved on a full record.

### 1.      There is General Personal Jurisdiction over BPLC in New York.

General personal jurisdiction may be exercised over BPLC in New York—consistent with due process and the principles articulated in *Daimler*—for at least three reasons.

**First:**  By its own admission, BPLC considers itself "at home" in New York.  *Daimler* noted that the "paradigmatic" bases for general personal jurisdiction over a corporation are its principal place of business and its place of incorporation, but it also allowed that in an "exceptional case … a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." *Daimler,* 134 S. Ct. at 760-61, & n.19.  The key inquiry is whether a corporation's contacts with a State are so "continuous and systematic" that it is "essentially at home" in that State. *Id.*; *cf. Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014) (facts that Bank of China only had four branch offices in United States and conducted "a small portion of its worldwide business" in New York were insufficient to render it "at home" in New York for general jurisdiction purposes).

BPLC's public statements show it considers itself to be "at home" in New York.  As its CEO James Staley stated in his note at the beginning of BPLC's 2016 Annual Report,[51] the company considers itself as having dual bases of operation in London and New York: "A year ago we laid out our intention to accelerate the restructuring of Barclays and refocus our business as a

---

[51] In assessing whether general personal jurisdiction exists, "district courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances—up to and including the date the suit was filed." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 628 n.8 (2d Cir. 2016).

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 108

transatlantic, consumer, corporate and investment bank, *anchored in the two financial capitals of the world, London and New York*."  Amanat Decl. Ex. 8 at 4 (emphasis added); *see also id.* at 8 ("[O]ur geographic focus: *firmly anchored* in the two financial centres of London and *New York*, with global reach.").  Other statements BPLC has made in public documents further show the extent to which BPLC considers itself to be at home in New York and maintains extensive contacts in this State.  Those statements include, among others:

- "Our *dual home markets*, in the UK and US, *anchor our business* in the two most important global financial centres and two of the most resilient western economies."  Amanat Decl. Ex. 8 (BPLC 2016 Annual Report) at 32 (emphasis added).

- "We have made strong progress in 2016 to accelerate the restructuring of Barclays and refocus our business as a transatlantic, consumer, corporate and investment bank *anchored in London and New York*."  Amanat Decl. Ex. 9 (BPLC Pillar 3 Report 2016  at 2 (emphasis added).

- "At the heart of Barclays' strategy is to build on our strength as a Transatlantic Consumer, Corporate and Investment bank, *anchored in the two financial centres of the world, London and New York*."  Amanat Decl. Ex. 10 (BPLC 2015 Annual Report) at 5 (emphasis added).

- "The Group aims to focus its operations in the two leading financial centres of the world, London and New York."  Amanat Decl. Ex. 11 (BPLC Country Snapshot 2016) at 3.

- BPLC's American Depository Receipts ("ADRs"), which "represent the ownership of Barclays PLC shares," are "traded on the New York Stock Exchange."  Amanat Decl. Ex. 12 (BPLC Strategic Report 2016) at 53; *id.* Ex. 8 (BPLC 2016 Annual Report) at 377; *accord* Barclays Br. Smith Decl. ¶ 9 ("Barclays PLC sponsors Level 1 American Depository Receipts within the United States").

- "Barclays PLC is registered as a financial holding company with the Federal Reserve Bank of New York pursuant to the Bank Holding Company Act of 1956, 12 U.S.C. § 1841 *et seq.*" Barclays Br., Smith Decl. ¶6.

- In 2015 and again in 2016, various committees of the BPLC Board of Directors held meetings at "Barclays' New York offices," including the BPLC Board Risk Committee and the BPLC Board Reputation Committee. Amanat Decl. Ex. 8 (BPLC 2016 Annual Report) at 69, 74; Ex. 10  (BPLC 2015 Annual Report) at 53.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 109

In short, BPLC—which consistently holds itself out to the public as having dual bases of operations in New York and London, and which in fact conducts extensive business operations in New York—has contacts with New York that are so "continuous and systematic" that it should be considered "at home" here, and thus subject to general personal jurisdiction.  *See Daimler*, 134 S. Ct. 746, 760-61, & n.19.

**Second:** General personal jurisdiction may also be exercised over BPLC based on its agency relationship with its New York-based subsidiaries, including (among many others), Defendants Barclays Bank, Barclays Capital, BGUS, BUSLLC, BCAP LLC, Securitized Asset Backed Receivables LLC, and Sutton Funding LLC, all of which are headquartered or have their principal place of operations in New York.  AC ¶¶ 29-36.[52]

"In a federal question case where a defendant resides outside the forum state, a federal court applies the forum state's personal jurisdiction rules if the federal statute does not specifically provide for national service of process." *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997).  Under longstanding New York law (which *was not* overruled by *Daimler*[53]), general personal jurisdiction may be established under an agency theory.  Specifically, "a court of New York may assert jurisdiction over a foreign corporation when it affiliates itself with a New York representative entity and that New York representative renders services on behalf of the foreign

---

[52] In discovery, BPLC has, to date, identified nine subsidiaries that are incorporated in New York, or registered or licensed to do business in New York: Barclays Bank, Barclays Capital, Barclays Capital Commodities Corp., Barclays Capital Energy Inc., Barclays Capital Real Estate Finance Inc., Barclays Capital Real Estate Inc., Barclays Commercial Mortgage Services LLC, Barclays Services Corp., and Barclays US GPF Inc.  Amanat Decl. ¶ 16 and Ex. 16.  In addition, BPLC's 2016 Annual Report identifies five other wholly-owned subsidiaries with New York addresses (Alynore Investments Limited Partnership, Curve Investments GP, Preferred Liquidity, LLC, HYMF, Inc., and Barclays Insurance US Inc.).  The Annual Report also identifies dozens more wholly-owned subsidiaries with agents for service of process in various states in the United States; at least several of these are headquartered in BPLC's New York offices in Manhattan.   Amanat Decl. Ex. 8 (BPLC 2016 Annual Report) at 369-70; *see also* AC ¶¶ 29-36.

[53] *See Daimler*, 134 S. Ct. 746, 759 ("we need not pass judgment on invocation of an agency theory in the context of general jurisdiction").

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 110

corporation that go beyond mere solicitation and are sufficiently important to the foreign entity that the corporation itself would perform equivalent services if no agent were available." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000) (*citing Frummer v. Hilton Hotels Int'l Inc.*, 19 N.Y.2d 533, 537, 227 N.E.2d 851, 853-54 (1967), and other cases).[54]  To show general jurisdiction based on an agency theory, "a plaintiff need demonstrate neither a formal agency agreement, nor that the defendant exercised direct control over its putative agent," as long as the agent is "primarily employed by the defendant and not engaged in similar services for other clients." 226 F.3d at 95 (citations omitted); *see also In re Hellas Telecomm. (Luxembourg) II SCA*, 524 B.R. 488, 507-508 (Bankr. S.D.N.Y. 2015) (Deutsche Bank's New York office sufficient to subject German Deutsche Bank parent to general jurisdiction in New York under *Daimler*).

In *Wiwa*, the Second Circuit found the presence in New York of an "investor relations" office (nominally part of Shell Oil, an indirect subsidiary of Royal Dutch Petroleum Company and Shell Transport and Trading Co. PLC), which provided investor services to the foreign parents, sufficient to subject those foreign parents to general jurisdiction in New York.  *Wiwa*, 226 F.3d at 95-96.  Similarly, in *Frummer*, a seminal case on agency jurisdiction under New York law, the New York Court of Appeals held a foreign corporation, Hilton Hotels (U.K.) Ltd., subject to general jurisdiction in New York based on the New York office of an entity called Hilton Reservation Service, which was under common ownership with the Hilton U.K. entity and "helps generate business [in New York] for" that entity.  19 N.Y.2d at 537, 227 N.E. 2d at 854.

As noted above, BPLC has many subsidiaries based in New York, which provide far more extensive services on its behalf in New York than the subsidiaries at issue in *Wiwa* and *Frummer*,

---

[54] *Wiwa* has not been abrogated by the Second Circuit following *Daimler*.  *See Sonera Holding BV v. Cukurova Holding A.S.*, 750 F.3d 221, 226 (2d Cir. 2014).

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 111

both of which were found to be sufficient to subject their foreign parents to general jurisdiction. As evidenced by statements on its website, BPLC's New York-based subsidiaries conduct wide-ranging business activities for BPLC in New York—services that go beyond "mere solicitation" of business and that are a critical component of BPLC's business.

 For instance, BPLC's website notes that, under its new structure, it is consolidating all of its operations into two operating divisions, one of which ("Barclays International," run by Barclays Bank) is based in New York and conducts wide-ranging business activities including "personal, corporate and investment banking, credit cards and wealth management," while the other ("Barclays UK," run by a new "ring-fenced" entity yet to be created) is based in London.  Amanat Decl. Ex. 3 ("Business Structure"); *see also id.* Ex. 13 ("Corporate Banking in USA") ("Our dedicated teams based in New York and Miami work closely with the wider Barclays group to deliver local expertise in the UK, Europe and Africa, and provide access to a wide range of corporate banking solutions, including accounts, payments and collections, and liquidity, as well as risk management, lending and trade.").  In addition, BPLC's 2016 Annual Report touts an integrated "Corporate & Investment Bank" or CIB operating in "our two home markets" of London and New York that serves to present a "single integrated view" of BPLC to its corporate and institutional clients.  Amanat Decl. Ex. 8 (Barclays PLC 2016 Annual Report) at 34 ("The CIB offers wholesale banking products and services to corporate and institutional investor clients. The business is anchored around our two home markets—two of the largest capital markets in the world ... [W]e now present a single integrated view of Barclays to our corporate and institutional clients through our CIB . . . .").  The Report even notes that BPLC relies on Barclays Capital and Barclays Bank, both based in New York, for "regular business funding" (also referred to as "liquidity"); it

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 112

states that Barclays Capital and Barclays Bank hold "liquidity pools" for the Barclays Group, which are "available to meet liquidity needs across the Group." *Id*. at 211.

Such activities by BPLC's New York subsidiaries—substantive business activities carried out for BPLC and to benefit it and the global Barclays brand—are more than sufficient to subject BPLC to general personal jurisdiction in New York.

**Third**:  BPLC is also subject to general jurisdiction on the basis of an alter-ego or "mere department" relationship with one or more of its New York based subsidiaries.  *See Volkswagenwerk AG v. Beech Aircraft Corp.*, 751 F.2d 117, 120-122 (2d Cir. 1984) (under New York law, a foreign parent may be subject to general jurisdiction in New York based on the contacts of its subsidiary, if the subsidiary is a "mere department" of its foreign parent).  As with an "agency theory," *Daimler* expressly did not rule on the viability of an alter-ego theory of general jurisdiction.  134 S. Ct. 746, 758 ("[A]t no point have they [plaintiffs] maintained that MBUSA is an alter ego of Daimler.").

New York courts consider the following factors to determine whether a subsidiary is a "mere department" or alter-ego of its parent: (1) "nearly identical ownership interests"; (2) "financial dependency of the subsidiary on the parent corporation; (3) "the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities"; and (4) "the degree of control over the marketing and operational policies of the subsidiary exercised by the parent." *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 12-Civ.-3419 (GBD), 2017 WL 1113080, at *6 (S.D.N.Y. March 10, 2017) (*quoting Volkswagenwerk,* 751 F.2d at 120-122.)

The only "essential factor"—the first one listed—is satisfied here for all of BPLC's New York based subsidiaries, because they are wholly-owned by BPLC. *Volkswagenwerk*, 751 F.2d at

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 113

120 ("New York courts regard one factor as essential to the assertion of jurisdiction over a foreign related corporation and three others as important. The essential factor is common ownership…. Since East is wholly owned by Beech, that requirement is met in the instant case.").  In addition, BPLC's own corporate governance guidelines show BPLC maintains significant control over the operational policies of its subsidiaries, satisfying the fourth factor (the degree of control over the subsidiary).  Those guidelines mandate that each committee of the Board of Directors of BPLC is "concerned with the business of the whole Barclays Group" (BPLC and all of its subsidiaries), not just BPLC, and that every committee "derives its authority" from and "regularly reports" to the Board of Directors of BPLC.  Amanat Ex. 14 ("Corporate Governance in Barclays," approved by the Board on 21 April 2016) at 48, 60, 62, 68, 70, 74, and 79.

As discussed previously, Barclays' website strongly supports the conclusion that Barclays Capital, at least, operates as a mere department and alter ego of BPLC.  Further jurisdictional discovery is needed to explore in more detail the degree of control by BPLC over its New York subsidiaries and to assess whether the other factors for an "alter ego" or "mere department" theory are met for each or any of those relationships.  In the meantime, the allegations in the Complaint and the documents cited herein are more than sufficient to make out a *prima facie* case for general personal jurisdiction in New York over BPLC.[55]

---

[55] Barclays argues that in *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, MDL No. 11-2262, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015), the court purportedly "concluded 'without hesitation' that no general jurisdiction existed for another Barclays entity based on this same set of facts." Barclays Br. at 59-60.  This argument lacks merit. *LIBOR* was limited to a different entity, Barclays Bank, as to which personal jurisdiction in this case (both general and specific) is undisputed.  Moreover, plaintiffs in *LIBOR* relied on different theories than those presented here to support the exercise of general jurisdiction over Barclays Bank PLC. *Id.*, 2015 WL 6243526, at *27.  The case provides no basis to dismiss BPLC as a defendant here.

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 114

## 2.     There is Specific Personal Jurisdiction over BPLC in New York.

Finally, BPLC is subject to specific personal jurisdiction in New York.  As a threshold matter, BPLC is subject to specific jurisdiction as the successor-in-interest to Barclays Capital.  *See* Fed. R. Civ. P. 25(c); *Transfield ER Cape Ltd. v. Industrial Carriers, Inc.*, 571 F.3d 221, 224 (2d Cir. 2009); *Libutti v. United States,* 178 F.3d 114, 124-25 (2d Cir. 1999) (an allegation of successor liability against an entity whose predecessor is subject to personal jurisdiction can provide personal jurisdiction over the successor entity).

The Government's claims against BPLC arise, in any event, from its own conduct, and that of its agents, in New York.  As noted in *Daimler*, "a corporation can purposefully avail itself of a forum," and be subject to specific jurisdiction there, "by directing its agents or distributors to take action there."  *Daimler*, 134 S. Ct. at 759 n.13.  New York's long-arm statute—which governs the exercise of specific jurisdiction here, *PDK Labs, Inc.*, 103 F.3d at 1108-09—provides for personal jurisdiction over any non-domiciliary that transacts business within the state, commits a tortious act (e.g., fraud) within the state, or commits a tortious act outside the state causing injury within the state, where the cause of action arises from that conduct.  *See* N.Y.C.P.L.R. § 302(a)(1), (2), (3).  A person need not be physically present in New York to be subject to specific personal jurisdiction under the long-arm statute.  *See Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010); *Fischbarg v. Doucet*, 9 N.Y.3d 375, 880 N.E.2d 22 (2007).  Personal jurisdiction under section 302 can be imputed to a non-domiciliary by the acts of an agent occurring in New York.  *See Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331, 345 (S.D.N.Y. 2015) (finding prima facie case of personal jurisdiction under N.Y.C.P.L.R. § 302(a)(1) [transaction of business in New York] and 302(a)(2) [tortious conduct occurring in New York] based on acts of agent); *Emerald Asset Advisors, LLC v. Schaffer*, 895 F. Supp. 2d 418, 430 (E.D.N.Y. 2012); *Courtroom*

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 115

*TV Nwk. v. Focus Media, Inc.*, 264 A.D.2d 351, 353, 695 N.Y.S.2d 17, 18 (1st Dep't 1999)

(personal jurisdiction under N.Y.C.P.L.R. § 302 may be predicated on "acts of an in-state agent.").

Barclays does not dispute—nor can it—that the conduct giving rise to the claims in this action occurred primarily in New York. The Subject Deals were executed, marketed, and sold from Barclays' New York office, and many investors in New York suffered harm from the fraudulent representations. BPLC purposefully availed itself of the New York forum by directing its New York based agents—including its wholly-owned subsidiaries Barclays Capital, Barclays Bank, BCAP LLC, Securitized Asset Backed Receivables LLC, and Sutton Funding LLC—to engage in the business of underwriting, issuing, and selling RMBS in New York. The causes of action for fraud arise out of BPLC's transaction of business in New York through its New York agents, *see* N.Y.C.P.L.R. § 302(a)(1), as well as out of its commission of tortious acts (fraud) within New York based on those business activities, *see id.* § 302(a)(2).

BPLC cannot claim it had no involvement in the Subject Deals or in Barclays' U.S. RMBS business. As alleged in the Complaint,

> one or more of BPLC's employees or committees was involved in authorizing, approving, reviewing, evaluating, funding, directing, and setting policy or parameters for, *inter alia*, (a) Barclays' RMBS business as a whole; (b) Barclays' bid on, purchase, or securitization of pools of mortgage loans securitized in the Subject Deals; and (c) the participation of specific counterparties in the Subject Deals. On information and belief, BPLC also approved and consummated the acquisition of the mortgage loan originator EquiFirst Mortgage Corporation, which originated the loans securitized in EQLS 2007-1, and it approved the extension of warehouse lines of credit to originators and other credit facilities to promote or support the origination of loans securitized in the Subject Deals. On all but four of the Subject Deals (ALBT 2007-OA1, ARSI 2005-W5, ARSI 2006-W2, and FHLT 2006-C), the Prospectus Supplement specifically lists BPLC as the ultimate parent company of all Barclays affiliates involved in the deal.

AC ¶ 33. Indeed, in promoting the involvement of the global Barclays brand in the Subject Deals, the ProSupp for SABR 2006-FR4 describes BPLC as "one of the largest financial services

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 116

companies in the world by market capitalization." *See* Amanat Decl. Ex. 15 (SABR 2006-FR4 ProSupp, dated December 11, 2006) at S-54.

Although the allegations in the Complaint, when taken as true, are more than sufficient to make a *prima facie* showing of personal jurisdiction over BPLC, at a minimum, the Government should be afforded a full opportunity to take jurisdictional discovery from BPLC. *See Dorchester, 722 F.3d at 84-85.* Even without that showing, dismissal is inappropriate, and discovery is warranted: "It is well settled under Second Circuit law that, even where plaintiff has not made a *prima facie* showing of personal jurisdiction, a court may still order discovery, in its discretion, when it concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record." *Leon v. Shmukler*, 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014) (*citing In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d Cir. 2003), and other cases).

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants' motions to dismiss should be denied.

Dated: Brooklyn, New York
       August 25, 2017

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201-1820

By:  /s/ {SUBMITTED ELECTRONICALLY}
     F. FRANKLIN AMANAT
     Senior Counsel
     MATTHEW R. BELZ
     CHARLES S. KLEINBERG
     EVAN P. LESTELLE
     JOSEPHINE M. VELLA
     Assistant United States Attorneys
     Eastern District of New York
     (718) 254-7000

Plaintiff's Memorandum in Opposition to Motions to Dismiss
*United States v. Barclays Capital, Inc., et al.*, No. 16-CV-7057 (KAM/JO) (EDNY)
Page 117